## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **JAKUB MADEJ** | CIVIL ACTION No. 3:20CV133(JCH) |
| **Plaintiff,** | |
| v. | **JURY TRIAL DEMANDED** |
| **YALE UNIVERSITY, MARVIN CHUN, MARK SCHENKER, PETER SALOVEY, JESSIE ROYCE HILL** | **JANUARY 30, 2020** |
| **Defendants.** | |

## COMPLAINT AND JURY DEMAND

Plaintiff Jakub Madej, a senior international student, completed seven semesters at Yale College. He received full financial aid since his first semester, and worked as a research assistant for two prominent faculty members since 2017. Jakub incorporated a consulting business in February 2019 and reduced his then courseload to two classes. Unfortunately, Yale imposed an academic warning on Jakub for the number of credits alone, not his grades, without notifying him until mid-October, months into the fall semester.

Jakub sustained a serious wrist injury in late October, followed by a surgery, whose financial and logistical burden fell entirely on him. Jakub did not receive academic accommodations he requested and was approved for, and ultimately received a failing grade in one course. Yale dismissed Jakub a semester before graduation, though absent Yale's omissions he would not be on warning, let alone withdrawn.

1

Upon return to campus in January, Jakub was given forty minutes to retrieve his property from his old college dorm, was denied any meaningful opportunity to be heard, and only received inconsistent, cursory statements whenever he tried to explain the situation. His college dean and Yale administration refused to meet in person, or to disclose any policies, procedures, or standards his case was decided on. Yale has never published withdrawal statistics, and provided no support or appeal mechanism process to students who were forced to withdraw, including Jakub.

Jakub wrote a petition detailing nine arguments against his withdrawal, an academic plan showing he is still likely to graduate on time, delineated Yale's omissions, attached supporting letters, and provided contact information to professors who can speak of Jakub's abilities. Yale did not address Jakub's petition in any meaningful way, instead stalling for time knowing that Jakub must leave the country in days before violated his immigration status. Yale knew Jakub was treated for depression and attention deficit disorder for years, but provided little to no help in these extremely vulnerable moments.

Relentless and unsatisfied with Yale's treatment of his case, Jakub traveled to Canada in a rental car and returned using a visitor visa in his old, previously cancelled passport. He currently relies on hospitality and generosity of his friends and professors but cannot continue his work, education, or even use Yale's libraries for self-education.

Jakub was never charged with violating University regulations yet received no treatment granted to anyone investigated for disciplinary reasons; instead, he was given only 36 hours to leave the country with no ability to appeal. Jakub's future was jeopardized because of administration's arbitrary and capricious decision.

## JURISDICTION AND VENUE

1. Diversity jurisdiction lies with this Court because Plaintiff and Yale University are citizens of different states. Amount in controversy exceeds $314,159, which exceeds $75,000.

2. Personal jurisdiction lies with this Court because Yale University is a citizen of Connecticut.

3. Venue is proper because a substantial part of the events described took place in Connecticut.

## PARTIES

4. Yale University is a private university located in New Haven, Connecticut. Yale University is a tax-exempt 501(c)(3) organization managed by Yale Corporation. All actions described in this report concern Yale College, the University's only undergraduate school.

5. Jakub Madej is a Yale College senior student, a Polish citizen, and a resident of New Haven, Connecticut.

6. Upon knowledge and belief, Jessie Royce Hill ("Jessie Hill") resided at all times in New Haven, Connecticut. She has been Dean of Benjamin Franklin College, one of Yale's fourteen residential colleges, since the College first opened in 2017.

7. Upon knowledge and belief, Marvin Chun resided at all times in New Haven, Connecticut. He has been Dean of Yale College since July 2017.

8. Upon knowledge and belief, Mark Schenker resided at all times in New Haven, Connecticut. He continues to work as Dean for Academic Affairs at Yale College.

9. Upon knowledge and belief, Peter Salovey resided at all times in New Haven, Connecticut. He has been President of Yale University since July 2013.

## FACTS

**Jakub's First Years in America Were Fundamental in Shaping His Mindset and Future Plans**

10. Jakub graduated from a British boarding school in southeast London, achieving top marks at A Levels, UK's main school leaving examination. He moved to England after receiving a prestigious scholarship for his academic achievements, which covered his tuition.

