UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| **JAKUB MADEJ** | |
| **Plaintiff,** | CIVIL ACTION No. 3:20-cv-00133-JCH |
| v. | |
| **YALE UNIVERSITY, MARVIN CHUN, MARK SCHENKER, PETER SALOVEY, JESSIE ROYCE HILL** | FEBRUARY 24, 2020 |
| **Defendants.** | |

### AFFIDAVIT OF JAKUB MADEJ IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

I, Jakub Madej, being duly sworn, depose and say:

1. My name is Jakub Madej. I am the plaintiff in the above-captioned case. I have personal knowledge of the facts and circumstances described in this Affidavit.

2. I have reviewed the factual allegations in my complaint, filed with the Court January 30, 2020. I verify that the facts stated therein are true and accurate to the best of my knowledge. I verify that the allegations stated therein that I lack personal knowledge about are true based on specific information and documents. I submit this affidavit *in lieu of* verified complaint.

3. Below, I reiterate and substantiate several assertions stated in the original complaint.

*Immigration Issues: Legal Limitations and Restrictions for "Legal Migrants"*

4. I am an international student from Krakow, Poland. I am neither a U.S. citizen nor a U.S. permanent resident. I currently reside in New Haven, Connecticut on a visitor/business

visa, also known as B1/B2 (Exhibit 20[1]). At all times of my enrollment at Yale, I held a valid student visa (F-1).

5. A visitor/business visa (B1/B2) explicitly prohibits accepting employment, performing productive work or opening a new business in the United States. Federal law also prohibits aliens with B1/B2 status to enroll in for-credit educational programs. This includes all degree-granting programs at Yale University. There is no exhaustive list of permissible and prohibited activities for B1/B2 visa holders, or for holders of any specific category of U.S. visa.

6. Students with a valid F-1 visa are ordinarily permitted to work on-campus (up to 20 hours a week); they may also seek an employment authorization from USCIS to work off-campus during school year if they experience "severe economic hardship caused by unforeseen circumstances beyond the student's control." Visitors on B1/B2 are not eligible for either option.

7. International students in legal F-1 status can seek temporary employment authorization known as OPT (Optional Practical Training) valid for a cumulative maximum of 12 months. Students who hold a STEM degree, as defined by the U.S. Government, can extend their OPT employment authorization for up to 2 additional years. Economics at Yale University is a STEM degree under relevant provisions and statutes. OPT is the most common way for international students to legally work in the United States after graduation.

8. As a general rule, B1/B2 visa holders are allowed to remain in the United States for six months after their arrival to the country. F-1 students are allowed to remain in the United States during the entire length of their program.

9. CBP (Customs and Border Protection) personnel has discretion to admit or deny admission to any alien arriving in the United States, pursuant to pertinent regulations. For example, CBP may deny a foreigner admission if it reasonably suspects she will violate her visa conditions, or have done so in the past.

10. SEVIS (Student and Exchange Visitor Information System) is web-based system for maintaining information on international nonimmigrant students in the United States.

---

[1] Refer to Exhibits Table of Contents to easily locate the relevant exhibit. This table of contents was electronically filed together with all exhibits.

SEVIS is administered by SEVP (Student and Exchange Visitor Program), a program of Department of Homeland Security (DHS). Yale ranks in top 100 of F-1 schools by number of active SEVIS records.

11. Students whose withdrawal was approved by Designated School Official (DSO) must leave the United States within 15 days of the termination date. DSO is a school official that oversees immigration issues for all international students currently enrolled.
12. Upon knowledge and belief, my termination date under this definition is January 2, 2020. Accordingly, the latest date by which I must leave the United States was January 17, 2020.
13. Upon knowledge and belief, Yale University exercises reasonable discretion in selecting the specific termination date for SEVIS purposes, subject to relevant regulations and policies.

*Who am I?*

14. I am the first person in my immediate family to study in the United States, or anywhere abroad. My father's cousin attended University of Chicago on full scholarship; he graduated in 2015. I do not know of anyone else in my entire family who pursued any degree in the United States.
15. I have been financially independent since my sophomore year of college. This means I receive no regular payments from parents, family or any other person. All funds I have at my disposal are what I earned, saved or successfully invested.
16. I have no family in the United States that supports me financially, legally, socially or otherwise. I am unaware of any family member that resides permanently in the United States.

