**U.S. District Court, District of Connecticut**

**CIVIL ACTION no. 3:20-cv-00133-JCH**

# Table of Contents: Exhibits

Attached to Plaintiff's Motion for Preliminary Injunction

Dated: February 24, 2020

<u>Procedures, Policies, Reports</u>

| | | |
|---|---|---|
| <u>Exhibit 1</u> | Handbook for DUS in Yale College: Committee | 3 p. |
| <u>Exhibit 2</u> | Report, Yale's Committee on Withdrawal Review… | 11 p. |
| <u>Exhibit 3</u> | MIT Committee on Academic Performance website | 24 p. |
| <u>Exhibit 4</u> | Yale College Programs of Study, part J. | 5 p. |
| <u>Exhibit 5</u> | Yale College Executive Committee materials | 35 p. |
| <u>Exhibit 6</u> | MIT Review of Withdrawal and Readmission Practices | 34 p. |

<u>Communication</u>

| | | |
|---|---|---|
| <u>Exhibit 10</u> | Communication from Yale College: BF College | 5 p. |
| <u>Exhibit 11</u> | Communication with Yale Health, Part 1. | 2 p. |
| <u>Exhibit 12</u> | Communication with Yale Health, Part 2. | 3 p. |
| <u>Exhibit 13</u> | Communication with Jessie Royce Hill, October 2019 | 2 p. |
| <u>Exhibit 14</u> | Communication with Mark Schenker | 9 p. |
| <u>Exhibit 15</u> | Communication with Jessie Royce Hill, January 2020 | 2 p. |
| <u>Exhibit 16</u> | Communication with Ozan Say, January 2020 | 1 p. |

<u>Documents</u>

| Exhibit 20 | Plaintiff's I-94 record (active, as of February 23, 2020) | 2 p. |
| Exhibit 21 | Plaintiff's financial aid letter, history | 4 p. |
| Exhibit 22 | Committee Notice of Petition Denial | 1 p. |
| Exhibit 23 | Committee Justification of Petition Denial | 3 p. |
| Exhibit 24 | [MOTION TO SEAL FILED – February 23, 2020] | 13 p. |
| Exhibit 25 | Official Letter of Withdrawal | 2 p. |

<u>Miscellanea</u>

| Exhibit 31 | Yale Daily News article (February 2020) | 8 p. |
| Exhibit 32 | Letter "No trust without transparency" (May 2015) | 3 p. |

**U.S. District Court, District of Connecticut**

**CIVIL ACTION no. 3:20-cv-00133-JCH**

# Exhibit 1

Attached to Plaintiff's Motion for Preliminary Injunction

Dated: February 23, 2020

Description:

Handbook for DUS in Yale College:
Committee on Honors and Academic Standing

# Handbook for Directors of Undergraduate Studies in Yale College 2019–2020

## Committee on Honors and Academic Standing

The Yale College Faculty has charged the Committee on Honors and Academic Standing to act for it and with its authority in matters of academic rules and standards. A chief role of the Committee on Honors and Academic Standing is thus to enforce, interpret, and apply the academic regulations of Yale College. It also has the responsibilities of administering the award of General Honors and Distinction in the Major and of considering proposals for Special Term Courses and Special Divisional Majors.

From 1926 to 1981, both academic and disciplinary matters were handled by the Yale College Executive Committee. In 1981 the Yale College Faculty changed the name of the Committee on Honors and Special Projects to the Committee on Honors and Academic Standing, committing to it all of the academic business previously delegated to the Executive Committee. The Yale College Executive Committee is now solely a disciplinary committee. For more information on the Executive Committee as presently constituted, see The Residential College Deans.

The Committee on Honors and Academic Standing meets about twice a month during the regular academic year. A good deal of the routine business of the committee is delegated to the chair, but the full committee decides any matter that raises a question of academic policy or that is in some other way unusual. The chair of the committee, Dean Mark J. Schenker, is in general the person to consult about any of the academic regulations of Yale College. All questions about General Honors, Distinction in the Major, Special Divisional Majors, or Special Term Courses may also be referred to him.

Topics in this section:

- Special Academic Problems
- Routine Matters
- Grading Disputes
- Honors and Distinction
- Special Divisional Majors
- Special Term Courses

http://catalog.yale.edu/dus/committee-honors-academic-standing    Go

40 captures
5 Sep 2015 - 5 Jan 2020

APR    JUN    JUL
◀   03   ▶
2018   2019   2020

About this capture

# Yale University Publications 2018–2019

## Committee on Honors and Academic Standing

The Yale College Faculty has charged the Committee on Honors and Academic Standing to act for it and with its authority in matters of academic rules and standards. A chief role of the Committee on Honors and Academic Standing is thus to enforce, interpret, and apply the academic regulations of Yale College. It also has the responsibilities of administering the award of General Honors and Distinction in the Major and of considering proposals for Special Term Courses and Special Divisional Majors.

From 1926 to 1981, both academic and disciplinary matters were handled by the Yale College Executive Committee. In 1981 the Yale College Faculty changed the name of the Committee on Honors and Special Projects to the Committee on Honors and Academic Standing, committing to it all of the academic business previously delegated to the Executive Committee. The Yale College Executive Committee is now solely a disciplinary committee. For more information on the Executive Committee as presently constituted, see The Residential College Deans.

The Committee on Honors and Academic Standing meets about twice a month during the regular academic year. A good deal of the routine business of the committee is delegated to the chair, but the full committee decides any matter that raises a question of academic policy or that is in some other way unusual. The chair of the committee, Dean Mark J. Schenker, is in general the person to consult about any of the academic regulations of Yale College. All questions about General Honors, Distinction in the Major, Special Divisional Majors, or Special Term Courses may also be referred to him.

Topics in this section:

- Special Academic Problems
- Routine Matters
- Grading Disputes
- Honors and Distinction
- Special Divisional Majors
- Special Term Courses

http://catalog.yale.edu/dus/committee-honors-academic-standing/   Go

40 captures
5 Sep 2015 - 5 Jan 2020

AUG   **SEP**   DEC
◀ 06 ▶
2014   **2015**   2016

▼ About this capture

Skip to Content

AZ Index

Catalog Home

Institution Home

Yale University

## Yale College Programs of Study

# Committee on Honors and Academic Standing

The Yale College Faculty has charged the Committee on Honors and Academic Standing to act for it and with its authority in matters of academic rules and standards. A chief role of the Committee on Honors and Academic Standing is thus to enforce, interpret, and apply the academic regulations of Yale College. It also has the responsibilities of administering the award of General Honors and Distinction in the Major and of considering proposals for Special Term Courses and Special Divisional Majors.

From 1926 to 1981, both academic and disciplinary matters were handled by the Yale College Executive Committee. In 1981 the Yale College Faculty changed the name of the Committee on Honors and Special Projects to the Committee on Honors and Academic Standing, committing to it all of the academic business previously delegated to the Executive Committee. The Yale College Executive Committee is now solely a disciplinary committee. For more information on the Executive Committee as presently constituted, see The Residential College Deans.

The Committee on Honors and Academic Standing meets about twice a month during the regular academic year. A good deal of the routine business of the committee is delegated to the chair, but the full committee decides any matter that raises a question of academic policy or that is in some other way unusual. The chair of the committee, Dean Mark J. Schenker, 28 SSS, 432-2920, is in general the person to consult about any of the academic regulations of Yale College. All questions about General Honors, Distinction in the Major, Special Divisional Majors, or Special Term Courses may also be referred to him.

Topics in this section:

- Special Academic Problems

- Routine Matters

- Grading Disputes

- Honors and Distinction

- Special Divisional Majors

- Special Term Courses

**U.S. District Court, District of Connecticut**

**CIVIL ACTION no. 3:20-cv-00133-JCH**

# Exhibit 2

Attached to Plaintiff's Motion for Preliminary Injunction

Dated: February 23, 2020

Description:

Report of the Yale College
Withdrawal and Readmission Review Committee
(April 2015)

# Report of the Yale College Withdrawal and Readmission Review Committee

April 2015

John Rogers, Chair

In the fall of 2014, Yale College Dean Jonathan Holloway appointed a committee to review the policies and procedures in Yale College regarding withdrawal and readmission.  The members of the committee were John Rogers, Professor of English, who served as Chair; Jasmina Besirevic-Regan, Dean of Trumbull College; Caroline G. Hendel, Senior Associate, Office of General Counsel; Sara Samuel, Yale College Class of 2015; Susan Sawyer, Senior Associate, Office of General Counsel; and Mark Schenker, Dean of Academic Affairs, Yale College.

We met as a committee a total of 11 times, from December 2014 through April 2015.  During that period we attempted to assemble as much information as possible about the multi-faceted elements of our withdrawal and readmission processes.  As is well known, the policies at any institution concerning a student's withdrawal from and return to school are tied to and in many ways constrained by policies outside the university, such as regulations concerning federal financial aid distribution, medical rights to privacy, immigration and naturalization, and even NCAA eligibility.  In order to inform ourselves about some of the external factors, particularly in regard to financial aid, behind current policies and the openings that might exist for future changes, we interviewed the University Registrar, Gabriel Olszewski, and the University Director of Financial Aid, Caesar Storlazzi.  The reasons behind Yale's current policies of readmission are also complex.  Seeking to understand the current readmission policies, as well as to solicit input regarding future changes, we interviewed the Yale College Readmissions Committee, whose members include the chair, Pamela George, Joseph Gordon, Dr. Howard Blue, and Dr. Lorraine Siggins, Chief of Yale Mental Health and Counseling.  We solicited, further, in a large group meeting, the perspective of

the residential college deans.  The committee chair also met with and sought the opinions of the masters of the residential colleges at a meeting of the Council of Masters.  Additionally, our committee reviewed and discussed the wide range of practices concerning withdrawal and readmission at our peer institutions.

It goes without saying that no one is more affected by the withdrawal and readmission policies than those students who withdraw (or who are considering withdrawing), those withdrawn students who seek to be reinstated in Yale College, and those reinstated students who find themselves back in Yale College anywhere from two terms to several years after the initial withdrawal.  For that reason, the committee devoted a significant amount of time to the consideration of the wide range of student perspectives on the subject.  We were fortunate to have access to the report issued by the Yale College Council in March, 2014, "Recommendations for Improvement to Withdrawal and Leave of Absence Policies."  And we sought additional student opinions about both withdrawal and readmission by means of a survey we distributed to all currently enrolled students who have withdrawn from and then returned to Yale.  We gathered from the extensive responses to that survey a wealth of information about student experiences of and opinions about withdrawal and readmission.  We took seriously as well the content of the many editorials and articles about the student perspective on withdrawal and readmission that appeared over the course of the Fall 2014 and Spring 2015 terms.

Additionally, committee chair John Rogers met with the members of the Dean's Student Advisory Committee, who shared their sense of the main student concerns touching withdrawal and readmission.  On February 25, 2015 Rogers and committee member Sara Samuel attended a town hall meeting of students and administrators concerning mental health and counseling, at which several students valuably detailed concerns about withdrawal and readmission practices as they pertain to students whose medical withdrawals involve mental health issues.  Rogers met with Michael Herbert '16, president of the Yale College Council, as well as with several recently readmitted students who chose to express their responses to the review committee's survey in person rather than in writing.  Through these many avenues by which reports of student experiences were expressed, we were able to familiarize ourselves with the surprisingly wide range of student opinion about what works well, and what needs to be changed, regarding withdrawal and readmissions in Yale College.  What follows is an articulation of the committee's sense of some of the central concerns involving withdrawal and readmission, along with our recommendations for change.

# A change in terminology

We have been struck by a misconception common among some students about the meaning of a temporary withdrawal from Yale College.  Because the current term for the process by which a student seeks to return to Yale after a withdrawal is readmission, many students are understandably concerned that a withdrawal brings with it a nullification of the student's initial acceptance by Yale's Office of Admissions.  In order to clarify the fact that students who withdraw from Yale College are in no way un-admitted to Yale, we propose a change in terminology: readmission should henceforth be called reinstatement (and what is currently referred to as "reinstatement" should be called "automatic reinstatement").  The committee overseeing the return of withdrawn students to campus should be called the Reinstatement Committee.

# Leaves of absence and withdrawals

As is the case at nearly all institutions, there is a significant difference in Yale College between a "leave of absence" and a "withdrawal."  At Yale, a student in academic good standing who wishes to interrupt his or her studies may currently petition the Committee on Honors and Academic Standing for no more than one or two terms of leave of absence, so long as that petition is received by the tenth day of the term.  A student who leaves Yale after the tenth day must withdraw from Yale College, and that withdrawal falls under one of the following categories: personal, financial, medical, academic, or disciplinary.  It is undeniable that a leave of absence from Yale carries with it certain advantages a withdrawal does not.  Unlike students who withdraw, students on a leave of absence are able to retain their Yale identification cards as well as their library and email privileges.  Students who petition for a leave of absence by the tenth day of the term, and whose petition is granted, receive a rebate of any tuition already paid.  Additionally, they do not have that term counted as one of the total of eight terms of enrollment they are normally granted.

In light of the advantages attached to a leave of absence for students wishing to interrupt their studies, we propose increasing the length of time at the beginning of each term during which a student can elect to take a leave of absence.  The period during which a student may elect to take a leave of absence, which currently concludes on the tenth calendar day of the term, should be extended to the last day of the course selection period.  A student who elects to take a leave of absence during this period, expanded now an additional five days in the fall and six days in the spring, should receive a full rebate of tuition and prorated refund of room and board, as is the case now with students who elect a leave on or prior to the tenth day of the term.  The logistical and

financial advantage of this expansion of the period in which a student can petition for a leave of absence is clear.  No less significant perhaps would be the additional time that a student, in consultation with the residential college dean, has to make what is often the difficult but very important determination to take time away from Yale.

Although the regulations concerning a leave of absence are articulated fully in the Yale College Programs of Study ("YCPS" or "Blue Book"), many students who are considering taking time off from their studies at Yale are unfamiliar with the leave policy and its strict deadline.  Because of the advantages to the student of a leave of absence, we propose increasing student awareness of the leave of absence window at the beginning of each term.  Yale College should take responsibility for making certain that the leave of absence policy is publicized clearly and effectively to all students and their parents, and every effort should be made to communicate as clearly as possible the logistical and financial consequences of leaves of absence as opposed to withdrawals.  Official announcements, for example, could encourage all students considering a leave of absence to consult with their residential college deans as soon as possible at the beginning of the term.

One simple and significant way to improve the current situation would be to clarify the language in the YCPS or Blue Book that describes leaves, withdrawals, and reinstatement.  We strongly recommend, in addition to this clarification of the language in the Blue Book, the creation of a Yale College website that presents students and their families with clear information about these matters, directing them where appropriate to related resources.  One resource available on this website should be downloadable materials for application for reinstatement.

# Integrating the processes of withdrawal and reinstatement

One striking fact we gleaned from the survey of recently reinstated students involved the uncertainty and confusion that some withdrawn students feel about the status of their withdrawal and the upcoming process of reinstatement.  Because the process of withdrawal is largely administered at the level of the residential college while the process of reinstatement is overseen by Yale College, some students experience a disconnect between two practices that many students, understandably, feel should be experienced as related components of a single process.  To assure that students who withdraw experience a more continuous connection between the time of withdrawal and the time of reinstatement, we suggest four changes to the current practice.

First, the Chair of the Reinstatement Committee should be informed automatically of all withdrawals from Yale College, a step that could be implemented simply by copying the Chair of the Reinstatement Committee on the letter of withdrawal generated by the residential college dean.  The Chair of the Reinstatement Committee could then initiate contact with the student at an earlier point in the period of withdrawal, and the student might be likelier to experience the time of withdrawal as one more clearly preparatory for reinstatement.

Second, and relatedly, the Chair of the Reinstatement Committee should inform each of the residential college deans of all relevant student applications for reinstatement.  In cases in which withdrawn students are not in regular contact with their residential college deans, the dean may in some instances learn of a student's application for reinstatement at a very late stage in the process.  If routinely informed of a student's interest in reinstatement, a dean could much more effectively counsel the student through the reinstatement process, and could potentially help foster a student's sense of a connection with the college in particular and Yale in general.

Third, withdrawn students should be reminded that they have continued access to their residential college deans: they should be encouraged to stay in regular contact with the dean both during the period of withdrawal and the period following reinstatement.  The sense of alienation experienced by some withdrawn students, noted above, could be diminished if students were sent a clear, unequivocal message that they are entitled to maintain a relationship with the dean during the period of withdrawal.

Fourth, students who have withdrawn from Yale College for personal, academic, or medical reasons should be permitted to petition the Yale University Library System for certain online library privileges.

# Additional measures with respect to withdrawal

At any time during the year, a student may withdraw from Yale College for personal reasons.  Currently, students who elect to take a personal withdrawal are obliged to spend two terms away from Yale, not including the term in which the withdrawal occurred.  Many students have singled out this two-term rule as both unnecessary and unintentionally punitive.  We propose that students who withdraw for personal reasons, and who are deemed to have exceptional circumstances (such as a terminally ill parent or comparable emergency), be granted an exemption from the usual requirements of reinstatement.  Such students should be allowed to petition the Chair of the Reinstatement Committee in this regard.

We have learned also that there is a good deal of confusion among students concerning the amount of time they have between notification of their withdrawal from Yale College and their departure from the Yale campus.  We propose a clarification of the time such students have to leave campus, which is no more than 72 hours.  Like the rest of the information concerning withdrawals from Yale College, this policy should be made clear both in the YCPS and the newly created website offering information about leaves of absence, withdrawals, and reinstatement.

We also learned from student responses to our survey, as well as from the YCC report on withdrawal, that there exists a very real concern among students who have withdrawn for personal, academic, medical, or financial reasons that their withdrawals from Yale College might be construed by outsiders studying their transcripts as disciplinary in nature.  It is true that, in the current system, in every case of withdrawal, the only entry on the transcript is the word "Withdrawn" along with the date of withdrawal; there is no designation of a reason for the withdrawal (there is the exception of cases of expulsion, which are clearly marked as expulsion on a student's transcript).  We strongly recommend maintaining the current practice of not specifying the reason for withdrawal in cases of personal, academic, medical, or financial withdrawal.  But in order to destigmatize withdrawal and more clearly differentiate the majority of withdrawals from disciplinary withdrawals, we recommend further that student transcripts, in the case of a student suspended for disciplinary reasons, note that the reason for the withdrawal was disciplinary.

Students have as well expressed confusion about the policy concerning Yale identification cards and email accounts at the time of withdrawal.  Presently, some students have cards and accounts that are turned off instantly upon withdrawal, while others report that their accounts are active many months after withdrawal.  In the name of equity, and in order to prevent this confusion, we propose that the University Registrar ensure that when students are withdrawn, their Yale ID cards are deactivated within 72 hours from the official date of withdrawal and that their Yale email accounts are suspended after fourteen days.  These practices should all be specified clearly on the new website, providing students with adequate notice of the pending changes.

# Reducing the negative financial impact of medical withdrawals

As noted above, a leave of absence entails a full rebate of tuition and prorated refund of room and board.  Such is not the case, however, in instances of withdrawal.  Like nearly all schools that accept federal financial aid subsidies, Yale requires a student who withdraws to forfeit part or all of

the tuition already paid for the term of withdrawal (the amount of tuition forfeited is tied to the date of withdrawal).   It should be noted that the same policy is in effect even at institutions, such as Harvard, that employ the term "leave of absence" to apply to cases of the interruption of studies that would go by the name of "withdrawal" at Yale; Harvard, for example, just as Yale presently does, requires a specified forfeiture of tuition when a student leaves school after the tenth day of the term.

For these reasons, withdrawals can entail significant financial setbacks for students and their families.  One very simple way in which Yale could lessen the financial impact assumed by a family in the case of a medical withdrawal from Yale College would be to publicize much more clearly and effectively an important and consequential benefit already available to Yale students and their parents or guardians.  At the cost of about $350 per year, Yale Tuition Insurance, administered by A. W. G. Dewar, provides up to a 90% refund of tuition, room, and board in the case of medical withdrawals. Dewar requires that such insurance be purchased before the first day of the term, a fact that should also be communicated clearly to students and parents.

# Reinstatement after withdrawal

There is no question that Yale College is committed to the reinstatement of all students who have withdrawn.  In fact, the vast majority of students who apply for reinstatement are reinstated.  But the process of reinstatement is not therefore inconsequential or needless.  Life as a student in such an exciting but high-octane academic and social environment can be full of innumerable sources of pressure and stress.  It is not an environment to which all students can easily return after a withdrawal, especially if that withdrawal involved difficult or painful circumstances.  The reinstatement process, which typically involves a student's successful completion of two outside college courses, exists to allow students to demonstrate to the College and, perhaps more important, to themselves, their ability to resume the demanding life of a Yale student.  Experience has long shown that students who seek reinstatement only after a confident demonstration of their preparedness to resume their busy academic and social lives at Yale are much more likely to succeed upon their return to campus.

As important as the reinstatement process is, it is also a source of great frustration for many students who have undergone or who are undergoing the process.  There were students who voiced in their responses to our survey a sense that reinstatement after a withdrawal should be automatic, and that anything like an application process felt unnecessarily punitive.  We certainly understand

how, in the sometimes very difficult experience of withdrawal from school, such feelings could emerge.  But we were moved as well by the students who expressed gratitude for the requirement that they not return to Yale until they were likely to feel comfortable again in the institution's unique academic and social environment. Careful consideration led us to affirm many of the principles underlying the current reinstatement process.

That is not to say that the process as currently configured is perfect.  We were fully sympathetic to the many student complaints concerning both the financial burden of reinstatement and the awkward timing of the reinstatement process, which presently occurs in the days leading up to the beginning of each term.  We propose here a number of reforms, which we feel lessen considerably the burden of the cost and the logistical awkwardness of the current readmission process.

# Proposed changes to the process of reinstatement

There are currently two deadlines in the reinstatement process, one deadline by which students must request application materials and another for the actual submission of the application.  We propose eliminating the first deadline, as application materials for reinstatement should be made readily available on the proposed Yale College website for leaves, withdrawals, and reinstatement.  As noted below, there will still be a deadline by which the application must be submitted to the Reinstatement Committee.  We propose, too, eliminating the current $50 readmission application fee.

We also propose a significant change to the timing of the reinstatement process, which currently unfolds very close to the beginning of the term. The new deadlines for the submission of the reinstatement application should be July 1, for fall-term reinstatement, and November 1, for spring-term reinstatement.  It is understood that the final reinstatement decision would be contingent on the student's successful completion of any course requirements, the evidence for which may not be available until late August or early January.  This significant change in the timing of the application process has many advantages.  It promises to reduce much of the student and family anxiety currently surrounding a process that is not fully concluded, in the present system, until just before the beginning of the term.  It allows too for a more organized and efficient plan for housing the reinstated student in the residential college, benefiting both the returning student and his or her suitemates.

Coincident with the change in the application deadline, we propose two significant changes to the requirement of the applicant's interviews with the members of the Reinstatement Committee.  First, the interviews should be moved up to July and November, for fall and spring terms, respectively. Second, the interviews, though preferably conducted in person, may be conducted by video teleconference when circumstances warrant.  The changes proposed here would surely lessen the financial burden felt by those students who live far from New Haven but who in the present system have had to pay not only for costly flights but for lodging in New Haven during the period that precedes the opening of the dorm rooms.

We also propose a change of the role of the residential college dean in the proceedings of the Reinstatement Committee. Currently, each residential college dean is given a vote when the Committee discusses the applicants in his or her college.  Out of an interest to preserve the advisory nature of the relation between the residential college dean and the applicant, we propose that the Reinstatement Committee should include as voting members only a Yale Health official, the Chair of Reinstatement, and a dean from the Yale College Dean's Office.  What is currently now considered the reinstatement interview with the residential college dean should be replaced by an advisory meeting with the residential college dean, a meeting that would take place typically before mid-June or after mid-August, for fall-term reinstatement, and in November, in cases of spring-term reinstatement.  Preferably conducted in person, this advisory meeting could also be conducted, when warranted by circumstances, by video teleconference.  The Reinstatement Chair should consult with the residential college dean about the student both before and after the reinstatement process.

Another long-standing complaint about the reinstatement process concerns the expense of the two courses that applicants are required to complete.  Some students complete that requirement by enrolling in Yale Summer Session.  It has long been possible, though not well-publicized, for students on financial aid at the time of withdrawal to receive a need-based tuition scholarship from Yale Summer Session.  We believe strongly that Yale College should make clear that students who withdraw for personal, academic, or medical reasons, and who are eligible for financial aid, be given clear information about the Summer Session's need-based scholarships.

Many students take the courses required for reinstatement at colleges or universities near their homes during the period of withdrawal.  Unfortunately, there is no mechanism by which Yale financial aid could be extended directly to outside institutions.  We can envision a process that works nonetheless to reduce the tuition expense incurred by some students who, preparing for reinstatement, elect to take college courses outside of Yale.  We propose that students on financial

aid who have successfully completed the course requirements for readmission in the summer prior to reinstatement be forgiven their Student Income Contribution (SIC), currently assessed at $3,050. Such students should be permitted to apply for this consideration from Yale's Student Financial Services.

Some students require, upon reinstatement in Yale College, a ninth term in order to complete their Yale degrees. Currently, for reasons stemming from Federal Financial Aid policies, a "ninth-term penalty" is assessed, by which some students enrolling for a ninth term are expected to produce an additional Student Income Contribution (SIC), currently valued, as noted above, at $3,050. We propose that Student Financial Services forgive that additional $3,050 expectation, replacing the SIC with a grant funded by the university.

Finally, we want to express our support for maintaining two of the current reinstatement practices that are generous by most institutional standards. We propose continuing the current practice of not limiting the number of times a student may withdraw for medical reasons or the number of times a student may apply for reinstatement after a medical withdrawal. We also propose continuing the current practice of not limiting the number of years in which a student can be withdrawn before reinstatement.

# Life after reinstatement

In addition to student complaints about withdrawal and the application process for reinstatement, we heard many reinstated students voice their experiences of awkwardness that accompanied their return to enrollment in Yale College. We suggest that the Chair of the Reinstatement Committee work with the Yale College Dean's Office to implement practices that would help reinstated students adjust to life back at Yale. Another concern about life after reinstatement involved the time it took to reactivate the ID cards and Yale email accounts of reinstated students. We feel strongly that those cards and email accounts should be reactivated within 24 hours of a student's reinstatement.

# Conclusion

The changes proposed above should improve the experience of many students undergoing the processes of withdrawal and readmission. The reforms we advocate in this report should clarify for students considering a leave of absence, a withdrawal, or readmission the range of options before them. They should eliminate some of the anxiety and logistical complexity faced by students and

their families during the reinstatement process.  And, finally, several of the changes we propose promise to reduce the costs associated with withdrawal and reinstatement.  Those proposals helping to reduce student expenses include the extension of the period during which a student may elect to take a leave of absence, the elimination of the reinstatement application fee, the increase in awareness of scholarship funds to cover tuition at Yale Summer Sessions, the university-funded waiver of the Student Income Contribution for students who have completed the outside courses required for reinstatement, the university-funded waiver of the SIC for students who are required to enroll in Yale College for a ninth term, the change of deadlines for the reinstatement process, and the opportunity when circumstances warrant to request to interview with the Reinstatement Committee by video teleconference.

It is of course not our assumption that a reform of the processes of withdrawal and reinstatement will eliminate all the difficulties students experience when they leave Yale during the term or when they return to Yale after a period of absence.  Students who withdraw from Yale College during a semester often do so in complicated, even painful, circumstances. It is our hope, however, that the changes proposed in this report will make what can be a difficult process clearer and less burdensome for the students involved.

John Rogers, Chair

Jasmina Besirevic-Regan

Caroline G. Hendel

Sara Samuel

Susan Sawyer

Mark Schenker

**U.S. District Court, District of Connecticut**

**CIVIL ACTION no. 3:20-cv-00133-JCH**

# Exhibit 3

Attached to Plaintiff's Motion for Preliminary Injunction

Dated: February 23, 2020

Description:

Massachusetts Institute of Technology (MIT)
Committee on Academic Performance (CAP) website
(as of February 23, 2020)

Committee On
**Academic Performance**

About the Committee     Petition Process and Forms     Progress Toward the Degree     End of Term Review     Search [          ] Go

- **Process**
- **Procedures**
- **Decisions**
- Advice for Students
- Advice for Advisors
- Advice for Departments

## End of Term Academic Review: Process

At the end of each regular term, the Registrar flags the records of students whose **term GPA is 3.0 or lower,** or whose **end of term registration is 35 or fewer units.** (Because of special freshman grading, the standard for **first-year students is 39 or fewer units.)** These records are reviewed first by the student's home department, then by the CAP in two sets of meetings, Grades and Deferred Action.

Students do not appear in person before the CAP. They are represented by the home department undergraduate officer and administrator at the Grades Meeting and the advisor at a Deferred Action Meeting. Students whose cases are considered at the Deferred Action Meeting are strongly encouraged to submit a written statement to the Committee well before the meeting.

### Department Review

Once most grades are recorded, each academic department reviews the records of its students (majors) whose **term GPA is 3.0 or below,** or whose **end of term registration is 35 or fewer units.** (Because of special freshman grading, the standard for **first-year students is 39 or fewer units.**

The department (UAAP in the case of first-year students) decides on a recommended action for each student—No Action (which often includes a departmental warning), Warning, or Required Academic Leave. The department's undergraduate officer and academic administrator present these recommendations to the CAP at the Grades Meetings. Departments may also ask the Committee to review records not flagged, if circumstances warrant.

### Grades Meetings

At the Grades Meetings, held in the first weeks of January and June, the CAP reviews student records and considers department recommendations. See Procedures for details of how the Committee conducts this review.

The Committee may accept the department's recommendation, or may vote for a different action than the department recommends. Decisions at the Grades Meetings include:

- No Action
- Warning
- Deferred Action.

Deferred Action triggers a second review, at the Deferred Action Meetings, held two weeks later.

## Deferred Action Meetings

At the Deferred Action Meetings, in the third weeks of January and June, the CAP reviews two sets of student records in more depth. These include:

- students for whom relevant information was not available at the Grades Meeting;
- students who may be required to take a year away from MIT (Required Academic Leave).

In each case students are represented by their academic advisor or other departmental officer. Students are invited to submit a written statement for consideration at the meeting. See Procedures for details of how the Committee conducts this review.

Decisions at the Deferred Action Meetings include:

- No Action
- Warning
- Required Academic Leave.

Massachusetts Institute of Technology, Staff to the CAP, Room 7-104, Tel: 617.253.4164, Contact CAP

**MIT** Committee On
**Academic Performance**

About the Committee     Petition Process and Forms     Progress Toward the Degree     End of Term Review     Search [          ] Go

- Process
- **Procedures**
- Decisions
- Advice for Students
- Advice for Advisors
- Advice for Departments

## End of Term Academic Review: Procedures

The Committee on Academic Performance conducts its End of Term Review meetings according to the following procedures and principles:

- Participation
- Representation
- Equity
- Decisions
- Confidentiality and Notification
- Institute Records

### Participation

The CAP invites additional individuals to participate in the End of Term meetings, beyond its voting and *ex officio* members. Among these additional participants are representatives of Admissions, MIT Medical, and Student Support Services, who answer questions and provide advice to the Committee.

### Representation

Students do not appear in person before CAP. They are represented by the home department undergraduate officer and administrator at the Grades Meeting and the advisor at a Deferred Action Meeting. Students whose cases are deferred are encouraged to submit a written statement to CAP for the Deferred Action Meeting.

If a student gives permission, S3 deans can provide relevant personal information to the Committee.

If a student signs a written release form, Medical staff will share information that is directly relevant to academic performance and possible CAP action.

Other members of the MIT community who have additional relevant information (instructor, housemaster, coach, graduate resident tutor, administrator) should relay it to either the academic advisor or the S3 dean, depending on the nature of the information to be given.

## Equity

The Committee on Academic Performance reviews records **_individually and in context._** It considers not only grades but progress toward the degree—the total number of General Institute Requirements (GIRs) and units beyond GIRs completed, the nature of subjects taken—and those personal factors that may have affected performance in a given term.

In all cases the CAP takes care to ensure that its decisions are **_consistent across undergraduate departments,_** while still taking into account students' individual circumstances.

## Decisions

Votes at End of Term Meetings include:

- No Action
- Warning
- Deferred Action
- Required Academic Leave.

See the Decisions page for explanations of each vote.

## Confidentiality and Notification

**_All Committee proceedings are_ confidential.** Committee decisions are reported only to the student, advisor, and home department academic administrator. Summaries of CAP actions are sent to offices with the "need to know".

Students, advisors, and departments are notified of decisions by email soon after the Committee meets; printed letters confirming the decision go out within two

days.

In January the Committee mails letters only to the term address; in June letters go to the permanent address. Letters for students whose review is deferred are sent to both addresses in each term. Students can update these addresses in the Biographic Record on WebSIS. Students may also ask that one or both printed letters not be sent: email cap@mit.edu.

## Institute Records

**Warning status** appears on the internal record with the code "W" next to the word "Academic", following the term's grades on the WebSIS Grade Report.

**Required Academic Leave** appears on the internal record with the code "RW" next to the word "Academic", following the term's grades on the WebSIS Grade Report.

**CAP actions, including Warning and Required Academic Leave, never appear on external records.**

A few medical and other graduate schools ask in their application forms for information on "institutional actions". MIT does not consider CAP votes as institutional actions:

- Warning is a temporary internal status used for advising purposes; it should not be reported to another institution.
- Required Academic Leave is not the same as disciplinary expulsion. There is no obligation to report a Required Academic Leave to a graduate school. However, the gap in registration shown on the external transcript may need explanation.

Massachusetts Institute of Technology, Staff to the CAP, Room 7-104, Tel: 617.253.4164, Contact CAP

**Committee On**
# Academic Performance

About the Committee        Petition Process and Forms        Progress Toward the Degree        End of Term Review        Search [_____] Go

- Process
- Procedures
- **Decisions**
- Advice for Students
- Advice for Advisors
- Advice for Departments

## End of Term Academic Review: Decisions

CAP makes one of the four following decisions on each record reviewed at the End of Term: No Action, Warning (including Communication Requirement Warnings), Deferred Action, or Required Academic Leave.

## No Action

The Committee takes no formal action on the term's performance. Nothing appears on the internal or external record. If this decision is made at the Grades Meeting, students and advisors are **not** notified. However, the department may send a Departmental Warning letter, which is noted only in department records.

No Action is occasionally voted at the Deferred Action Meetings. In this case, because students and advisors have already been notified of the Deferred Action decision, they **will** also be notified of the No Action vote. As before, nothing appears on the internal or external record.