11. Jakub previously attended a top public high school in Poland, the country of his birth. He excelled in foreign languages, including Spanish, French, Russian, and Italian. He continues to be fluent in all four.

12. Jakub enrolled at Yale College in August 2016 and completed seven consecutive terms, obtaining a total of twenty-nine credits. Yale requires thirty-six credits for graduation. Most undergraduates graduate in eight semesters, or four years.

13. Since 2016, Jakub continuously worked as a research assistant for a prominent Nobel Prize-winning faculty member. Jakub's employment was extended three times at professor's request; he also acknowledged Jakub's contributions in his most recent book.

14. Jakub has been financially independent for over two years, by his own volition, and does not receive any funds from friends or family. He qualified and received full financial aid (no parent contribution) at all times at Yale.

15. Jakub worked at Yale between 17 and 19 hours a week in the last three years, earning funds necessary to support his entrepreneurial plans.

16. Jakub has been treated for depression twice during his time at Yale. He has been on medication for depression and attention deficit disorder since early 2018, without interruption.

**Yale "Forgot" to Notify Jakub about Academic Warning it Imposed For no Apparent Purpose**

17. Jakub inadvertently learned in October 2019 that he was placed on academic warning months earlier because he completed only two credits in the spring 2019 semester. Academic warning is imposed on underperforming students who struggle academically; for example, those who receive three failing grades. Jakub's academic warning was imposed not for his grades or class performance, but for completing only two courses in that particular semester.

18. Jakub obtained eleven credits his sophomore year; an average student completes nine credits a year. Jakub started the spring 2019 semester with five classes but gradually reduced his courseload to two, as he wanted to fully concentrate on his new consulting business that he spent over sixty hours a week on.

19. Yale first notified Jakub about the academic warning after the Registrar realized in mid-October, halfway through the semester, that Jakub was erroneously enrolled in a course that required prior registration. Jakub was unaware that any approval was necessary; the course syllabus made no such mention, no official application was required, and Jakub's course schedule was approved at all stages. Absent this unplanned event, Yale would likely not notify Jakub about the warning it imposed on him until he would be withdrawn.

20. Had Yale notified him about academic warning in a timely manner, he would easily remediate his status by enrolling in a half-semester course, or not withdrawing from another class he dropped earlier. Students frequently enroll in half-semester classes that start only at the end of March; Jakub completed three such short courses before, and achieved grades of A or A- in all of them.

21. Jessie Hill claimed that she sent a letter to Jakub informing him about AW in May but admitted not doing so when challenged. Mark Schenker claimed months later that she passed the letter to Jakub in August, which was also untrue.

22. Course schedules with fewer than three credits must be approved by student's college dean; all schedules and changes to schedules must submitted in person to college dean or their assistant. Jakub never received any notice, verbally or in writing, from his dean, dean's assistant, or anyone else, that he would self-impose an academic warning by submitting the schedule. Yale alleged in January 2020, nine months after the supposed event, that his dean's assistant stated this fact clearly but provided no details as to when, or how such an event might have happened.

23. No reasonable student can be expected to impose an academic warning onto themselves if he or she understands the consequences of such a decision, and can easily make an alternative decision that avoids the warning.

**Jakub Sustained an Open Wrist Injury in October, Followed by a Surgery and Month-long Recovery**

24. Jakub sustained a serious wrist injury in late October 2019. He was referred to the emergency department of Yale-New Haven Hospital ("Yale-NHH") where he received narcotic painkillers, had his wrist reset, and put into a cast. The Hospital staff scheduled a surgery for two weeks later. At all times Jakub had to arrange all visits himself, i.e. without any support of Yale University.

25. Jakub's emergency hospital bill was estimated at $28,000 for facilities alone. Jakub spent hours throughout the next few weeks contacting various departments of Yale-NHH to ensure his coverage was in place after he notified his insurer about the injury. Unfortunately,

miscommunication within the Hospital caused stress and delays. Jakub's first operation was cancelled after he arrived on site for financial reasons even though a Yale-NHH staff member confirmed the coverage by phone a day before.