*Verified Timeline of Certain Events Stated in My Original Complaint*

17. On December 31, 2020, I arrived in the United States after a weeklong visit to China.
18. On January 1, 2020, I first saw and read an email from Michael Schmertzler, an instructor in my economics seminar, which stated that he was unable to open a file I sent him

3

December 19, 2019. I replied January 2, also via email, and promptly received a reply. The message stated in pertinent part:

*"If your Dean considers it appropriate in the broader context they administer and asks me to reopen the matter and read your exam, I shall."*

My Dean is Jessie Royce Hill, one of the defendants. At no point did Dean Hill referred to such possibility; she never mentioned it over phone or in writing, though she was aware that I was unable to access my inbox as I was in China, where Chinese government strictly limits access to Google, as well as many other English-language websites. To the best of my knowledge, she spoke to Michael Schmertzler before any conversation I had with Dean Hill.

19. On January 3, 2020, I was informally notified via email by Dean Jessie Hill that I would be withdrawn from Yale College (Exhibit 15). I received no information whether or not I could appeal this decision, whose decision it was, or what to do if I believed this decision was reached in error. The email contained no answer to any question a student might reasonably be expected to ask in such situation.

20. On January 6, 2020, I first learned that the withdrawal was "determined January 2, 2020". I did not receive any notice about the withdrawal January 2, 2020. (Exhibit 16).

21. On January 8, 2020, I was formally notified for the first time that I have been withdrawn. The attached letter (Exhibit 21) is dated "January 6, 2020" but it was sent to me January 8, 2020. I am unaware when the letter was actually written and signed. According to Microsoft Word metadata information, the file I received was created January 8, 2020 on 10:16 a.m., not January 6.

22. On January 8, I submitted a petition to the Committee on Honors and Academic Standing (Exhibit 24) by sending it to via email to Dean Jessie Hill. I was directed to so over phone after I insisted on appealing the withdrawal that I believed was unfair and unjustified. I received no such information in writing. I was unable to find any relevant information in writing anywhere online.

23. On January 13, 2020, I returned to New Haven from two conferences I attended as part of my job as a research assistant at Yale School of Management. I contacted one of the campus

superintendents, who kindly offered help in retrieving items from my old dorm in Benjamin Franklin College. We coordinated to meet early in the morning, approximately on 8:30 a.m. At this time, I had no access to the College dorms, nor did I have a key to my old room. In the process, I learned that I am unwelcome at the College and that Jessie Royce Hill was unhappy that superintendent was helping me retrieve my property. Ultimately, I had *forty-five minutes* to take the most important items, and leave everything else behind, with no expectation I would ever be allowed to salvage my remaining property. (On that occasion, I would like to thank the unnamed superintendent, who offered kind help to me whenever we interacted.)

24. On January 13, 2020, I received an email (Exhibit 22) saying that "the Committee on Honors and Academic Standing voted without dissent not to approve your petition." This email was silent on why the Committee decided not to grant the petition, who sat in the Committee, how many members voted not to grant the petition, how many members the Committee has, or what procedures govern how the Committee reaches any decision. I received no information, in this email or in any other way, whether and if so, how could I appeal this decision. I was unable to find any pertinent information anywhere online. No person who might be a Committee member was included in email's carbon copy (cc).

25. On January 14, 2020, I rented a white midsize Chevrolet from Hertz at 1 George St. in New Haven. As a general rule, a person must have the following to rent a vehicle: (1) valid U.S. driver's license or a government-accepted international driver's license along with the IDP (International Drivers Permit), (2) active credit card for deposit, (3) enough funds on a debit or credit card to pay for rental and fees. Many international students have none of the three; I know few who have all three. I intended to drive to Canada and return, thus changing my active immigration status to continue pursuing my case, as at the time it seemed unlikely that Yale University would take any action in the remaining two and a half days. Several days earlier I realized I had a valid B1/B2 visa issued in 2014 (expires 2024) in my old passport, which I have not used since 2016.

26. On January 14, 2020, I crossed the Canadian border, and ultimately reached Montreal. Since 2008, Polish citizens can enter Canada without a visa. Most nationalities need a visa to enter Canada; such visa cannot be purchased at the border and must be applied for and approved before arrival. I am a Polish citizen and have a valid Polish passport.