## Warning

A vote of Warning is a formal notice to the student, advisor, and department that a record does not meet MIT's minimum requirements and that the student must make satisfactory progress toward the degree in the next term. A second term with an unsatisfactory record will raise the possibility of Required Academic Leave, though this is not automatic: the department and CAP review each term and student individually.

Students on Warning have a **credit limit for the following term.** This is usually **four subjects, 48-51 units.** First-year students are strictly limited to 48 units.

Occasionally CAP will impose a higher or lower limit, usually in response to departmental request.

If the record at the end of the following term is satisfactory, that is, above minimum standards, the student is automatically removed from Warning status and has no credit limit in the following term. The CAP Chair sends a letter of congratulation to these students.

Students, see Responding to Academic Warning for advice on how to respond constructively to a vote of Warning.

**Communication Requirement Warnings**

Communication Requirement Warnings are equivalent in every respect to Academic Warnings. The Communication Requirement is the only "paced" General Institute Requirement (GIR), that is, students are expected to pass one Communication-Intensive (CI) subject each year. Failure to keep up this pace is unsatisfactory progress toward the degree.

At the end of each term the CAP reviews the records of students who have not kept pace with the Communication Requirement. Based on recommendations from the Subcommittee on the Communication Requirement (SOCR), the CAP votes one of three Warnings:

- C (one term behind pace)
- CC (two or more terms behind pace)
- WC (Academic Warning and behind pace).

Each Warning carries a credit limit:

- C: an appropriate CI subject plus no more than four additional subjects (usually 60 units total)
- CC: an appropriate CI subject plus no more than three additional subjects (48-51 units total)
- WC: an appropriate CI subject plus no more than three additional subjects (48-51 units).

Students, address questions about Communication Requirement Warnings to the Communication Requirement Advisor (commreq@mit.edu, room 5-133, 617-253-

2313), See Responding to Communication Requirement Warning for advice on how to respond constructively to this Warning.

## Deferred Action

At the Grades Meetings, CAP will postpone action on records of two kinds:

- where the Committee wants to hear more information;
- where the final vote may be Required Academic Leave.

In both cases students, advisors, departments, and housemasters are notified of the Deferred Action so that they can prepare information for the Deferred Action Meetings, held two weeks later. Students and advisors receive this notice by email and posted letter.

Students and advisors, see If Your Review is Deferred for advice on how to respond constructively to a deferred decision.

## Required Academic Leave

Required Academic Leave means that the student must stay away from MIT for at least a full calendar year. Its purpose is to give the student time in which to assess priorities, work at clearing issues or situations that contributed to failure, and prepare for possible return to MIT. In requiring this leave the CAP will state actions the student must take before applying to return, including coursework at another institution, medical treatment if warranted, employment, and/or other activities appropriate for the individual student. The Institute encourages such students to keep in touch with their advisor, department, and a dean in Student Support Services while on Required Academic Leave.

CAP rarely imposes Required Academic Leave without at least one term spent on Warning, though circumstances sometimes warrant this.

For full information about processes for Required Academic Leave and requesting return, see the Student Support Services website.

Students, see Responding to Required Academic Leave for advice on how to respond constructively to this action.

Massachusetts Institute of Technology, Staff to the CAP, Room 7-104, Tel: 617.253.4164, Contact CAP

**Committee On
Academic Performance**

About the Committee     Petition Process and Forms     Progress Toward the Degree     End of Term Review     Search [        ] Go

- **Types of Petitions**
- Statement Guidelines
- Submission Deadlines
- Committee Review and Decisions
- Online Petition Help

## Petition Process: Types of Petitions

The Committee on Academic Performance (CAP) considers petition requests (from registered undergraduates only) in two main categories:

- **Online petitions for late changes to registration/grading** *after the deadline* **listed in the** **Academic Calendar, such as:**

  - Adding a subject after Add Date

  - Dropping a subject after Drop Date

  - Changing subject grading or registration status, such as
    - Regular to Sophomore Exploratory Status
    - Sophomore Exploratory Status to Regular
    - Change Sophomore Exploratory Subject from Credit to Listener
    - Letter Grades to Junior/Senior P/D/F
    - Junior/Senior P/D/F to Letter Grades
    - Credit to Listener
    - Listener to Credit
    - Regular to PNR
    - PNR to Regular

- **Hard-copy petition requests** to:

  - Late Drop an Incomplete
  - Exceed Warning Credit Limit
  - Exceed IAP Credit Limit
  - Continue on Light Load

- Register After Clearance of a Hold

Consult the CAP Administrator for situations not mentioned here.

Massachusetts Institute of Technology, Staff to the CAP, Room 7-104, Tel: 617.253.4164, Contact CAP

**Committee On Academic Performance**

About the Committee        Petition Process and Forms        Progress Toward the Degree        End of Term Review        Search [        ] Go

- Types of Petitions
- **Statement Guidelines**
- Submission Deadlines
- Committee Review and Decisions
- Online Petition Help

## Petition Process: Statement Guidelines

The CAP reviews each petition individually in the context of MIT's policies. It seeks to make consistent decisions while remaining sensitive to individual circumstances. Because the CAP is entrusted with upholding the integrity of Institute records, it is important for the Committee to confirm (as much as possible) the events you set forth in a petition. That is the purpose of statements from your advisor, instructor, and possibly other Institute personnel.

### Writing Your Personal Student Statement

When reading student statements the Committee looks for honest evidence of your intention to meet the deadline. It recognizes that circumstances beyond a student's control (illness, family issues, etc.) sometimes prevent students from meeting deadlines or fulfilling an academic obligation.

Be concise; write only a paragraph or two. State the facts of your situation, then explain how the requested change would benefit your education. Refer to external circumstances in general terms ("I was ill on Drop Date", "My mother was hospitalized"); omit irrelevant details.

If your extenuating circumstances are of a personal or medical nature you should consult with a dean in Student Support Services (Room 5-104, 617-253-4861), **before submitting a petition.** The deans can offer guidance with your petition statement, and they should receive any medical records you have authorized for release. The deans will not discuss your situation with the Committee without your permission. The Committee holds all student information in the strictest confidence.

### Statements from Advisors and Instructors

Because your **advisor** approves your initial registration and any changes to it, the CAP needs to hear her or his understanding of what led to a missed deadline or a request to exceed a credit limit. Similarly, **instructors** are asked to document your participation in their subject, to help the Committee make an informed decision on your request.

Advisors and instructors submit statements for late registration petitions (e.g. Late Add, Late Drop, Late Change of Status) online via Student Forms and Petitions. Although they are notified automatically when you submit a petition, you should contact them directly to make sure they have all the facts to write an informed statement.

For other petitions (such as Exceed the IAP or warning credit limits, drop a subject with a grade of Incomplete or register following a hold), you must ask advisors and instructors to write a statement on the applicable PDF petition form. Alternatively, they may email their statements to cap@mit.edu.

Statements must be received by the CAP **directly** from the author; the Committee will not accept a statement forwarded by you or someone else. If you have asked for emailed statements, please note this on your petition form. You may then submit the form without signatures from your advisor and/or instructor.

## Questions for Advisors

The CAP asks you to explain your reasons for supporting or not supporting your advisee's request. Specific questions are listed on petition forms; in general, they ask whether you can confirm facts given by the student and what educational benefit would be served by approving the request.

See the Quick Guide for help with submitting statements online for late registration petitions. Statements for other petitions are provided on PDF petition forms or emailed to cap@mit.edu.

## Questions for Instructors

The CAP asks you to provide data about the student's participation (or lack thereof) in your subject. For example, "This student has attended class from the first day of the term," or "This student stopped handing in psets after the sixth week." Specific questions are listed on petition forms. An indication of support (or lack thereof) alone is not sufficient for the Committee to make an informed decision.

See the Quick Guide for help with submitting statements online for late registration change petitions. Statements for other petitions are provided on PDF petition forms or emailed to cap@mit.edu.

## Substitute Signers/Online Approvers

If you have tried several times but failed to reach an advisor or instructor, the CAP will accept substitute signatures and statements from certain individuals. These people must both have permission to act on behalf of the individual in question and be able to comment knowledgably on the petition. Substitute signers include:

- Undergraduate Academic Administrators
- Staff assistants to faculty members (the department office or website can identify these people)
- Teaching Assistants

The Committee will occasionally table a petition, pending receipt of additional information that a substitute signer cannot provide.

Massachusetts Institute of Technology, Staff to the CAP, Room 7-104, Tel: 617.253.4164, Contact CAP

# Committee On Academic Performance

About the Committee     Petition Process and Forms     Progress Toward the Degree     End of Term Review     Search

- Types of Petitions
- Statement Guidelines
- **Submission Deadlines**
- Committee Review and Decisions
- Online Petition Help

## Petition Process: Submission Deadlines

The Committee accepts petitions on a rolling basis, and reviews them as schedules permit. Decisions are reported by email as soon as possible after each meeting.  Meetings are currently scheduled for each month during the academic year.  Students can expect to be notified of petition decisions during the following weeks:

## The week of:

- September 16, 2019
- October 21, 2019
- November 4, 2019
- November 25, 2019
- December 16, 2019
- February 17, 2020
- March 16, 2020
- April 13, 2020
- May 4, 2020
- May 18, 2020

## Petitions to Exceed Credit Limits

Petitions to exceed credit limits should be submitted before the beginning of each term, so that you will know how to register:

- September 6 for Fall 2019
- January 3 for IAP 2020
- February 7 for Spring 2020.

## Late or Incomplete Petitions

**The Committee will not review a petition until it is complete.** The CAP Administrator will hold your incomplete petition and notify you via email of any missing information.

Note that the CAP reviews petitions **for undergraduates only;** graduate students should follow the petition process outlined on the website of the Office of Graduate Education.

Massachusetts Institute of Technology, Staff to the CAP, Room 7-104, Tel: 617.253.4164, Contact CAP

**Committee On**
**Academic Performance**

About the Committee     Petition Process and Forms     Progress Toward the Degree     End of Term Review     Search [        ] Go

- Types of Petitions
- Statement Guidelines
- Submission Deadlines
- **Committee Review and Decisions**
- Online Petition Help

## Petition Process: Committee Review and Decisions

After confidential discussion, the CAP then decides to approve, deny, or table your petition. Decisions are usually made by consensus, occasionally by majority vote.

The Committee reads each petition individually, giving significant attention to your request and statements from your advisor, instructor, and others. Voting members discuss your request in the context of Faculty policy and Committee precedent. The Committee acts solely based on the written information provided, in light of advice from the *ex officio* members, if given. Students, advisors, and instructors do not appear before the CAP. Discussions and votes are not recorded, and members observe strict confidentiality.

If you submit more than one petition, the Committee will act on each separately; they may choose to approve one while denying another. Several petition requests approved at the same time will be charged only one filing fee and fine, if applicable.

Decisions are reported by email to you, your advisor, and your department administrator. You can also see decisions for online late registration change petitions on your My Forms page.

Note that this process is **for undergraduates only;** graduate students should follow the petition process outlined on the website of the Office of the Dean for Graduate Education.

## Details on the three types of CAP petition decisions are provided below:

Petitions can be:

- **Approved**: When an online late registration change petition is approved, your record is automatically updated and you can see the change in WebSIS. For other types of petitions, the CAP Administrator asks the Academic Records Office to make the requested change and other relevant offices are notified (e.g. International Students Office, Student Financial Services, etc.). Some petitions are approved with a notation of **administrative neglect.** This is done when the student failed to meet the Institute deadline because of inattention or procrastination. Once administrative neglect has been noted by the Committee, further petitions of this sort are likely to be denied unless there is clear evidence that missing a future deadline was caused by circumstances beyond the student's control. **A $25 filing fee** will be charged to your MITPAY account by the Registrar's Office for a petition approved by the CAP. Petitions approved with neglect will be charged an additional $25 fine; a second approval with neglect incurs a fine of $50.

- **Denied:** The CAP strives to apply Faculty policies and maintain equitable treatment across all departments and undergraduates. Occasionally this means denying a petition that if approved would give a student an unfair advantage over classmates. Another guiding principle is that the transcript should reflect all work that a student did, in the term in which the work was done. No fee is charged for petitions that are denied. Petition decisions are **final:** the Committee will not consider an appeal unless the student and advisor can provide **substantial and relevant new academic information.** This must be information unavailable to the Committee when it made its initial decision. Students who wish to appeal must submit a new petition that explains their situation and the new information now available. New signatures and statements that address the student's revised statement must be gathered. The CAP Chair will decide whether to accept the new petition for review by the full Committee. If accepted, appeal petitions are reviewed in the same way as initial petitions.

- **Tabled:** Occasionally the Committee will table a petition in order to gather more information before making a decision. The CAP Administrator will contact the student and advisor via email, and specifically define the information sought by the Committee. Once the additional information is received, the CAP will review the petition at its next meeting.

**Committee On Academic Performance**

About the Committee     Petition Process and Forms     Progress Toward the Degree     End of Term Review     Search [        ] Go

- Role & Function
- CAP Membership

## About the Committee: CAP Membership

The CAP is composed of nine voting members and eight *ex officio* members.

The Office of the Vice Chancellor designates two *ex officio* members, the Medical Director designates one. Others serve in functions defined in the Faculty Rules. *Ex officio* members provide information but do not vote.

If you have a question for the Committee, please email cap@mit.edu or contact the CAP Administrator in room 7-104, 617-253-4164. It is not appropriate to contact Committee members directly to inquire about a decision or influence a vote.

### Voting Members

Of the nine voting members, six are faculty (including the Chair) and three are students.

#### Faculty

- Prof. Kristala L. Prather, *Chair*, Chemical Engineering
- Prof. Sandy Alexandre, Literature Section
- Prof. Jeremiah A. Johnson, Chemistry
- Prof. Markus Klute, Physics
- Prof. Kripa Varanasi, Mechanical Engineering
- Prof. Lizhong Zheng, Electrical Engineering-Computer Science

#### Students

- Saffron Deasey, '20
- Ricardo Gayle, '22
- A.J. Haeffner, '21

### *Ex Officio* Members

- Ms. Leslie Bridson, Designated Representative, Dean of Admissions and Student Financial Services
- Dean DiOnetta Jones Crayton, Office of Minority Education/Office of the Vice Chancellor Designate
- Dean Gerardo Garcia-Rios, Student Support Services
- Dean Kathleen Monagle, Student Disabilities Services
- Dean David Randall, Designated Representative, VP and Dean for Student Life
- Dr. Antio Lim, MIT Medical/Co-Designate
- Dr. Haleh Rokni, MIT Medical/Co-Designate
- Ms. Ri Romano, Designated Representative, Registrar's Office
- Dr. Karen Singleton, MIT Medical/Co-Designate
- Dean Elizabeth Cogliano Young, Designated Representative, Vice Chancellor

### Staff to the Committee

- Ms. Jocelyn P. Heywood, 7-104, cap@mit.edu

Massachusetts Institute of Technology, Staff to the CAP, Room 7-104, Tel: 617.253.4164, Contact CAP

Committee On
**Academic Performance**

About the Committee     Petition Process and Forms     Progress Toward the Degree     End of Term Review     Search [        ] Go

- **Role and Function**
- CAP Membership

## About the Committee: Role and Function

The Committee is concerned with the academic performance of undergraduates. Its key functions include the following:

1. **Review of Petitions Requesting a Change to Student's Academic Record:** The Committee acts on petitions from individual undergraduates requesting changes to registration after Institute deadlines or exceptions to established academic standards. Petitions often seen by the Committee include requests to add or drop a subject, or change the grading status of a subject.

2. **Enforcement of Credit Limits:** Credit limits exist for first-year students, students taking subjects during IAP, and students on Academic Warning. The Committee considers petitions from students requesting permission to exceed the IAP or Warning credit limit, and adjusts the registrations of those students who do not comply with their limit within a reasonable period of time.

3. **End of Term Academic Review:** The Committee reviews the academic performance of all undergraduates at the conclusion of the fall and spring terms. End of term actions include imposition of Academic Warning for the following term or, when necessary, Required Academic Leave for a minimum of one academic year.

4. **Degree Candidate Review:** In September, February, and June the Committee recommends to the Faculty candidates presented by academic departments to be awarded the SB degree.

5. **Recommendations to the Faculty:** The Committee also makes recommendations to the Faculty on matters relating to academic standards, examinations, degree requirements, and grading.

6. **Return from Leave:** The Committee reviews the applications of undergraduates who apply to return from Required Academic Leave and Medical Leave.

Massachusetts Institute of Technology, Staff to the CAP, Room 7-104, Tel: 617.253.4164, Contact CAP

| Community Concern | Committee Recommendation(s) *(only applicable to undergraduate students)* |
|---|---|
| No easy way for undergraduate students to leave the Institute | A "Leave of Absence" category will be created to allow undergraduate students to flexibly pursue opportunities or to fulfill personal or educational commitments. This category is intended for undergraduate students who leave in between semesters and will have minimal administrative processes. |
| Terminology and expectations suggested undergraduate students on leave were no longer part of the MIT community | **New Terminology** "Withdrawal" will be called "Leave" "Readmission" will be called "Return" "Readmission Application" will be called "Request to Return" "Voluntary Withdrawal" will be called "Personal Leave"  •  "Suspension of Services" statement will be renamed and revised  •  Undergraduate students on leave can be involved in MIT activities open to non-students |
| S3 has dual and conflicted role of being supporter and decision maker in return process | S3 will be support and guide, while CAP will be decision maker in return process |
| Concern about the financial impact of taking a leave | The possibility of providing financial support and health insurance to those who need it will be investigated  •  Undergraduate students on required academic leave will now be required to complete only 1 semester of coursework rather than 2 |
| Confusion about expectations while on leave | CAP and S3 letters will be revised to be clearer and have a more supportive tone  •  Undergraduate students and S3 will work together (with MIT Medical and Academic Departments) to develop a clear and agreeable action plan  •  Undergraduate students will be encouraged to remain in contact with supports on campus such as their S3 Dean, Academic Advisor, and Department |
| Undergraduate students nervous about what it is like to take a leave or return from leave | An online and representative collection of undergraduate student experiences while on leave will be created  •  S3 will develop a mentorship program for undergraduate students considering leave and while on leave |
| Undergraduate students feel rushed off campus after requesting leave and wanted guaranteed housing upon return | Undergraduate students will have 72 hours, instead of 48 hours, to move out of MIT affiliated housing and housing will coordinate with S3 to make sure students are not unnecessarily rushed  •  Eligible undergraduate students returning from leave will be guaranteed housing if requested |
| Lack of clarity about the process of leave/return | CAP and DUE will increase efforts to communicate about the return and leave processes, data, and outcomes to faculty, administrators, and staff  •  S3 will edit and clarify their website  •  FAQ page will be created to address common concerns |
| Students fearful of psychiatric hospitalizations and involuntary withdrawals | A committee will be charged by the Chancellor to examine these processes  •  Involuntary withdrawal will never be used to coerce students to leave MIT |

**U.S. District Court, District of Connecticut**

**CIVIL ACTION no. 3:20-cv-00133-JCH**

# Exhibit 4

Attached to Plaintiff's Motion for Preliminary Injunction

Dated: February 23, 2020

Description:

Yale College Programs of Study 2019-2020
J. Leave of Absence, Withdrawal, and Reinstatement

# Yale College Programs of Study 2019–2020

## J. Leave of Absence, Withdrawal, and Reinstatement

### LEAVE OF ABSENCE

Any student in Yale College who is in academic good standing will normally receive permission, upon petition to the Committee on Honors and Academic Standing through the residential college dean, to take one or two terms of leave of absence, provided that the student departs in academic good standing at the end of a term and returns at the beginning of a term. See section D, Promotion and Good Standing, "Requirements for Academic Good Standing." In order that the University may make plans to maintain enrollment at the established level, students desiring leaves of absence are requested to make their intentions known to their residential college deans as soon as possible. Yale College assumes that students who take leaves of absence will inform their parents or guardians in good time that they intend to do so. Ordinarily, residential college deans do not notify parents or guardians that a student has taken a leave of absence, though they may do so if they believe that such notification is appropriate.

1. **Petition for a fall-term leave**  For a fall-term leave of absence, a student is requested to submit a petition by May 1. Since a student's plans often change during the summer, however, the Committee on Honors and Academic Standing will ordinarily grant a petition for a leave that is received on or before the fifteenth day of the term in the fall.

2. **Petition for a spring-term leave**  For a spring-term leave of absence, a student's petition must be received on or before the fifteenth day of the term in the spring.

3. **Relinquishing housing**  Students considering a leave of absence should be aware that there is a substantial financial penalty for relinquishing on-campus housing after the relevant deadlines for relinquishing such housing. See "Rebates of Undergraduate Charges" under "Financial Services" in the Yale College online publication *Undergraduate Regulations*.

4. **Canceling a leave**  A student may cancel a leave of absence for either term as late as the first day of classes in the term for which the leave has been requested. However, the deadlines for payment of the term bill and the penalties for late payment apply in such cases. See "Payment of Bills" under "Financial Services" in the Yale online publication *Undergraduate Regulations*.

5. **Total terms of leave**  A student is eligible for a total of two terms of leave of absence. These two terms need not be taken consecutively.

6. **Accelerated students**  A student taking an accelerated degree by use of acceleration credits who has had two terms of leave of absence may receive a third term of leave if the third term of leave is needed to bring the student's pattern of attendance into conformity with the pattern of attendance stipulated for an accelerated degree. See section Q, Acceleration Policies.

7. **Returning from a leave**  Permission to take a leave of absence normally includes the right to return, with prior notification to the residential college dean but without further application, at the beginning of the term specified in the student's petition to the Committee on Honors and Academic Standing. In

the case, however, in which a student achieved eligibility for a leave of absence because of a postponement of a deadline for course work as a result of an identified medical problem, the Yale College Dean's Office may require medical clearance from Yale Health before the student's return from the leave of absence. Such clearance may also be required for a student who had sought and had been granted, on medical grounds, a waiver of the fee for the late relinquishment of housing at the time the leave of absence was requested.

8. **Financial aid** Students taking leaves of absence who have received long-term loans will be sent information about their loan repayment obligations, which in most cases begin six months after the last day of formal enrollment at Yale. A student taking a leave of absence who is receiving financial aid through Yale must consult with a counselor in Student Financial Services before leaving Yale; see "Rebates of Undergraduate Charges" under "Financial Services" in the Yale online publication *Undergraduate Regulations*.

9. **Health coverage** A student on a leave of absence is eligible to retain coverage by Yale Health during the time of the leave, but the student must take the initiative to apply for continued membership in Yale Health by completing an application form and paying the fee for membership. See "Leave of Absence" under "Health Services" in the Yale online publication *Undergraduate Regulations*. Application forms and details about medical coverage while on leave of absence may be obtained from the Member Services Department of Yale Health.

# WITHDRAWAL

There are five types of withdrawal, three of which—academic, medical, and personal—are discussed below. For information on disciplinary and financial withdrawals, consult the Yale online publication *Undergraduate Regulations.* The period of withdrawal for disciplinary reasons is imposed by the Yale College Executive Committee or recommended by the University-Wide Committee on Sexual Misconduct at the time the student's enrollment is suspended.

Regardless of the type of withdrawal, students who have been withdrawn may not stay in residences on campus, attend classes, participate in organized extracurricular activities, or make use of University library, athletic, and other facilities. They may come to campus only upon receiving prior permission from their residential college dean or the Dean of Student Affairs.

## ACADEMIC WITHDRAWAL

Students may be dismissed for academic reasons on a variety of grounds; see section I, Academic Penalties and Restrictions, "Dismissal for Academic Reasons." Students whose withdrawal was for academic reasons must remain away for at least one fall term and one spring term, in either order, not including the term in which the withdrawal occurred.

## MEDICAL WITHDRAWAL

A withdrawal for medical reasons must be authorized by the director of Yale Health or the chief of the Mental Health and Counseling department, or by their official designees within the Health Center. If a student under the care of a non–Yale Health physician wishes to withdraw for medical reasons, that physician should submit sufficient medical history to the director of Yale Health for a final decision on the recommendation. A student planning to return to Yale should discuss the requirements for reinstatement with the residential college dean or the chair of the Committee on Reinstatement.

Yale College reserves the right to withdraw a student for medical reasons when, on recommendation of the director of Yale Health or the chief of the Mental Health and Counseling department, the dean of Yale College determines that, because of a medical condition, the student is a danger to self or others, the student has seriously disrupted others in the student's residential or academic communities, or the student has refused to cooperate with efforts deemed necessary by Yale Health and the dean to make such

determinations. Each case will be assessed individually based on all relevant factors, including, but not limited to, the level of risk presented and the availability of reasonable modifications. Reasonable modifications do not include fundamental alterations to the student's academic, residential, or other relevant communities or programs; in addition, reasonable modifications do not include those that unduly burden university resources. An appeal of such a withdrawal must be made in writing to the dean of Yale College no later than seven days from the effective date of withdrawal. An incident that gives rise to voluntary or mandatory withdrawal may also result in subsequent disciplinary action.

Students whose withdrawal has been authorized as medical by the director of Yale Health or the chief of the Mental Health and Counseling department must normally remain away at least one full term before a return to Yale College, not including the term in which the withdrawal occurred.

## WITHDRAWAL FOR PERSONAL REASONS

At any time during the year, a student may withdraw from Yale College for personal reasons. After consulting with the residential college dean, a student wishing to withdraw should write a letter of resignation to the college dean. In consulting with the college dean, a student planning to return to Yale should discuss the requirements for reinstatement. Also, students in academic good standing who fail to register in a term will be withdrawn for personal reasons.

Students whose withdrawal was for personal reasons must remain away for at least one fall term and one spring term, in either order, not including the term in which the withdrawal occurred. A student who withdraws from Yale College for personal reasons rather than face disciplinary charges that are pending against that student will not be eligible for Yale College reinstatement, re-enrollment, or a Yale College degree until the student's case has been adjudicated by the Yale College Executive Committee or the University-Wide Committee on Sexual Misconduct.

## REBATES OF UNDERGRADUATE CHARGES

For information on financial rebates on account of withdrawal from Yale College, consult the section "Financial Services" under "Regulations" in the Yale online publication *Undergraduate Regulations*.

# REINSTATEMENT

During the time that students who have withdrawn are away from Yale College, the Committee on Reinstatement expects them to have been constructively occupied and to have maintained a satisfactory standard of conduct.

Further requirements depend to some extent on the circumstances of the withdrawal and its duration. Students who are not in academic good standing, i.e., students who withdrew while a term was in progress or who were dismissed for academic reasons, must ordinarily complete the equivalent of at least two term courses, either in Yale Summer Session or at another college or university, earning grades of A or B. See section I, Academic Penalties and Restrictions. Courses conducted online, whether taken at Yale Summer Session or elsewhere, do not fulfill this reinstatement requirement. In general, such a record of course work is also required of students who withdrew for medical reasons and of any students who have been away from full-time academic work for more than four terms, whether or not they were in academic good standing at the time of their departure, in order to demonstrate that upon return they can satisfactorily complete their academic program. Courses themselves, as well as the institution at which they are taken, should be cleared in advance with the chair of the Committee on Reinstatement. All such course work must be completed no later than the opening of the term to which the student has applied to be reinstated, but no earlier than two years before the date that term begins. Courses completed in fulfillment of reinstatement that are eligible for graduation credit must be applied to the student's Yale College transcript.

While the majority of students who apply for reinstatement do return to Yale College, reinstatement is not guaranteed to any applicant. Since the committee seeks to reinstate only those students who have demonstrated the ability henceforth to remain in academic good standing and thus complete degree requirements within the specific number of terms of enrollment remaining to them, the committee may sometimes advise applicants to defer their return until a time later than the one originally proposed. At the conclusion of each of the two terms following their reinstatement, students are expected to complete and pass all of the courses in which they remained enrolled. Students who fail to meet this condition are ordinarily required to withdraw after their record has been reviewed by the Committee on Honors and Academic Standing.

A student is eligible to be reinstated only once; a second reinstatement may be considered only under unusual circumstances, ordinarily of a medical nature.

For reinstatement to a fall term, applications must be submitted in person or by mail by June 1. For reinstatement to a spring term, applications must be submitted in person or by mail by November 1. These deadlines are strictly enforced.

Frequently Asked Questions are available online to provide additional information about reinstatement procedures as well as contact information for the chair of the Committee on Reinstatement for reinstatement inquiries.

## FINANCIAL WAIVERS AND REINSTATEMENT

Students on financial aid who have successfully completed the course requirements for reinstatement *in the summer prior to reinstatement* will be forgiven their Student Income Contribution (SIC) for the subsequent summer. Students may apply for a waiver of the SIC through Yale's Student Financial Services.

Some students require, upon reinstatement in Yale College, a ninth term of enrollment in order to complete their bachelor's degree. Students who receive financial aid and find themselves in such a situation should consult with a counselor in Student Financial Services about possible Federal financial aid implications.

## REINSTATEMENT INTERVIEWS

Interviews with members of the Committee on Reinstatement are required of all applicants for reinstatement. The committee may not approve a student's return to Yale College until after the necessary interviews have taken place. These may include individual in-person meetings for any applicant with the chair of the committee and any other member of the committee, including a member of the Yale Health staff. Interviews are normally conducted prior to the beginning of the term to which the student is seeking reinstatement. While the expectation is that these meetings will take place in person, they may be conducted by video teleconference when circumstances warrant. Contact the chair of the Committee on Reinstatement with questions.

As an integral part of the application for reinstatement, students who withdrew for medical reasons must obtain a recommendation from Yale Health. Such a recommendation must come from either the director of Yale Health or the chief of the Mental Health and Counseling department, or from their official designees within the Health Center; no such recommendation can be made in the absence of documentation provided to Yale Health that the student has had successful treatment from an appropriate health clinician.

## U.S. MILITARY SERVICE REINSTATEMENT POLICY

Students who interrupt their studies to perform U.S. military service are subject to a separate U.S. military leave reinstatement policy.

In the event that a student withdraws or takes a leave of absence from Yale College on or after August 14, 2008, in order to serve in the U.S. military, the student will be entitled to guaranteed reinstatement under the following conditions:

1. Students must have served in the U.S. Armed Forces for a period of more than thirty consecutive days.

2. Students must give advance written or verbal notice of such service to their residential college dean. In providing the advance notice students do not need to indicate whether they intend to return. This advance notice need not come directly from the student, but, rather, can be made by an appropriate officer of the U.S. Armed Forces or official of the U.S. Department of Defense. Notice is not required if precluded by military necessity. In all cases, this requirement of giving notice can be fulfilled at the time the student seeks reinstatement, by submitting an attestation that the student performed the service.

3. Students must not be away from the University to perform U.S. military service for a period exceeding five years (this includes all previous absences to perform U.S. military service but does not include any initial period of obligated service). If a student's time away from the University to perform U.S. military service exceeds five years because the student is unable to obtain release orders through no fault of the student, or the student was ordered to or retained on active duty, such students should contact their residential college dean to determine if they remain eligible for guaranteed reinstatement.

4. Students must notify Yale within three years of the end of the U.S. military service of their intention to return. However, students who are hospitalized or recovering from an illness or injury incurred in or aggravated during the U.S. military service have up until two years after recovering from the illness or injury to notify Yale of their intent to return.

5. Students may not have received a dishonorable or bad conduct discharge or have been sentenced in a court-martial.

A student who meets all of these conditions will be reinstated for the following term unless the student requests, in writing, a later date of reinstatement. Any student who fails to meet one of these requirements may still be eligible for reinstatement under Yale's general reinstatement policy but is not guaranteed reinstatement. Upon returning to Yale, such students will resume their education without repeating completed course work for courses interrupted by U.S. military service. They will have the same enrolled status last held and will be in the same academic standing. For the first academic year in which such students return, they will be charged the tuition and fees that would have been assessed for the academic year in which they left the institution. Yale may charge up to the amount of tuition and fees that other students are assessed, however, if veterans' education benefits will cover the difference between the amounts currently charged other students and the amount charged for the academic year in which the student left. In the case of students who are not prepared to resume their studies with the same enrollment status and academic standing as when they left or who will not be able to complete the program of study, Yale will undertake reasonable efforts to help such students become prepared. If, after reasonable efforts, Yale determines that the student remains unprepared or will be unable to complete the program, or Yale determines that there are no reasonable efforts it can take, Yale may deny reinstatement.

**U.S. District Court, District of Connecticut**

**CIVIL ACTION no. 3:20-cv-00133-JCH**

# Exhibit 5

Attached to Plaintiff's Motion for Preliminary Injunction

Dated: February 23, 2020

Description:

Yale College Disciplinary Committee
Semester Reports, Policies and Procedures, Review Committee Info

# Yale College Undergraduate Regulations 2019–2020

## The Disciplinary Procedures of the Executive Committee of Yale College

The Yale College Executive Committee is responsible for the fair, consistent, and uniform enforcement of the Undergraduate Regulations, the disciplinary rules governing students in Yale College. It receives reports of alleged infractions of those regulations whether academic or nonacademic. Its jurisdiction also includes other actions on the part of undergraduates that may in the judgment of the committee warrant disciplinary action because these actions may imperil the integrity and values of the academic community or the safety of its members. The Executive Committee may assign penalties as provided in the Undergraduate Regulations, though in some cases authority is delegated to other University officials such as the heads of the residential colleges, the University Librarian, the directors of the Yale computer facilities, and the Executive Director of Yale Dining, who may summarily impose certain penalties for violations of dormitory, library, computer facility, and dining services regulations. Violations of sexual misconduct policies are addressed by the University-Wide Committee on Sexual Misconduct (UWC), which has authority to recommend penalties to the dean of Yale College.

As an institution, the Executive Committee is responsible to the Yale College Faculty and ultimately to the University. The committee is charged with protecting the Yale College community so as to ensure the integrity of academic instruction, the physical security of students, and the preservation of the property and educational resources of the University. The committee is bound at all times to consider the manner in which its actions and decisions may affect the persons and groups—faculty, student body, administration, and staff—whose activities carry and foster the intellectual and residential life of Yale College.

## A. COMPOSITION OF THE EXECUTIVE COMMITTEE

1. The Executive Committee of Yale College is appointed by the dean of Yale College. The committee shall have twenty regular voting members: eight members of the Yale College faculty and twelve undergraduate students. At least four of the eight faculty members should be tenured. Should an occasion arise when, as a result of the conflict-of-interest provisions of these procedures or other unavailability of members, a quorum cannot be gathered from regular voting members, the dean of Yale College shall appoint a member or members from the faculty and undergraduate student body ad hoc to participate in the business then before the committee.