26. Jakub had a surgery approx. three weeks after the injury. The surgery was successful, and recovery took between four and five weeks. Jakub received a dean's excuse, a usual procedure at Yale granting students additional time to complete assignments. Yale provided no additional support, for example academic accommodations he was granted two years earlier for an unrelated reason.

27. Academic accommodations at Yale are organized by Resource Office on Disabilities ("ROD"). Standard accommodations include extended time on tests and exams, permission to type on exams instead of handwriting, and ability to take exams in a separate room at ROD supervised by a proctor. Jakub completed the necessary paperwork but did not receive these accommodations. Anecdotal evidence reveals that many students struggled to organize accommodations in similar circumstances; most often, ROD's staff promised to return to the student with details but did not, also after repeated reminders.

28. The injury caused significant stress and cost Jakub enormous energy and time, as he was responsible for arranging all visits, procedures, and coverage. Yale University provided little guidance or understanding.

**Jakub Encountered Numerous Logistical Issues within Yale's Support System**

29. Consequences of the injury dragged into December. Jakub received no exam accommodations from Yale's Resource Office on Disabilities, even though his circumstances were more serious than usual. In some courses it was impossible for Jakub to arrange such accommodations as

the Office requires to be notified in advance about any requests while instructors provided information about exams a few days in advance.

30. Jakub submitted all of his end-of-term assignments and left New Haven for China on a personal visit. Unbeknown to Jakub, one of his instructors was unable to open the document Jakub sent him with his final report. The instructor e-mailed Jakub asking to have the file re-sent.

31. At that time Jakub was already in China, and was unable to access his Yale e-mail account because the Chinese government blocks access to all services operated by Google. Yale uses Google to provide e-mail accounts to all undergraduate students.

32. Jakub arrived in the United States on January 1. Only then did he realize the instructor was unable to access his final report few days earlier. As a result, Jakub ultimately received a failing grade in that course.

33. Jakub explained the situation to the instructor, who suggested he might read Jakub's report and reassess the grade upon request of his college dean, Jessie Hill. Jakub provided detailed information about his situation to her but she took no action.

**"Petition the Committee"**

34. On January 3, Jakub received a withdrawal letter dated January 2. International students on student visa (F-1) must leave the U.S. within 15 days from stated withdrawal date. Yale did not explain how and who specifically determined the withdrawal date, or why it delayed notifying Jakub.

35. The letter did not mention any possibility of appeal, explanation, or contact information to an administrator Jakub might explained the situation to.

36. Jessie Hill also did not advise Jakub whether he was entitled to appeal, hearing, conversation with an advisor, or how should he proceed in case of disagreement. Should the withdrawal be imposed in error, or its consequences be unambiguously detrimental, a student would struggle to identify any possible steps he could take.

37. Jakub insisted on talking over the phone with his dean; she was only available three days later. Before the conversation, he sent her a detailed description of all relevant circumstances and explicitly asked how to seek an appeal. During the conversation, she verbally advised Jakub to petition the Committee on Honors and Academic Standing ("CHAS", "Committee"). She offered to pass the petition to the Committee but provided no additional information regarding, *inter alia*, what the Committee is, who sits on the Committee, what guidelines or principles the Committee makes decisions on, or when it might arrive at the decision. She was unable to point Jakub to any document where he might find any of these pieces of information. Jakub searched the Internet extensively but also found no concrete information.

38. Not knowing what he is petitioning for, Jakub wrote a 6200-word-long document, and spent approx. thirty hours on writing, proofreading, and fact-checking to ensure all facts are correct, and that he included all information a reader might want to find about him. Among others, he (a) provided nine clearly separated arguments against the withdrawal imposed, (b) described his accident in detail and declared its consequences are unlikely to impact his performance the following semester, (c) explained what accommodations Yale failed to provide, (d) attached a detailed academic plan which showed he is likely to graduate on time iff he is petition is granted. He also provided clear contact information, and specific dates and times when he is available to explain his situation in person.

39. Jakub asked three people who knew him well to write letters to the Committee. Jakub never learned the contents of any letter, and engineered a way to never be able to read them. Jakub also included phone numbers of senior faculty members he worked with who could speak to his integrity and character, and described the extent of their joint work.

40. Jakub submitted his document via e-mail to Jessie Hill, who forwarded it to the Committee. Jakub is prepared to provide an exact copy of his petition under seal, upon the Court's request.