27. On January 15, 2020, I was admitted to the United States as a B1/B2 visitor at Highgate Springs, VT, and returned to New Haven. It takes approximately 400 miles and 6.5 hours to drive from New Haven to Montreal one-way.

28. On January 15, 2020, I received an email (Exhibit 24) from Mark Schenker, which I believe was intended to serve as a final justification of Committee's decision. This fact was not expressly or unambiguously stated or assumed. I received no further communication about my petition from anyone who might sit on the Committee. This email, which consisted of 938 words, failed to address or acknowledge any argument I unambiguously articulated in my petition. On careful examination, I noted that most material facts the Committee used to justify its decision were untruthful. I provide examples and explanations below.

*"You had been informed of this consequence by the BF Dean's Office senior administrative assistant in spring 2019, when you withdrew from MATH 251 after midterm, thereby having a course schedule that would earn no more than two course credits, which is a condition of AW."*

I was not informed of this consequence by the BF Dean's Office senior administrative assistant in spring 2019, when I withdrew from MATH 251 after midterm, thereby having a course schedule that would earn no more than two course credits, which is a condition of AW. Nor was I informed of this consequence by the BF Dean's Office at any time, or by any other person at any time in spring 2019 or later, orally or in writing. The email offered no further information as to where this assertion is coming from. This purported fact was never stated before: nobody at Yale College has previously claimed this has, in fact, happened.

*"They noted also that Dean Hill subsequently gave you a copy of the AW letter in August."*

Dean Hill did not give me a copy of the AW letter in August. In October 2019, she admitted in writing that this has not happened. The email offered no further information as to where this assertion is coming from. This purported fact was never stated before: nobody at Yale College has previously claimed this has, in fact, happened.

6

> *"In the end, the Committee could find no grounds for granting you the exception you were seeking and so voted without dissent not to approve your request. As a result, the grade of F recorded for you in ECON 456 will stand."*

I expressly stated in my petition that I do not wish to challenge any grade, nor did I provide any reasoning that might suggest so. I was previously advised the Committee cannot contest grades submitted by the instructor. Relevant regulations unambiguously state that "*The faculty legislation that established the Committee on Honors and Academic Standing categorically bars the committee from considering a petition from a student for a change of term grade.*"

29. I have been unable to determine whether the Committee has indeed met to consider my petition, whether the Committee has any rudimentary rules or procedures, or who sat on the Committee when it decided on my case. I repeatedly requested, in no uncertain terms, such documents but I never received a reply addressing my request or even acknowledging it.
30. When Mark Schenker sent the email (¶ 28) he knew, or was negligent in not knowing, that I must leave the United States by January 17, and thus I would have no meaningful opportunity to address any statements, truthful or not, that he makes.
31. To my best knowledge, my academic advisor was never notified that any proceedings were taking place, or that the Committee reached an unfavorable decision. I included his phone number and email in my petition submitted January 8, 2020. He learned about the process from me only.

### *Forced Withdrawal: Courtesy of The Black Box Committee*

32. At all times, Yale College has not provided me with any policies regarding CHAS, or dismissals in general. I asked multiple administrators, including Committee's Chair Mark Schenker and Dean Jessie Hill, to help me find some but none of these requests were acknowledged or addressed in any way. (Exhibits 14, 15)

33. Whenever I refer to "policies" or "procedures" of a Committee, I mean a statement in writing reasonably explaining questions such as but not limited to the following:
    a. who sits on a committee, how are these members selected, how many members there are, and what their term is;
    b. how often, when, and where the committee meets, if it does;
    c. how the committee makes decisions, what steps it must take before making a decision, if the committee treated routine matters the same as highly consequential cases that profoundly impact the future of the student in question

    In plain language, I sought to know who, when, where, how, and why makes decisions of utmost consequence to my future career and life.

34. I attempted to locate such policies online but could not find any, either on Yale's or other websites. I am unaware if such policies and procedures exist, and I am unable to determine if they do as all relevant documents, if they exist, are in possession of Defendant Yale University.

35. Upon knowledge and belief, Mark Schenker chaired CHAS in 2000. According to an article in Yale Daily News from 2004, he chaired the Committee in September 2004. I was unable to determine who were the Committee's members in any year when the Committee existed.