2. In addition to the regular voting members there shall be three officers of the Executive Committee who are also members: chair, vice-chair, and secretary. They shall be appointed annually by the dean of Yale College and shall be charged with particular responsibilities.

    a. The chair shall be either a tenured member of the Yale College Faculty or an associate dean of Yale College. The chair shall coordinate all activities of the committee, shall preside at meetings or designate the vice-chair to preside, shall organize the conduct of meetings or designate the vice-chair to do so. The chair shall be the person who communicates on behalf of the Executive Committee to the Yale College Faculty. In hearings, the chair or vice chair, whichever of the two is presiding, shall vote as a regular voting member.

b. The vice-chair shall be either a tenured member of the Yale College Faculty or an associate dean of Yale College. The vice-chair will assist the chair in the coordination of committee activities and will preside at meetings when designated by the chair.

c. The secretary shall normally be an assistant or associate dean of Yale College. This person shall assist the chair in the daily details of committee business, keep the records relating to committee business, handle official correspondence on behalf of the committee, and help ensure that all required procedural steps have been taken by the committee. The secretary shall attend all hearings and shall vote only to break a tie.

d. The chair, vice-chair, and secretary shall constitute the Coordinating Group of the Executive Committee. The Coordinating Group shall prepare and organize all matters coming before the Executive Committee.

3. In evaluating allegations of misconduct, the Executive Committee may request the assistance of an adviser who has knowledge of a particular subject matter or issue in question, and a factfinder, who is responsible for gathering any relevant facts. Advisers and factfinders will produce a written report to the committee, detailing the results of any investigation or analysis and any opinions reached. The report will be provided to the voting members and responding student(s) prior to any hearing. When practical, advisers and factfinders will attend the hearing and be available to answer questions regarding the report and any opinions presented.

a. An adviser is a member of the Yale College Faculty who assists the work of the Executive Committee as an expert in a particular academic field. Advisers may be appointed either annually or ad hoc by the dean of Yale College.

b. In complex cases – usually involving multiple parties – the chair or secretary may request the dean of Yale College to appoint a factfinder to conduct an investigation of the incident(s). The factfinder may be a member of the Yale College Faculty, a staff member, or an investigator engaged by the university for the purpose of conducting the investigation.

4. Each student conduct hearing will be conducted by a panel drawn from the membership of the Executive Committee. A hearing panel shall have seven members: the chair (or vice-chair), the secretary (or designate), two faculty voting members, and three student voting members. The presence of five of these members shall constitute a quorum, provided that at least two student members, the chair, and the secretary are present. A majority vote shall decide questions before the hearing panel.

5. There shall be a Committee of Review which in circumstances described below (See section C.7) may review decisions of the Executive Committee.

# B. SUBMISSION OF MATTERS TO THE EXECUTIVE COMMITTEE

Concerns regarding undergraduate student conduct that may violate the *Undergraduate Regulations*, academic or nonacademic, shall initially be referred to the secretary of the Executive Committee or to the chair. A report should be made in writing and should detail the conduct in question and provide all available and relevant evidence.

1. Reports of possible Academic Offenses

a. A member of the faculty finding evidence of academic dishonesty on a class assignment or examination will bring the matter to the secretary of the Executive Committee. The faculty member must provide a written statement explaining, in detail, the reason for concern about the integrity of the examination or assignment. The faculty member will also be expected to provide copies of the student work that allegedly violates the regulations, copies of the relevant

examination or assignment prompt, and any apparent source materials or other relevant evidence. The secretary will keep the faculty member apprised of major developments in the case and may ask the faculty member to respond to student statements or other issues that may arise.

b. If a student becomes aware of an instance of possible academic dishonesty, they should report the matter to the instructor. If this procedure is not feasible, the student may report the matter to the chair of the department or their residential college dean. The department chair or residential college dean will then inform the instructor about the report (without identifying the reporting student) and seek the instructor's input on the matter.

2. Reports of possible Nonacademic Offenses

a. Any member of the faculty, residential college head, residential college dean, or member of the University administration or staff may bring an alleged infraction to the attention of the secretary of the Executive Committee.

b. An undergraduate student may bring a report of a nonacademic infraction to the attention of the secretary only in conjunction with their residential college head, residential college dean, a member of the Yale College Dean's Office, a member of the President's Committee on Racial and Ethnic Harassment, or the Yale Police Department.

c. In addition, the Coordinating Group shall review reports of student misconduct lodged by the Yale Police Department. The Coordinating Group shall take note of conduct in the reports that may be in violation of the *Undergraduate Regulations* and appears to warrant action by the Executive Committee and shall refer the student(s) for action under section 3 immediately below.

3. Initial Disposition and Referral of Reports. Each week the Coordinating Group shall review all reports received by the secretary and shall make one of the following judgments in regard to each report:

a. Reports for which sufficient information is available and which, if substantiated, would constitute a violation of the *Undergraduate Regulations* shall be submitted to the Executive Committee, unless withdrawn as provided below in section E.2.

b. If there is a need to locate documents, inquire further into matters of fact, or pursue additional information before an informed decision may be made by the Coordinating Group, the secretary shall make preliminary inquiries. When deemed necessary, the chair or secretary shall request that a factfinder be appointed to conduct an investigation. In cases of alleged academic offenses, it remains the responsibility of the faculty member to furnish copies of any relevant source materials.

c. If, after an investigation or at any time during the disciplinary process, the Coordinating Group determines that there is insufficient information to reach a conclusion or that the act does not amount to a violation of the Undergraduate Regulations, the Coordinating Group will close the matter.

d. Reports that should have been directed to an administrative official, such as infractions of housing, library, or dining services regulations, shall be referred to the proper authority.

e. Reports that appear to involve sexual misconduct shall be referred to the secretary of the University-Wide Committee on Sexual Misconduct (UWC). In complex cases that combine allegations of sexual misconduct and other offenses, the chair of the Executive Committee and the chair of the UWC shall consult pursuant to the provisions of the procedures of the UWC.

f. See section E for reports concerning alleged acts of violence or physical force, harassment, intimidation, or coercion.

# C. PROCEDURES FOR CONSIDERATION OF A MATTER BY THE EXECUTIVE COMMITTEE

1. Notification of the Student. If the Coordinating Group decides that a report is to be referred to the Executive Committee for a hearing, the secretary shall, in writing, notify the student or students of this fact and specify the regulation that has been allegedly violated. The notification shall include a copy of the report that provides the basis for the allegation of misconduct. The secretary will also provide to the student a list of the membership of the Executive Committee and a copy of these procedures, including the summary for students appearing before a hearing panel of the committee. (See section J.) The secretary shall simultaneously inform the relevant residential college head(s) and residential college dean(s) of the allegation. The student and their residential college dean should review information relevant to the proceedings. The chair or secretary can familiarize the student and the student's adviser with practical as well as procedural aspects of the hearing process, so that the student can be as well prepared and comfortable as possible in meeting with the hearing panel.

2. The Adviser to the Student. The student may choose an adviser. The adviser is not an advocate, but rather a source of personal and moral support to the student. The adviser should aid the student in preparing to appear before the Executive Committee. The adviser should also accompany the student to the committee meeting and counsel him or her. During the meeting the adviser may unobtrusively suggest questions or issues for the student to raise with the committee. The adviser may not participate directly in the proceedings except for making a brief concluding statement if the student so desires.

   a. The student's residential college dean will ordinarily serve as their adviser. The student may select an alternative adviser in situations where the college dean is unavailable, or the student feels another adviser would be more appropriate. That adviser may be the residential college head, another residential college dean, a college adviser, a Yale College faculty member, a Yale College administrator, a coach, or any other faculty or staff member of the University who is not a member of the Executive Committee or the Office of the University General Counsel. Should a student find themselves unable to identify an appropriate adviser, the secretary of the Executive Committee shall assist the student and provide recommendations.

   b. In the case of an allegation of physical assault or other possible infractions, a residential college head or dean shall not serve as adviser to a student in his or her college in a case involving a report made by another student in the same college.

   c. The student shall notify the secretary of the Executive Committee as soon as they have chosen an adviser.

   d. When a report involves alleged offenses against persons and/or property, the student may choose an attorney as a second adviser. The legal adviser may counsel the student but may not address the hearing panel or otherwise participate directly in the proceeding.

   e. On all occasions when a student has requested the presence of an attorney in the meeting with the Executive Committee, the chair will as a matter of course request the presence of the University General Counsel or a representative of that office.

3. Student Statement. Students may respond in writing to the allegation. This statement allows the student to provide their perspective on events and any broader context or other information that will help the Coordinating Group and the committee to better understand the situation. Written statements will ordinarily be due to the secretary no more than 3 business days after the student receives notification. Upon receiving the student statement, the Coordinating Group may: 1) refer the matter directly on to the hearing panel, 2) postpone the hearing to allow for additional factfinding, or 3) close the matter in light of new information presented.

4. Consideration of the matter by a hearing panel of the Committee. Unless the report is withdrawn (as provided in section E.2), all reports referred by the Coordinating Group will be reviewed by a hearing panel of the Executive Committee.

5. Hearing Preparation:

a. The secretary will provide the student with copies of any additional materials, beyond the original notification, that will be considered by the committee. These might include: a factfinding report, witness statements, audio or video recordings, physical evidence, or additional documentation. These materials should be made available to the student no less than three business days prior to the hearing, except when the student requests that less time be allowed in order to schedule an earlier hearing. The same materials will be made available to the adviser.

b. The Coordinating Group may arrange for the appearance of witnesses. If it does so, their names shall be made available to the student no less than two business days before the meeting. The student may also request to invite a reasonable number of witnesses to the hearing. The student must provide the name and relevance of any proposed witness to the secretary no less than two business days before the meeting. The invitation of any witness will be made at the discretion of the Coordinating Group.

c. If it is a matter of academic dishonesty, the reporting faculty member may request from the chair permission to make a brief explanatory statement to the committee in the presence of the student.

d. Inspection of Records. The documents relating to the report, including the initial report, any report of the factfinder, the statement by the student, and any other materials deemed relevant by the Coordinating Group, shall be made available to the committee for inspection in the Yale College Dean's Office or by secure electronic distribution normally no less than twenty-four hours before the time of the meeting. These documents are confidential.

e. Excuse for Conflicts of Interest. The chair or secretary shall ascertain whether any members should be excused because of a conflict of interest (in accordance with section H.)

6. Procedures during the Student's Meeting with the hearing panel of the Committee.

a. The purpose of the meeting between the student and the committee is to vent fully all sides of the issue or issues raised in the report.

b. Students are expected to tell the truth in all their dealings with the Executive Committee. The members of the Executive Committee will give such credence and weight to the student's statements as they believe appropriate.

c. Every student shall be put on notice that lying to a factfinder or to the Executive Committee may be taken into account in fixing the penalty and could serve as the basis for an additional violation as provided in the *Undergraduate Regulations* (See Offenses, section I, "Misconduct at a formal hearing.").

d. When a hearing panel meets with the student, the chair (or vice-chair) shall explain the substance of the matter and the specific undergraduate regulation allegedly violated or the other alleged action that in the committee's judgment may warrant disciplinary action.

e. The student may make a statement of reasonable length to the hearing panel.

f. If a factfinder has conducted a review, the student or members of the committee may request the factfinder to explain his or her report.

g. When invited to a hearing, witnesses or the reporting person will address the hearing panel and answer questions.

h. The student may answer questions asked by the panel members.

i. With the student's permission, their adviser may speak briefly on their behalf.

j. The student may make a closing statement of reasonable length to the hearing panel.

k. Deliberative Session of the hearing panel. Upon completion of the discussion of the matter, the student, the factfinder or the adviser (if there is one), and all other persons except the chair (or

vice-chair), the secretary, and the regular voting members of the hearing panel shall withdraw. The panel shall then address the question of whether the student has violated the *Undergraduate Regulations*, and shall give an affirmative answer if it is satisfied that a violation has been shown by a clear preponderance of the evidence.

After a full consideration, the committee shall reach its decision, through a secret ballot, by majority vote. Should the initial ballot result in a tie, a second ballot shall be taken after further discussion. Should the result again be a tie, the secretary shall cast the deciding vote. The actual vote shall not be indicated to the student and shall remain a part of the confidential record.

The chair shall inform the student and their adviser of the outcome immediately after a decision is reached.

Should the meeting of the committee to consider the matter extend beyond a reasonable hour, the chair may postpone the remainder of the meeting. The chair should reconvene the meeting in person or by other means as soon as possible. If the meeting is so adjourned, the same committee members must participate in the reconvened meeting at which the hearing or deliberations shall be resumed or the penalty assigned.

l. Assignment of a Penalty. The Yale College Faculty believes it is proper for the Executive Committee to view a particular infraction of the Undergraduate Regulations in the context of the total personal and academic record of the student involved.

   i. When a hearing panel of the Executive Committee proceeds to consider assigning a penalty, it shall invite the student and the adviser to return to the room. The secretary will inform the panel of any previous infractions of the *Undergraduate Regulations* on the part of the student. The hearing panel shall permit the student and his or her adviser to present a statement of reasonable length relevant to the determination of the penalty.

   ii. After the student and the adviser have again withdrawn, the secretary will inform the panel about the nature of previous penalties assessed for similar offenses. The panel will discuss what penalty it should impose. If the panel has found that the student purposely misled the committee during its deliberations, the panel may consider that factor as grounds for imposing a more severe penalty. The chair will propose a penalty upon which the voting members of the panel will vote by secret ballot. The chair (or vice-chair) votes with the panel. If the vote is a tie, there shall be further discussion and a second vote. If a second consecutive vote results in a tie, the secretary shall vote to break the tie.

   iii. Should a panel under extraordinary circumstances propose a penalty other than one of those specifically listed in the *Undergraduate Regulations* (e.g., some form of work service or repair of damaged property), the chair shall first ascertain that the persons upon whom would rest responsibility for overseeing enforcement of the penalty are willing to accept that responsibility.

   iv. The penalty of suspension must apply to periods when Yale College is in regular session. Students who are suspended must vacate the college and return keys and Yale identification to the residential college dean's office within the time period specified by the hearing panel of the Executive Committee. In no case may that period be greater than 72 hours after the imposition of the penalty. A suspended student may not return to campus during the period of suspension for any reason unless they receive express written permission in advance from their residential college dean or head, or the dean of student affairs.

   v. When the hearing panel has reached its decision about the penalty, the chair shall inform the student and the adviser of the committee's decision.

   vi. The secretary shall inform the relevant residential college head(s) and dean(s) of the committee's decision. The secretary shall also inform the residential college dean of the exact

manner in which the infraction is to be indicated in the record and recommendations for the student. This communication should ordinarily take place in writing within two weeks of the disposition of the matter. Copies of those letters shall form part of the permanent record of the Executive Committee.

vii. The secretary shall also send written notice of the decisions of the committee to the reporting person and/or the person who is the alleged victim of any crime of violence. (See section E below.)

viii. The secretary may disclose to other universities and schools information concerning disciplinary action taken against a student for conduct that posed a significant risk to the safety or well-being of that student, other students, or the University community.

7. Appeals to the Committee of Review. Decisions of the Executive Committee are final and take immediate effect, notwithstanding whether the student is applying to the Committee of Review for reconsideration of a decision as provided herein. Decisions may be reopened by the Executive Committee itself only when substantial new evidence that may exonerate the student becomes available. The Executive Committee may also be requested by the Committee of Review to reconsider a decision; see below.

a. There shall be a Committee of Review, which may review and, when appropriate, request reconsideration of the decisions of the Executive Committee. The Committee of Review will be composed of three persons, two of them members of the Yale College Faculty, appointed by the president for a term of five years, one of whom shall be designated by the president as chair of the committee. Each year, the faculty members of the Committee of Review, in consultation with the Yale College Council, will select a student member to serve on the committee.

b. The Committee of Review will receive written appeals from (1) a student or students who have been assigned a penalty by the Executive Committee or the Coordinating Group (2) the dean of Yale College, where either the student(s) or the dean believes that a decision of the Executive Committee or the Coordinating Group, in matters of fact or the assignment of penalties, is inconsistent with precedent or otherwise in error. An appeal must be received by the Committee of Review no later than five business days after the decision of the Executive Committee. In order to review such appeals, the Committee of Review will have access to all the written records of the Executive Committee.

c. In response to an appeal, the Committee of Review will have the right (1) to decline to take action; (2) to request in writing a reconsideration by the Executive Committee; (3) to publish commentary on the case which, while maintaining the confidentiality of the Executive Committee hearings, seeks to clarify the principles involved in the case and to offer useful counsel for future decisions.

d. It is anticipated that in the vast majority of cases, the Committee of Review will decline to take action. It will request reconsideration by the Executive Committee only in cases where it believes that (1) some pertinent evidence was not taken into account; (2) long-standing precedents, in decisions of culpability and the assignment of penalties, were ignored; (3) errors in procedure may have substantially affected the decision; (4) certain key principles of the University were not sufficiently considered in the original decision.

e. The Coordinating Group will have the authority, on behalf of the Executive Committee, to grant or deny a request for reconsideration. In the case where the Coordinating Group has granted the request to reconsider, the chair of the Executive Committee and the Committee of Review will discuss appropriate procedures for the Executive Committee's reconsideration. At a meeting for reconsideration of a case by the Executive Committee, the chair of the Committee of Review will appear before the Executive Committee or the Coordinating Group in order to make clear what motivated the call for reconsideration. The Executive Committee or the Coordinating Group will be free either to alter or to confirm its original decision. It may not, however, make a finding of

culpability where it had previously exonerated a student, or assign a penalty more serious than that assigned originally.

8. Timing on Disposition of Matters. The process of factfinding, Coordinating Group consideration, and Executive Committee action should normally be completed by the end of the academic semester after the semester in which a report has been submitted ("Academic semester" for this purpose means a semester in which the student is registered and in residence at Yale).

   Matters involving an administrative suspension shall be governed by the time limits provided for that procedure. (See section D.3.)

   A student who withdraws from Yale College for personal reasons rather than face disciplinary charges that are pending against that student will not be eligible for Yale College reinstatement, re-enrollment or a Yale College degree, and a notation to this effect will be entered on the transcript. A student in such a situation must go through the disciplinary proceeding in order to be eligible for reinstatement. If a disciplinary case brought against a graduating senior is pending at the time of graduation, the Coordinating Group will recommend to the dean of Yale College that the student's degree be withheld until the case is resolved.

# D. MATTERS BEFORE THE EXECUTIVE COMMITTEE RESPECTING CASES BEFORE THE COURTS

When a report alleging an infraction of the *Undergraduate Regulations* relates to a case that either will be or is in process of adjudication by the courts, the Executive Committee may address the matter by one of the following procedures:

1. If in the judgment of the Coordinating Group sufficient information is available to consider the matter, the committee may consider it in the normal manner.

2. The Coordinating Group may decide to defer consideration of the matter until after the case has been adjudicated by the courts. When the Coordinating Group so defers consideration, it shall decide either to permit the student to continue in regular enrollment and residence in his or her residential college or to permit the student to enroll in classes but not to live in the residential college. Before the Coordinating Group makes this decision, the chair shall request the written opinion of the student's residential college head. The student may also present a written statement in regard to his or her ongoing residence in the residential college.

3. The student may request in writing that the Executive Committee defer its consideration of the matter and that they receive an administrative suspension. This provision is intended for use by the Executive Committee very rarely and only in situations in which the criminal charges are very serious and in which action by the Executive Committee might irreparably prejudice the student's cause before the courts.

An administrative suspension suspends the student from Yale College in the same manner as any suspension by the Executive Committee; however, the administrative suspension is without prejudice to the review of the allegation against the student. In effect, an administrative suspension means that the student facing a criminal hearing voluntarily withdraws from enrollment and residence in Yale College with the understanding that they may re-enroll, through the normal procedures for reinstatement or readmission, only after the standing matter has been considered in the normal manner by the Executive Committee. The decision to provide an administrative suspension resides solely in the authority of the Executive Committee; even when a student requests an administrative suspension, the committee may decide to consider the matter immediately.

The administrative suspension may remain in effect for no longer than one year, at the end of which time it must be reviewed by the Executive Committee. The student may then request in writing an extension of the administrative suspension for another period not to exceed one year. However, an extension of an administrative suspension normally does not remain in effect longer than one month past the date on which the matter has been adjudicated by the courts or settled otherwise, or normally longer than two weeks beyond the opening of the academic term if determination by the courts has occurred when the College is not in session.

When the matter comes for consideration by the Executive Committee after the period of administrative suspension, the committee will consider the matter in the normal manner and without prejudice.

A decision favorable to the student in the courts will not necessarily exonerate him or her from having committed the alleged infraction of the Undergraduate Regulations.

# E. PROCEDURES FOR ALLEGED ACTS OF VIOLENCE OR PHYSICAL FORCE, HARASSMENT, INTIMIDATION, OR COERCION

1. In any report involving alleged acts of violence or physical force, harassment, intimidation, or coercion (see Offenses, section C and section E), the procedures for the disposition before the committee (see Procedures, section C) are amended in the following ways:

   a. The person against whom one of the acts described above was allegedly committed (referred to here as the "reporting person," whether or not they actually made the report) shall receive copies of all documents submitted relating to the matter, including the initial report, any report of the factfinder, the statement by the responding student, and any other materials deemed relevant by the Coordinating Group, no less than five business days before the hearing. All documents are strictly confidential and may not be shared or disclosed except with the reporting person's adviser or legal adviser, if any. All physical documents must be returned to the secretary of the Executive Committee and all electronic documents must be permanently deleted once the process has ended.

   b. If the reporting person appears as a witness before the committee, they may choose to be accompanied for moral support by an adult member of the Yale community who will not participate directly in the proceedings. The reporting person may also be accompanied by a legal adviser who similarly may not participate directly in the proceeding. At the request of either the reporting person or the responding student, the testimony of the reporting person may be given out of the presence of the responding student. The responding student's adviser (and legal adviser, if permitted pursuant to section C.2.), however, may be present in the hearing room during the testimony. In addition, the committee will arrange for the responding student to hear the testimony through audio transmission to a private room.

2. In any report involving acts of violence or physical force, harassment, intimidation, or coercion (see General Conduct and Discipline, Offenses, section C and section E), the reporting person may, at any time before the day scheduled for the Executive Committee's hearing, request in writing that the Coordinating Group dismiss the matter. The Coordinating Group will consider the request, and may inquire into the circumstances (including as appropriate consulting with the reporting person's adviser or residential college dean) to determine whether the matter has been resolved fairly and to the satisfaction of the parties, whether the reporting person's request is fully voluntary, whether the interests of the Yale community would be better served by hearing the case, and other relevant matters. The Coordinating Group will then decide to grant or deny the request, in its sole discretion. The decision of the Coordinating Group on the request will be final.

3. It shall be the duty of the chair to explain to all parties involved in a case of alleged harassment on the basis of sex, sexual orientation, gender identity or expression, race, color, religion, age, disability, status as a protected veteran, or national or ethnic origin that the Executive Committee disposition of the matter does not constitute the equivalent of action or redress at law. The chair shall also explain that the extent of the jurisdiction of the Yale College Executive Committee is limited to the enforcement of the *Undergraduate Regulations* by means of the penalties provided therein.

4. Should the allegation of harassment, intimidation, coercion, or assault be simultaneously pursued in the courts, the procedures in <u>section D</u> regulating such situations shall be in effect

# F. REPORTS OF GENDER DISCRIMINATION OTHER THAN SEXUAL MISCONDUCT

In proceedings involving allegations of gender discrimination by students other than sexual misconduct, the provisions of <u>section E</u> and the following provisions shall apply:

1. The reporting student shall have the same option as the responding student to bring an appeal to the Committee of Review as provided in <u>section C.7</u>.

2. Written notice of the outcome of the proceeding must be provided to the reporting student.

# G. CONFIDENTIALITY IN EXECUTIVE COMMITTEE MATTERS

The Executive Committee and all members of the Yale community who are involved in a matter before the Executive Committee are expected to maintain the confidentiality of its proceedings and any information circulated in regard to those proceedings.

All documents, and other materials, prepared by, prepared for, or received from the Executive Committee in connection with an Executive Committee proceeding must be held in strict confidence. Students may not disclose Executive Committee Materials to anyone other than their advisers in the Executive Committee proceeding, their residential college dean, family members, and attorneys. Students must inform these recipients that Executive Committee materials and documents are strictly confidential and may not be further disclosed.

Disciplinary action may be taken against a student who discloses any Executive Committee documents or materials in violation of these procedures, or who is responsible for the improper disclosure of such documents or materials by others. In addition, whether or not an Executive Committee document has been disclosed, disciplinary action may be taken against a student who breaches confidentiality in order to retaliate against a person for their participation in an Executive Committee proceeding.

# H. CONFLICT OF INTEREST

Members of the Executive Committee should be alert to potential conflicts of interest between themselves and the persons bringing matters to the committee or the student against whom a matter has been brought.

1. Committee members having past or present ties of kinship, marriage, or other very close personal relationship to any of the parties involved in the matter should notify the chair that a conflict of interest exists and should be automatically excused from participation. The nature of the relationship need not be disclosed to the chair.

2. Committee members having some form of close professional relationship to one or more of the parties involved in the matter (e.g., collaboration or cooperation in research, writing, or teaching with a

colleague or service as an ongoing academic adviser or instructor to the student in a very small class) should notify the chair that a potential conflict of interest exists and may request to be excused from participation.

3. A committee member should inform the chair that they are in some manner involved in the specific details of the matter and may request to be excused from participation.

4. A member of the committee should inform the chair that the nature of the matter creates an occasion for a conflict of interest and may request to be excused from participation.

5. The student against whom a matter has been brought may request that a committee member be excused because of a proven conflict of interest as provided in the foregoing provisions.

6. Should one of the members of the Coordinating Group be excused for a conflict of interest, a faculty member of the committee shall carry out the responsibilities of that member of the Coordinating Group in regard to the matter under consideration.

7. All issues relating to conflict of interest should be raised and settled before the committee begins consideration of the matter. Questions relating to conflict of interest may not be raised after the committee has reached decisions, nor may they be grounds for reconsideration of committee decisions.

8. The foregoing provisions are intended not to be inclusive of all possible situations of conflict of interest, but rather to provide guidance. It is the intention of these provisions to enable the committee to avoid both the appearance and the reality of conflict of interest, so that the community will have confidence in the fairness of the proceedings. In case of doubt, the chair and committee members should assume that a potential conflict of interest exists.

# I. RECORDS OF THE EXECUTIVE COMMITTEE

The records of the Executive Committee are of four types. The first three (described in sections I.1-3.) are unavailable to the public unless subpoenaed by the court or other government agency and should be stored securely by the Yale College Dean's Office. The fourth type of record (described in section I.4.) will be published twice per year and made available to students and other members of the Yale community. The Committee of Review will have access to all records of the Executive Committee.

1. The secretary shall maintain a record of all matters acted on by the Executive Committee. This record shall include the original written report, any forms or statements signed or submitted by the student and all materials submitted to the committee prior to the hearing, including the report of the factfinder or adviser, should there be one.

2. The secretary shall keep a record of minutes from each meeting of the Executive Committee. These need not be a verbatim transcript, but they should reflect a record of the statements of witnesses and substance of the discussions and decisions of the committee. Minutes shall not be kept of the private committee discussion prior to reaching a decision by vote on the substance of the allegation or the assessment of the penalty. A written record shall be kept of those committee members in attendance; the decision of the majority in determining whether a violation has occurred, including the penalty assessed if any; the witnesses appearing before the committee; and any written materials submitted to the committee.

3. The secretary shall keep a careful, ongoing written record of the alleged violations sustained by the Executive Committee and the particular penalties assigned. The purpose of this record shall be to aid the committee in equitably addressing reports of a similar character.

4. The secretary shall prepare a brief narrative of each decision of the Executive Committee, describing the alleged act(s), the alleged violation, the committee's finding, the mitigating or exacerbating circumstances, and the penalty, if any. The report should be written so as not to reveal, directly or indirectly, the identities of the individuals involved in the case. Because the reports are summaries,

they do not contain all the relevant considerations in every case. For that reason, students should rely on them only for general guidance, not as binding precedent.

# J. SUMMARY OF KEY PROVISIONS FOR STUDENTS INVOLVED IN EXECUTIVE COMMITTEE PROCEEDINGS

The following summary should be given to all students being informed that a report has been made against them. Students in Yale College requested to meet with the Executive Committee in regard to a report of their having violated one or more of the *Undergraduate Regulations*, or in regard to other actions that in the committee's judgment may warrant disciplinary action, should be aware of the following:

1. The student shall receive written notification of the report and of the specific alleged infraction of the *Undergraduate Regulations*. (See section C.1.)

2. The student will be given a statement of the procedures, including the conflict-of-interest provisions and a list of the members of the Executive Committee. (See section H.)

3. The student may choose an adult adviser from the Yale community as provided in the procedures. If the matter involves an offense against persons and/or property, the student may also bring an attorney to the meeting of the Executive Committee as provided in the procedures. (See section C.2.)

4. Normally five business days must elapse between notification of the student and the meeting of the committee at which the matter is to be considered, but upon written request of the student a briefer interval may suffice.

5. The student may request the secretary to make reasonable efforts to locate particular documents or to gather relevant information.

   Throughout the investigation of the matter, the student may choose to remain silent. The student should, however, understand that by doing so they forfeit the opportunity to ensure that the Executive Committee obtains all the relevant information. Every student should understand that lying to the factfinder or to the Executive Committee will be taken into account in fixing penalties and may constitute a separate violation of the regulations. (See section C.6.c. and section C.6.l.ii.)

6. The student may see all written materials to be submitted to the committee, including the report of the factfinder, no less than three business days before the meeting. The student shall also be furnished with a list of all persons who have been requested to be witnesses at the meeting no less than two business days before the meeting. (See section C.5.a.and section C.5.b.)

7. The student may request witnesses be contacted on their behalf. (See section C.5.b.)

8. During the meeting of the committee the student may choose to remain silent. The committee is not to draw a negative inference from the student's silence, but the student should understand that by doing so they forfeit an opportunity to present orally their side of the matter. The student should also understand that the committee will base its decision on the information presented to it, and that while the members of the Executive Committee expect that students will tell them the truth, they will give such credence and weight to the student's statements as they believe appropriate. (See section C.6.b.)

9. The student shall have the option of making a statement of reasonable length relevant to the determination of the penalty prior to the penalty phase of the committee's meeting. (See section C.6.l.)

10. In the circumstances outlined in section D of the procedures the student may request an administrative suspension, but the granting of such a suspension is entirely at the discretion of the committee. (See section D.3.)

11. If, subsequently, substantial new information of an exonerating nature becomes available, the student may request a reconsideration of the matter. The student may appeal to the Committee of Review no

later than five business days after the decision of the Executive Committee only when they believe that it can be demonstrated that (1) pertinent evidence has not been taken into account in the Executive Committee's decision; (2) long-standing precedents, in decisions of culpability and the assignment of penalties, have been ignored; (3) errors in procedure may have substantially affected the decision; (4) certain key principles of the University have not been sufficiently considered. (See <u>section C.7</u>.)

12. The student should understand that the records of the Executive Committee may be subject to subpoena by the courts, but that in the absence of a court order or government inquiry the records of the committee will not be publicly disclosed (except as provided in <u>section I</u>).

**Executive Committee Chair's Report**
for hearing cycle Spring 2017
Presented to the faculty on November 2, 2017

**Explanation of Structure and Process**
The Yale College Executive Committee has 10 regular voting members: three tenured and three untenured faculty members; three undergraduate students; and the Dean of Yale College or his designee. In addition, there are three officers. In Spring 2017 these were: chair, Paul North, Professor of German; fact-finder, Fabian Drixler, Professor of History; and Jill Cutler who took over as secretary from Pamela George in March 2017.

The majority of cases are adjudicated by a coordinating group made up of the chair, secretary, fact-finder, and one student member. The coordinating group meets weekly to hear the cases in which a student or students have admitted the validity of the charge against them.

In a typical case, a complaint comes to the secretary of the committee from a faculty member, dean, or another member of university staff. The coordinating group reviews the complaint and decides whether to charge the student under one or more sections of the undergraduate regulations. If a charge is made, the student, along with their dean or advisors, receives a charging letter explaining the charge and asking whether they admit validity or wish to dispute the charge. Disputing the charge leads to a full hearing. To give a sense of the ratio, in Spring 2017 there were 19 dispositions without formal hearings and 1 full hearing.

Dispositions without a formal hearing give students and their advisors every chance to tell their side of the story to the coordinating group. By the undergraduate regulations, prior to the hearing, the students receive all the materials for the case, including details of the complaint against them, any police report, supplemental testimony, or email correspondence should there be any. The student then writes a statement in response, explaining what happened, their motives, the context, their state of mind and thought process, and anything else they think might help the committee understand their actions. All this becomes matter for questioning during the hearing. After reading prepared remarks reminding students of the guidelines and of their obligation to be honest, the Chair invites the student or students to make an opening statement that may reiterate what was in their statement or add something new that is of importance. The committee then asks questions. The tenor of the questions depends very much on the type of case. Since the majority of cases involve charges of academic dishonesty, Coordinating Group members usually ask the student to reconstruct the events leading up to the incident, to recall the guidelines for assignments listed in the syllabus, to explain their psychological state, and so on. State of mind, it should be said, is not a mitigating factor, but it can help give a fuller picture of the kind of dishonesty—whether it was a one-time lapse or perhaps a more routine habit. In the question period, the committee tries to get as full a picture as possible. Once members are satisfied that they have a full enough picture, the student's advisor has a chance to speak on the student's behalf. Finally, the student is allowed another chance to speak, to give a closing statement. Then deliberations begin.

1

There are three goals in the deliberation phase of the coordinating group hearings: 1. to determine an appropriate penalty in accordance with the undergraduate regulations and with precedent, 2. to see to it that harm done to the university community is mitigated, and 3. to help the students learn something about themselves and envision ways to avoid this kind of behavior in the future. Sometimes, in addition to one of the standard penalties (reprimand, probation, suspension, expulsion), the committee asks a student to write a letter of apology to parties involved, write a short text on the university value they imperiled with their actions, or meet regularly with a dean or tutor to work on better ways of going through college. When there has been damage to property, students are often required to repay the losses. Sometimes, also, Students are required to make amends in other ways as well, such as stepping down from a leadership position in a campus group, restrictions on social events, or for leaders of a campus group, a requirement to draft a safety plan.

In Spring 2017, there were 19 dispositions without formal hearings, involving a total of 23 charged students.