**Less-than-happy return to New Haven, Connecticut**

41. Jakub returned to New Haven at night of Sunday, January 12. He earlier attended two conferences as part of his research work, one in San Diego, the other in Las Vegas.

42. On Monday morning, Jakub attempted to retrieve his personal property he left in the old dorm in Benjamin Franklin College. He was unable to take most of his items when the fall term ended a month earlier. Jakub notified the College staff when he left New Haven in December, and hoped to receive a full day to clean his room.

43. Unfortunately, he was given <u>forty minutes</u> to take most important items and leave all of his personal property behind, without being ever able to receive it back.

44. Retrieving his personal property was only possible because a friendly college worker helped him gain access to the room. In the process, Jakub learned that he is not welcome at the College, and that Jessie Hill was unhappy that college workers wanted to help Jakub.

45. Jessie Hill knew about Jakub's difficult situation but did not meet, talk or call Jakub after his return to New Haven.

**A Black Box Committee: who, where, when, and how makes decision**

46. On Monday evening, Mark Schenker, the Committee's chairman notified Jakub via e-mail that his petition was denied "without dissent". He did not specify what this phrase actually means, or how Committee arrived at this decision.

47. He provided no justification for Committee's decision, no response to *any* of Jakub's arguments, or anything else Jakub included in his petition. To his best knowledge, Committee conducted no fact-finding or any investigation. It did not contact his academic advisor, and provided no opportunity for Jakub to be heard.

48. Jakub suffered and continues to suffer depression and emotional distress since that day, as Committee unfairly ignored everything he spent years of work at and described in detail, and unusually difficult circumstances following Jakub's accident. It also failed to address in any way, in writing or orally, Yale's procedural and substantive errors regarding the academic warning or accommodations.

49. Committee did not disclose its procedures, and Jakub did not know who could appeal the decision to, how much time is allowed for the appeal, or how to submit such an appeal.

50. Mark Schenker offered no material information about the Committee, or who Jakub might discuss this matter with. He knew at all times that Jakub must leave the United States in three days for immigration reasons; in fact, Jakub expressly stated this in his petition.

51. Jessie Hill forwarded an updated withdrawal letter to Jakub the following morning without addressing any of his reasonable concerns.

52. Mark Schenker's second e-mail, which Jakub received on Wednesday, was similarly vague and inconsistent. He assured Jakub that all members reviewed his petition "with care" but the facts he offered directly contradicted what Jakub previously wrote in the petition, and suggested that Committee never read what Jakub wrote.

53. For example, he stated that Jakub "had been informed of this consequence [Academic Warning] by the BF Dean's Office senior administrative assistant in spring 2019". Jakub explicitly wrote in his petition this has never happened. He also alleged that Jessie Hill gave Jakub an official letter in August, which never happened.

54. Jakub clearly and unambiguously wrote in his petition that he is <u>not</u> requesting any grade changes or grade reassessments, as he was advised against it. Still, Committee wrote that "*In the end, the Committee could find no grounds for granting you the exception you were seeking and so voted without dissent not to approve your request. As a result, the grade of F recorded for you in ECON 456 will stand.*"

55. Committee did not release any report or other document explaining the merits of its decision.

56. Mark Schenker ignored or refused all requests to produce Committee's decision-making procedures, internal rules, reports, or the cover sheet written by Jessie Hill that was attached to Jakub's file. He refused to further investigate, and suggested he is not in the power to change Committee's decisions. Yale's website (Exhibit 1) lists Mark as the only contact for all matters related to the Committee. Upon knowledge and belief, Mark Schenker has been the Committee's Chairman since at least 2000.

57. Committee on Academic Performance ("CAP"), an analogous committee at Massachusetts Institute of Technology, has a comprehensive website written in plain language which specifies, *inter alia*:

   a)  Information about all members of the Committee;

   b)  Committee's headquarters (specific room);

   c)  Contact information (e-mail and phone) to Committee's Administrator;

   d)  Alternative contact information, should the Administrator be unresponsive;

e) Defined classes of decisions the Committee makes, each with detailed description;

f) 8-page guide for students on how to submit a petition, both as .pdf as .docx;

g) Instructions on what to address in a petition;

h) Decision-making guidelines for all committee members;

i) All types of petitions students may submit, including pdf files with instructions.