### *Post-Withdrawal Distress and Discovery of Organizational Chaos*

36. I continue to receive conflicting information from Yale College regarding material issues such as access to Mental Health & Counseling, access to yale.edu email and all services associated with my account, or my ability to by physically located on Yale College campus. I provide examples regarding access to email below.

    *"Yale.edu email addresses remain active for up to three years after the term of withdrawal. Students are strongly advised to check their yale.edu inboxes regularly for communications from the Committee on Reinstatement and their residential college deans."*

    Reinstatement FAQ

> *"…when students are withdrawn, their Yale ID cards are deactivated within 72 hours from the official date of withdrawal and that their Yale email accounts are suspended after fourteen days."*
>
> Yale's Withdrawal and Readmission Review Committee

> *"Yale students who are not actively registered are not eligible for Yale email accounts"*
>
> Yale ITS, quoted from Yale Daily News

I have inquired multiple Yale College workers about this matter but I never received an unambiguous answer that might reconcile my observations and experience, as well as the experience of other students. I believe no such answer exists.

Yale employee who brought a suit against the University to this Court in 2012 alleged, not in pertinent part, that "her Yale email and Net ID were immediately cancelled denying [her] access to ten years of college contacts." Parties have eventually settled in full in 2017.

Email accounts of all students are linked to oft-used services including Google Docs, Google Sheets, Google Drive, and Google Photos. I use these services to write virtually anything I write, store one terabyte of data, tens of thousands of personal photos, and more. Most students use Google services associated with their yale.edu email in a similar fashion. Should I suddenly lose access to my yale.edu account, I would lose access to all data I stored on this account, including tens of thousands of e-mails, hundreds of contacts, documents, and all previously mentioned content.

37. On February 18, 2020, I was denied prescription necessary to obtain medication I take daily (Exhibit 12). In late January, I explained my unusual situation to the therapist at Yale Health, who upon my request arranged a prescription for me. It was not until I arrived at the pharmacy that I learned the prescription was issued for one medication only. I take two prescription medications. On February 4, 2020, I explained this situation to my therapist over email, requesting the outstanding prescription. I have not received a reply until February 18, even though I sent two reminder messages. The response did not acknowledge

9

or address the prescription but merely said "*Unfortunately your status prevents us from further providing our services.*" I have two valid insurance policies which would cover any costs associated with visits; however, all my attempts to find a reasonable alternative remain unanswered. I asked whether, and if so, where can I find an information that I am no longer allowed to continue treatment, whether paid or unpaid, but this message also remained unanswered. Yale Health uses MyChart to store all health information in one place. I was unable to find any indication in my MyChart account whether the coverage was discontinued, whether it became paid as apposed to free, or whether I am no longer allowed to use Yale Health, even if I am able to and willing to pay to continue treatment.

*Different Language, The Same Thing*

38. Yale College labeled what has happened to me "withdrawal for academic reasons." Absent the language, withdrawal is not meaningfully different from suspension, one of the most serious and harshest penalties, second only to expulsion.

    All suspended students forfeit "all privileges of enrollment, including residence, attendance at classes, participation in organized extracurricular activities, and use of University libraries as well as of athletic and other facilities." Withdrawn students "may not stay in residences on campus, attend classes, participate in organized extracurricular activities, or make use of University library, athletic, and other facilities." Students on suspension "may not return to campus during the period of suspension for any reason unless he or she receives express written permission in advance from his or her residential college head or dean, or from the dean of student affairs," while withdrawn students "may come to campus only upon receiving prior permission from their residential college dean or the Dean of Student Affairs." "Suspension shall be recorded on the academic transcript," but withdrawals are also recorded on the academic transcript.

    I was never subject to a disciplinary action at Yale or in high school.

10

### *Yale Withdrawal and Reinstatement Policies: Reviewed and That's It*

39. In 2015, Yale experienced a period of heated debate and student outrage over Yale's withdrawal and reinstatement policies following two suicides of then Yale undergraduates.

40. To the best of my knowledge, Yale University has never disclosed how many students are withdrawn from Yale College. Yale College administrators consistently present ambiguous, conflicting statements whenever prompted. Below, I quote all such statements I was able to find and reasonably verify the source.