Hearings before the full Executive Committee operate in a very similar manner to those before the coordinating group. These hearings are for students who contest the charges made against them. There are a few differences in procedure. For full hearings, the fact-finder investigates. Normally, they interview the student charged, witnesses if necessary, and the complainant. They also review all the written materials, so that they can produce in the end a report laying out the evidence for and against the student. The fact-finder is specifically enjoined in the regulations to be on the lookout for evidence that might exculpate the student. All the procedures are the same in this type of hearing, except that there are two phases, a judgment phase and a penalty phase. In the judgment phase, after hearing the student's statement, a period of questioning, hearing from the student's advisor, and a closing statement by the student, should the student wish to make one, the full committee may decide to withdraw charges or, conversely, to find the student responsible for the act. If the student is found responsible, the committee then deliberates on a penalty and chooses one of the following: reprimand, probation, suspension, or expulsion.

In Spring 2017, there was 1 formal hearings involving 1 charged student.

There are very few standard penalties listed in the undergraduate regulations. And although there are many years of precedents to guide the choice of penalty, judgments made by the coordinating group and the full committee are always responsive to the details of a particular case. Plagiarism may be as serious and extensive as copying an entire paper from a classmate, or as unreflective as failing to cite sources fully. Vandalism may be the result of a moment of foolishness or a pattern of alcohol abuse. It is to the great credit of committee members that they are deeply patient and careful and weigh many factors in their decisions.

**Reflections after a second semester as Chair**:

I continue to be concerned about the "culture of excellence" and how this affects students' feelings, well-being, and behavior, particularly their behavior toward themselves. High expectations I would say are the main cause of cheating in otherwise honest and fully capable students, who hit a roadblock of one sort or another. I will quote some lines from last semester's "reflections": "As previous chairs have remarked in their periodic reports, students who come before the committee almost always commit infractions unwittingly or under stress, because of mounting emotional problems, or poor judgment of a foolish or occasionally of an egregious kind. That is: few do these things out of malice. There does seem to be, however, for many students, a shared framework, and that is the college itself and its implied ideals. Two infractions, academic dishonesty and hazing, are frequently dark shadows of the pressure on students to be "leaders" and to achieve "excellence" in all they do. The pressure is internal to the students, of course, and the vast majority of undergraduates at this institution don't make the sorts of poor decisions because of the pressure that land them in front of the executive committee. But it may be helpful to consider how students could be encouraged to take advantage of the intellectual and social gift of spending 4 years in this community, without running a marathon to the top of every hill. The expectation to be excellent at everything is unrealistic and dangerous."

There is a new pressure weighing on some of our students, and it probably ought to be recognized as a category of concern by everyone directly involved in student life in the college. This category is political turmoil and persecution. Obviously turmoil is not new in the world, but it is newly intensified in many regions and newly relevant for Yale, as the university recruits students from around the world and as it begins to think of itself as a global institution. Political turmoil is increasingly violent and can result in high anxieties for students, not to mention destruction and displacement of their homes and loved ones. Important to note: students may still not recognize clearly for themselves just how much dictatorship, persecution, violence, and injustice in their home country, in general or when enacted directly against friends and family, will affect them in New Haven, which is, to add to the difficulties, also often very far away from the scene of conflict and their focus of worry. Along with being a global university comes the responsibility to offset injustice where our students come from with as much support here as we teachers, advisors, and deans can give.

The chair expresses the utmost gratitude to the members of the executive committee. The hearings are long and the task is often unpleasant. Special thanks go to the student members, who in their wisdom and experience give the most luminous window onto student life. For his meticulous and absolutely principled collection and assessment of facts, thanks go to Professor Fabian Drixler. Without his thoroughness as fact-finder, and without his willingness to play devil's advocate in every possible situation, the process would be much less rigorous. Jill Cutler brought precision and moral rectitude to the proceedings, along with her long experience. Thanks to Susan Sawyer in the General Counsel's office for her help interpreting the regulations and assessing the stakes of many cases. Lisa Miller in the Yale College Dean's office kept the steady flow of documents organized and the committee members informed—for that the chair offers her deep thanks.

This year (17-18) we welcome Gregg Peeples, Assistant Dean of Student Conduct as the Secretary to the Committee, and Prof. Laura Wexler as Fact Finder. And we bid goodbye to Lisa Miller after many years of dedicated work and wisdom for the committee.

Respectfully,

Paul North                                                    October 25, 2017
Chair of the Executive Committee, 2016-2018
Professor of German

**Spring 2017**

**Formal Hearings**
**1** formal hearings, involving 1 student

**Dispositions without Formal Hearings**
19 dispositions without formal hearings, involving 23 students

**Penalties from dispositions and formal hearings**
The following penalties were assigned to students:
*suspensions* -  2
*withhold degree* -  1
*probations* - 7
*reprimands* - 11
*not guilty* – 3
*expulsion* - 0

**Academic Dishonesty**
21 students were charged with Academic Dishonesty which resulted in:
*withhold degree* - 0
*suspensions* - 1
*probations* - 1
*reprimands* - 6
*charge withdrawn* - 8
*carried over to spring term* - 5

**Plagiarism**
5 of the 21 cheating cases were plagiarism which resulted in:
*withhold degree* - 0
*suspensions* - 0
*probations* - 0
*reprimands* - 2
*charges withdrawn* - 3
*carried over to the spring term* - 0

**Other Cheating**
16 of the remaining cheating cases were other forms of cheating:

6 copied answers from another student
1 changed an answer on an exam after it was turned in
1 turned in multiple papers after their deadlines
1 copied information he heard from other students to answer oral exam questions
1 copied answers from an answer key and submitted them as her own

1 tried to obtain final exam questions after scheduling a make-up exam
1 submitted another student's exam as his own
2 collaborated on an assignment
2 collaborated on final exam papers

**Referred Cases**
26 students were referred to the residential college for alcohol intoxication.
Of the 26 students who were intoxicated, 25 were transported to YNHH or University Health Services.

**Formal Hearing**
In a formal hearing, Senior charged with Academic Dishonesty for changing an answer on an exam after it was turned in, was reprimanded.

**Dispositions without Formal Hearings**

Freshman, charged with Academic Dishonesty for copying another student's take-home test, was placed on probation for one term.

Senior, charged with Academic Dishonesty for submitting a senior essay largely identical to a paper used for another course, had degree withheld for 2 terms.

Sophomore, charged with Academic Dishonesty for plagiarizing a final paper, was suspended for 1 term.

Sophomore, charged with Falsification of Documents and Academic Dishonesty for altering a Dean's Excuse, was placed on probation for 3 terms.

Freshman, charged with Academic Dishonesty for copying code for a problem set, was reprimanded.

2 Juniors, charged with Academic Dishonesty for submitting nearly identical problem sets, were placed on probation for 1 term.

Junior, charged with Academic Dishonesty for turning in multiple papers after their deadlines, was reprimanded.

Junior, charged with Academic Dishonesty for plagiarizing a paper, was reprimanded.

Junior, charged with Academic Dishonesty for plagiarizing a written assignment, had charge withdrawn.

Junior, charged with Academic Dishonesty for plagiarizing a written assignment, had charge withdrawn.

Junior, charged with Academic Dishonesty for plagiarizing a written assignment, had charge withdrawn.

Junior, charged with Defiance for refusing to cooperate with freshmen counselors in Vanderbilt Hall, was reprimanded.

Sophomore, charged with Willful Property Damage for discharging two fire extinguishers in Saybrook College, was placed on probation for 2 terms and given 20 hours of community service.

Sophomore, charged with imperiling the integrity of the university for misuse of a bathroom in Pierson College, was reprimanded.

Sophomore, charged with imperiling the integrity of the university for misuse of a bathroom in Pierson College, was placed on probation for 1 term.

Freshman, charged with Academic Dishonesty for plagiarizing a paper, was reprimanded.

Senior, charged with Academic Dishonesty for copying another student's homework assignment, was placed on probation.

Freshman, charged with Academic Dishonesty for submitting identical lab reports, was reprimanded.

Senior, charged with Defiance, Harassment and Intimidation for behavior in the Silliman Buttery, was reprimanded.

Senior, charged with Academic Dishonesty for trying to obtain final exam questions after scheduling a make-up exam, was reprimanded.

Sophomore, charged with Academic Dishonesty for plagiarizing two papers, was reprimanded.

Junior, charged with Academic Dishonesty for submitting another student's exam as his own, was suspended for 2 terms.

**Referrals**

Freshman, 18 y.o., found intoxicated in Vanderbilt Hall.  AMR transport to YNHH.

Freshman, 18 y.o., found intoxicated in Vanderbilt Hall.  AMR transport to YNHH.

Senior, 21 y.o., found intoxicated at Morse College.  Yale Security transport to Yale Health.

Sophomore, 19 y.o., found intoxicated on Broadway approaching the intersection of Tower Parkway.  AMR transport to YNHH.

Junior, 20 y.o., found intoxicated in Baker Hall, Room 320 at 100 Tower Parkway.  AMR transport to YNHH.

Freshman, 18 y.o., found intoxicated in Timothy Dwight College.  AMR transport to YNHH.

Senior, 21 y.o., found intoxicated in Silliman College.  AMR transport to YNHH.

Sophomore, 19 y.o., found intoxicated in Morse College.  AMR transport to YNHH.

Freshman, 19 y.o., found intoxicated at Farnam Hall.  Yale Security transport to Yale Health.

Freshman, 19 y.o., found intoxicated at Bingham Hall.  Yale Security transport to Yale Health.

Senior, 21 y.o., found intoxicated in Pierson College.  Yale Security transport to Yale Health.

Freshman, 20 y.o., found intoxicated at Silliman College.  AMR transport to YNHH.

Sophomore, 20 y.o., found intoxicated in Bingham Hall.  AMR transport to YNHH.

Freshman, 19 y.o., found intoxicated at Lanman Wright Hall.  AMR transport to YNHH.

Freshman, 19 y.o., found intoxicated at Durfee Hall.  AMR transport to YNHH.

Junior, 20 y.o., found intoxicated in Pierson College.  AMR transport to YNHH.

Freshman, 19 y.o., found intoxicated at Vanderbilt Hall.  AMR transport to YNHH.

Freshman, age not recorded, found intoxicated in Silliman College.  AMR transport to YNHH.

Freshman, age not recorded, found intoxicated at Spring Fling on Old Campus.  AMR transport to YNHH.

Senior, age not recorded, found intoxicated at Spring Fling on Old Campus.  Transported to Yale Health Center.

Senior, age not recorded, found intoxicated at Spring Fling on Old Campus.  AMR transport to YNHH.

Junior, age not recorded, found intoxicated at Spring Fling on Old Campus.  AMR evaluated but did not transport.

Freshman, age not recorded, found intoxicated at Spring Fling on Old Campus.  AMR transport to YNHH.

Senior, 23 y.o., found intoxicated in front of 242 Dwight St. AMR transport to YNHH.

Freshman, 19 y.o., found intoxicated at Lanman-Wright Hall.  AMR transport to YNHH.

Junior, 21 y.o., found intoxicated in Saybrook College.  AMR transport to YNHH.

**Fall 2017**

**Formal Hearings** - 1 formal hearings, involving 1 student

**Dispositions without Formal Hearings** - 36 dispositions without formal hearings, involving 36 students

**Penalties from dispositions and formal hearings:**
*9 suspensions*
*14 probations*
*10 reprimands*
*1 charge withdrawn after hearing*
*2 charges were withdrawn after factfinding*

**Academic Dishonesty** - 46 students were charged with academic dishonesty which resulted:
*8 suspensions*
*13 probations*
*5 reprimands*
*2 charges withdrawn after hearing*
*2 charges withdrawn after factfinding*
*16 carried over to spring term*

**Plagiarism** - 13 of the 46 cheating cases heard were plagiarism which resulted in:
*suspensions - 1*
*probations - 2*
*reprimands - 3*
*charges withdrawn after hearing – 1*
*charges withdrawn after factfinding - 2*
*carried over to the spring term – 4*

**Other Cheating** -21 of the remaining cheating cases were other forms of cheating:
*3 Shared their code, notes or problem sets with another student*
*12 Copied another student's code or problem set*
*3 Cheated on an exam*
*3 Improper collaboration*

**Referred Cases** -16
*15 students were referred to the residential college for possession of alcohol by a minor. Of the 15 students referred, 1 was in possession of a fake id.*
*1 students was referred for possession of less than one-half ounce of cannabis type substance.*

**Non-academic cases:** 9 students were charged with the following violations:
*1 charged with alcohol and defiance of authority*
*2 charged with alcohol, trespassing, social functions, imperil integrity*
*1 charged with alcohol, special provisions student organizations*
*2 charged with defiance of authority*
*1 charged with harassment, imperil integrity*
*1 charged with imperil integrity*
*1 charged with property damage*

**Penalties for non-academic cases:**
*5 reprimands*
*1 probation*
*1 suspension*
*2 cases were carried over to the spring term*

**Executive Committee Chair's Report**
for hearing cycle Fall 2018
Presented to the faculty on May 2, 2019

**Explanation of Structure and Process**

The Yale College Executive Committee has 10 regular voting members: three tenured and three untenured faculty members; three undergraduate students; and the Dean of Yale College or his designee. In addition, there are three officers. In Fall 2017 these were: chair, Paul North, Professor of German; fact-finder, Laura Wexler, Professor of Women's, Gender, and Sexuality Studies, American Studies, and Film and Media; and Gregg Peeples, Assistant Dean for Student Conduct and Community Standards.

The majority of cases are adjudicated by a coordinating group made up of the chair, secretary, fact-finder, and one student member. The coordinating group meets weekly to hear the cases in which a student or students have admitted the validity of the charge against them.

In a typical case, a complaint comes to the secretary of the committee from a faculty member, dean, or another member of university staff. The coordinating group reviews the complaint and decides whether to charge the student under one or more sections of the undergraduate regulations. If a charge is made, the student, along with their dean or advisors, receives a charging letter explaining the charge and asking whether they admit validity or wish to dispute the charge. Disputing the charge leads to a full hearing. To give a sense of the ratio, in Spring 2018 there were 53 dispositions without formal hearings and 4 full hearings.

Dispositions without a formal hearing give students and their advisors every chance to tell their side of the story to the coordinating group. By the undergraduate regulations, prior to the hearing, the students receive all the materials for the case, including details of the complaint against them, any police report, supplemental testimony, or email correspondence should there be any. The student then writes a statement in response, explaining what happened, their motives, the context, their state of mind and thought process, and anything else they think might help the committee understand their actions. All this becomes matter for questioning during the hearing. After reading prepared remarks reminding students of the guidelines and of their obligation to be honest, the Chair invites the student or students to make an opening statement that may reiterate what was in their statement or add something new that is of importance. The committee then asks questions. The tenor of the questions depends very much on the type of case. Since the majority of cases involve charges of academic dishonesty, Coordinating Group members usually ask the student to reconstruct the events leading up to the incident, to recall the guidelines for assignments listed in the syllabus, to explain their psychological state, and so on. State of mind, it should be said, is not a mitigating factor, but it can help give a fuller picture of the kind of dishonesty—whether it was a one-time lapse or perhaps a more routine habit. In the question period, the committee tries to get as full a picture as possible. Once members are satisfied that they have a full enough picture, the student's advisor has a chance to speak on the student's behalf. Finally, the student is allowed to give a closing statement. Then deliberations begin.

There are three goals in the deliberation phase of the coordinating group hearings: 1. to determine an appropriate penalty in accordance with the undergraduate regulations and with precedent, 2. to see to it that harm done to the university community is mitigated, and 3. to help the students learn something about themselves and envision ways to avoid this kind of behavior in the future. Sometimes, in addition to one of the standard penalties (reprimand, probation, suspension, expulsion), the committee asks a student to write a letter of apology to parties involved, write a short text on the university value they imperiled with their actions, or meet regularly with a dean or tutor to work on better ways of going through college. When there has been damage to property, students may be required to repay the losses. Sometimes, also, students are required to

make amends in other ways as well, such as stepping down from a leadership position in a campus group, restrictions on social events, or for leaders of a campus group, a requirement to draft a safety plan.

In Fall 2018, there were 58 dispositions without formal hearings, involving a total of 58 charged students.

Hearings before the full Executive Committee operate in a very similar manner to those before the coordinating group. These hearings are for students who contest the charges made against them. There are a few differences in procedure. For full hearings, the fact-finder sometimes investigates. Normally, they interview the student charged, witnesses if necessary, and the complainant. They also review all the written materials, so that they can produce in the end a report laying out the evidence for and against the student. The fact-finder is specifically enjoined in the regulations to be on the lookout for evidence that might exculpate the student. All the procedures are the same in this type of hearing, except that there are two phases, a judgment phase and a penalty phase. In the judgment phase, after hearing the student's statement, a period of questioning, hearing from the student's advisor, and a closing statement by the student, should the student wish to make one, the full committee may decide to withdraw charges or, conversely, to find the student responsible for the act. If the student is found responsible, the committee then deliberates on a penalty and chooses one of the following: reprimand, probation, suspension, or expulsion.

In Fall 2018, there were 10 formal hearings involving 10 charged students.

There are very few standard penalties listed in the undergraduate regulations. The one noteworthy exception to this is the standard penalty for Academic Dishonesty, which is two semesters of suspension. There are also many years of precedents to guide the choice of appropriate penalty, and judgments made by the coordinating group and the full committee are also always responsive to the details of the particular case. Plagiarism may be as serious and extensive as copying an entire paper from a classmate, or as unreflective as failing to cite sources fully. Vandalism may be the result of a moment of foolishness or a pattern of alcohol abuse. It is to the great credit of committee members that they are deeply patient and careful and weigh many factors in their decisions.

**Reflections after a fifth semester as chair**:

From time to time students come before the Committee who, if they had had extra support to navigate the Yale ecosystem beforehand, might not have had to go through a disciplinary process. Some students from groups that in other contexts are quite distinct, such as athletes, international students, and first-generation college students can, as we already know, find special challenges when they come to campus. Yale has programs to help such students in all sorts of ways. I think it is our special responsibility to make sure we do everything possible to catch students from under-resourced educations or with different experiences before they land in Executive Committee. Let me be clear: in no way am I saying that students in these groups are more likely to commit infractions, or that they come before the Committee more frequently. We have no data on this and the question is not posed properly anyway. When students from these groups happen to commit infractions, however, one factor sometimes distinguishes their cases from others. What is expected of a student on campus here can be drastically different from what was expected of some students in high school or at home. If we could boil down a few crucial parts of the regulations, with the goal of heading off misunderstandings, we could start to take responsibility for this dissonance. Faculty and staff, advisors, professors, first-year-counselors and peers could have frank and sympathetic discussions, in advance, with students who might need extra work to digest the complexities of the undergraduate regulations. What counts as academic dishonesty and what kinds of situations usually precipitate it is not always clear beforehand. What are the key offenses to guard against and how penalties might be applied need careful explication. A good course of action would be to increase training about the regulations for all students, with vivid examples of the kinds of situations that are likely to land someone at Executive Committee. If we take steps to interpret key conduct expectations that might be new and bewildering for some members of the community, we could help stop a few students before they hit a wall—an Executive Committee proceeding—for which they may be less prepared than some of their peers.

Thanks to Dean Chun and to the Provost's office, the Executive Committee has begun to expand its staff so that it can handle the rising number of cases and the new kinds of cases that are coming up. Continued expansion will allow the staff, in addition to preparing and hearing cases, to work at high levels with faculty, coaches, college deans, and of course with students on preventative measures as well as on punitive ones. I particularly want to welcome Earle Lobo, who has just started as Assistant Secretary of the Committee, to the staff.

I am immensely grateful to Assistant Dean Gregg Peeples for his expertise and incredibly careful and caring work with students and faculty over the two years we have worked together. I can't thank him enough. Thanks also to Profs. David Vasseur, fact finder last Fall, and Emily Erikson, Vice Chair this Spring under the revised procedures, for their incredible work.

Respectfully,
Paul North                                                    April 30, 2019

Chair of the Executive Committee, 2016-2019
Professor of German

**Executive Committee Fall 2018**

**Formal Hearings –** 10 formal hearings, involving 10 students
**Dispositions without Formal Hearings** - 58 dispositions without formal hearings, involving 58 students
**Penalties from dispositions and formal hearings:**
  *5  suspensions*
*15 probations*
*43 reprimands*
  5 charges were withdrawn
**Academic Dishonesty** - 35 students were charged with academic dishonesty which resulted:
  *2 suspensions*
*14 probations*
 *8 reprimands*
 *9 charges withdrawn*
 2 carried over to spring term
**Plagiarism** -  7 of the cheating cases heard were plagiarism which resulted in:
 *1 suspension*
 *2 probations*
 *3 charges withdrawn*
*1 carried over to the spring term*
**Other Cheating –** 28 of the remaining cheating cases were other forms of cheating:
*11 cheated on an exam*
 *5 cheated on laboratory exercises*
*12 cheated on problem sets*
**Non-academic cases:**  39 students were charged with the following violations:
 *2 - charged with acts of violence or physical force*
 *1 - charged with acts of violence or physical force, imperil, defiance of authority*
 *1 - charged with acts of violence or physical force, harassment*
 *2 - charged with defiance of authority, drugs, theft*
 *1 - charged with imperil integrity and defiance of authority*
 *3 - charged with imperil integrity*
 *2 – charged with drugs*
 *2 – charged with drugs and imperiling*
 *2 – charged with alcohol and imperiling*
*21 – charged with trespassing*
 *2 – charged with trespassing and defiance of authority*
**Penalties for non-academic cases:**
*37 - reprimands*
 *0 - probations*
 *2 – suspensions (cases of acts of violence or physical force or harassment*

**Yale College Executive Committee Chair's Report**
Hearing cycle for Spring 2019
Presented to the Yale College Faculty on Dec 5th, 2019

**Report Content**
    i)   Explanation of Structure and Process
    ii)  Summary of Activities
    iii) Chair's Reflections
    iv)  Spring 2019 Data

**i) Explanation of Structure and Process**

The Yale College Executive Committee has 20 regular voting members including 6 members of the faculty (3 tenured and 3 untenured), 14 undergraduate students and the Dean of Yale College or his designate.  In addition, the committee has three officers which form the committee's coordinating group.  In Spring 2019 these were the chair, Paul North, Professor of German; vice-chair, Laura Wexler, Professor of Women's, Gender, and Sexuality Studies, American Studies, and Film and Media; secretary, Gregg Peeples, Assistant Dean for Student Conduct and Community Standards and assistant secretary, Earle Lobo, Assistant Director, Student Conduct and Community Standards.

Spring 2019 represented the first hearing cycle following substantial revisions to the executive committee's procedures.

In a typical case, a report is made to the secretary of the committee by a faculty member, dean or another member of the university staff.  The coordinating group reviews the report and decides, if appropriate, to charge the student with a violation of one or more sections of the undergraduate regulations.  The student, along with their residential college dean or advisor receives a formal letter explaining the charge along with a copy of the report and relevant evidence.  The student is asked to name an advisor and to provide a written response to the charge within three business days.  Upon receipt of the statement the coordinating group decides to i) move the matter forward to a hearing, ii) conduct additional fact-finding, or iii) close the matter.

Hearings are generally scheduled two to three weeks after the coordinating group's decision; however, significant backlogs of cases often arise during certain parts of the academic calendar resulting in delays.  Hearings are conducted by a panel drawn from the committee and including the chair (or vice-chair), the secretary (or designate), two faculty members and three student members.  At least 3 business days before the hearing the student receives all the materials for the case, including any fact-finding reports and evidence received after the initial report.  The hearing begins with prepared remarks from the chair which are intended to ensure that the student understands the procedures and has identified any conflict of interest with panel members.  The student is invited to make an opening statement to the panel and the panel members follow with questions related to the student's remarks, written statement, and other evidence.  In many cases, students admit the validity of the charges in

their written or oral statements and in these circumstances questioning by the panel helps to fill in the circumstances surrounding the events and to determine what steps they have taken to rectify their actions and safeguard against future violations of the undergraduate regulations.  In cases where students deny the validity of the charges, questioning by the panel seeks to determine the student's responsibility in the matter while paying particular attention to any information that may exculpate the student. When the panel is satisfied, the student is given an opportunity to have their advisor speak on their behalf.  The student is then permitted to make a closing statement.  The panel then begins its deliberations.

Deliberations are broken into two phases.  In the first phase, the panel addresses the question of whether the student has violated the undergraduate regulations. The panel votes by secret ballot and is charged to give an affirmative answer if the violation is supported by a "*clear preponderance of the evidence*".  At this point, the student and their advisor are informed of the panel's decision.  If found "not responsible" the matter is closed.  If found "responsible", the student and advisor have the opportunity to address the panel again to provide any information that would be relevant for the determination of a penalty. The second phase of deliberations then begins with the secretary informing the panel about the nature of penalties imposed for similar offenses and any previous infractions of a similar nature involving the student. The chair proposes a penalty on which the panel votes by secret ballot.

Penalties are chosen from the following: reprimand, probation, suspension, or expulsion. Each of these is described in detail in the undergraduate regulations.  In some circumstances, the panel may impose an additional penalty in the form of work-service or a fee for the repair of damaged property.

## ii) Summary of activities

In spring 2019 the executive committee charged 120 students with violations of the undergraduate regulations.  Of these, 30 were for academic dishonesty and 90 were for non-academic violations, including 64 cases of trespassing arising from group protests on two separate occasions.

The committee resolved 77 cases and the remaining 43 cases were carried forward to the fall term.  Of the 77 cases resolved by the committee, the outcomes were: 3 suspensions, 13 probations, 55 reprimands and 6 findings of no responsibility.

## iii) Chair's Reflections

Spring 2019 was the first academic term where the executive committee operated under its newly revised procedures.  Formerly, students who admitted the validity of the charges against them would receive a disposition with the coordinating group rather than a full hearing.  While this procedure allowed more expedient handling of cases, it put undue pressure on our students to admit responsibility and cede their right to a full hearing.  As chair during the current academic term (F19), and in contrast to my experience last fall as the committee's fact-finder, I have found that our students are as likely to make an admission of

responsibility to the committee (in comparison to the previous procedures) while all students benefit from the additional diversity and perspective that hearings (rather than dispositions) provide.  In short, the new procedures are working well.

Plagiarism continues to represent a substantial portion of the academic misconduct charges that are issued by the executive committee.  While this is not new, it is evident that an increasing number of students are falling victim to digital-age habits that put their integrity at risk.  Students commonly cite the practice of copying source material into a workspace and later losing track of the words and ideas that belong to others.  While those students remain responsible for their actions, it is clear that it was poor practice, not direct intent, that brought them before the executive committee.  Shared documents in online platforms also pose a significant challenge to academic integrity, particularly when students are allowed to collaborate on their methods or research, but not their final product.  In all cases, clear expectations on what is deemed appropriate versus inappropriate collaboration on assignments and syllabi are necessary both for our students and for the executive committee.

Lastly, but with great importance, I would like to note that there is a growing need for reconsideration of how student protestors who violate the undergraduate regulations are referred to and handled by the executive committee. In spring 2019, charges stemming from student protests resulted in more than half of the executive committee's cases and at current, many remain unresolved due to the backlog these have generated.  Students often use their time before the committee to echo their cause and I worry that they view the executive committee as a conduit for conveying their message and validating their actions.  The executive committee has a clear role in upholding the undergraduate regulations and in order to continue to effectively do so, for all of our students, we should provide alternative channels for students to communicate their concerns while at the same time seek an expedient procedure for resolving protest cases.

My reflections stem mainly from my work as chair in the current academic term and from my previous experience as the committee's fact-finder.  I am indebted to the excellent leadership and guidance provided by the past chair, Paul North and to the service provided by the committee's current vice-chair, Nancy Levene, secretary, Earle Lobo, and faculty and student members.

Respectfully,

David A. Vasseur
Chair, Yale College Executive Committee and
Associate Professor
Ecology and Evolutionary Biology

**iv) Spring 2019 Executive Committee Data**

There were 120 students charged with a violations of the undergraduate regulations. 77 cases were resolved during the spring term.

Outcomes:
   3 - Suspensions
13 - Probations
55 - Reprimands
   6 – Found not responsible

| Academic Dishonesty Cases (30) | Non-Academic Dishonesty Cases (90) |
|---|---|
| 24 - plagiarized pset or lab assignment | 1 - acts of violence |
| 2 - collaborated inappropriately on a take home assignment or exam | 1 - defiance of authority |
| 4 - plagiarized a paper, poem or essay | 1 - defiance of authority/imperil |
| | 1 - defiance of authority/campus safety |
| **Outcomes** | 1 - harassment |
| 1 – suspension – one term | 2 - hazing |
| 11 - probations | 3 - hazing/alcohol |
| 14 - reprimands | 1 - imperil the integrity of the University |
| 3 - found not responsible | 3 - trespassing in steam tunnels |
| 1 - carried over to fall 2019 | 2 - trespassing at 1 Prospect Street, SSS, |
| | 8 - trespassing at Payne Whitney Gym |
| | 62 - trespassing at 55 Whitney Avenue |
| | 1 - trespassing in vacant student housing |
| | 1 - trespassing in a student's room |
| | 1 - unauthorized use of services/imperil |
| | 1 - willful property damage |
| | |
| | **Outcomes** |
| | 2 - suspensions |
| | 2 - probations |
| | 41 – reprimands |
| | 3 – cases were withdrawn |
| | 3 - found not responsible |
| | 39 – carried over to fall 2019 |

Detailed outcomes:
 A senior charged with hazing was found not responsible.
 A senior charged with hazing was found not responsible.
 After investigation, the charges were withdrawn from a senior charged with trespassing.
 A senior who plagiarized a pset was placed on probation.
 A senior who collaborated inappropriately on a pset was placed on probation.
 A senior elected to receive a reprimanded for trespassing at 55 Whitney Avenue during a protest at the Investments Office.

A senior who was charged with trespassing during a protest of the student income contribution was reprimanded.

A senior was reprimanded for trespassing at 55 Whitney Avenue during a protest at the Investments Office.

A senior was reprimanded for trespassing at 55 Whitney Avenue during a protest at the Investments Office.

A senior who trespassed in one of the Payne Whitney Gym pools was reprimanded.

A senior was reprimanded for trespassing at 55 Whitney Avenue during a protest at the Investments Office.

A senior who was charged with trespassing during a protest of the student income contribution was reprimanded.

A senior charged with alcohol and hazing violations was reprimanded.

A senior who trespassed in one of the Payne Whitney Gym pools was reprimanded.

A senior elected to receive a reprimanded for trespassing at 55 Whitney Avenue during a protest at the Investments Office.

A senior was reprimanded for trespassing at 55 Whitney Avenue during a protest at the Investments Office.

A senior was reprimanded for trespassing at 55 Whitney Avenue during a protest at the Investments Office.

A senior who trespassed in one of the Payne Whitney Gym pools was reprimanded.

A senior was reprimanded for trespassing at 55 Whitney Avenue during a protest at the Investments Office.

A senior was reprimanded for trespassing at 55 Whitney Avenue during a protest at the Investments Office.

A senior elected to receive a reprimanded for trespassing at 55 Whitney Avenue during a protest at the Investments Office.

A senior was reprimanded for trespassing at 55 Whitney Avenue during a protest at the Investments Office.

A senior was reprimanded for trespassing at 55 Whitney Avenue during a protest at the Investments Office.

A senior elected to receive a reprimanded for trespassing at 55 Whitney Avenue during a protest at the Investments Office.

A senior who trespassed in one of the Payne Whitney Gym pools was reprimanded.

A senior elected to receive a reprimanded for trespassing at 55 Whitney Avenue during a protest at the Investments Office.

A senior who trespassed in the steam tunnel was reprimanded.

A senior elected to receive a reprimanded for trespassing at 55 Whitney Avenue during a protest at the Investments Office.

A senior elected to receive a reprimanded for trespassing at 55 Whitney Avenue during a protest at the Investments Office.

A senior charged with hazing was reprimanded.

A senior elected to receive a reprimanded for trespassing at 55 Whitney Avenue during a protest at the Investments Office.

A senior who plagiarized a senior essay was suspended.

A junior charged with harassment was found not responsible.

A junior charged with plagiarism was found not responsible.

A junior was placed on probation for plagiarizing a pset.

A junior who trespassed in one of the Payne Whitney Gym pools was reprimanded.

A junior elected to receive a reprimanded for trespassing at 55 Whitney Avenue during a protest at the Investments Office.

A junior who trespassed in one of the Payne Whitney Gym pools was reprimanded.

A junior elected to receive a reprimanded for trespassing at 55 Whitney Avenue during a protest at the Investments Office.

A junior elected to receive a reprimanded for trespassing at 55 Whitney Avenue during a protest at the Investments Office.

A junior elected to receive a reprimanded for trespassing at 55 Whitney Avenue during a protest at the Investments Office.

A sophomore charged with inappropriate collaborating on a pset was found not responsible.

A sophomore charged with academic dishonesty was found not responsible.

After investigation, the charges were withdrawn from a sophomore charged with trespassing.

After investigation, the charges were withdrawn from a sophomore charged with trespassing.

A sophomore who plagiarized a pset was placed on probation.

A sophomore charged with defiance of authority and offenses compromising campus safety was placed on probation.

A sophomore who plagiarized a pset was placed on probation.

A sophomore who plagiarized was reprimanded.

A sophomore charged with trespassing and offenses regarding campus housing and university facilities was reprimanded.

A sophomore who trespassed in one of the Payne Whitney Gym pools was reprimanded.

A sophomore who plagiarized a pset was reprimanded.

A sophomore who trespassed in one of the Payne Whitney Gym pools was reprimanded.

A sophomore who plagiarized a pset was reprimanded.

A sophomore was suspended for one term for unauthorized use of services or facilities and for actions that imperil the integrity and values of the Yale community or the well-being of its members. The penalty was changed to four terms probation in the fall 2019.

A sophomore charged with acts of violence or physical force was suspended.

A First-Year who collaborated inappropriately on a pset was placed on probation.

A First-Year who collaborated inappropriately on a pset was placed on probation.

A First-Year charged with defiance of authority, violence/physical force and actions that imperil the integrity and values of the Yale community or the well-being of its members was placed on probation. The charge of imperil was withdrawn.

A First-Year was placed on probation for collaborating on a take home exam.

A First-Year who plagiarized a pset was placed on probation.

A First-Year who collaborated inappropriately on a pset was placed on probation.

A First-Year was placed on probation for collaborating on a take home exam.

A First-Year who plagiarized code was reprimanded.

A First-Year who plagiarized code was reprimanded.

A First-Year who collaborated inappropriately on a pset was reprimanded.

A First-Year who plagiarized was reprimanded.

A First-Year elected to receive a reprimanded for trespassing at 55 Whitney Avenue during a protest at the Investments Office.

A First-Year was charged with trespassing and willful property damage. The charge of willful property damage was withdrawn nd the student was reprimanded.

A First-Year who shared their pset with another student was reprimanded.