58. Yale's Committee discloses none of a) - i). A *post factum* comprehensive online search produced no meaningful results except for Exhibit 1.

59. Yale University offers no statistics or any other empirical information about withdrawals. To Jakub's best knowledge, Yale claimed to never keep such statistics internally.

## How Yale Implements Withdrawals: An Insider Guide

60. Jakub's transcript was sealed by 9:00 am on Tuesday, the morning after he learned about the Committee's decision. Nonetheless, he continues to receive course-related messages from instructors in courses Jakub selected days earlier. One instructor individually reached out to Jakub asking whether he is still planning to enroll.

61. Jakub was advised that he his card would be deactivated in 72 hours from evening on Monday, January 13. His Yale ID card was cancelled on Wednesday, January 15, less than 48 hours into that period. At Yale, a student card is necessary to access most buildings, libraries, or common spaces.

62. Jakub inquired whether it is possible to appeal the Committee's decision within the University, for example to Dean Marvin Chun or President Peter Salovey. He was advised against it because the Committee enjoyed "excellent reputation" and his chances of success were low.

63. Jessie Hill encouraged Jakub to "contact her for assistance" but ignored his requests for guidance. Jakub attempted to locate a person who can explain his concerns regarding little transparency surrounding his withdrawal but found nobody. To his best knowledge, no procedures or institutions exists within Yale College in such cases.

64. Yale advised Jakub that his immigration record could not be reactivated if his efforts to appeal were successful. Jakub later learned this is false, and Yale can request a status change at no charge.

65. Jakub continued to be overwhelmed by time pressure and apparent apathy of Yale's staff. Relentless, Jakub rented a car, traveled to Canada and returned to the United States on a visitor visa in his old, previously cancelled passport.

66. On return, Jakub attempted to contact Jessie Hill and Mark Schenker. Both declined to speak or meet in person and provided vague, incomplete answers to Jakub's questions about his dissatisfaction at Yale's handling of his case, or to any other questions he had.

**Yale Continues to Provide Conflicting, Ambiguous Information to Jakub**

67. Yale University continues to provide unclear, contradictory information to Jakub about, *inter alia*:

   a) eligibility for mental health & counseling;

   b) coverage for his scheduled appointments at mental health & counseling in January 2020;

   c) access to yale.edu e-mail and related services, which include Google Docs, Drive, Sheets, Slides, and more;

   d) University rules about physical presence on campus.

68. Per Undergraduate Regulations, Jakub may not use University libraries, attend courses, or be physically present on campus for any reason without Jessie Hill's written permission. In the same time, he receives multiple requests to retrieve his mail from the college office every week.

## Jakub Suffered Severe Consequences Following Yale's Mistreatment of His Case

69. As a result of Defendants' discriminatory and unlawful conduct, Jakub was denied an opportunity to continue the education to which he devoted years of hard work.

70. Forced withdrawal had severe consequences for Jakub. He continues to suffer from insomnia, alienation, anxiety, and depression. Jessie Hill knew that Jakub has been on medication for depression and attention deficit disorder but did not provide any help during this difficult process.

71. Yale's conduct was particularly detrimental to Jakub because he is an international student on full financial aid. Yale knew at all times that Jakub has limited time to resolve his matters but failed to adjust the grace period, which was practicable, to allow more time for investigating Jakub's claims.

72. Jakub previously made financial commitments in advance of the spring semester, which he expected to cover with his financial aid. He is currently unable to meet these commitments.

73. Should his @yale.edu be terminated without notice, he would lose access to his e-mail, documents, presentations, and other content he devoted years of hard work to. Yale continues to provide conflicting answers on whether Jakub will lose access or not: an IT worker confirmed no issues with his account but anecdotal evidence suggests Yale has no clearly defined internal policies for deleting accounts.

74. Jakub is unable to work or study on his current visa, which limits how long he can remain in the United States.

75. Jakub was denied the opportunity to seek employment permission following his graduation, which would allow him to continue his education in a professional setting.

76. Jakub was denied the opportunity to participate in his 2020 graduation, or to continue enrollment according to the plan he prepared and acted on months in advance.