> *"Few, if any, students are forced to withdraw for medical reasons in a given year"*
> T. Conroy, Yale University spokesperson (2015)

> *"Yale says it has a robust medical system that makes withdrawals infrequent"*
> Business Insider (2015)

> *"Caroline Posner '17, a staff columnist for the News who suffers from depression, anxiety and Attention Deficit and Hyperactivity Disorder, asked why the number of withdrawals per year is not made public, despite the fact that revealing this information would not identify students. Genecin said that information is kept at the Yale College Dean's Office. "I don't have that information," Holloway replied."*
> Yale Daily News (2015)

> *"[Yale's] policies on withdrawal and reinstatement reflect careful study and deliberation, and community feedback."*
> T. Conroy, Yale University spokesperson (2020)

41. In May 2015, seventeen Yale College students, leaders of student organizations, including the Yale College Council, publicly submitted a letter to senior Yale College administrators about withdrawal and reinstatement policies. The letter's title was "No trust without

transparency." (Exhibit 32) They requested, *inter alia*, the "publication of the operative standards for involuntary withdrawal and an overview of the involuntary withdrawal process." The letter was printed in Yale Daily News, and was widely discussed on campus. Upon knowledge and belief, no standards for involuntary withdrawal were ever published, no written overview of the involuntary withdrawal process was released, no matter how vague or nonspecific, and no response to or acknowledgement of this request was ever made.

42. In 2014, Jonathan Holloway, then a Yale College Dean, appointed a committee to review the policies and procedures in Yale College regarding withdrawal and readmission. Six individuals worked for over six months researching relevant Yale policies. Mark Schenker was one of the six members.

43. In April 2015, the abovementioned committee published its final report (Exhibit 2) and subsequently dissolved. Yale administrators heaped praise on committee's work. English professor John Rogers, who chaired the committee that wrote the report, said he would "*like to think that these changes [suggested by the committee] set a new standard.*" Jonathan Holloway stated that "*Taken together, the recommendations greatly improve the policies on withdrawing from and returning to Yale College.*" Committee's final report does not include a single number; it also lacks any indication that members attempted to find any data on withdrawals. On its face, that report reveals that the committee failed to conduct any meaningful investigation of even one individual case; instead, they hastily solicited general student input. That committee did not make any changes, and it was never conceived to make them: committee's role was to solely *make recommendations of changes*, not implement the changes themselves. Still, committee's findings appear to be superficial and cursory.

44. At least one action has been brought to this Court alleging the plaintiff was involuntarily treated at Yale-New Haven Hospital and forced to withdraw from Yale University. As of February 2020, this suit is in discovery phase.

45. I often encountered a feeling among Yale undergraduates that, regardless of the case's merits, an individual student stands no chance against Yale University, backed by $30 billion in endowment, over 300 years of history, 15,000 employees, and millions of alumni. One of my good friends who enthusiastically wrote an affidavit for the present case and

had it notarized subsequently requested that I do not file it, fearing retaliation and stigma at the University. This individual's text messages to me tellingly reveal the underlying thinking:

*"F\*\*\* you know I'm googling and I think I changed my mind, I really really don't want anything in the court in my name again [sic] yale"*

*"Please please please please don't use my affidavit!! I just don't want to be affiliated with this…"*

This affidavit has never been filed.

I declare under penalty of perjury that the foregoing is true and correct.
Executed February 24, 2020.

                                                  Respectfully submitted,

                                                  Jakub Madej
                                                  Plaintiff

# JURAT

State/Commonwealth of __TEXAS__ )
)
☐ City ☑ County of __Dallas__ )

On __02/24/2020__, before me, __Keisha Murrell__,
       *Date*                                   *Notary Name*

the foregoing instrument was subscribed and sworn to before me by:

__Jakub Madej__.
*Name of Affiant(s)*

**KEISHA MURRELL**
ID NUMBER
128561947
COMMISSION EXPIRES
OCTOBER 4, 2022

Signature: _____
*Notary Public*

Notary Commission Number: _____

My Commission Expires: __10/04/2022__

*Notarized online using audio-video communication*

**DESCRIPTION OF ATTACHED DOCUMENT**

Title or Type of Document: __Affidavit__

Document Date: __02/24/2020__

Number of Pages (w/ notarial certificate): __14__

( 14 )