A First-Year who plagiarized was reprimanded.

A First-Year who collaborated inappropriately on a pset was reprimanded.

A First-Year who collaborated inappropriately on a lab assignment was reprimanded.

A First-Year who collaborated inappropriately on a pset was reprimanded.

A First-Year who plagiarized a pset was reprimanded.

A First-Year who trespassed in the steam tunnel was reprimanded.

A First-Year elected to receive a reprimanded for trespassing at 55 Whitney Avenue during a protest at the Investments Office.

A First-Year elected to receive a reprimanded for trespassing at 55 Whitney Avenue during a protest at the Investments Office.

A First-Year who trespassed in the steam tunnel was reprimanded.

A First-Year who collaborated inappropriately on a pset was reprimanded.

Yale University

# Office of the President

HOME  >  ADVISORY GROUPS  >  PRESIDENT'S COMMITTEES  >  REVIEW COMMITTEE OF THE YALE COLLEGE EXECUTIVE COMMITTEE

# Review Committee of the Yale College Executive Committee (2019-20)

**Chair:**

Charles Baltay

**Committee Members:**

Peggy Clark

Alex McGrath

Joel Silverman

Yale

.

Copyright © 2020 Yale University · All rights reserved
3 Prospect Street, New Haven, CT 06511 | P.O. Box 208229, New Haven, CT 06520-8229

**U.S. District Court, District of Connecticut**

**CIVIL ACTION no. 3:20-cv-00133-JCH**

# Exhibit 6

Attached to Plaintiff's Motion for Preliminary Injunction

Dated: February 23, 2020

Description:

MIT Review of Withdrawal and Readmission Practices
2015/2016

**Review of the Undergraduate Withdrawal and Readmission Practices**
**Massachusetts Institute of Technology**
**Fall 2015-2016**

Summary

In September 2015, Chancellor Cynthia Barnhart charged the Committee on Academic Performance (CAP) and the Office of the Dean for Undergraduate Education (DUE) with reviewing MIT's withdrawal and readmission processes. During the Fall Semester of 2015, the CAP conducted this review. In the process, it met with nearly twenty stakeholder groups, conducted a survey of recently readmitted MIT undergraduates, reviewed corresponding policies at peer institutions, and met nine times to discuss its findings and recommendations.

We found that those responsible for implementing MIT's withdrawal and readmissions processes do so in a caring, organized, and professional manner. Many students report positive experiences with withdrawal and readmission, even when withdrawals have been required due to poor academic performance. Approximately 130 students withdraw from MIT each year and approximately 100 are granted readmission, which indicates that students who withdraw, even under difficult circumstances, generally return and finish their degrees.[1]

Nonetheless, we also found that policies related to withdrawal and readmission are often misunderstood and that communications are ineffective. Students expressed confusion, fear, and anger about certain aspects of the withdrawal and readmission processes. Some students were reluctant to withdraw when it was appropriate, out of fear they would not be readmitted. Students expressed concern that decisions about their withdrawal and readmission applications are made without due regard for their particular circumstances. The Office of Student Support Services (S3) was seen as playing conflicting roles, as both a support for students and arbiter of their return.

Because of findings such as these, we make a series of recommendations, with the expectation that they will make these processes more open, less uncertain, and easier to navigate for students. Among the many recommendations made in this report, the following are the most fundamental:

1.  All undergraduate students, once admitted by MIT, remain members of the MIT community and are presumed to be eligible to return as students, even when they withdraw. When a student departs MIT in the middle of a semester because of a medical crisis or because the student's academic performance warrants a time away to regain his or her bearings, MIT still expects the student to return (if he or she wants) and finish the degree. The Institute must communicate this clearly to all students, both those registered and those who have taken withdrawal.

---

[1] Approximately 150 students apply for readmission annually. Student undergoing the readmission process for the first time have a success rate of 65-75%, and most students are readmitted on subsequent attempts.

2. The Institute should no longer speak of "withdrawal" and "readmission" but of "leave" and "return." These changes of nomenclature not only better communicate these policies to students and the outside world, they reflect better the philosophy that should guide how MIT thinks about taking time away from the Institute.

3. The Institute should create a status of "leave of absence" that would allow students to interrupt their studies for up to two years and then return without substantial bureaucratic barriers. The leave of absence, which could be taken once during a student's academic career, may be used for a variety of reasons, including partaking in meritorious opportunities, fulfilling personal obligations, or simply clearing one's head.

4. The CAP should move toward a model of decision making about returns following leaves that clearly separates the student-support role of S3 from the decision making role of the CAP. The logistical hurdles to achieving this goal are substantial, and will require the CAP to experiment with new modes of operating to make this happen.

5. Policies about invoking involuntary medical withdrawal and psychiatric hospitalization are unclear and should be reviewed by a committee charged by the Chancellor. Independent of that review, involuntary medical withdrawal should never be used to coerce students into taking a voluntary leave. This attitude must be communicated and reinforced throughout the Institute.


## Charge to the Committee from the Chancellor

In September 2015, Chancellor Cynthia Barnhart wrote a letter to the MIT Community outlining new steps to enhance mental health and wellness support at MIT. In this letter, the Chancellor stated "…students have expressed concerns about the clarity, transparency, and fairness of existing (withdrawal and readmission) policies, and about the level of support for students who take time away and transition back to MIT." The Chancellor listened to feedback from the community about the policies during informal conversation with students and from a formal report by the Committee on Student Life, who engaged in an extensive conversation about this topic during the 2014-2015 academic year. She charged the CAP and DUE with gathering feedback from students and faculty, and recommend changes to bolster and clarify our policies, which had not been formally reviewed since 2010.


## Process of Our Review

The CAP and the DUE received the charge of Chancellor Barnhart in September 2015. The Chair of the CAP (Professor Charles Stewart III) and the dean (Professor Dennis Freeman) agreed that the CAP would be directly responsible for implementing the charge of the Chancellor. The review itself began at a meeting of the CAP at the end of September 2015; this report was finalized in March 2016.

In addition to the outreach activities outlined below, the CAP had nine meetings on the topic, beginning in the Fall semester and ending at the beginning of the Spring term, in which the critical issues were discussed. Because the withdrawal and readmission processes are complex and intersect with many people and offices across the Institute, the CAP decided at the onset of its review to consult with a broad variety of stakeholders, including the following:

- All readmitted students currently at MIT
- Committee on Student Life
- Chair of the Faculty
- Former Chairs of the CAP
- Housemasters
- MIT Medical Department
- MIT Mental Health and Counseling
- Office of Minority Education (OME) Faculty Advisory Committee
- OME Student Advisory Council
- Panhellenic, Interfraternity Council, and Dorm Con (two representatives from each group)
- Senior leaders in the Division of Student Life (DSL)
- Students at MIT Allied for Student Health (SMASH) board
- Student Support Services Deans
- Undergraduate Administrators
- Undergraduate Advising and Academic Programming (UAAP) Student Advisory Board
- Undergraduate Association's Wellness sub-committee
- Undergraduate Officers

In most cases, feedback from these stakeholder groups was gathered in a face-to-face meeting with members of the CAP. Generally, at least one student and one non-student member met with each group. Feedback from readmitted students currently at MIT was received in three ways. First, all currently-enrolled readmitted students were sent an anonymous survey (23% response rate). Second, every student was invited to a focus group discussion about his or her experiences led by a faculty and student member of the CAP. Third, any MIT students who wanted to share their opinions privately were offered the opportunity to meet with a member of the CAP.

In addition to the formal interviews listed, students' opinions and experiences were solicited, and students were consulted on the final recommendations. The CAP Chair Stewart and Dean Freeman co-wrote two articles in the *The Tech* about the review process. The community was invited to share their ideas via email. The committee listened to student leaders, students who had been through the withdrawal and readmission processes, and students who had no direct experience with withdrawal or readmission, but still had an interest in the issue. As part of our newly formed partnership with the Jed Foundation,[2] the committee also consulted with them about general best practices regarding leaves and return.

---

[2] The Jed Foundation is an organization dedicated to promoting emotional health and prevent suicide among college students.

It should be noted that information gathering with students began long before this review was announced. The 2014–2015 academic year was challenging for the MIT community, with three undergraduate student suicides, and concerns about the withdrawal and readmission processes. Many conversations were had with groups of students, including an Active Minds event on March 2015 in which the community was invited to learn and ask questions about the withdrawal and readmission processes.  The faculty Committee on Student Life also conducted a review of the withdrawal and readmission process during the academic year and issued a report that emphasized the importance of communicating with students who had withdrawn in a more sensitive fashion.

<u>Survey of Readmitted Students — Summary of Results</u>

The CAP believed that it would be important to survey all recently readmitted students, to gain their perspectives on how the process is currently functioning. It was felt necessary to conduct a survey both to give a voice to students who would feel reluctant to share publicly their experiences with the withdrawal and readmission process, and to provide a baseline against which to evaluate these processes in the future.

Therefore, a survey was sent to all currently enrolled MIT undergraduates who had at some time in the past been readmitted to the Institute. The survey consisted of 17 questions (4 Likert-style questions, 10 open-ended questions, and 3 demographic questions), and was divided into four sections: the withdrawal process, time away from the Institute, the readmission process, and the return to MIT. It was sent out via e-mail to a listserv of 194 current students who have returned from withdrawals; 45 students responded (response rate of 23%). Sixteen of the respondents had been on voluntary withdrawal, 20 on medical withdrawal, and 9 on required withdrawal.

While the response rate was relatively low, which means we cannot treat the responses as being representative of all returned students, the responses did provide important insights about withdrawal and readmission, as they are currently experienced. Answers to the open-ended questions in the survey have been incorporated into the feedback given during the meetings, and are included in the "Findings and Recommendations" section below.

We have reported details about the closed-ended questions in the appendix to this report, but we have included the graphical summary of the results below. Please note that the numbers to the left of the graphs are actual numbers rather than percentages of student respondents.









Information from Peer Institutions

Information from Peer Institutions

In addition to receiving feedback from members of the MIT community, particularly students, we concluded that it was important to survey peer institutions, to learn how they handle what MIT calls withdrawal and readmission. Although MIT is a distinct learning environment among elite universities in the United States, much can be learned from how our peers handle these processes, since the students at those institutions face many of the same pressures and opportunities confronting MIT students. There were two major goals in this survey: first, to benchmark MIT against the practices of peer institutions and, second, to ascertain whether there were best practices at these institutions from which we could learn.

The survey of the practices at peer institutions was conducted by the Associate Dean for S3, Dr. David Randall, who reviewed their policies online and spoke by phone to knowledgeable staff.[3] Furthermore, we took an especially close look at Yale University, which recently conducted similar student and administrative reviews when concerns arose about their withdrawal and readmission processes.[4]

This research revealed that there is no one single way that withdrawals and readmissions are handled at institutions we regard as our peers. Our policies tend to be on the conservative end of the spectrum, that is, MIT tends to be much more restrictive in setting expectations and requirements for return. On the other hand, our health insurance policy is generous in comparison. Furthermore, while we readmit 65-75% of all applicants who apply in a particular year, most of our peers readmit all students, with rare exception.

---

[3] This review included Caltech, Chicago, Harvard, Yale, Stanford, and Princeton.
[4] Student report: http://www.ycc.yale.edu/files/2015/06/YCC-Withdrawal-Policies-25ncxs2.pdf
Administration's report: http://yalecollege.yale.edu/faculty-staff/faculty/policies-reports/report-yale-college-withdrawal-and-readmission-review

However, we did learn that at our peer institutions, the term "withdrawal" tends to imply a permanent separation from the university, while the term "leave" is used to indicate a temporary departure. This, of course, is contrary to MIT's current practice, in which the term "withdrawal" applies to all separations, permanent or temporary.

Most of the schools we spoke to involved a faculty committee and a dean's office in the withdrawal and readmission processes, and most have an involuntary withdrawal policy that is overseen by a dean. Moreover, prorating tuition is standard practice, as is an expectation that students who leave the university during the term have 72 hours to vacate student housing.

Most schools require there be separation from the school upon withdrawal. That is, students generally are not allowed to live, work, or participate in student activities on campus.

Background of Current Policies

We begin the substance of our report by reviewing current withdrawal and readmission policies. This overview is based on a review of documents that describe the policies, in addition to oral reports given by those involved in the implementation of these policies.

<u>Withdrawals from the Institute</u>

There are currently seven categories of actions used by the Institute for students who leave before receiving their degree: voluntary withdrawal, medical withdrawal, academic required withdrawal, failure to register ("no shows"), involuntary medical withdrawal, disciplinary suspension, and disciplinary expulsion. The no show, suspension, and expulsion processes were outside the charge of our review. However, in the interest of describing the full set of reasons why MIT students leave the Institute before graduating, we briefly describe each category here, noting where responsibility lies for the administration and oversight of these processes.

1. <u>Voluntary withdrawals</u> are intended for students who wish to take time away for non-medical reasons, such as participating in an educational or personal growth experience (e.g., internship, service experience, or religious mission) or attending to personal or family circumstances (e.g., death of a parent). Under the terms of a voluntary withdrawal, a student must generally take at least one full semester away from MIT and must be readmitted to MIT by the CAP before registering again.[5]

---

[5] A "full semester" is defined by add date. That is, if a student withdraws on or before add date, they are eligible to request return for the following semester. If they withdraw after add date, they need to remain out of MIT for the following semester. Students are able to withdraw up until the last day of the semester. About 45 voluntary withdrawals are processed every year.

2. <u>Medical withdrawals</u>[6] are intended for students who, because of reasons pertaining to physical or mental health, are unable to make satisfactory progress towards meeting Institute graduation requirements. Under the terms of a medical withdrawal, a student must generally take at least one full semester away from MIT (defined in the same way as voluntary withdrawal), and complete the prescribed course of treatment before being considered for readmission. As with voluntary withdrawals, students who have taken medical withdrawal must be readmitted to MIT by the CAP before registering again. About 55 medical withdrawals are processed every year.

3. <u>Required withdrawals</u> for academic reasons are based on a vote by the CAP taken at its end-of-term meetings at the end of the Fall and Spring terms, as part of its responsibility to "review the academic records of undergraduate students and to take appropriate action in the name of the Faculty."[7] Under current practices, students who are required to withdraw for academic reasons must generally be away for at least one academic year (two regular terms) before they are permitted to apply to the CAP for readmission to the Institute. Under the terms of a required withdrawal, a student is generally expected to take at least two consecutive semesters of challenging courses at another college or university, receiving grades of B or better. The CAP votes to require an average of 20–30 students to withdraw for academic reasons each year.

4. The <u>no show</u> designation is reserved for students who do not register for the semester by add date, but who are otherwise eligible to register. This is a category that allows the Institute to account for the status of all students who are eligible to register. Generally, fewer than 5 students are designated no show each term. Students who are designated as no shows must be readmitted to the Institute by the CAP before being allowed to register again.

5. <u>Involuntary medical withdrawal</u> is intended for a student who poses a significant risk to the health or safety of self or others, and/or when it is established that a student is unable to function academically or participate in campus life.[8] The circumstances that could lead to the involuntary medical withdrawal include, but are not limited to, an inability to complete or make satisfactory progress towards academic requirements. In addition, a student may be placed on involuntary withdrawal for medical reasons, if a student does not cooperate with efforts, deemed necessary by the Institute, to determine if the student poses a significant risk to the health or safety of self or others. To date, MIT has never processed an involuntary withdrawal. However, as we discuss below, the circumstances surrounding other withdrawal processes give the impression that involuntary medical withdrawals are

---

[6] The juxtaposition of these two withdrawal categories — "voluntary" and "medical" withdrawals highlights one unfortunate consequence of the terminology currently used to label types of withdrawals at the Institute, to the degree that it is incorrectly implied that medical withdrawals are involuntary.  We revisit this important point below.

[7] MIT, *Rules and Regulations of the Faculty,* §1.73.5.c.
[8] http://mit.edu/uaap/s3/withdrawals/medwithd_policy.html.

common, or if they are not common, the status is used to coerce students to withdraw voluntarily.

6. The final two categories are overseen by the Committee on Discipline (COD). These disciplinary withdraws, as well as the entire COD process, have been subject to regular review over the years. The last comprehensive review of the discipline system was done in 2005 and was published in the Gibson Report.[9] The review of suspensions and expulsions were outside the scope of our charge, and we have no further comments to make about the processes.

   a. A <u>disciplinary suspension</u> is the removal "of a student from the Institute for a defined period of time" for disciplinary reasons, through a vote taken by the COD.[10] Students who are suspended from MIT must be readmitted to the Institute through a process overseen by the COD.

   b. <u>Disciplinary expulsions</u> is the "permanent separation of a student from MIT" for disciplinary reasons, through a vote taken by the COD.[11]

The DUE is responsible for overseeing all withdrawals, even when decisions about the status are made by the CAP (required withdrawals). The DUE has delegated the day-to-day administration of withdrawals to S3. Suspensions and expulsions are overseen by the COD, and the Dean of Student Life (DSL) has delegated the administration of suspensions and expulsions to the Office of Student Citizenship (OSC).

Readmission

As noted previously, there are seven ways that a student can leave the Institute before receiving a degree. In all cases, the *Rules of the Faculty* require that a student who has interrupted his or her studies apply for readmission to the Institute. In this section, we describe the readmission process. Because the charge to the CAP excluded disciplinary suspensions and expulsions, we do not address readmissions following disciplinary actions here.

The MIT *Rules of the Faculty* provide that the CAP "shall act with power . . . on applications for readmission at the undergraduate level after a voluntary, medical, or required withdrawal."[12] The CAP has exercised this authority for many decades in close cooperation with S3 and its predecessors. The readmission process has been reviewed regularly in that time. The last review of

---

[9] The full text of the Gibson report can be found here: http://web.mit.edu/faculty/reports/pdf/disciplinereport.pdf. More recently, the COD issued a comprehensive report concerning the handling of student sexual misconduct complaints.  The COD's recommendations may be found here: http://cod.mit.edu/sites/default/files/documents/COD-Task-Force-Recommendations-Summary-4-17-2015.pdf.

[10] MIT, *COD Rules and Regulations,* §11.C.i.

[11] MIT, *COD Rules and Regulations,* §11.D.i.

[12] MIT, *Rules and Regulations of the Faculty,* §1.73.5.b.

the readmission process occurred in the Spring 2010. The following description of the readmission process reflects procedures that have been in place since then.

The readmission process has been designed to verify that students are ready to resume successful work at MIT. This means that students must demonstrate that they fulfilled the requirements discussed during their withdrawal process, which may include medical treatment, rigorous coursework, or meritorious work. General requirements for readmission vary by the category of withdrawal; the requirements faced by any individual student may be modified on a case-by-case basis, but the process for readmission is the same for all withdrawals.

Students on withdrawal must complete the undergraduate application for readmission. The readmission application is composed of an essay and timeline about time away, a detailed plan for coursework in future semesters, input from the academic advisor or department, transcripts, letters of recommendation, and medical letters (if applicable). In the process of filing the application, students also discuss the circumstances of their withdrawal and plans for return with the relevant S3 dean. For students under medical withdrawal, the application is also reviewed by a representative of the MIT Medical Department.[13]

The application deadlines for readmission are June 15 for readmission to the Fall term and November 15 to the Spring term; students are informed that they will be notified of the readmission decision no later than August 10 and January 10 respectively. Despite these deadlines, applications for readmission are considered on a rolling basis.

Under the process established by the readmission review that occurred in 2010, the Readmission Committee reviews all applications for readmission and makes a recommendation to the CAP, which ultimately approves or denies the applications. The Readmission Committee consists of three deans in S3 and is chaired by the head of S3. The Readmission Committee must seek consensus on its decision whether or not to recommend readmission of an applicant to CAP. In rare cases, the Readmission Committee may forward a divided recommendation to the CAP for a decision.

The Chair of the Readmission Committee is granted the authority to expedite consideration of readmission applications when the initial review indicates that the decision is clear, given the readmission guidelines and the specific expectations for return associated with a student. For instance, if a student had voluntarily withdrawn to pursue a one-year internship at Apple, the Readmission Chair can expedite the recommendation without a committee review. On the other hand, the Readmission Chair may recommend an expedited denial of an application for a student on academic required withdrawal who did not successfully complete coursework while away from MIT.

---

[13] As a general matter, students whose withdrawal was related to issues of mental health (the vast majority of medical withdrawals) are reviewed by clinicians in MIT Mental Health and Counseling, whereas all other cases of readmission after medical withdrawal are reviewed by the Director of Student Health.

All readmission recommendations are forwarded to the CAP for final approval. Under the plan established in 2010, the CAP has delegated to the Chair of the CAP the authority to approve unanimous recommendations by the Readmission Committee and to make the final decision in the case of a non-unanimous Readmission Committee vote. The CAP Chair also reviews expedited recommendations for approval or reference to the full CAP. The Chair of the CAP may overturn a unanimous recommendation of the Readmission Committee only after review by the full CAP.

S3 receives approximately 150 applications for readmission every year. About half of these are from students on medical withdrawal, and a quarter each are from students on academic required or voluntary withdrawal. Roughly 65-75% of these applications are approved, and 25-35% are denied with recommendations for how to reapply successfully and return to MIT. Students whose applications' were denied typically demonstrated inadequate academic performance at school away from MIT or had not been cleared medically to return.

The CAP and S3 take great care in the readmission process and believe MIT is distinct in this regard. For many schools, the return process is an administrative matter and does not fully take into account a student's readiness to return. At MIT, the goal is to readmit someone when he or she is truly ready to return. We believe this is appropriate for two major reasons. First, MIT's intense academic environment makes it difficult for a student who is not prepared to re-enter at a high level of performance. Second, if a student returns and struggles again, the associated shame and pain are tremendous. Thus, the MIT process is aimed at trying to ensure that a readmitted student will do more than just get by, but will succeed.

The CAP in recent years has endeavored to systematically track the academic performance of students who have withdrawn and then been readmitted. The data collected suggest that the current process leads students who have withdrawn under difficult circumstances to succeed once they return. For instance, on average, students who were on academic required withdrawal see their GPAs improve one full point (from 3.0 to 4.0 on average) upon their return to MIT.

### Findings and Recommendations

We found that there were many parts of the withdrawal and readmission processes at MIT that work quite well; they are organized, thoughtful, and well connected. The goals are to help students transition smoothly away from MIT and then return to the Institute when they are ready. The deans in S3 work closely with students, most of whom request withdrawals on their own, to determine a plan for their readmission and the best path back to MIT. The process includes important stakeholders across the campus including academic advisors, academic departments, MIT Medical, Mental Health and Counseling, DSL, the Registrar, Student Financial Services, Student Disability Services, the International Students Office, and the Office of Minority Education.

We also uncovered several areas that could benefit from changes. Some of the areas of change arise because this review has simply suggested ways to accomplish the goals of the withdrawal and

readmission processes more effectively. But, we must also note that some of the changes we recommend arise because of the heartfelt expressions of concern we heard from students about these processes, which sometimes extend to outright widespread distrust. While we recognize that the nature of withdrawal and readmission decisions will always generate negative feelings and misunderstandings, it is undoubtedly true that as the level of distrust goes up, the effectiveness of MIT's student support system goes down, as does trust that decisions are being made wisely and fairly about important aspects of students' lives. Therefore, the recommendations we developed are aimed at making the withdrawal and readmission decisions not only more *effective*, but also more *open* and *understood* by the MIT community.

We organize this section along the lines of the most important themes that emerged in the feedback we heard from the community, especially the students, about the withdrawal and readmission processes. In developing these recommendations, we were guided by three goals:

1. The withdrawal and readmission processes should be easily understood; outcomes about decisions should be communicated clearly and directly.

2. While the decision is MIT's, students who are most directly affected by the withdrawal and readmission processes should feel they have a meaningful say in the processes.

3. All students who withdraw are expected to return to MIT (if they want to) and receive their degree. This includes those who are required to withdraw or who voluntarily withdraw because they face profound personal and medical challenges.

The recommendations in this section are organized along five major themes:

1. <u>Openness of communication.</u> Despite dedicated efforts by everyone at MIT who is involved in withdrawal and readmission, information about how these processes unfold is ineffectively communicated to the community. All at MIT who are involved in the withdrawal and readmission processes must redouble their efforts to communicate information about the process openly, clearly, and directly.

2. <u>Terminology.</u> The terms "withdrawal" and "readmission" impose a significant barrier to student understanding of the processes associated with leaving and returning. MIT must change its language about these processes. We must emphasize that time away from the Institute does not constitute a permanent severing of its relationship with a student; return to the Institute should not make students feel that their initial admission to MIT was a mistake.[14]

---

[14] In these findings and recommendations section, below, we recommend a significant change in terminology. From this point forward, "withdrawal" will be replaced with "leave" and "readmission" replaced with "return." Moreover, we will refer to "readmission application" as "request to return." The notable exceptions will be when discussing students who have already gone through these processes, and when discussing historic experiences with the process.

3. <u>Normalization of taking leave from the Institute.</u> The culture and practices of the Institute stand in the way of students stepping away from MIT, when doing so would be to their benefit. We must lower the barriers to MIT students taking time away, not only to pursue distinguished business, economic, and social endeavors, but also to allow students to clear their heads and to assess their trajectory through MIT.

4. <u>Support while on leave.</u> Many students who have withdrawn express that they feel like they have been abandoned by the Institute; many caring and dedicated faculty and staff at MIT feel hampered from reaching out to withdrawn students to help them navigate a path back to readmission. MIT must develop new ways to engage with students while they are on leave from the Institute.

5. <u>Transition back to MIT.</u> Some students express frustration with the timing of decisions made about their request to return — not only about the return decision itself, but also about related decisions, such as housing. If the goal of the return process is to ensure the successful reintegration of students on leave into the MIT academic community, then many administrative practices at the Institute, both those overseen by the DUE and by the DSL, must be reconsidered and revised.

As well, there were three items that arose during the consideration of our charge that this report has recommendations about. They are (1) involuntary medical withdrawals, (2) psychiatric hospitalizations, and (3) issues related to graduate students.

We consider these broad categories of recommendations in order.

<u>Openness of Communication</u>

There is confusion about the processes and expectations of leave and return. While comprehensive, clear information is available on the S3's website, the community, from faculty members to students, seem to be unaware of it. Better efforts need to be made to disseminate information, and make the community aware of the policies for leave and return.

Many students who have withdrawn also expressed confusion about the expectations upon them during their time away, and what requirements they needed to fulfill to return to MIT. Moreover, it appears that the student body is unaware of the accurate percentage of students who are granted return.

We recognize that the environment in which leave and return policies are communicated is challenging. Students who are required to leave for academic reasons or who face serious medical crises are often not receptive to the information provided about these policies, or even in a condition to discover it. Even with these limitations, we believe that efforts could be undertaken to

communicate more effectively with the MIT community, and especially students, about the policies associated with leave and return.

1. Overall efforts need to be made to communicate actively about how the processes operate, expectations concerning return, and results of the leave and return process.
    a. The CAP and DUE should report annually about the number of students seeking leave and return, the rates of return, and measure of academic success among students who return from leave. The CAP and DUE should also regularly communicate with the faculty and administrative staff about how these processes work, and about the resources available to students, faculty, and staff who come in contact with leave and return.
    b. The CAP and DUE should work with *The Tech* and other communications resources at the Institute to ensure that this same information is reported on a regular basis to the community.

2. S3 should undertake a review of the sections of their website that communicate information concerning leave and return policies, to ensure that the information is communicated clearly and effectively. It should create and regularly update a FAQ section on their website that addresses common concerns about leaves and return.

3. A physical or virtual book of student experiences while on leave should be made available to students considering leave.

Terminology

Students have clearly expressed a fear and distrust of the current withdrawal and readmission processes. Both processes communicate a sense of rejection by MIT. The term "withdrawal" connotes that students have been permanently separated from the Institute — a sense that is reinforced by the fact that this term is generally used by universities when the relationship is in fact permanently severed. The term "readmission" likewise connotes that the initial admission was mistaken, therefore the student must prove all over again that his or her initial admission was valid. Even in cases where return seems like a foregone conclusion, students report that they must relive the stress of their initial application for college admission to MIT, since readmission to MIT is not guaranteed.

Also, the current categories send unintended messages about the reasons for the withdrawals. The labels associated with two frequently-used categories — "voluntary withdrawal" and "medical withdrawal" — communicate the mistaken impression that all (or most) medical withdrawals occur involuntarily.

The nomenclature surrounding the status of students who have withdrawn from MIT can be unclear and embarrassing to students who must explain their status to the outside world. To allay

this sense of shame, the Institute should encourage the use of a better term to describe the status of students when they are withdrawn.

1. The terms associated with the current processes of withdrawal and readmission should be changed.
    a. The term "withdrawal" should no longer be used; the corresponding processes should be termed "leave."[15] Implementing this change will involve amending the Rules of the Faculty.[16]
    b. The categories of leave that the Institute maintains should be the following:
        i. Personal leave
        ii. Medical leave
        iii. Involuntary medical leave
        iv. Required academic leave
    c. The term "readmission" should no longer be used and instead be called "return from leave" or just simply "return."
    d. The term "readmission application" should not be used. Students are not applying to MIT, they are "requesting to return from leave."

2. Students should be encouraged to use the generic description of being "on leave" when they interrupt their studies at the Institute for the reasons outlined in this section of the report.[17] The categorization of the types of leave (personal leave, medical leave, etc.) is strictly for internal purposes, and should not be reflected on the transcript, in keeping with current practice related to withdrawals. We encourage the registrar to use the terminology "leave of absence" rather than "withdrawal" on the external transcript when students take leave in the middle of the semester. [18]

---

[15] We recognize that Federal regulations require the Financial Aid Office to use the term "withdrawal" on their materials. However, MIT's financial aid materials should make every effort to indicate that their continued use of this term is due to federal requirements, and not MIT policy.

[16] The Rules of the Faculty would need to be amended at the following places:
- §1.73.4 (pertaining to the jurisdiction of the Committee on Undergraduate Admissions and Financial Aid). The following phrase would be deleted from this section: "except in cases of students applying for readmission," This phrase is the strongest language in the Rules of the Faculty that equates readmission with admission.
- §1.73.5 (pertaining to the jurisdiction of the CAP). This section would be rewritten as follows: "The Committee shall act with power on petitions from individual undergraduate students relating to exceptions to established academic standards, and establish regulations related to the return of students at the undergraduate level after a personal, voluntary or involuntary medical, or required academic leave."

[17] Students who have been suspended or expelled should not identify themselves as being on leave from MIT.

[18] The committee supports continuing the current practice of not noting a withdrawal (or leave) on a student's transcript when study is interrupted between semesters, simply leaving a gap in the dates on the transcript.

<u>Streamlining the Processes of Leaving and Returning to MIT</u>

In addition to the fear students experience about the prospect of leave, there are also logistical issues pertaining to both leaving the Institute and returning that were raised by students, faculty, and staff. As a general matter, many students who leave in the middle of the term or who are required to leave for academic reasons report feeling like they are rushed out the door. At the point of return, students often express frustration at the conditions placed on them and the return process.

The committee recognizes the value of having students who are on leave depart from the Institute as soon as arrangements can be made, both for the benefit to the student and to the larger Institute community. However, leaves often occur under difficult circumstances, and it is appropriate to allow a small amount of additional time to depart. Students whose leave is unplanned must make a series of life decisions in an extremely brief period of time under very stressful circumstances. They must vacate Institute housing and find new lodging. They must navigate complex and confusing rules about financial aid to receive refunds, and figure out issues like health insurance when they are no longer covered by MIT's policy.

The time crunch associated with unplanned leaves is particularly salient in the case of vacating Institute housing, where the current expectation that students depart within 48 hours of a leave causes a hardship for many. The additional time we recommend is not very much — an extra day. We believe, however, that in many cases giving a student 72 hours to check out of Institute housing would ease some of the anxiety often associated with leaving, and also help with the administrative details.[19]

Currently, every student who seeks a leave is given a set of expectations to meet before return. Setting these expectations for all students is consistent with the philosophy that has governed return policy for many years, which is that the Institute has wanted to ensure that everyone who takes time away from the rigors of MIT's academic environment is ready to return —  even students who in the past showed no signs of struggling with the environment.

Students who leave to pursue an exciting educational opportunity or to fulfill a personal commitment are expected to follow through on their announced plans, complete essays that account for their time and reflect on what they accomplished while away, assemble letters of recommendation, and plot out a detailed academic roadmap before they are readmitted. Students who leave under medical leave are generally required to spend at least one semester away from the Institute undergoing treatment. In applying for return, not only must they assemble a dossier that parallels that of students who take voluntary leave, their treatment must also be documented by healthcare providers and verified by MIT's Medical Department. Students who are required to leave

---

[19] The CAP recognizes that there will be rare cases where it will be appropriate to require a student to vacate Institute housing in less than 72 hours, especially in circumstances in which the safety to the student or community are at issue. These are not typical cases, however, and the committee believes that departure policies should not be determined primarily by atypical cases.

for academic reasons are expected to spend at least two semesters away from the Institute, generally taking rigorous college-level classes and getting A and B grades; these students, too, must also complete an extensive application that requires letters of recommendation, transcripts, and reflective essays.

Students who leave MIT meet with a dean from S3 to help mold expectations to meet the specific circumstances of the students. However, all students who take leave must still reapply, and the expectations for time away (i.e., one semester for medical leave and two semesters for required academic leave) are rarely relaxed.

In the minds of students who have taken leave from the Institute, the request to return process often appears to create barriers to returning, and may seem arbitrary and unrelated to educational purposes. Setting detailed expectations about returning seems extraneous for those taking time to explore an exciting educational opportunity (a prestigious internship, developing a start-up, or volunteering internationally) or fulfill a personal commitment (family member's illness, military service, or religious mission). Moreover, the expectation that students who are required to leave for academic reasons pursue a full year of college-level study as a non-degree student at another college can be an insurmountable obstacle for students of meager financial means.

Also, the prospect of having to surmount the barrier of return looms large when students consider whether to leave in the first place. After all, if even a junior with a 5.0 average who leaves for a year to pursue an internship with Microsoft is not guaranteed return to the Institute, what is a student who is struggling academically to think?

All these considerations together lead us to recommend a series of policy changes to ease the processes of temporarily leaving the Institute and returning after a hiatus. The committee particularly urges the adoption of the first recommendation that immediately follows.