77. Jakub's financial situation deteriorated significantly because he did not receive the financial aid he was awarded, cannot continue his employment. In the same time, he incurred additional expenses to be able to pursue his case, and faces previously made financial commitments.

78. Yale continues to openly make statements that directly contradict Jakub's experience, which further reinforces his frustration at University's apathy and broken promises:

> "Students live in or are affiliated with a residential college with a head of college and a dean who are always (ready) to help with any problem, and to find ways and accommodations to help students thrive and progress. The mental health counseling, if needed, is free and provided by excellent and caring clinicians."[1]

> "Yale fully and effectively supports its students regardless of a disability, and discriminates against none. Its policies on withdrawal and reinstatement reflect careful study and deliberation, and community feedback."[2]

---

[1] http://www.westhartfordnews.com/news/report-yale-fails-to-meet-grade-in-mental-health-leave/article_ad682e46-88b2-5d8a-bae6-4fb07587d703.html
[2] https://www.nhregister.com/news/article/Report-Yale-fails-to-meet-grade-in-mental-health-13489303.php

16

**A Non-Exhaustive List of Defendants' Wrongful Actions**

79. Defendants failed to conduct an exhaustive investigation or assessment of Jakub's situation.

80. Defendants failed to provide any information about how the Committee made its decision, and instead knowingly presenting incorrect statements as true knowing that Jakub could not take any action in response.

81. Defendants provided insufficient time for Jakub to take any action whatsoever before he was forced to leave the country.

82. Defendants created and developed an atmosphere of insecurity and uncertainty, which dispirited Jakub in the most vulnerable moments where he needed Yale's support the most.

83. Defendants provided Jakub with fewer opportunities to act on his case than they offer to students facing disciplinary charges for serious breaches of conduct.

84. Defendants have provided inconsistent and unclear answers to Jakub's questions, which obstructed his attempts to seek reasonable resolution of his case.

85. All of these errors, individually and when considered together, unfairly and materially affected the outcome of Jakub's case.

## CLAIMS

### COUNT I

### BREACH OF CONTRACT

86. Plaintiff incorporates by reference the allegations contained in other paragraphs.

87. Jakub's accepting Yale's offer of admission and moving to the United States should be construed as a contract.

88. Jakub was repeatedly promised, in writing and orally, that Yale is committed to helping international students thrive on campus.

> I write now to affirm Yale's steadfast commitment to our international students and scholars; they are vital to the university community. (...) We pair our unequivocal commitment to careful research stewardship with another: international students and scholars are welcome and respected on our campus."
>
> Peter Salovey, Jun 06, 2019

89. As a member of the Yale community, Jakub has certain rights that are contractual in nature.

90. Yale University breached its contract by not following or disclosing guidelines for protecting Jakub's civil rights.

91. Yale University breached its agreement by failing to provide Jakub with timely information he needed to make reasonable decisions regarding his academic choices.

92. Yale University breached its agreement by creating hostile atmosphere in his residential college, where he felt alienated and unwelcome by his college dean, Jessie Hill.

93. Yale University breached its agreement by providing conflicting, illogical answers to all questions regarding his situation, and refusing to provide reasonable support in the face of unusual circumstances.

94. Yale University breached its contract with Jakub by refusing to consider whether the Committee's decision is arbitrary, supported by the evidence, and not providing any way to request such action.

95. Yale's incomplete and arbitrary actions breached the binding contract with Jakub by failing to provide the guarantees of due process and fundamental fairness, and breaking the implied covenant of good faith and fair dealing.

96. Yale breached its contract with Jakub by improperly investigating withdrawals at Yale College, providing scant resources to the dismissed student in his most vulnerable moment, and no avenue for meaningful review of unexplained and unclear decision.

97. Yale's dismissal of Jakub will preclude him from completing his undergraduate degree and will negatively contribute to his overall education.

98. As a direct and foreseeable consequence of these breaches, Jakub has sustained damages.

99. Yale's secret adjudicatory process is contrary to Jakub's reasonable expectations.

100.   Yale's decision to automatically withdraw Jakub from the University, failure to provide a mechanism to explain his situation is in violation of Jakub's procedural and substantive contractual rights and reasonable expectations.