1. The Institute should create a flexible category of leave, the "leave of absence," that would be available to all students who are eligible to register in the following semester. This category should be flexible, both as it relates to the purpose of the leave and the administrative processes related to claiming the leave and returning from it.
   a. This status would be reserved for students who are eligible to register in the upcoming semester. Thus, it would not be available for students choosing to withdraw in the middle of the semester or to avoid review by the CAP at the end-of-term meetings.
   b. Students taking a leave of absence would be permitted to return to the Institute within two years from the date of the leave without formal review.
   c. Students would be allowed to take one leave of absence over their undergraduate career.
   d. The administrative process to take a leave of absence would be minimal, but still require students to consult with their advisors and with a dean at S3. It is appropriate to require students taking a leave of absence to discuss their plans and

receive advice from their academic advisor and S3 dean, but these consultations should not be considered part of a process to approve the leave.

e. The leave of absence and return processes would be managed by S3 and involve very little effort on the part of the student. Students would not need to submit a formal request to return, although it would be appropriate for students to notify the DUE (via S3) of their intended return date according to a published deadline.

2. Letters sent to students taking leave for medical or required academic reasons should be revised to more clearly delineate expectations for student return. Leave letters issued by the CAP and S3 should be reviewed and modified to be supportive in tone.

3. Students should be permitted 72 hours to move out of Institute housing at the time of leave. S3 should carefully coordinate with Housing to ensure that students have adequate ability to move out in this time frame.

4. Student Financial Services and the Registrar's Office should continue to prorate tuition for students taking leave from the Institute. However, there should be a ten day grace period at the start of the semester so that students may decide to take a leave and still be given a full tuition refund.

5. Tuition insurance should be more prominently advertised by Student Financial Services.

6. More flexibility should be allowed for personal and medical leave processes; S3 deans, in consultation with appropriate campus colleagues, should have the ability to decrease the required minimum amount of time away or provide fewer expectations.

7. Required academic leave should still be for a full year but students should be asked to demonstrate academic readiness over the course of one semester rather than two.

These recommendations largely relate to the actions taken by the Institute on behalf of the Faculty, or in administering leave policies. These recommendations do not address the internal procedures of the CAP as it acts on behalf of the Institute Faculty in determining whether students are prepared to return to the Institute following personal, medical, and required academic leaves.

## Support While on Leave

The separation of a student from the Institute, especially when it is unplanned or unwanted, can result in a great deal of confusion, even in the best of circumstances. We recognize that there will always be misunderstanding, anger, and disappointment associated with leave and return. However, this reality does not exempt the Institute from seeking to minimize friction that is associated with leave.

The first step in easing the negative feelings surrounding leave (and the associated return) process is to make one fact clear: The Institute intends to welcome back the student, in the future, who is leaving, and ultimately to see the student graduate.

Because the forms of leave that are reviewed in this report are temporary, not permanent, it is imperative that the relationship between the Institute and the student reflect this fact for the period when the student's studies have been interrupted. For a variety of legal and administrative reasons, there must be distinctions between students who are registered and those who are on leave. However, a student who goes on leave remains part of the MIT community and is expected to return to MIT as a student.

In making this statement, we note that sturdy barriers have been erected in the past between withdrawn students and the Institute, and that some of those barriers have been necessary. In particular, in the not-too-distant past, the Institute had a difficult time ensuring that unenrolled students had vacated Institute housing and that the small number of withdrawn students who were disruptive to the community had left. However, it is our belief that problems associated with "ghosting" in the dormitories are under much better (if imperfect) control. And in any case, policies that govern the Institute's relationship with students on leave should not be governed by the behavior of a small number of people.

While it is standard practice across universities to prohibit students on leave from using university services, the language and practice associated with the use of services during a student's leave causes a great deal of confusion across the MIT community. Departmental administrators expressed to us uncertainty about whether they are allowed to contact those who are on leave, housemasters expressed concern about the support of students while away, and students communicated that they feel isolated by the policies that seem to restrict their contact with their support community. This confusion across the Institute results in inconsistent communication between those who are away with staff and faculty, which leads to greater feelings of isolation.

With these considerations in mind, we recommend the following.

1. It should be made clear to students when they take leave from the Institute, especially if the leave is required or unplanned, that their admission to MIT has not been withdrawn, they are still a part of the MIT community, and that we are eager to see them return and graduate.

2. An action plan should be developed for every student who takes leave from MIT, regardless of the reason for the leave. This action plan — which should be shared and developed with the active participation of the student — should not only record expectations about what the student will be doing while on leave and what is required to re-register in the future, but should also explicitly identify MIT contacts for students at time of leave for while they are away.

3. Better efforts should be made to clarify to students and departments that students on leave are strongly encouraged to be in contact with their dean, academic advisor, and department for support and guidance.

4. The Institute's Suspension of Services statement[20] should be reviewed to make clear to students both the support available, as well as the limits of what they may do in the community. It is appropriate that students on leave not live in MIT owned or affiliated housing, attend classes, participate in UROP, or have an activated MIT card. However, as a general matter, students on leave should not be precluded from activities on campus any more than members of the local community. In other words, it should generally be appropriate for students on leave to be employed at MIT and participate in campus activities that are open to non-students.[21] The committee agrees that students should be permitted to retain their MIT email address through sponsorship. The committee acknowledges, however, that for many students, physical distance from MIT is exactly what is necessary to address the issues that were causing problems at the Institute.

5. S3 should extend its robust and lauded program of support for returning students to students on leave, by developing an extended mentorship network with returned students, alumni, and interested faculty members.

6. The MIT Medical Department should investigate the cost involved to offer MIT Health Insurance to all students who take leave and were on the MIT Extended Plan. This would extend a policy that currently applies to students who take medical leave to all students on leave. For students who do not purchase the Extended Plan, every effort should be made by the MIT Medical Department to educate students about the health care exchanges and the importance of adequate health insurance coverage.

7. MIT should establish a fund to help support students with financial hardships who are on leave, to relieve the burdens that are often imposed, especially when students are required to withdraw for academic reasons. The funding requirements to fulfill this recommendation are not trivial, and could approach $500,000 a year. However, we believe that such an effort is critical if we are to make our commitment to students on leave a reality.


Returning to MIT

The Committee heard consistently from students that the return process is daunting, and challenges presented by the prospect of confronting it were at the center of their decision whether or not they should withdraw. The survey results from returned students showed that those on

---

[20] http://web.mit.edu/academic-guide/section_13.html
[21] This is the general expectation that we would recommend, recognizing that there will be cases where a student would appropriately be required to be absent from the MIT community, either in whole or in part. However, such a requirement should rarely be imposed, and should only be a condition of return to MIT after approval of the CAP.

voluntary leaves were the most dissatisfied with the process. Many students on all types of leave reported that the expectations of the Institute were unclear; this leads to anxiety about the strength of their return case. Students who had withdrawn also expressed concerns about the timing of notification of return. Students applying for return can be notified of the decision just a couple of weeks before the beginning of a semester, which causes logistical difficulties related to housing, financial aid, and the reactivation of the MIT ID card.

Students on medical and required leave often expressed the opinion that there was a conflict of roles with S3, which provides support during the time the student is on leave, but then is seen as making final return decisions.

Housemasters questioned whether the current process facilitated the placement of students in appropriate housing to ensure community support, and stated that they were unsure of which students in their dormitories were returning. Academic departments also stated that they were unsure of timelines for return, and that they wished to be kept informed about decisions, especially in those cases in which a student returned to the Institute as a major in another department.

Of all these concerns, the one that seemed the most fundamental was the problem of the dual, seemingly conflicting, role of S3 in the process of return. The role of S3 is to support students in all phases of their relationship with the Institute. Although the role of S3 in the return process is advisory, the clear impression past withdrawn students get is that S3 is the sole arbiter about whether or not a student may return.

As noted earlier, return decisions are made by the CAP, but from the perspective of students applying for return, S3 makes the decision. This confusion is reinforced by the practice of having the letter that notifies the student of the return decision come over the signature of the head of S3. This source of misunderstanding is easily remedied. How to provide a more meaningful "airlock" between S3 and the CAP has been one of the most complex matters which the committee wrestled with.

The design challenge is that the deans of S3 are the most knowledgeable MIT employees when it comes to the specific circumstances of students who are on leave, and yet the CAP, which by its nature will always have less intimate knowledge of students' specific circumstances, must make the decision. Therefore, a way must be found to apply the insights of S3 about individual students to the final decisions about return that must be made by the CAP.

However, the calendar presents further problems that prevent the full CAP from considering applications for return. For return in the Fall semester, grades that are relevant to return cases are generally not available until the Spring semester has ended and the CAP can no longer be convened as a full body.[22] For return in the Spring semester, grades are made available during the winter

---

[22] Current CAP student members confirm that their summer commitments to end-of-term grades and deferred action meetings already make it difficult to navigate with summer internships and employment. Furthermore, faculty members are either not employed by the Institute during the summer, or grant

break and during the period when S3 and the CAP are intensively engaged in end-of-term assessments of currently enrolled students.

Because of these calendar constraints, the return process described at the beginning of this report puts heavy emphasis on S3 forming a recommendation about each student's application for return that is then presented to the CAP Chair for ratification or referral to the full CAP. This way, the full CAP only needs to be involved in the most difficult of decisions. The fact that the process is weighted heavily in favor of intensive S3 deliberation and less intensive active involvement of the full CAP, other than by the Chair, easily leads to the students' impression that decisions are in fact made by S3.

Other universities deal with these same calendar constraints in ways that avoid some of the problems that the current MIT return process is prone to, but in ways that seem alien to MIT's culture. Many universities, for instance, leave the faculty out of the return decision altogether, putting the decision in the hands of a single dean who may, or may not be, a member of the faculty. MIT, on the other hand, values the primacy of faculty in all fundamental academic decisions, including decisions about whether students are prepared to engage in classes. Some universities only have one deadline for applications to return, during the school year, which constrains return to the university to occur only in the Fall semester. By setting the deadline early enough in the spring, it allows fuller involvement of faculty and staff in return decisions, but it also creates a big gap in time between the classes that a student might take to demonstrate their being ready to return to MIT and recommencing study at the Institute.

After careful deliberation of all the issues surrounding the return process, the CAP has concluded that a way must be found to make it clear that the primary role of the deans who work for S3 is to support students while on leave from the Institute, not to decide whether they are ready to return. S3's role in the return process is to provide advice to students who are on leave about how to prepare to return, and to advise the CAP about the progress that students have made along the path to return. The decision must be in fact, and in appearance, made by the faculty CAP.

1. To position S3 and the CAP to do their respective jobs, it is absolutely critical for there to be clear and explicit expectations at the time of the leave (see recommendation #2 in the "Streamlining the processes of leaving and returning to MIT section"). Indeed, the leave needs to be connected closely to the return and this starts with specific expectations. Recommendations from MIT Medical need to be clear, and the CAP also needs to clarify a standard set of expectations for students on academic required leave.

2. With a clear set of expectations it is our hope that the Readmission Committee in S3 could be dissolved. S3's role would transform from being a decision maker in this process to being a coordinator and supporter. We anticipate that there will be a transition period to get to

---

restrictions prohibit them from performing administrative duties unrelated to their sponsored research over the summer.

this state, and that the CAP and S3 will collaborate with S3 to make the change as quickly and smoothly as possible.

    a. S3 would be responsible for assembling the return materials, shepherding the students through the process, and providing the CAP with information about whether or not the concrete expectations for leave were met.

    b. MIT Medical and Mental Health would be asked to provide clear guidance about medical clearance and academic departments would be asked to do the same about academic readiness to return.

    c. Our vision is that the CAP Chair can make decisions on behalf of the committee, but would consult with additional members of the CAP before denying someone the ability to return.

3. Since the CAP will have much more direct oversight of the return process, ensuring the committee is well informed and trained will be critical. The full CAP will review (after the fact) all denials and a sample of acceptances, for the purpose of providing oversight to the process and helping S3 calibrate the advice it gives to students who apply for return in the future .[23]

4. Decision letters, both denials and acceptances, will go out over the signature of the Chair of CAP.

5. In addition to this significant alteration of the return process, we recommend the following ways to improve the process of the return for students:

    a. S3 should develop an online return application portal that would make it easier for students to submit their materials in a timely fashion. This will require significant technical and financial support.

    b. All students living on campus at the time of their leave, and who have not used their eight semesters of eligibility for housing, should be guaranteed housing upon return. The Housing Office and S3 should consult every semester about the likely return cases to be considered early enough, so that rooms can be set aside for students returning from leave. Furthermore, this planning should prioritize returning students to their previous dormitory assignment, if that is their wish.

    c. It is critical that DSL forward on to the housemasters the list they receive from S3 about returning students, so that housemasters can prepare to support those students as they reintegrate into the community.

    d. The following should occur as soon as practicable after the decision to return:

        i. Reactivation of the MIT ID card

        ii. Assignment to housing

---

[23] This recommendation will be implemented immediately in the Spring 2016 semester for the most recent set of readmission applications. The remaining experiments pertain to readmission applications for Fall 2016 and beyond.

   iii. Decisions about financial aid[24]

  e. If a student switches majors upon return to the institute, notification of the return should be provided to both the student's new department, as well as the original department.

<u>Other Recommendations</u>

Throughout this review, the Committee heard concerns about MIT policies and practices that are outside the CAP's purview, or not in the charge of the committee, but which nonetheless affect the leave and return issues we have reviewed. They should be addressed by the Institute without undue delay.

The related set of issues we wish to flag are the following:
- Involuntary medical leave
- Psychiatric hospitalization
- Graduate student leave and return

We briefly consider these in order.

<u>Involuntary Medical Leave</u>

As mentioned earlier, involuntary medical leave is a process intended for the rarest of cases, when a student is a danger to him- or herself, the community, or both, and when the student refuses to voluntarily commit to a course of action to address the student's condition that has created the situation. Students, faculty, and staff were often incredulous to learn that the policy of involuntary medical leave has never been invoked at the Institute.

We heard from students the frequent claim that the threat of invoking the involuntary medical leave policy has been used to coerce students into taking a leave "voluntarily." This must stop. If there is, in fact, a belief that the policy should be invoked, it should be invoked, not threatened. This attitude must be communicated and reinforced throughout the Institute.

  Therefore, we urge the Chancellor to assign the Medical Department, the DUE, the DSL, and the Dean for Graduate Education (ODGE) the task of reviewing policies related to involuntary medical leave, and that the review be conducted in such a way that widespread engagement with the community occurs.

---

[24] It is particularly important for international students to be made aware of their financial award well in advance of their return to MIT.

Psychiatric Hospitalization

Between 40 and 50 undergraduate students are hospitalized during an academic year, owing to concerns about the student's mental health. We were not charged with reviewing psychiatric hospitalizations, nor did we have the expertise to conduct such a review. However, student concerns about the hospitalization process were universal. The concerns raised included issues of emotional support while in the hospital, communication, coordination among the different offices involved in working with the student and the hospital, and feelings that hospitalized students often feel coerced to take a leave. These concerns loom so large that they are major impediments to the smooth operation of current leave policies.

The concerns we heard were often precisely the same ones that have been expressed for decades around the Institute. This suggests two possibilities. One is that they are inevitable consequences of the circumstances that often lead to hospitalizations and MIT's decentralized administrative culture. The other is that the Institute has devoted insufficient attention to this set of problems, and has been inattentive to working to achieve a community consensus about how to deal with hospitalizations.

> We urge the Chancellor to sponsor a review of MIT's policies concerning student hospitalizations that engages the entire Institute. We believe this review would be a natural fit and could occur together with the review mentioned previously on involuntary medical leaves.

Graduate Student Leave and Return

The Chancellor's charge to the committee confined this review to processes that affect undergraduate students. As the length and complexity of the report suggests, simply focusing on undergraduates is a substantial task. Several times during our review, we were reminded that many of the issues we encountered also pertain to graduate students. Because of the different administrative context of graduate education at MIT — namely, graduate students are admitted by departments, not by a centralized admissions process, and support for graduate students is focused in ODGE (along with graduate administrators in the departments) rather than with S3 — the precise details of the issues we wrestled with differ when it comes to graduate students. Nonetheless, the issue of leaves from and returns to graduate programs causes distress among graduate students and confusion among graduate departments.

> We therefore urge the Dean for Graduate Education to sponsor a review of these issues as they relate to graduate education at MIT.

Committee on Academic Performance
Academic Year 2015--2016

Voting members
- Prof. Charles Stewart III (Chair), Political Science
- Prof. Arnold Barnett, Sloan School of Management
- Prof. Robert Berwick, Electrical Engineering & Computer Science
- Prof. Tanja Bosak, Earth, Atmospheric & Planetary Sciences
- Prof. Scott Hughes, Physics
- Prof. Kristala Jones Prather, Chemical Engineering
- Ms Jeannette Maisano-Brown '17, Physics
- Mr. Obasi Onuoha '17, Computer Science & Engineering
- Ms Amelia Trainer '18, Nuclear Science & Engineering

*Ex-officio* members
- Ms Leslie Bridson, Director of Financial Aid (Designee of Student Financial Services)
- Dean DiOnetta Jones Crayton, Director of the Office of Minority Education/DUE (Designee of the Dean of Undergraduate Education)
- Dr. Haleh Rokni, MIT Medical Department (Designee of the Medical Director)
- Dean Kathleen Monagle, Director of Student Disabilities Services
- Dean Julie Norman, Director of the Office of Undergraduate Advising and Academic Programming, DUE (Designee of the Dean of Undergraduate Education)
- Dean David Randall, Director of Student Support Services
- Ms Ri Romano, Associate Registrar (Designee of the Registrar)

Staff to the committee
- Mr Stephen Pepper, Staff Associate of the Office of Undergraduate Advising and Academic
- Ms Kimberly Benard, Assistant Director in Global Education and Career Development

**Appendix A**

**Results of Readmitted Students Survey**

The returned students survey was designed to gather feedback directly from students who have been through the withdrawal and readmission process, but who might not wish to participate in-person. The survey was sent out via e-mail to a listserv of 194 current students who have returned from withdrawals. The survey consisted of 17 questions (4 Likert-style questions, 10 open-ended questions, and 3 demographic questions), and was divided into four sections: the withdrawal Process, Time Away from the Institute, the Readmission Process, and the Return to MIT. Seventy students began the survey and 45 completed it for a response rate of 23%. Sixteen of the respondents had been on voluntary withdrawal, 20 on medical withdrawal, and 9 on required withdrawal. While the response rate was low, we felt this was an important part of our review process because it would allow students most affected by the process a way to share their feelings anonymously. Answers to the open-ended questions in the survey have been incorporated into the feedback given during the meetings, and are together in the "Findings and Recommendations" section in the body of the report.

*The Withdrawal Process*

The survey included three questions about the withdrawal process, beginning with students' overall impressions: "Using the following scale, indicate your overall impression of the withdrawal process, taking into account all the MIT offices you worked with." Overall responses were normally distributed with most of the responses clustering around a neutral impression. In general, students who took medical withdrawals reported a more negative experience (43% negative or somewhat negative) and those who took required withdrawal had a less negative experience (18% negative or somewhat negative). Students who took voluntary withdrawals generally had a neutral impression of the process. See the graph in the body of the text for more information.

*Time Away from MIT*

Students were asked four questions about resources during their time away from MIT, beginning with their overall experience: "Using the following scale, indicate your overall impression of the resources MIT provided during your time away from MIT." Overall, very few students reported a positive impression (10% positive or somewhat positive). The students on required withdrawal portrayed a negative experience (44% negative or somewhat negative, 0% positive or somewhat positive) as did the students on medical withdrawal (33% negative). Most of the students on voluntary withdrawal reported feeling "neutral" about resources while they were away (78%).

*The Readmission Process*

The next section of the survey focused on the readmission process. It included three questions, beginning with asking students to rate their overall impression of the readmission process. Students on required withdrawal had a more positive experience (55% somewhat positive or positive). Students on voluntary withdrawal reported a more negative experience (50% somewhat negative or negative). Students on medical withdrawal were more mixed (45% negative or somewhat negative and 40% positive or somewhat positive).

*Returning to MIT*

The survey continued by asking about students' experiences coming back to MIT: "Using the following scale, indicate your overall impression of the return process, taking into account all the MIT offices you worked with." Students were more positive overall (60% somewhat positive or positive). None of the students on required withdrawal reported a negative or somewhat negative impression, with the majority reporting positive experiences (77% positive or somewhat positive). As is shown in the graph in the body of the report, there were very few negative impressions overall (19% of students on voluntary withdrawal, 10% of students on medical withdrawal).

**Appendix B**

**Summary of All Recommendations**

Openness of Communication[25]

1. Overall efforts need to be made to communicate actively about how the processes operate, expectations concerning return, and results of the leave and return process.
   a. The CAP and DUE should report annually about the number of students seeking leave and return, the rates of return, and measure of academic success among students who return from leave. The CAP and DUE should also regularly communicate with the faculty and administrative staff about how these processes work, and about the resources available to students, faculty, and staff who come in contact with leave and return.
   b. The CAP and DUE should work with *The Tech* and other communications resources at the Institute to ensure that this same information is reported on a regular basis to the community.

2. S3 should undertake a review of the sections of their website that communicate information concerning leave and return policies, to ensure that the information is communicated clearly and effectively. It should create and regularly update a FAQ section on their website that addresses common concerns about leaves and return.

3. A physical or virtual book of student experiences while on leave should be made available to students considering leave.

Terminology[26]

1. The terms associated with the current processes of withdrawal and readmission should be changed.
   a. The term "withdrawal" should no longer be used; the corresponding processes should be termed "leave."[27] Implementing this change will involve amending the Rules of the Faculty.[28]
   b. The categories of leave that the Institute maintains should be the following:
      i. Personal leave
      ii. Medical leave
      iii. Involuntary medical leave
      iv. Required academic leave

---

[25] For full recommendation, see pp. 13-4.
[26] For full recommendation, see pp. 14-5.

      c.  The term "readmission" should no longer be used and instead be called "return from leave" or just simply "return."

      d.  The term "readmission application" should not be used. Students are not applying to MIT, they are "requesting to return from leave."

2.  Students should be encouraged to use the generic description of being "on leave" when they interrupt their studies at the Institute for the reasons outlined in this section of the report.[29] The categorization of the types of leave (personal leave, medical leave, etc.) is strictly for internal purposes, and should not be reflected on the transcript, in keeping with current practice related to withdrawals. We encourage the registrar to use the terminology "leave of absence" rather than "withdrawal" on the external transcript when students take leave in the middle of the semester. [30]

Streamlining the Processes of Leaving and Returning to MIT[31]

1.  The Institute should create a flexible category of leave, the "leave of absence," that would be available to all students who are eligible to register in the following semester. This category should be flexible, both as it relates to the purpose of the leave and the administrative processes related to claiming the leave and returning from it.

      a.  This status would be reserved for students who are eligible to register in the upcoming semester. Thus, it would not be available for students choosing to withdraw in the middle of the semester or to avoid review by the CAP at the end-of-term meetings.

      b.  Students taking a leave of absence would be permitted to return to the Institute within two years from the date of the leave without formal review.

      c.  Students would be allowed to take one leave of absence over their undergraduate career.

      d.  The administrative process to take a leave of absence would be minimal, but still require students to consult with their advisors and with a dean at S3. It is appropriate to require students taking a leave of absence to discuss their plans and receive advice from their academic advisor and S3 dean, but these consultations should not be considered part of a process to approve the leave.

      e.  The leave of absence and return processes would be managed by S3 and involve very little effort on the part of the student. Students would not need to submit a formal request to return, although it would be appropriate for students to notify the DUE (via S3) of their intended return date according to a published deadline.

---

[31] For full recommendation, see pp. 16-8.

2.   Letters sent to students taking leave for medical or required academic reasons should be revised to more clearly delineate expectations for student return. Leave letters issued by the CAP and S3 should be reviewed and modified to be supportive in tone.

3.   Students should be permitted 72 hours to move out of Institute housing at the time of leave. S3 should carefully coordinate with Housing to ensure that students have adequate ability to move out in this time frame.

4.   Student Financial Services and the Registrar's Office should continue to prorate tuition for students taking leave from the Institute. However, there should be a ten day grace period at the start of the semester so that students may decide to take a leave and still be given a full tuition refund.

5.   Tuition insurance should be more prominently advertised by Student Financial Services.

6.   More flexibility should be allowed for personal and medical leave processes; S3 deans, in consultation with appropriate campus colleagues, should have the ability to decrease the required minimum amount of time away or provide fewer expectations.

7.   Required academic leave should still be for a full year but students should be asked to demonstrate academic readiness over the course of one semester rather than two.


<u>Support While on Leave</u>[32]

1.   It should be made clear to students when they take leave from the Institute, especially if the leave is required or unplanned, that their admission to MIT has not been withdrawn, they are still a part of the MIT community, and that we are eager to see them return and graduate.

2.   An action plan should be developed for every student who takes leave from MIT, regardless of the reason for the leave. This action plan — which should be shared and developed with the active participation of the student — should not only record expectations about what the student will be doing while on leave and what is required to re-register in the future, but should also explicitly identify MIT contacts for students at time of leave for while they are away.

3.   Better efforts should be made to clarify to students and departments that students on leave are strongly encouraged to be in contact with their dean, academic advisor, and department for support and guidance.

---

[32] For full recommendation, see pp. 18-20.

4. The Institute's Suspension of Services statement[33] should be reviewed to make clear to students both the support available, as well as the limits of what they may do in the community. It is appropriate that students on leave not live in MIT owned or affiliated housing, attend classes, participate in UROP, or have an activated MIT card. However, as a general matter, students on leave should not be precluded from activities on campus any more than members of the local community. In other words, it should generally be appropriate for students on leave to be employed at MIT and participate in campus activities that are open to non-students.[34] The committee agrees that students should be permitted to retain their MIT email address through sponsorship. The committee acknowledges, however, that for many students, physical distance from MIT is exactly what is necessary to address the issues that were causing problems at the Institute.

5. S3 should extend its robust and lauded program of support for returning students to students on leave, by developing an extended mentorship network with returned students, alumni, and interested faculty members.

6. The MIT Medical Department should investigate the cost involved to offer MIT Health Insurance to all students who take leave and were on the MIT Extended Plan. This would extend a policy that currently applies to students who take medical leave to all students on leave. For students who do not purchase the Extended Plan, every effort should be made by the MIT Medical Department to educate students about the health care exchanges and the importance of adequate health insurance coverage.

7. MIT should establish a fund to help support students with financial hardships who are on leave, to relieve the burdens that are often imposed, especially when students are required to withdraw for academic reasons. The funding requirements to fulfill this recommendation are not trivial, and could approach $500,000 a year. However, we believe that such an effort is critical if we are to make our commitment to students on leave a reality.

Returning to MIT[35]

1. To position S3 and the CAP to do their respective jobs, it is absolutely critical for there to be clear and explicit expectations at the time of the leave (see recommendation #2 in the "Streamlining the processes of leaving and returning to MIT section"). Indeed, the leave needs to be connected closely to the return and this starts with specific expectations. Recommendations from MIT Medical need to be clear, and the CAP also needs to clarify a standard set of expectations for students on academic required leave.

---

[35] For full recommendation, see pp. 20-4.

2. With a clear set of expectations it is our hope that the Readmission Committee in S3 could be dissolved. S3's role would transform from being a decision maker in this process to being a coordinator and supporter. We anticipate that there will be a transition period to get to this state, and that the CAP and S3 will collaborate with S3 to make the change as quickly and smoothly as possible.

    a. S3 would be responsible for assembling the return materials, shepherding the students through the process, and providing the CAP with information about whether or not the concrete expectations for leave were met.

    b. MIT Medical and Mental Health would be asked to provide clear guidance about medical clearance and academic departments would be asked to do the same about academic readiness to return.

    c. Our vision is that the CAP Chair can make decisions on behalf of the committee, but would consult with additional members of the CAP to deny someone the ability to return.

3. Since the CAP will have much more direct oversight of the return process, ensuring the committee is well informed and trained will be critical. The full CAP will review (after the fact) all denials and a sample of acceptances, for the purpose of providing oversight to the process and helping S3 calibrate the advice it gives to students who apply for return in the future .[36]

4. Decision letters, both denials and acceptances, will go out over the signature of the Chair of CAP.

5. In addition to this significant alteration of the return process, we recommend the following ways to improve the process of the return for students:

    a. S3 should develop an online return application portal that would make it easier for students to submit their materials in a timely fashion. This will require significant technical and financial support.

    b. All students living on campus at the time of their leave, and who have not used their eight semesters of eligibility for housing, should be guaranteed housing upon return. The Housing Office and S3 should consult every semester about the likely return cases to be considered early enough, so that rooms can be set aside for students returning from leave. Furthermore, this planning should prioritize returning students to their previous dormitory assignment, if that is their wish.

    c. It is critical that DSL forward on to the housemasters the list they receive from S3 about returning students, so that housemasters can prepare to support those students as they reintegrate into the community.

    d. The following should occur as soon as practicable after the decision to readmit a student:

        i. Reactivation of the MIT ID card

        ii. Assignment to housing

      iii.   Decisions about financial aid[37]

    e.   If a student switches majors upon return to the institute, notification of the return should be provided to both the student's new department, as well as the original department.

Involuntary Medical Leave[38]

Therefore, we urge the Chancellor to assign the Medical Department, the DUE, the DSL, and the Dean for Graduate Education (ODGE) the task of reviewing policies related to involuntary medical leave, and that the review be conducted in such a way that widespread engagement with the community occurs.

Psychiatric Hospitalization[39]

We urge the Chancellor to sponsor a review of MIT's policies concerning student hospitalizations that engages the entire Institute. We believe this review would be a natural fit and could occur together with the review mentioned previously on involuntary medical leaves.

Graduate Student Leave and Return[40]

We therefore urge the Dean for Graduate Education to sponsor a review of these issues as they relate to graduate education at MIT.

---

[38] For full recommendation, see p. 24.
[39] For full recommendation, see p. 25
[40] For full recommendation, see p. 25

**U.S. District Court, District of Connecticut**

**CIVIL ACTION no. 3:20-cv-00133-JCH**

# Exhibit 10

Attached to Plaintiff's Motion for Preliminary Injunction

Dated: February 23, 2020

Description:

Communication from Yale College
Benjamin Franklin College



**Jakub Madej <jakub.madej@yale.edu>**

## Mail in BF College Office

1 message

**Benjamin Franklin College At Yale** <benjaminfranklincollege@gmail.com>                    Mon, Jan 27, 2020 at 11:19 AM
To: Benjamin Franklin <benjaminfranklincollege@gmail.com>

If you are receiving this email, you have mail in the Benjamin Franklin College Office. Come pick it up as soon as you can, and keep in mind that the office is open on weekdays from 10am to 5pm. Thanks, and have a great day.



**Jakub Madej <jakub.madej@yale.edu>**

## Mail in the Office
1 message

**Benjamin Franklin College Aides** <bfcaides@yale.edu>          Fri, Jan 31, 2020 at 4:02 PM

Hi!

Please pick up your mail in the HOC office. We are open from 9 am to 5 pm.

All the best,
BFC Aide



**Jakub Madej <jakub.madej@yale.edu>**

---

## You've Got Mail!
1 message

---

**Benjamin Franklin College Aides** <bfcaides@yale.edu>                    Thu, Feb 6, 2020 at 10:26 AM

Good Morning,

You have mail in the HoC office. Please pick it up at earliest convenience.

Thank you!

Best wishes,
BF College Aide



**Jakub Madej <jakub.madej@yale.edu>**

## Mail in the Office

**Benjamin Franklin College Aides** <bfcaides@yale.edu>                    Wed, Feb 12, 2020 at 11:51 AM

Hi!

We have received mail for you in the college office. Please pick it up as soon as possible, we are open from 9-5pm on weekdays! Thank you.

Best,
BF College Aide



**Jakub Madej <jakub.madej@yale.edu>**

---

## mail in hoc office

---

**Benjamin Franklin College Aides** <bfcaides@yale.edu>                              Fri, Feb 21, 2020 at 11:19 AM

see subject

-namra
college aide

**U.S. District Court, District of Connecticut**

**CIVIL ACTION no. 3:20-cv-00133-JCH**

# Exhibit 11

Attached to Plaintiff's Motion for Preliminary Injunction

Dated: February 23, 2020

Description:

Communication from Yale Health
Part 1.



**Jakub Madej <jakub.madej@yale.edu>**

---

## Yale Health
9 messages

---

**Riollano Bayouth, Carlos** <carlos.riollano@yale.edu>                    Mon, Jan 6, 2020 at 10:20 AM
To: "jakub.madej@yale.edu" <jakub.madej@bulldogs.yale.edu>

Hello Jakub,

Hope you had a wonderful holiday. I'm following up about your last Yale Health visit and would like to find a good time to meet. Perhaps you can give me your available times to find one that matches mine. Look forward to hearing from you soon.

Bests

Carlos

**Carlos Riollano, Ph.D.**

**Postdoctoral Fellow**

**Mental Health and Counseling**

**Yale Health Center**

**Desk: (203)436-5412**

**carlos.riollano@yale.edu**

---

**Jakub Madej** <jakub.madej@yale.edu>                              Mon, Jan 6, 2020 at 5:34 PM
To: "Riollano Bayouth, Carlos" <carlos.riollano@yale.edu>
Cc: "jakub.madej@yale.edu" <jakub.madej@bulldogs.yale.edu>

Hi Carlos,

Thanks for reaching out! Glad you remembered about our visit even though it was brief and short notice.

I tentatively scheduled a visit with Doctor Paxton back in December – should I separately meet you and her, choose one person depending on availability, or something else? I'm new to the Mental Health department, so I may be missing something.

Have a great Monday,
Jakub
[Quoted text hidden]

---

**Riollano Bayouth, Carlos** <carlos.riollano@yale.edu>                    Tue, Jan 7, 2020 at 11:10 AM
To: "jakub.madej@yale.edu" <jakub.madej@bulldogs.yale.edu>

Hi Jakub

We have different roles. How about we meet and further talk about ques  ons you may have.

Best

Carlos

[Quoted text hidden]

---

**Jakub Madej** <jakub.madej@yale.edu>                                    Wed, Jan 8, 2020 at 11:00 AM
To: "Riollano Bayouth, Carlos" <carlos.riollano@yale.edu>
Cc: "jakub.madej@yale.edu" <jakub.madej@bulldogs.yale.edu>

Sounds good to me!

I return to New Haven on January 13 but I have to sort a few unfinished things soon after my arrival. How about the week of January 30, for example Friday? Early morning is always good for me (even very early) but I'm flexible.

How early can we schedule a meeting on a given day? Just trying to fit this into my schedule; few courses meet on Friday, so I'm generally more available then, but other days of the week are also an option.

Otherwise, I can pick a date if you suggest a few that work for you.

Have a great Wednesday,
Jakub

[Quoted text hidden]

---

**Riollano Bayouth, Carlos** <carlos.riollano@yale.edu>                   Wed, Jan 8, 2020 at 12:15 PM
To: "jakub.madej@yale.edu" <jakub.madej@bulldogs.yale.edu>

Hi Jakub

I have you confirmed for Friday 1/31 @9:15 am.