101.   Yale's decision to withdraw Jakub from the University is capricious and arbitrary.

102.   As a direct and proximate result of the foregoing events of breach, Jakub faces imminent irreparable harm to his emotional well-being, ongoing education and professional career goals for which no adequate legal remedy exists. Jakub intends to motion this Distinguished Court for injunctive relief.

COUNT II
NEGLIGENCE

103.    Plaintiff incorporates by reference the allegations contained in other paragraphs.

104.    When Jakub made academic choices, he relied on defendants' duty to provide him with information that might materially impact Jakub's decision.

105.    When Jakub appealed the involuntary withdrawal, he relied on defendants' duty to protect him from reasonable harm.

106.    Defendants knew, or was negligent in not knowing, that it adopted no mechanism or avenue for appeal to Jakub, or any other person in Jakub's situation.

107.    Defendants knew that Jakub has been treated for depression, and that Jakub reasonably relied on their duty to protect him from harm.

108.    Defendants breached their duty of reasonable care.

109.    A reasonable person would have suffered severe emotional distress under the same or similar circumstances.

110.    As a result, Jakub is entitled to recover damages, to be determined at trial, plus attorney fees and costs.


## **PRAYER FOR RELIEF**


Jakub demands judgment against Yale University and remaining defendants as follows:


- Produce and publicly release all statistics regarding the number of students withdrawn;

- Compel Yale University to reassess procedures for adjudicating academic withdrawal, and publicly audit how previously used policies were implemented, if such policies existed;

- Restrain and enjoin Yale University from denying Jakub the opportunities and benefits afforded undergraduate students, including access to libraries and reading rooms;

- Restrain and enjoin Defendant, Yale University, from implementing Jakub's dismissal;

- Admitting Jakub as a student in good academic standing;

- Award Jakub damages for breach of contract in an amount exceeding $314,159, to be determined at trial;

- Award Jakub damages for emotional distress in an amount exceeding $121,232, to be determined at trial;

- Compel Yale University to introduce and implement all-university Plain Language policy, similar to the federal plain language policies, in all communication with students;

- Compel Yale University to investigate all instances of involuntary withdrawals it executed since the beginning of spring 2016 term, and determine the extent to which Yale's employees contributed to these dismissals;

- Award Jakub damages in an amount to be determined at trial for past and future economic losses, loss of educational and career opportunities, attorneys' fees, expenses, costs and disbursements;

- Award punitive damages for intentionally inflicting emotional distress upon Jakub.


## JURY DEMAND


Plaintiff hereby demands a trial by jury on all claims so triable.

Respectfully submitted,

Jakub Madej

The Plaintiff

535 Fifth Avenue, 16th Floor

New York, NY 10017

j.madej@lawsheet.com

Telephone: (646) 776-0066

Fax: (860) 760-6436

Exhibit 1

# Handbook for Directors of Undergraduate Studies in Yale College 2019–2020

## Committee on Honors and Academic Standing

The Yale College Faculty has charged the Committee on Honors and Academic Standing to act for it and with its authority in matters of academic rules and standards. A chief role of the Committee on Honors and Academic Standing is thus to enforce, interpret, and apply the academic regulations of Yale College. It also has the responsibilities of administering the award of General Honors and Distinction in the Major and of considering proposals for Special Term Courses and Special Divisional Majors.

From 1926 to 1981, both academic and disciplinary matters were handled by the Yale College Executive Committee. In 1981 the Yale College Faculty changed the name of the Committee on Honors and Special Projects to the Committee on Honors and Academic Standing, committing to it all of the academic business previously delegated to the Executive Committee. The Yale College Executive Committee is now solely a disciplinary committee. For more information on the Executive Committee as presently constituted, see The Residential College Deans.

The Committee on Honors and Academic Standing meets about twice a month during the regular academic year. A good deal of the routine business of the committee is delegated to the chair, but the full committee decides any matter that raises a question of academic policy or that is in some other way unusual. The chair of the committee, Dean Mark J. Schenker, is in general the person to consult about any of the academic regulations of Yale College. All questions about General Honors, Distinction in the Major, Special Divisional Majors, or Special Term Courses may also be referred to him.

Topics in this section:

- Special Academic Problems
- Routine Matters
- Grading Disputes
- Honors and Distinction
- Special Divisional Majors
- Special Term Courses