See you then

[Quoted text hidden]

---

**Jakub Madej** <jakub.madej@yale.edu>                                    Mon, Jan 27, 2020 at 10:25 PM
To: "Riollano Bayouth, Carlos" <carlos.riollano@yale.edu>

Hi Carlos, are we still good for Friday 1/31 @ 9.15 am?

Best,
Jakub

**Jakub Madej** | Class of 2020, Yale College (?) | P.O. Box 204000, New Haven, CT 06520-4000 | (203)-928-8486 |
jakub.madej@yale.edu

if you ever need to reach me quickly, just call (203)-928-8486. i will pick up or call you back

[Quoted text hidden]

---

**Riollano Bayouth, Carlos** <carlos.riollano@yale.edu>                   Tue, Jan 28, 2020 at 11:04 AM
To: "jakub.madej@yale.edu" <jakub.madej@bulldogs.yale.edu>

Hi Jakub

Yes we are,

See you then

**U.S. District Court, District of Connecticut**

**CIVIL ACTION no. 3:20-cv-00133-JCH**

# Exhibit 12

Attached to Plaintiff's Motion for Preliminary Injunction

Dated: February 23, 2020

Description:

Communication from Yale Health
Part 2.

[Quoted text hidden]

---

**Jakub Madej** <jakub.madej@yale.edu>                    Tue, Feb 4, 2020 at 11:15 AM
To: "Riollano Bayouth, Carlos" <carlos.riollano@yale.edu>

Hi Carlos,

Thanks for arranging the prescription. I assume it was Doctor Paxton who prescribed it -- I just received a call directly from the pharmacy.

I picked up one medication last weekend; the pharmacist said he only received one prescription. I don't know if that's an error on their side, or something else. What should I do to make sure they receive the other prescription? Or who should I talk to?

I put down our next appointment for 2/21 at 12:15p in my calendar. I will let you know if anything changes.

Thanks,
Jakub

**Jakub Madej** | Class of 2020, Yale College (?) | P.O. Box 204000, New Haven, CT 06520-4000 | (203)-928-8486 |
jakub.madej@yale.edu

if you need to reach me quickly, call (203)-928-8486. i will pick up or call you back

[Quoted text hidden]

---

**Jakub Madej** <jakub.madej@yale.edu>                    Tue, Feb 11, 2020 at 8:20 PM
To: "Riollano Bayouth, Carlos" <carlos.riollano@yale.edu>

Hi Carlos,

Let me know what should I do. I can e-mail Doctor Paxton directly, if necessary.

Best,
Jakub

**Jakub Madej** | Class of 2020, Yale College (?) | P.O. Box 204000, New Haven, CT 06520-4000 | (203)-928-8486 |
jakub.madej@yale.edu

if you need to reach me quickly, call (203)-928-8486. i will pick up or call you back

[Quoted text hidden]

---

**Jakub Madej** <jakub.madej@yale.edu>                    Mon, Feb 17, 2020 at 7:53 AM
To: Heather Lee Paxton <heather.paxton@yale.edu>

Hi Doctor Paxton,

Carlos recently arranged a prescription for me. I assume he did it directly with you. I tried to get in touch with him but he didn't get back to me yet. I assume he's been busy recently.

I picked up the medication at Stop & Shop, where I usually do it, but the pharmacist there said they only received one prescription, though I take two different medications (Effexor and Concerta). Could you issue a second prescription for me, please? I am almost running out.

Thanks!
Jakub

**Jakub Madej** | Class of 2020, Yale College (?) | P.O. Box 204000, New Haven, CT 06520-4000 | (203)-928-8486 |
jakub.madej@yale.edu

if you need to reach me quickly, call (203)-928-8486. i will pick up or call you back

[Quoted text hidden]

---

**Riollano Bayouth, Carlos** <carlos.riollano@yale.edu>                    Tue, Feb 18, 2020 at 10:07 AM
To: "jakub.madej@yale.edu" <jakub.madej@bulldogs.yale.edu>

Hi Jakub,

Unfortunately your status prevents us from further providing our services. There are several providers in New Haven you could look into should you have a private insurance. Otherwise, there's also other clinics in New Haven that provide services without insurance, such as the CMHC. Should there be an emergency go to the YNHH ER.

All the best,

[Quoted text hidden]

---

**Jakub Madej** <jakub.madej@yale.edu>                    Thu, Feb 20, 2020 at 8:15 AM
To: "Riollano Bayouth, Carlos" <carlos.riollano@yale.edu>
Cc: "jakub.madej@yale.edu" <jakub.madej@bulldogs.yale.edu>

Hi Carlos,

I understand. What is my current status in the system? Did it change since our last visit? I see no change in my MyChart account; in fact, our Friday appointment shows up as confirmed. What was my status two and a half weeks ago when I requested a prescription? I received only one medication at the pharmacy, whether intentionally or by mistake. I am almost out of medication at the moment -- I sent several e-mails to you precisely to avoid this situation.

Best,
Jakub

**Jakub Madej** | Class of 2020, Yale College (in litigation) | P.O. Box 204000, New Haven, CT 06520-4000 | (203)-928-8486 | jakub.madej@yale.edu

if you need to reach me quickly, call (203)-928-8486. i will pick up or call you back

[Quoted text hidden]

---

**Riollano Bayouth, Carlos** <carlos.riollano@yale.edu>                    Thu, Feb 20, 2020 at 11:42 AM
To: "jakub.madej@yale.edu" <jakub.madej@bulldogs.yale.edu>

Hi Jakub,

I checked with member services and your eligibility expired on 1/31 2020 due to Withdrawal. You may forward further ques ons to member.services@yale.edu. I reiterate my previous message. Should there be an emergency please go to the ER at Yale New Haven Hospital.

Best,

[Quoted text hidden]

---

**Jakub Madej** <jakub.madej@yale.edu>                    Thu, Feb 20, 2020 at 12:00 PM
To: "Riollano Bayouth, Carlos" <carlos.riollano@yale.edu>
Cc: "jakub.madej@yale.edu" <jakub.madej@bulldogs.yale.edu>

Ok, thank you.

Jakub

[Quoted text hidden]

---

**Jakub Madej** <jakub.madej@yale.edu>                                        Thu, Feb 20, 2020 at 2:33 PM
To: "Riollano Bayouth, Carlos" <carlos.riollano@yale.edu>
Cc: "jakub.madej@yale.edu" <jakub.madej@bulldogs.yale.edu>

Just one more quick question: can I check on MyChart whether my coverage ended on 1/31/2020 or on some other date? I believe that's your what system says – I'm just trying to establish some facts.

Jakub

[Quoted text hidden]

**U.S. District Court, District of Connecticut**

**CIVIL ACTION no. 3:20-cv-00133-JCH**

# Exhibit 13

Attached to Plaintiff's Motion for Preliminary Injunction

Dated: February 23, 2020

Description:

Communication with Jessie Royce Hill
October 2019



**Jakub Madej <jakub.madej@yale.edu>**

---

## PSYC 330
8 messages

---

**Hill, Jessie** <jessie.hill@yale.edu>                                              Thu, Oct 10, 2019 at 3:02 PM
To: "jakub.madej@yale.edu" <jakub.madej@bulldogs.yale.edu>

Dear Jakub,


I heard from Prof. Lockhart that you were erroneously enrolled in her course, though you hadn't applied or been given a spot.  I'm writing in part to confirm that will be withdrawn from the course, which I believe you already know.


I'm also wondering if you'd like to meet next week or after the break to talk through your classes and see what might be helpful to optimize your experience in the back half of the semester.  As you're aware, you are on academic warning this term so it's important to pass your classes and keep progressing. I'd be happy to set up a time to touch base.



Best,

Dean Hill

---

**Jakub Madej** <jakub.madej@yale.edu>                                          Thu, Oct 10, 2019 at 9:37 PM
To: "Hill, Jessie" <jessie.hill@yale.edu>
Cc: "jakub.madej@yale.edu" <jakub.madej@bulldogs.yale.edu>

Hi Jessie,

Thanks for letting me know. I was not aware I'm on academic warning this term -- no one ever notified me about this but, judging by academic regulations, it should be my responsibility. Was it because I dropped out of these classes last semester?

I did enrol in this course -- the syllabus didn't mention anything about applications (it still doesn't) or a limited number of spots. I originally intended to register for a BK college writing seminar on journalism & Wall Street but I indeed wasn't given a spot there. I received a message from professor Lockhart where she explained the situation -- I understand she turned away many people but the syllabus didn't contain a clue about limited enrollment and/or a need for an application. I'm checking the number of credits required for graduation with Michelle as we speak -- apparently she was out of the office today.

I'll come after the break, as I leave campus this Monday.  What times work for you/when are your office hours?

Best,
Jakub

**Jakub Madej** | Class of 2020, Yale College | P.O. Box 204000, New Haven, CT 06520-4000 | (203)-928-8486 |
jakub.madej@yale.edu

[Quoted text hidden]

**Hill, Jessie** <jessie.hill@yale.edu>                                    Thu, Oct 10, 2019 at 10:02 PM
To: "jakub.madej@yale.edu" <jakub.madej@bulldogs.yale.edu>

Dear Jakub,

You were placed on academic warning on May 31 and the letter I'm attaching was emailed to you at that time.
Additionally, I emailed you on August 20 before the term started suggesting we meet and talk about a good game plan for
the term.  Michelle also followed up to try to arrange an appointment.

I'm happy to meet upon your return from break and think it's a good idea we do.  Can you come in Monday the 21st? I am
open that entire morning at the moment.  Let me know what works.

Best,

Dean Hill

Jessie Royce Hill

Dean of Benjamin Franklin College
Yale University

(203) 432-2934



[Quoted text hidden]

---

 **Jakub Madej.pdf**
167K

---

**Jakub Madej** <jakub.madej@yale.edu>                                    Thu, Oct 10, 2019 at 10:11 PM
To: "Hill, Jessie" <jessie.hill@yale.edu>
Cc: "jakub.madej@yale.edu" <jakub.madej@bulldogs.yale.edu>

I checked my e-mail for May 31 and neighbouring dates, and I have *not* received this email. I understand it might have
been sent via snail mail to my home address in Europe -- I was there twice this summer and never received any
correspondence from Yale. I remember Michelle contacting me in September but I didn't know at all it's about academic
warning... I see your e-mail but again, it didn't say anything about the academic warning -- thus I assume you're just
offering general help. Regardless of what happened, I wish I knew about all of this before.

I won't be here on Monday the 21st, unfortunately. I could come next Monday (Nov 14) morning or any time?

Best,
Jakub

**Jakub Madej** | Class of 2020, Yale College | P.O. Box 204000, New Haven, CT 06520-4000 | (203)-928-8486 |
jakub.madej@yale.edu

[Quoted text hidden]

**Hill, Jessie** <jessie.hill@yale.edu>                                    Sun, Oct 20, 2019 at 5:36 PM
To: "jakub.madej@yale.edu" <jakub.madej@bulldogs.yale.edu>

Dear Jakub,

Hope you've had a nice break.  First, my apology, as I checked and see that while I filed your letter of academic warning in May I did <u>not</u> forward you a copy.  I'm sorry about that.  While you are correct that the academic regulations place the onus on the student to track their progress, I do make it a practice to inform my students directly. I checked my sent batch from the spring and yours was not among them. I regret the omission.

Let's definitely meet before Nov. 14 to set as positive a plan as we can for the second half of the term. When are you availavle this week?

Best,

Dean Hill

[Quoted text hidden]

---

**Jakub Madej** <jakub.madej@yale.edu>                                    Sun, Oct 20, 2019 at 11:00 PM
To: "Hill, Jessie" <jessie.hill@yale.edu>
Cc: "jakub.madej@yale.edu" <jakub.madej@bulldogs.yale.edu>

This week is difficult for me but I suggest next Tuesday or Wednesday. <u>The 2 pm - 4 pm time slot works best for me but I can come any time during these days.</u> Let me know what works best for you.

Best,
Jakub

Jakub Madej | Class of 2020, Yale College | P.O. Box 204000, New Haven, CT 06520-4000 | (203)-928-8486 | jakub.madej@yale.edu

[Quoted text hidden]

---

**Hill, Jessie** <jessie.hill@yale.edu>                                    Thu, Oct 24, 2019 at 11:04 AM
To: "jakub.madej@yale.edu" <jakub.madej@bulldogs.yale.edu>

Hi Jakub,

Tuesday the 29th at 2:00 works well. Look forward to seeing you then.

[Quoted text hidden]

---

**Jakub Madej** <jakub.madej@yale.edu>                                    Thu, Oct 24, 2019 at 11:08 AM
To: Jessie Royce Hill <jessie.hill@yale.edu>
Cc: "jakub.madej@yale.edu" <jakub.madej@bulldogs.yale.edu>

Great! Thanks.

Jakub
[Quoted text hidden]



**image001.png**
8K

**U.S. District Court, District of Connecticut**

**CIVIL ACTION no. 3:20-cv-00133-JCH**

# Exhibit 14

Attached to Plaintiff's Motion for Preliminary Injunction

Dated: February 23, 2020

Description:

Communication with Mark Schenker



Jakub Madej <jakub.madej@yale.edu>

---

## Reply Requested - Your Petition to the Committee on Honors and Academic Standing (MJS)

2 messages

---

**Schenker, Mark** <mark.schenker@yale.edu>                    Wed, Jan 15, 2020 at 12:05 PM
To: "jakub.madej@yale.edu" <jakub.madej@bulldogs.yale.edu>
Cc: "Insley, Sarah" <sarah.insley@yale.edu>, "Hill, Jessie" <jessie.hill@yale.edu>, "Tracey, Michelle" <michelle.tracey@yale.edu>


[Please acknowledge receipt of this le er. A signed hard copy will also be provided to you. -MJS]



# Yale College

*Office of the Dean*          *Campus address:*

*P.O. Box 208241*          *Grove & Prospect Streets*

*New Haven, CT 06520-8241*          *Telephone: (203) 432-2900*

*Fax: (203) 432-7369*


15 January 2020


Mr. Jakub Madej

c/o Benjamin Franklin College Dean's Office


*sent also via email*


Dear Mr. Madej,


As you already know from my email to you of this past Monday evening, the Committee on Academic Standing met on 13 January to consider your petition for an exception to the Academic Regulations regarding withdrawal for academic reasons. As you also know, the Committee voted not to grant your request. As a result, your withdrawal from College for academic reasons has been reinstated. As I previously informed you, you have until 8 pm on Thursday 16 January—72 hours from my emailed notice to you of the Committee's action—to turn in your ID card and any other University property (such as keys or access devices) to the office of your residential college dean. You will not be charged tuition for spring term 2019-2020, but there may be a prorated charge for room and board, if relevant. You will want to be sure to consult with the Office of Financial Aid, if relevant, and with the Office of International Students and Scholars.

Please consult closely with Dean Hill about this withdrawal and the routes available to you for the completion of your degree requirements.

The Committee is made up of tenured and non-tenured members of the Yale College Faculty, representatives of the Yale College Dean's Office, and undergraduate students. I serve as Chairman. In advance of the meeting, each of the members of the Committee had received a copy of: your (dated 8 January); a cover letter (8 January) from the residential college dean in the form on an email; a letter from Dean Hill to you (6 January) informing you of this academic withdrawal; and your academic record.

The members reviewed these materials with care, and with special attention to the grade of F you earned last term in ECON 456, which grade resulted in your withdrawal from Yale College for academic reasons. Noting that your "argument" that the "Grade of 'F' in ECON 456 Wasn't Justified" was the last of those you presented in your petition, members could find no grounds for agreeing with your view of that grade. The Committee observed that you stated in your petition that you "made a series of easily avoidable mistakes" and that you submitted the final paper after the deadline.

They noted also that, while it is regrettable that the BF Dean's Office did not send you in May a letter informing you that you would be on Academic Warning (AW) in for the fall term of 2019-2020, you had been informed of this consequence by the BF Dean's Office senior administrative assistant in spring 2019, when you withdrew from MATH 251 after midterm, thereby having a course schedule that would earn no more than two course credits, which is a condition of AW. They noted also that Dean Hill subsequently gave you a copy of the AW letter in August and that by your own account, you were aware of your AW status in October, well before the end of the fall term.

Lastly, the Committee was mindful of what the Academic Regulations have to say about Academic Warning:

> Academic Warning is an indication that a student's scholastic record is unsatisfactory. Students on Academic Warning who do not pass all of their courses in the term in which they are on Academic Warning will be dismissed for academic reasons. No matter how many course credits a student has earned, Academic Warning is automatic in the following cases: (a) failure in one term to earn more than two course credits; (b) a record that shows two grades of F in one term; (c) in two successive terms, a record that shows a grade of F for any course. **The college deans attempt to give written notification of Academic Warning to students whose records show these deficiencies, but such students should regard themselves as being on warning even in the absence of written notification.** A student permitted to continue in Yale College with fewer than the number of course credits ordinarily required for academic good standing may be placed on Academic Warning, and in such a case the student will be notified that he or she has been placed on warning. See section D, Promotion and Good Standing, "Requirements for Academic Good Standing." The Committee on Honors and Academic Standing may at its discretion disqualify a student on Academic Warning from participation in recognized University organizations.

> [Chapter II, Section I, "Academic Penalties and Restrictions,"
>
> *Yale College Program of Study, 2019-2020*; emphasis added]

In the end, the Committee could find no grounds for granting you the exception you were seeking and so voted without dissent not to approve your request. As a result, the grade of F recorded for you in ECON 456 will stand. Your withdrawal from Yale College for academic reasons has already been processed; you will want to be in close contact with your dean and with the Office of International Students and Scholars.

The members join me in the hope that as you move forward you will consider the full ramifications of your statement that "I don't think Academic Regulations apply differently to me than to any other student at Yale." And as importantly, that you give serious thought to how you wish to manage your study in Yale College before you re-engage in it following your current withdrawal and future reinstatement.

Yours sincerely,

Mark J. Schenker

Dean of Academic Affairs

cc:   Dean Jessie Royce Hill, Benjamin Franklin College

       Dean Sarah E. Insley, Secretary of the Committee on Honors & Academic Standing

       Ms. Emily Shandley, University Registrar

---

**Jakub Madej** <jakub.madej@yale.edu>                                        Fri, Jan 17, 2020 at 6:17 AM
To: "Schenker, Mark" <mark.schenker@yale.edu>
Cc: "jakub.madej@yale.edu" <jakub.madej@bulldogs.yale.edu>, "Insley, Sarah" <sarah.insley@yale.edu>, "Hill, Jessie" <jessie.hill@yale.edu>, "Tracey, Michelle" <michelle.tracey@yale.edu>

Dear Mr Schenker,

I confirm that I have received your e-mail, and read it with care yesterday. Michelle passed a hard copy to me when I came to pick up my other mail from Benjamin Franklin's College Office.

I have already consulted with the Office of Financial Aid and with the Office of International Students and Scholars -- Ozan Say was welcoming and helpful, as always. I assume that the explanation for the Committee's decision you provided in your e-mail is final, and I won't receive any further official documents or explanations regarding this decision. But please correct me if I am wrong.

I believe that a number of crucial points I made in my petition have not been satisfactorily addressed, and two important statements regarding my AW in the Committee's explanation are factually untrue, or simply false. Is there a way, formal or informal, to appeal from the decision on my case within Yale College or Yale University? If so, what would it be? Unfortunately, Undergraduate Regulations provide little guidance on this matter, as they did regarding my first appeal to this Committee, so I thought I would ask directly. I'm also interested in understanding the procedure by which the Committee reaches its final decision and how many members were sitting on the Committee on that day; is this information available?

In any case, I would like to better understand the Committee's thinking that led to this outcome. I think it would be more effective for everyone to speak in person than exchange e-mails. When would you be available to talk about this? How do I schedule an appointment with you? I was told your office is located on 1 Prospect Street, close to the Psychology Department.

I will contact Dean Hill separately with my other questions, including those about reinstatement.

Thanks,
Jakub

**Jakub Madej** | Class of 2020, Yale College (?) | P.O. Box 204000, New Haven, CT 06520-4000 | (203)-928-8486 |
jakub.madej@yale.edu

if you ever need to reach me quickly, just call (203)-928-8486. i will pick up or call you back

[Quoted text hidden]



**Jakub Madej <jakub.madej@yale.edu>**

---

## Madej BF '20 - In repply to your email of 17 January
1 message

---

**Schenker, Mark** <mark.schenker@yale.edu>                                    Mon, Jan 20, 2020 at 2:30 PM
To: "jakub.madej@yale.edu" <jakub.madej@bulldogs.yale.edu>
Cc: "jakub.madej@yale.edu" <jakub.madej@bulldogs.yale.edu>, "Insley, Sarah" <sarah.insley@yale.edu>, "Hill, Jessie"
<jessie.hill@yale.edu>, "Tracey, Michelle" <michelle.tracey@yale.edu>

Dear Mr. Madej,


I have attached a corrected version of my letter to you, and can have a signed hard copy mailed to a postal address you
provide. I regret my error (which had no bearing on the members' deliberations nor vote) and any confusion it may have
caused you.


The Committee's decision is indeed final, and my letter to you of 15 January (corrected 19 January, and included also below)
provides the grounds for the Committee's denial of your request. There will be no further formal written communication from
me on behalf of the Committee regarding your petition nor the members' action.


As to your question below: the Committee on Honors and Academic has seven voting members, and can act on petitions
and other matters requiring a vote with a quorum of four members present. The number of members present and voting on
your request exceeded that minimum number.


I cannot agree that it would be "more effective for everyone to speak in person." As you have already seen, the Committee
does it work *via written statements and documents*. Given this fact, and that I neither had a vote in the members' decision
nor am I empowered to alter it, I ask that you send me any questions or concerns in writing, and I will do my best to reply to
you as soon as I am able, within the limits of what I have written above (that is, I will not be speaking for the members
regarding your petition nor the Committee's vote).


Sincerely,


Mark J. Schenker

Dean of Academic Affairs


---

**From:** Jakub Madej <jakub.madej@yale.edu>
**Date:** Friday, January 17, 2020 at 6:18 AM
**To:** "Schenker, Mark" <mark.schenker@yale.edu>
**Cc:** "jakub.madej@yale.edu" <jakub.madej@bulldogs.yale.edu>, "Insley, Sarah"
<sarah.insley@yale.edu>, "Hill, Jessie" <jessie.hill@yale.edu>, "Tracey, Michelle"
<michelle.tracey@yale.edu>
**Subject:** Re: Reply Requested - Your Petition to the Committee on Honors and Academic Standing
(MJS)

Dear Mr Schenker,

I confirm that I have received your e-mail, and read it with care yesterday. Michelle passed a hard copy to me when I came to pick up my other mail from Benjamin Franklin's College Office.

I have already consulted with the Office of Financial Aid and with the Office of International Students and Scholars -- Ozan Say was welcoming and helpful, as always. I assume that the explanation for the Committee's decision you provided in your e-mail is final, and I won't receive any further official documents or explanations regarding this decision. But please correct me if I am wrong.

I believe that a number of crucial points I made in my petition have not been satisfactorily addressed, and two important statements regarding my AW in the Committee's explanation are factually untrue, or simply false. Is there a way, formal or informal, to appeal from the decision on my case within Yale College or Yale University? If so, what would it be? Unfortunately, Undergraduate Regulations provide little guidance on this matter, as they did regarding my first appeal to this Committee, so I thought I would ask directly. I'm also interested in understanding the procedure by which the Committee reaches its final decision and how many members were sitting on the Committee on that day; is this information available?

In any case, I would like to better understand the Committee's thinking that led to this outcome. I think it would be more effective for everyone to speak in person than exchange e-mails. When would you be available to talk about this? How do I schedule an appointment with you? I was told your office is located on 1 Prospect Street, close to the Psychology Department.

I will contact Dean Hill separately with my other questions, including those about reinstatement.

Thanks,

Jakub

———————————————

# Yale College

*Office of the Dean*

*P.O. Box 208241*

*New Haven, CT 06520-8241*

*Campus address:*

*Grove & Prospect Streets*

*Telephone: (203) 432-2900*

*Fax: (203) 432-7369*

{CORRECTION to letter of 15 January 2020, underlined in the 5th paragraph below. The error was entirely mine. The members had the correct information in the materials they received, as I did myself. I regret that I made the mistake in composing my first letter to you. - MJS ]

19 January 2020

Mr. Jakub Madej BF '20

c/o Benjamin Franklin College Dean's Office

*sent also via email*

Dear Mr. Madej,

As you already know from my email to you of this past Monday evening, the Committee on Academic Standing met on 13 January to consider your petition for an exception to the Academic Regulations regarding withdrawal for academic reasons. As you also know, the Committee voted not to grant your request. As a result, your withdrawal from College for academic reasons has been reinstated. As I previously informed you, you have until 8 pm on Thursday 16 January—72 hours from my emailed notice to you of the Committee's action—to turn in your ID card and any other University property (such as keys or access devices) to the office of your residential college dean. You will not be charged tuition for spring term 2019-2020, but there may be a prorated charge for room and board, if relevant. You will want to be sure to consult with the Office of Financial Aid, if relevant, and with the Office of International Students and Scholars.

Please consult closely with Dean Hill about this withdrawal and the routes available to you for the completion of your degree requirements.

The Committee is made up of tenured and non-tenured members of the Yale College Faculty, representatives of the Yale College Dean's Office, and undergraduate students. I serve as Chairman. In advance of the meeting, each of the members of the Committee had received a copy of: your petition (dated 8 January); a cover letter (8 January) from the residential college dean in the form on an email; a letter from Dean Hill to you (6 January) informing you of this academic withdrawal; and your academic record.

The members reviewed these materials with care, and with special attention to the grade of F you earned last term in ECON 456, which grade resulted in your withdrawal from Yale College for academic reasons. Noting that your "argument" that the "Grade of 'F' in ECON 456 Wasn't Justified" was the last of those you presented in your petition, members could find no grounds for agreeing with your view of that grade. The Committee observed that you stated in your petition that you "made a series of easily avoidable mistakes" and that you submitted the final paper after the deadline.

They noted also that, while it is regrettable that the BF Dean's Office did not send you in May a letter informing you that you would be on Academic Warning (AW) in for the fall term of 2019-2020, you had been informed of this consequence by the BF Dean's Office senior administrative assistant in spring 2019, when you withdrew from MATH 251 after midterm, thereby having a course schedule that would earn no more than two course credits, which is a condition of AW. They noted also that Dean Hill subsequently sent you a copy of the AW letter in October and that by your own account, you were aware of your AW status in October, well before the end of the fall term.

Lastly, the Committee was mindful of what the Academic Regulations have to say about Academic Warning:

Academic Warning is an indication that a student's scholastic record is unsatisfactory. Students on Academic Warning who do not pass all of their courses in the term in which they are on Academic Warning will be dismissed for academic reasons. No matter how many course credits a student has earned, Academic Warning is automatic in the following cases: (a) failure in one term to earn more than two course credits; (b) a record that shows two grades of F in one term; (c) in two successive terms, a record that shows a grade of F for any course. **The college deans attempt to give written notification of Academic Warning to students whose records show these deficiencies, but such students should regard themselves as being on warning even in the absence of written notification.** A student permitted to continue in Yale College with fewer than the number of course credits ordinarily required for academic good standing may be placed on Academic Warning, and in such a case the student will be notified that he or she has been placed on warning. See section D, Promotion and Good Standing, "Requirements for Academic Good Standing." The Committee on Honors and Academic Standing may at its discretion disqualify a student on Academic Warning from participation in recognized University organizations.

[Chapter II, Section I, "Academic Penalties and Restrictions,"

*Yale College Program of Study, 2019-2020*; emphasis added]

In the end, the Committee could find no grounds for granting you the exception you were seeking and so voted without dissent not to approve your request. As a result, the grade of F recorded for you in ECON 456 will stand. Your withdrawal from Yale College for academic reasons has already been processed; you will want to be in close contact with your dean and with the Office of International Students and Scholars.

The members join me in the hope that as you move forward you will consider the full ramifications of your statement that "I don't think Academic Regulations apply differently to me than to any other student at Yale." And as importantly, that you give serious thought to how you wish to manage your study in Yale College before you re-engage in it following your current withdrawal and future reinstatement.

Yours sincerely,

Mark J. Schenker

Dean of Academic Affairs

cc:   Dean Jessie Royce Hill, Benjamin Franklin College

Dean Sarah E. Insley, Secretary of the Committee on Honors & Academic Standing

Ms. Emily Shandley, University Registrar

**Madej CORRECTED No exception to regs re WD.doc**

 31K

**U.S. District Court, District of Connecticut**

**CIVIL ACTION no. 3:20-cv-00133-JCH**

# Exhibit 15

Attached to Plaintiff's Motion for Preliminary Injunction

Dated: February 23, 2020

Description:

Communication with Jessie Royce Hill
January 2020

 **Jakub Madej <jakub.madej@yale.edu>**

---

## your academic withdrawal

---

**Hill, Jessie** <jessie.hill@yale.edu>                                      Fri, Jan 3, 2020 at 12:56 PM
To: "jakub.madej@yale.edu" <jakub.madej@bulldogs.yale.edu>
Cc: "Tracey, Michelle" <michelle.tracey@yale.edu>

Dear Jakub,

I write to let you know that having received an "F" in ECON 456 you will be withdrawn from Yale for two semesters, effective immediately.  As your letter states (dated May 31 but forwarded to you on Oct. 10), students on Academic Warning who do not pass all of their courses in the term in which they are on Academic Warning will be dismissed for academic reasons.

http://catalog.yale.edu/ycps/academic-regulations/academic-penalties-restrictions/

I will send you an official letter this month, but wanted to be in touch right away.  If you would like to discuss any of this by phone, I'm certainly available to you. I know this is tough news and I'm sending you my best.

Jessie Royce Hill

Dean of Benjamin Franklin College
Yale University

(203) 432-2934



---

 **AR Jakub Madej.pdf**
9K



**Jakub Madej <jakub.madej@yale.edu>**

---

## updated Withdrawal Letter
3 messages

---

**Hill, Jessie** <jessie.hill@yale.edu>                                                    Tue, Jan 14, 2020 at 11:10 AM
To: "jakub.madej@yale.edu" <jakub.madej@bulldogs.yale.edu>

Dear Jakub,


Attached is an updated withdrawal letter (with a correction to the reinstatement date), for your records.


Please let me know if you have any questions about the process.


My best,

Dean Hill



**Jakub Madej.pdf**
148K

---

**Jakub Madej** <jakub.madej@yale.edu>                                                    Fri, Jan 17, 2020 at 2:25 PM
To: "Hill, Jessie" <jessie.hill@yale.edu>
Cc: "jakub.madej@yale.edu" <jakub.madej@bulldogs.yale.edu>
Bcc: j.macnar@columbia.edu

Hi Dean Hill,

I confirm that I received the letter. I noticed that my withdrawal date hasn't changed between the two letters, so I assume the only difference is a typo in possible reinstatement date.

I do have a few questions about the procedure and my circumstances. It would be perhaps easier for everyone to talk in person – when would you be available in the near future, for example today or Monday? I am flexible regarding timing and location.

Dean Schenker wrote in his response that the Committee reviewed, among other documents, a cover sheet from you regarding my case. Could I see this sheet in any form, electronic or paper? I am trying to understand the procedures and decision-making practices governing CHAS, which are not particularly transparent.

I believe that I cc'ed you in my message to Dean Schenker. I haven't received a response from him as of now but it would be helpful if you could address the questions and concerns I included in the email. I can resend that email to you if you haven't received. I am particularly concerned about the fact that CHAS didn't address any of my arguments except for one, and didn't provide any explanation for doing so.

On a different note, I have two appointments scheduled with the Mental Health Department at Yale Health in January, and I was referred to therapy that would most likely start in February. How does coverage look like for withdrawn students? How long does my coverage extend?

I'm in touch with OISS regarding immigration issues, as suggested in Dean Schenker's email. They're very helpful.

If it's easier for you to call me, my number is 203-928-8486.

Best,
Jakub
[Quoted text hidden]

---

**Hill, Jessie** <jessie.hill@yale.edu>                                                    Mon, Jan 20, 2020 at 3:34 PM
To: "jakub.madej@yale.edu" <jakub.madej@bulldogs.yale.edu>

Dear Jakub,


I see that Dean Schenker has replied to your message, along with a corrected letter.


As a withdrawn student, you will not be eligible for services at Yale Health, including MH&C.  If you're planning to stay in New Haven during your year away you might look into Connecticut Mental Health Center on Park St, which provides low cost treatment.  It won't be as flexible as a private clinician's services, but if cost is prohibitive it may be worth exploring. You can also ask Yale Health for a referral.


Best,

Dean Hill

[Quoted text hidden]

**U.S. District Court, District of Connecticut**

**CIVIL ACTION no. 3:20-cv-00133-JCH**

# Exhibit 16

Attached to Plaintiff's Motion for Preliminary Injunction

Dated: February 23, 2020

Description:

Communication with Ozan Say
January 2020



**Jakub Madej <jakub.madej@yale.edu>**

---

## Important Immigration: Withdrawal from Yale College
5 messages

---

**yasar.say@yale.edu** <yasar.say@yale.edu>                     Mon, Jan 6, 2020 at 3:20 PM
To: jakub.madej@yale.edu

**Office of International Students and Scholars**

Dear Jakub,

I hope you are well. OISS has now been notified that you have been withdrawn from Yale College, determined on January 2, 2020 and effective from December 18, 2019. I hope this brief time away from Yale will provide you the time to recharge and it will be productive. I am now writing to explain the immigration consequences of this action.

1. Students who are not registered full time no longer continue to maintain F-1 student status and must depart the U.S. within 15 days of the effective date of the withdrawal (in your case you need to leave by Friday, January 17th). This means that you cannot legally remain in the US in F-1 status during your withdrawal period and that your current F-1 record will be deactivated. If you are still in New Haven and would like to discuss your withdrawal further, please make an appointment with me to meet either in person or by phone. If you do not need to meet with me or if you have already left the US, please **respond to this email and confirm your date of departure**.
2. The Yale College Reinstatement process is outlined in the YCPS. If you have questions about the reinstatement process you can talk with your Residential College Dean or with Dean Risa Sodi.
3. If you decide to apply for reinstatement for Spring 2021 or later, contact me at least three months (October 2020) in advance so that I can guide you through the immigration steps. Upon confirmation that you have submitted a reinstatement application to Yale College we will be able to issue and send you a new I-20. Part of this process will entail submitting new financial certification to cover expenses for the academic year of your return. If you need to apply for financial aid, you will submit your application as a continuing student. Once the new I-20 is issued you will need to apply for a new F-1 visa and pay a new SEVIS fee. You will use the new I-20 and F-1 visa to re-enter the U.S.

Let me know if you have any questions or concerns.

Wishing you all the best,
Ozan

---

**Jakub Madej** <jakub.madej@yale.edu>                      Mon, Jan 6, 2020 at 5:31 PM
To: "Say, Ozan" <yasar.say@yale.edu>

Hi Ozan,

I hope you had a great break, wherever you happened to be!

I am currently appealing the academic withdrawal with the Committee on Honors and Academic Standing, and the grade of "F" that resulted in the withdrawal. I am happy to provide any information about this situation, but they have no bearing on the immigration matters and I am not including them here for now.

I scheduled a meeting with you on Wednesday, January 15 for 3:40pm. I intend to pursue further action even if the Committee denies my petition, so I will come with questions regardless of how the situation evolves. Plus it's always fun to visit OISS and feel like at OIS again.

On a more personal note, you were always of great help ever since I came to Yale in August 2016. You and other OISS members made my feel welcome and appreciated as I moved my life, relationships, commitments, and plans to the United States. I am unlikely to come back in 2021 in case other measures to resolve the ongoing dispute fail, and Yale and I don't achieve a mutually satisfactory outcome. None of this is personal, especially with regards to you or anyone at OISS but you were always of great help for me, so I simply wanted to say: thanks.

**U.S. District Court, District of Connecticut**

**CIVIL ACTION no. 3:20-cv-00133-JCH**

# Exhibit 20

Attached to Plaintiff's Motion for Preliminary Injunction

Dated: February 23, 2020

Description:

Jakub Madej's I-94 record
(as of February 23, 2020)

 For: **JAKUB JONASZ MADEJ**



**U.S. Customs and Border Protection**
Securing America's Borders

## Most Recent I-94

**Admission (I-94) Record Number : 443085390A2**

**Most Recent Date of Entry: 2020 January 15**

**Class of Admission : B2**

**Admit Until Date : 07/14/2020**

**Details provided on the I-94 Information form:**

| | |
|---|---|
| **Last/Surname :** | **MADEJ** |
| **First (Given) Name :** | **JAKUB JONASZ** |
| **Birth Date :** | **1996 XXXXXXXX** |
| **Passport Number :** | **EN9890XXX** |
| **Country of Issuance :** | **Poland** |

Get Travel History

► **Effective April 26, 2013, DHS began automating the admission process. An alien lawfully admitted or paroled into the U.S. is no longer required to be in possession of a preprinted Form I-94. A record of admission printed from the CBP website constitutes a lawful record of admission. See 8 CFR § 1.4(d).**

► **If an employer, local, state or federal agency requests admission information, present your admission (I-94) number along with any additional required documents requested by that employer or agency.**

► **Note: For security reasons, we recommend that you close your browser after you have finished retrieving your I-94 number.**

OMB No. 1651-0111
Expiration Date: 02/29/2020

For inquiries or questions regarding your I-94, please click here

Accessibility | Privacy Policy

--------------------------------------------------------------------------

(1) Birth month and date, and (2) Three last digits of passport number have been redacted before filing.

/s/ Jakub Madej

--------------------------------------------------------------------------

Passport Number : **EN9890856**

Passport Country of Issuance : **Poland**

| | Date | Type | Location |
|---|------|------|----------|
| **1** | **2020-01-15** | **Arrival** | **HIG** |
| **2** | **2020-01-14** | **Departure** | **328** |

**U.S. District Court, District of Connecticut**

**CIVIL ACTION no. 3:20-cv-00133-JCH**

# Exhibit 21

Attached to Plaintiff's Motion for Preliminary Injunction

Dated: February 23, 2020

Description:

Jakub Madej's Financial Aid Letters and History

Last five digits of SID have been redacted before filing.
/s/ Jakub Madej
--------------------------------------------------------------

# Yale *Office of Undergraduate Financial Aid*

Jakub Jonasz Madej
1245 Chapel St
New Haven, CT 06511

January 14, 2020
SID: 9164XXXXX

The Office of Undergraduate Financial Aid has adjusted your 2019-2020 financial aid award. Your eligibility for financial aid has changed based on our recent evaluation of new or updated information. Please refer to the Special Notes section for a more detailed explanation of this adjustment. If we can provide you any additional information or if you have questions, please contact us.

## Revised Financial Aid Award 2019-2020

### Estimated Cost to Attend Yale

| | |
|---|---|
| Tuition | 55,500 |
| Room and Board | 16,600 |
| Student Activity Fee | 125 |
| Senior Expenses | 200 |
| Hospitalization Insurance | 0 |
| **Billed Expenses:** | **72,425** |
| | |
| Books/Personal Expenses | 3,700 |
| Travel Expenses | 1,000 |
| Vacation Expenses | 1,500 |
| Budget Supplement | 600 |
| **Estimated Unbilled Expenses:** | **6,800** |
| | |
| **Estimated Cost of Attendance:** | **$79,225** |

- Billed Expenses are charges billed by Yale and will appear on your Student Account statement.
- Unbilled expenses are not paid directly to Yale and do not appear on any bill. The amounts shown here are estimates to help you plan for expenses you may incur throughout the year.
- The Estimated Cost of Attendance includes Billed and Unbilled expenses for the 2019-20 academic year.

### Gift Aid

| | Fall | Spring | Year |
|---|---|---|---|
| Yale Scholarship | 36,888 | 0 | 36,888 |
| Supplemental Allowance | 300 | 0 | 300 |
| Vacation Allowance | 750 | 0 | 750 |
| **Total Gift Aid:** | **37,938** | **0** | **$37,938** |

- Gift aid does not need to be repaid.
- The grants and scholarships shown reflect our calculation of your demonstrated need for gift aid.

### Expected Family Contribution

| | |
|---|---|
| **Calculated Family Contribution:** | **$1,675** |
| Parent Share | 0 |
| Student Share | 0 |
| Student Campus Employment Option | 1,675 |

**Other Payment Options and Resources**
- Yale Payment Plan
- Outside Scholarship/Aid
- Campus Employment Option
- Student and Parent Loans

- Parent and Student Share figures shown are suggested divisions of Billed and Unbilled expenses based on our assessment of your family's combined ability to pay.
- Families will decide how to divide the Expected Family Contribution and how to cover specific Billed and Unbilled expenses.
- Scholarship funds from outside sources can reduce the Student Share.
- Students and parents have the option to finance some or all of their Expected Family Contribution with a loan. Details on this and other payment options are included with your award.

JAKUB JONASZ MADEJ / SID 916421456 / PAGE 2 OF 2

**Special Notes about Your Award**

· You qualify for a Supplemental Allowance. This additional scholarship will be paid directly to your Yale Student Account.
· We have revised your award due to your withdrawal from Yale College. Once we make all the necessary adjustments to your account, we expect your account balance to be zero.

# Award History

Last five digits of SID have been redacted before filing.
/s/ Jakub Madej
------------------------------------------------------------------------
9164XXXXX Jakub J. Madej
Feb 14, 2020 08:46 pm

This is your financial aid award history arranged by aid year. To obtain more detailed information about a Direct, Stafford, PLUS, or alternative (private) loan listed below, click Loan Application History.

### History for the 2019-2020 aid year

| Fund | Offered | Accepted | Declined | Cancelled | Total | Paid to Date |
|------|---------|----------|----------|-----------|-------|--------------|
| Yale Scholarship | $36,888.00 | $36,888.00 | | | $36,888.00 | $36,888.00 |
| Supplemental Allowance | $300.00 | $300.00 | | | $300.00 | $300.00 |
| Vacation Allowance | $750.00 | $750.00 | | | $750.00 | $750.00 |
| Yale Term-time Job | $1,675.00 | | | | $1,675.00 | $0.00 |
| **Total** | $39,613.00 | $37,938.00 | $0.00 | $0.00 | $39,613.00 | $37,938.00 |

 No outside resource information is available for you at this time. Please contact your financial aid office if you have questions.

### History for the 2018-2019 aid year

| Fund | Offered | Accepted | Declined | Cancelled | Total | Paid to Date |
|------|---------|----------|----------|-----------|-------|--------------|
| Yale Scholarship | $70,830.00 | $70,830.00 | | | $70,830.00 | $70,830.00 |
| Supplemental Allowance | $600.00 | $600.00 | | | $600.00 | $600.00 |
| Vacation Allowance | $1,500.00 | $1,500.00 | | | $1,500.00 | $1,500.00 |
| Yale Term-time Job | $3,350.00 | | | | $3,350.00 | $0.00 |
| **Total** | $76,280.00 | $72,930.00 | $0.00 | $0.00 | $76,280.00 | $72,930.00 |

 No outside resource information is available for you at this time. Please contact your financial aid office if you have questions.

### History for the 2017-2018 aid year

| Fund | Offered | Accepted | Declined | Cancelled | Total | Paid to Date |
|------|---------|----------|----------|-----------|-------|--------------|
| Yale Scholarship | $70,552.00 | $70,552.00 | | | $70,552.00 | $70,552.00 |
| Supplemental Allowance | $600.00 | $600.00 | | | $600.00 | $600.00 |
| Vacation Allowance | $1,500.00 | $1,500.00 | | | $1,500.00 | $1,500.00 |
| Yale Term-time Job | $3,350.00 | | | | $3,350.00 | $0.00 |
| **Total** | $76,002.00 | $72,652.00 | $0.00 | $0.00 | $76,002.00 | $72,652.00 |

 No outside resource information is available for you at this time. Please contact your financial aid office if you have questions.

### History for the 2016-2017 aid year

| Fund | Offered | Accepted | Declined | Cancelled | Total | Paid to Date |
|------|---------|----------|----------|-----------|-------|--------------|
| | | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Yale Scholarship | $67,644.00 | $67,644.00 | | | $67,644.00 | $67,644.00 |
| Intern'l Travel Allowance | $1,000.00 | $1,000.00 | | | $1,000.00 | $1,000.00 |
| First Year Allowance | $1,000.00 | $1,000.00 | | | $1,000.00 | $1,000.00 |
| Vacation Allowance | $1,500.00 | $1,500.00 | | | $1,500.00 | $1,500.00 |
| Yale Term-time Job | $2,850.00 | $2,850.00 | | | $2,850.00 | $0.00 |
| **Total** | $73,994.00 | $73,994.00 | $0.00 | $0.00 | $73,994.00 | $71,144.00 |

 No outside resource information is available for you at this time. Please contact your financial aid office if you have questions.

Back to Top

| Award By Aid Year | Award Payment Schedule | Loan Application History | Cost of Attendance |
|---|---|---|---|

© 2020 Ellucian Company L.P. and its affiliates.

RELEASE: 8.24.0.1Y

**U.S. District Court, District of Connecticut**

**CIVIL ACTION no. 3:20-cv-00133-JCH**

# Exhibit 22

Attached to Plaintiff's Motion for Preliminary Injunction

Dated: February 23, 2020

Description:

Committee Notice of Petition Denial
January 2020



**Jakub Madej <jakub.madej@yale.edu>**

---

## CHAS result - Jakub Madej BF '20

---

**Schenker, Mark** <mark.schenker@yale.edu>                                    Mon, Jan 13, 2020 at 6:44 PM
To: "jakub.madej@yale.edu" <jakub.madej@bulldogs.yale.edu>
Cc: "Hill, Jessie" <jessie.hill@yale.edu>, "Kuhlman, Ann" <ann.kuhlman@yale.edu>, "Say, Ozan" <yasar.say@yale.edu>

Dear Mr. Madej:

In the interest of time, I am sending this brief notice to you now, with Dean Hill and the OISS cc'd. I will send you a fuller letter on behalf of the Committee later this week:

> At its meeting this afternoon the Committee on Honors and Academic Standing voted without dissent not to approve your petition for an exception to the Academic Regulations concerning withdrawal for academic reasons. As a result, your withdrawal for academic reasons is hereby reinstated and you will have 72 hours from 8 pm this evening to turn in your ID card and any other University property (such as keys or access devices) to the office of your residential college dean. You will not be charged tuition for spring term 2019-2020, but there may be a prorated charge for room and board, if relevant. You will want to be sure to consult with the Office of Financial Aid—again, if relevant.

While I understand that this note brings unwelcome news, Mr. Madej, in the end the members agreed with the statement you yourself made near the end of your petition: "I don't think Academic Regulations apply differently to me than to any other student at Yale."

Sincerely,

Mark J. Schenker, Dean of Academic Affairs

---

**From:** Jakub Madej <jakub.madej@yale.edu>
**Date:** Thursday, January 9, 2020 at 5:22 PM
**To:** "Schenker, Mark" <mark.schenker@yale.edu>
**Cc:** "Hill, Jessie" <jessie.hill@yale.edu>
**Subject:** Re: Reply requested

Dear Mr Schenker,

I appreciate this concrete message.

I confirm that I have received your e-mail, and that I understand my withdrawal has been provisionally rescinded while the Committee makes its final decision regarding my petition.

**U.S. District Court, District of Connecticut**

**CIVIL ACTION no. 3:20-cv-00133-JCH**

# Exhibit 23

Attached to Plaintiff's Motion for Preliminary Injunction

Dated: February 23, 2020

Description:

Committee Justification of Petition Denial
January 2020



Jakub Madej <jakub.madej@yale.edu>

**Reply Requested - Your Petition to the Committee on Honors and Academic Standing (MJS)**

**Schenker, Mark** <mark.schenker@yale.edu>
To: "jakub.madej@yale.edu" <jakub.madej@yale.edu>
Cc: "Insley, Sarah" <sarah.insley@yale.edu>, "Hill, Jessie" <jessie.hill@yale.edu>, "Tracey, Michelle" <michelle.tracey@yale.edu>

Wed, Jan 15, 2020 at 12:05 PM

[Please acknowledge receipt of this le  er. A signed hard copy will also be provided to you. -MJS]

# Yale College

*Office of the Dean*

*P.O. Box 208241*

*New Haven, CT 06520-8241*

*Campus address:*

*Grove & Prospect Streets*

*Telephone: (203) 432-2900*

*Fax: (203) 432-7369*

15 January 2020

Mr. Jakub Madej

c/o Benjamin Franklin College Dean's Office

*sent also via email*

Dear Mr. Madej,

As you already know from my email to you of this past Monday evening, the Committee on Academic Standing met on 13 January to consider your petition for an exception to the Academic Regulations regarding withdrawal for academic reasons. As you also know, the Committee voted not to grant your request. As a result, your withdrawal from College for academic reasons has been reinstated. As I previously informed you, you have until 8 pm on Thursday 16 January—72 hours from my emailed notice to you of the Committee's action—to turn in your ID card and any other University property (such as keys or access devices) to the office of your residential college dean. You will not be charged tuition for spring term 2019-2020, but there may be a prorated charge for room and board, if relevant. You will want to be sure to consult with the Office of Financial Aid, if relevant, and with the Office of International Students and Scholars.

Please consult closely with Dean Hill about this withdrawal and the routes available to you for the completion of your degree requirements.

The Committee is made up of tenured and non-tenured members of the Yale College Faculty, representatives of the Yale College Dean's Office, and undergraduate students. I serve as Chairman. In advance of the meeting, each of the members of the Committee had received a copy of: your (dated 8 January); a cover letter (8 January) from the residential college dean in the form on an email; a letter from Dean Hill to you (6 January) informing you of this academic withdrawal; and your academic record.

The members reviewed these materials with care, and with special attention to the grade of F you earned last term in ECON 456, which grade resulted in your withdrawal from Yale College for academic reasons. Noting that your "argument" that the "Grade of 'F' in ECON 456 Wasn't Justified" was the last of those you presented in your petition, members could find no grounds for agreeing with your view of that grade. The Committee observed that you stated in your petition that you "made a series of easily avoidable mistakes" and that you submitted the final paper after the deadline.

They noted also that, while it is regrettable that the BF Dean's Office did not send you in May a letter informing you that you would be on Academic Warning (AW) in for the fall term of 2019-2020, you had been informed of this consequence by the BF Dean's Office senior administrative assistant in spring 2019, when you withdrew from MATH 251 after midterm, thereby having a course schedule that would earn no more than two course credits, which is a condition of AW. They noted also that Dean Hill subsequently gave you a copy of the AW letter in August and that by your own account, you were aware of your AW status in October, well before the end of the fall term.

Lastly, the Committee was mindful of what the Academic Regulations have to say about Academic Warning:

Academic Warning is an indication that a student's scholastic record is unsatisfactory. Students on Academic Warning who do not pass all of their courses in the term in which they are on Academic Warning will be dismissed for academic reasons. No matter how many course credits a student has earned, Academic Warning is automatic in the following cases: (a) failure in one term to earn more than two course credits; (b) a record that shows two grades of F in one term; (c) in two successive terms, a record that shows a grade of F for any course. **The college deans attempt to give written notification of Academic Warning to students whose records show these deficiencies, but such students should regard themselves as being on warning even in the absence of written notification.** A student permitted to continue in Yale College with fewer than the number of course credits ordinarily required for academic good standing may be placed on Academic Warning, and in such a case the student will be notified that he or she has been placed on warning. See section D, Promotion and Good Standing, "Requirements for Academic Good Standing." The Committee on Honors and Academic Standing may at its discretion disqualify a student on Academic Warning from participation in recognized University organizations.

[Chapter II, Section I, "Academic Penalties and Restrictions,"

*Yale College Program of Study, 2019-2020*; emphasis added]

In the end, the Committee could find no grounds for granting you the exception you were seeking and so voted without dissent not to approve your request. As a result, the grade of F recorded for you in ECON 456 will stand. Your withdrawal from Yale College for academic reasons has already been processed; you will want to be in close contact with your dean and with the Office of International Students and Scholars.

The members join me in the hope that as you move forward you will consider the full ramifications of your statement that "I don't think Academic Regulations apply differently to me than to any other student at Yale." And as importantly, that you give serious thought to how you wish to manage your study in Yale College before you re-engage in it following your current withdrawal and future reinstatement.

Yours sincerely,

Mark J. Schenker

Dean of Academic Affairs

cc:   Dean Jessie Royce Hill, Benjamin Franklin College

Dean Sarah E. Insley, Secretary of the Committee on Honors & Academic Standing

Ms. Emily Shandley, University Registrar

**U.S. District Court, District of Connecticut**

**CIVIL ACTION no. 3:20-cv-00133-JCH**

# Exhibit 24

Attached to Plaintiff's Motion for Preliminary Injunction

Dated: February 23, 2020

Description:

[MOTION TO SEAL FILED – February 23, 2020]
REDACTED version follows



























**U.S. District Court, District of Connecticut**

**CIVIL ACTION no. 3:20-cv-00133-JCH**

# Exhibit 25

Attached to Plaintiff's Motion for Preliminary Injunction

Dated: February 23, 2020

Description:

Official Letter of Withdrawal
(January 2020)

# Yale College

Benjamin Franklin College
Office of the Dean
P.O. Box 208374
New Haven, CT 06520-8374

Campus address:
90 Prospect Street
Telephone: (203) 432-2934
Fax: (203) 432-8083

January 6, 2020

Jakub Madej
Os. 2 Pulku Lotniczego 16/157
Malopolskie
31-868 Cracow, Poland

Dear Jakub,

Enclosed is the official notification from the Yale College Committee on Honors and Academic Standing of your withdrawal for academic reasons, effective December 18, 2019.

In examining your record, we observed that you earned a grade of F in ECON 456 during the Fall 2019 term and that you were placed on Academic Warning for that same term. As you know from the academic regulations, any record that shows a grade of F for a student on Academic Warning in that term will result in that student's dismissal for academic reasons.

The *Yale College Programs of Study*'s Academic Regulations determine the conditions of withdrawal and reinstatement, and I urge you to read carefully the relevant paragraphs in Section J carefully (http://catalog.yale.edu/ycps/academic-regulations/leave-of-absence-withdrawal-reinstatement). I especially call your attention to the following points:

- Students whose withdrawal was for academic reasons must remain away for at least one fall term and one spring term, in either order, not including the term in which the withdrawal occurred.
- For reinstatement to a fall term, the application deadline is June 1. For reinstatement to a spring term, the application deadline is November 1. These deadlines are strictly enforced.

Thus, the conditions of your reinstatement are the following. The earliest term to which you may be reinstated is spring 2020; however, you may also elect to wait until a later term, if you prefer. You must successfully complete two term courses in Yale Summer Session or at an accredited, four-year, Bachelor's degree-granting institution and earn grades of A or B. Courses taken elsewhere, as well as the institution at which they are taken, should be cleared in advance by the chair of the Committee on Reinstatement, Dean Risa Sodi (risa.sodi@yale.edu). You must submit a complete application by the appropriate deadline, and you must arrange for an interview with Dean Sodi after you have submitted your application.

Additional reinstatement information is available online, on the Yale College Reinstatement FAQ page (https://yalecollege.yale.edu/academics/reinstatement-faq), including information about deadlines, application forms and materials, course work, and contact information.

The Committee on Reinstatement expects students to maintain a satisfactory standard of conduct and to remain constructively occupied while away from Yale. This may be done in many informal and formal ways, such as work, volunteering, or taking time to explore other pursuits, and will depend on each

student's situation. In addition, withdrawn students may not stay in residences on campus, attend classes, participate in student extracurricular activities, or make use of University libraries, athletic and other facilities. Withdrawn students may be on campus only upon receiving prior permission from the Dean of Student Affairs, Camille Lizarríbar (camille.lizarribar@yale.edu), or from me.

It is Yale College policy to inform parents or guardians in writing of any changes in a student's academic status, and so I will be sending a copy of this letter to your parents under separate cover.

Jakub, I hope that you will use your time away from Yale in a beneficial and rewarding manner and that you will return to complete your degree in good order. Even while you are away, I remain your dean and your primary campus contact. If I can be of any assistance, please do not hesitate to contact me.

Sincerely,

Jessie Royce Hill
Dean, Benjamin Franklin College
Yale University

Cc:     Mark J. Schenker, Dean of Academic Affairs
        Camille Lizarríbar, Dean of Student Affairs
        Risa Sodi, Assistant Dean of Academic Affairs and Chair, Committee on Reinstatement

Enc:    Academic record
        Report of action by the Committee on Honors and Academic Standing

**U.S. District Court, District of Connecticut**

**CIVIL ACTION no. 3:20-cv-00133-JCH**

# Exhibit 31

Attached to Plaintiff's Motion for Preliminary Injunction

Dated: February 23, 2020

Description:

Yale Daily News article about
Plaintiff's involuntary withdrawal

☰



Support the YDN.

*Please disable adblock for this domain*

# Student sues Yale alleging unfair dismissal

**OLIVIA TUCKER & MEERA SHOAIB** | 1:28 AM, FEB 06, 2020

STAFF REPORTERS



Yale News

A former member of the Yale College class of 2020 filed a lawsuit against Yale on Jan. 30, alleging that the University unfairly forced him to withdraw just a semester before his anticipated graduation date.

Jakub Madej '20 — a former photo staffer and guest columnist at the News — received a withdrawal notice on Jan. 3, while he was on winter recess in



of his senior year. The University automatically dismisses any student who receives a failing grade in a course while on an academic warning.

As an international student from Poland on an F-1 visa, the withdrawal left Madej with 15 days to leave the United States. Madej has since traveled to Canada and re-entered the country on a visitor B-2 visa, which will allow him to stay long enough to pursue his lawsuit.

"Yale isn't the land of milk and honey," Madej wrote in a Feb. 5 Facebook post. "The line at Durfees could be shorter. The journalism seminar I loved could be uncapped. I wish our dining halls were open throughout the day, just like those at Columbia. I wish I didn't have to sue Yale College for unfairly withdrawing me, giving [me] 36 hours to leave the country, and pretending all along nothing has ever happened."

The economics major in Benjamin Franklin College filed the suit against Yale, University President Peter Salovey, Yale College Dean Marvin Chun, Dean of Academic Affairs Mark Schenker and Dean of Benjamin Franklin College Jessie Royce Hill. Madej alleged in his complaint that Yale did not notify him of the warning — which he incurred last spring for taking a two-course schedule — until mid-October 2019. He also alleged that Yale neglected to provide pre-approved accommodations — such as extended time on assessments or permission to type exams — after a wrist injury last fall.

University spokesperson Karen Peart declined to comment and explained that Yale does not comment on pending litigation.

The demands in Madej's civil complaint include a reassessment of academic withdrawal policies and increased transparency, the reinstatement of Madej as a student in good academic standing, and an award to Madej of an amount exceeding $314,159 for breach of contract and $121,232 for emotional distress.

 

helped launch in February. According to his LinkedIn profile, he currently serves as the firm's "Chief Anti-Procrastination Officer."

Most students typically take four or five credits in a semester, or, with their dean's permission, three credits. In his complaint, Madej stated that he never received notice from the Yale administration that he would incur an academic warning by reducing his course load. While his residential college dean's assistant claimed that he had informed the student, Madej said that no proof of this notification exists.

According to Madej, Hill initially claimed that she notified him of the warning last May, but upon further questioning, admitted that she had filed the appropriate paperwork but never emailed a copy to him. Schenker later claimed that Hill notified Madej in August, which he refuted in the complaint.

According to Yale's online academic regulations, a college dean is not required to inform a student if they have been placed on academic warning. Students who have not completed more than two course credits in a term or have received two failing grades in a consecutive or single term should "regard themselves as being on warning even in the absence of written notification."

The complaint stated that Madej was on track to graduate on time with the class of 2020. However, the complaint also stated that by the end of his seventh semester, he had only earned 29 of the 36 credits required for graduation — meaning he would have had to take seven credits in his final semester in order to graduate in the spring of 2020.

According to his complaint, Madej submitted his final report for an advanced economics seminar to professor Michael Schmertzler in December 2019 before leaving on a personal trip to China. Schmertzler was unable to open the assignment file and notified Madej to that effect over email. However, Madej was unable to access his Yale email account



withdrawal.

Schmertzler told the News he was unaware of the suit, and declined to comment.

At Yale, Madej studied economics and conducted research with Sterling Professor of Economics Robert Shiller and former School of Management Dean Edward Snyder. He also served as the editor-in-chief of Rumpus, a campus tabloid that drew criticism in September 2018 for publishing jokes making light of sexual assault.

Snyder declined to comment for the story.

In the complaint, Madej highlighted a lack of support from the Yale administration and Office of Disabilities in making accommodations for his mental and physical health.

After receiving the withdrawal notice from Yale on Jan. 3, Madej called Hill, his college dean, who advised Madej to petition the Committee on Honors and Academic Standing for reinstatement. According to Madej, he received no guidance on relevant information to include in this petition and could not find details on these procedures online or elsewhere. Madej therefore wrote a 6,200-word document outlining nine separate arguments against his withdrawal and submitted it to Hill, who forwarded it to the committee.

Madej said he was given just 40 minutes to retrieve his belongings from Benjamin Franklin College on Jan. 13 and leave campus; that evening, the chairman of the committee — Schenker — informed him that his petition was denied "without dissent." In an interview with the News, Madej said that due to contradictory information from Schenker, he believes the committee never read his petition.

Finding little other opportunities for recourse, Madej decided to file a lawsuit under his own name and is representing himself in the proceedings.



In an interview with the News, Madej highlighted the opaqueness of withdrawals proceedings at Yale. Madej said that since his withdrawal, the Committee on Honors and Academic Standing has been a "black box committee" –– one that did not justify reasons for denying his petition or give any information on channels for appeal. He said that, by contrast, the process of appealing withdrawal decisions made by the University-Wide Committee on Sexual Misconduct is much more transparent.

Madej said he was unable to find any statistics or materials on other students who had been academically withdrawn from Yale.

"Yale breached its contract with Jakub by improperly investigating withdrawals at Yale College, providing scant resources to the dismissed student in his most vulnerable moment, and no avenue for a meaningful review of unexplained and unclear decision," Madej's civil complaint stated. "Yale's decision to withdraw Jakub from the University is capricious and arbitrary."

Madej stressed that he does not intend to villainize Yale as a whole in his lawsuit. Rather, he is trying to address flaws in a community to which he still feels deeply connected and emphasized the support he has received from his friends and close faculty members.

"It's not me against the University," Madej said. "I don't feel like I am out of the Yale family because I got a letter like this. I feel part of the Yale family more now than ever before."

Benjamin Franklin College is located at 90 Prospect St.

**Olivia Tucker |** olivia.tucker@yale.edu

**Meera Shoaib |** meera.shoaib@yale.edu

*This article has been updated to reflect the version run in print on Feb. 10.*

 

Chicago - Barcelona
**From $141**

New York - Barcelona
**From $154**

**5 Comments**   **Yale Daily News**                      **Jakub Madej** ⌄

♡ Recommend       Tweet     Share                    Sort by Newest ⌄

 | Join the discussion…

 **rick131** • 4 days ago
He didn't follow the rules of which he was well aware. This will go nowhere.

∧ | ∨ • Reply • Share ›

 **Jakub Madej** ↱ rick131 • 2 days ago
I appreciate your well warranted skepticism. If you wish to suggest I lied, I'd prefer you say it to me directly, not anonymously online. My phone number is (203) 586-0363.

∧ | ∨ • Edit • Reply • Share ›

 **CMCAlum** • 13 days ago
Uhh, yeah, this complaint seems like utter BS. Moreover, assuming that this student was on an F-1 visa (the standard student visa), he is required by US law to take a full-time courseload unless it is his final semester (which it seems like it was not). See https://oiss.yale.edu/immig...

Dropping down to 2 courses put his visa in jeopardy, and that's entirely on him. He would have received sufficient notice about this -- the fact that he ignored it until 36 hours beforehand is his fault.

1 ∧ | ∨ • Reply • Share ›

 **Jakub Madej** ↱ CMCAlum • 2 days ago • edited
I appreciate the healthy dose of skepticism. I encourage you to read the actual complaint -- which is in public record -- before making a judgment on the merits.

∧ | ∨ • Edit • Reply • Share ›

 

Um, what? It is very clearly stated in the YCPS that 2 credits leads to academic warning and failing while on warning leads to dismissal. I know this because I was on warning for having only 2 credits once. It sounds like he was trying to skate out of school while focusing only on his business, and he thought that the rules didn't apply to him.

︿  |  ﹀  •  Reply  •  Share ›

✉ Subscribe   ⊙ Add Disqus to your siteAdd DisqusAdd   🔒 Disqus' Privacy PolicyPrivacy PolicyPrivacy



**U.S. District Court, District of Connecticut**

**CIVIL ACTION no. 3:20-cv-00133-JCH**

# Exhibit 32

Attached to Plaintiff's Motion for Preliminary Injunction

Dated: February 23, 2020

Description:

Letter "No trust without transparency"
(May 2015)







# LETTER: 03.05.15

**THE YALE DAILY NEWS** | 2:04 AM, MAR 05, 2015

**No trust without transparency**

Dean Holloway, Dr. Genecin, Dr. Siggins, Dr. Blue and Professor Rogers,

We are grateful for the opportunity that last week's mental health forum offered to express concerns about administrative policy and the services of Yale Mental Health and Counseling, and we are encouraged by the progress the forum represents. This conversation marked a large step forward in administrative visibility on the issue, and we trust that you have heard our voices and thought over our concerns and suggestions.

However, despite frequent assurances that the administration is receptive to the changes suggested by the student body, we find that barriers to the success of this dialogue persist. We still await answers to many of our questions on policy and statistics in mental health care and withdrawal; we continue to fight for transparency in the reform process. In this letter, we illuminate some of our most urgent concerns and provide constructive suggestions for their resolution.

First, we are unsettled by the lack of transparency from the administration in matters of institutional reform, which we believe surpasses the level of discretion necessary to protect medical confidentiality. We reiterate Yale College Council President Michael Herbert's request that the



Improvement to Withdrawal and Leave of Absence Policies (March 2014). We do not demand definitive acceptance or rejection of any recommendation, but we do ask that the administration acknowledge and reply to each. We also ask that the administration cite any legal restrictions preventing the Review Committee on Withdrawal and Readmissions from releasing information about its proceedings. These acts will further understanding between students and administration.

Furthermore, there is currently no publicized timeline for the anticipated hiring of new MH&C staff, nor any offer of a provisional date for the release of the coming report by the Review Committee on Withdrawal and Readmission. The administration has repeatedly asked students to have faith in the committees and individuals tasked with discussing and enacting changes, but we in turn ask for evidence that our most urgent needs will be met with prompt and decisive action in the coming weeks.

Second, we are concerned by the administration's assertions that student perception of MH&C is misinformed or distorted. We worry that this belief may preclude a thorough investigation of the miscommunication between MH&C and students. We acknowledge that many students have had positive experiences with MH&C, and that published student experiences do not reflect overall rates of patient satisfaction. Still, a significant number of students report unsatisfying or unacceptable interactions with MH&C. We believe that if the administration makes information on MH&C policies more readily available, we can better distinguish legitimate policy shortcomings from incidents of miscommunication.

In particular, we request publication of the operative standards for involuntary withdrawal and an overview of the involuntary withdrawal process. This is absolutely necessary when Yale administrators, rather than clinical professionals, have the ultimate say in determining a student's future. Far too many students do not seek professional help or do not disclose the severity of their symptoms out of fear that their



case-by-case basis, the absence of information on the process discourages some students from obtaining the treatment they need to heal and thrive. If MH&C desires to close this information gap, we believe that this is a necessary first step.

Third, we emphasize that the burden of recognizing MH&C shortcomings does not lie on the patients. We trust that the administration was indeed unaware of specific policy violations, such as the failure to follow up after missed appointments or the enforcement of a twelve-session maximum for one-on-one counseling. But when such policies are not publicly or easily accessible, students cannot be expected to notice or report violations. We urge you to release a clear, comprehensive handbook of Yale's policies and statistics pertaining to mental health. To facilitate low-stakes avenues for patient-provider communication, we call for the distribution of simple post-visit patient satisfaction surveys and feedback tools to all patients of Yale MH&C.

The student body and administration must stay firmly focused on these mental health care issues and remain committed to maintaining productive collaboration. We urge you to move forward with the proposals we have outlined, and we look forward to a climate of constructive dialogue and reform that does not end with this academic year.

Respectfully submitted,

Chris Cappiello '15, Joseph Cornett '17, Hiral Doshi '17, Aaron Gertler '15, Carlee Jensen '15, Christopher Landry '15, Jessica Liang '17, Alexa Little '16, Adrian Lo '15, Tammy Pham '15, Šimon Podhajský '16, Caroline Posner '17, Korbin Richards '15, Nathan Sitaraman '15, Geoffrey Smith '15, Charlotte Storch '15, Ella Wood '15

March 5

*The above was sent as an open letter to the aforementioned individuals.*