UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JAKUB MADEJ                                  : | |
| : | CIVIL ACTION NO. |
| PLAINTIFF           : | 3:20-cv-00133-JCH |
| : | |
| v.                                            : | |
| : | |
| YALE UNIVERSITY, MARVIN CHUN,   : | |
| MARK SCHENKER, PETER SALOVEY AND   : | |
| JESSIE ROYCE HILL                        : | |
| : | |
| DEFENDANTS          : | MARCH 9, 2020 |

## DEFENDANTS' BRIEF IN OPPOSITION TO EMERGENCY MOTION FOR PRELIMINARY INJUNCTION

The defendants, Yale University, Marvin Chun, Mark Schenker, Peter Salovey, and Jessie Royce Hill (hereinafter "defendants"), hereby submit this brief in opposition to the plaintiff's Emergency Motion for Preliminary Injunction. Despite defense counsel's repeated inquiries as to if and when the plaintiff would be filing a brief, and the plaintiff's promises to do so, the plaintiff has yet to file a memorandum of law in support of his motion for preliminary injunction.[1] Thus, the defendants are forced to submit this brief with minimal knowledge of the arguments that the plaintiff intends to present to the Court in support of his motion for preliminary injunction. In the event that the plaintiff subsequently files a brief, the defendants' respectfully request that they be given an opportunity to respond to the arguments made therein.

---

[1] Over the past two weeks, the plaintiff has indicated to defense counsel that he would file his brief by multiple, self-imposed deadlines, the first being by 8:00 a.m. on February 24, 2020 and the most recent being March 5, 2020. Ironically, the plaintiff is in his present predicament because he failed to submit a final paper by the clear deadline imposed by his professor and Yale University.

## I.     **Introduction**

This action arises out of the plaintiff's involuntary withdrawal for academic reasons from Yale College, effective December 18, 2019.  He was withdrawn pursuant to the provision of the Yale College Programs of Study ("Programs of Study") which provides that a student on Academic Warning who receives a grade of F will be dismissed for academic reasons.  The plaintiff had been automatically placed on Academic Warning after the Spring, 2019 term because he had failed to earn more than two course credits in the Spring, 2019 term.  The plaintiff enrolled in five courses for the Spring, 2019 term, but then withdrew from three of them, leaving him with just two.[2]  He received an ▮ in one of the courses, thus earning only one course credit for the Spring, 2019 term.  (DX C, p. 2).[3]  The Programs of Study specifically states that a student who fails in one term to earn more than two course credits is automatically placed on Academic Warning.  (DX A, p. 2.)  While on Academic Warning in the Fall, 2019 term, the plaintiff received an F in one of the three courses in which he was enrolled because he performed poorly in the class (in fact, scoring a ▮, ▮▮▮▮▮▮, on the midterm), and then submitted his final exam nearly three and a half hours beyond the firm deadline for submission.  Submitting the paper late required the entering of an F for the course.  (DX C, p. 2; DX J, p. 1; DX L, p. 2.)  See also, Affidavit of Michael Schmertzler, ¶ 4, 5, 17, 21, filed concurrently with this brief.

---

[2] The plaintiff withdrew from two of the courses prior to midterm exams, and therefore those courses do not appear on his transcript.  The plaintiff withdrew from the third course, MATH 251, the day before classes ended for the Spring, 2019 term.  The college deans are available for students in advance if they choose to ask for advice before withdrawing from a class.  If advice is not sought, then the college deans assume that the students are aware of the ramifications of withdrawing from a course.  Since the plaintiff had withdrawn from six courses prior to withdrawing from MATH 251, he was clearly familiar with the process.

[3] All defendants' exhibits ("DX") referenced herein are attached to this opposition brief.

The Programs of Study provides that a student who is withdrawn for academic reasons must leave campus for two semesters.  (PX 4, p. 2).  The plaintiff is thus permitted to return to Yale College and resume his studies for the spring term of 2021.  He has filed this action in an attempt to resume his classes in the current semester in order to graduate with his class in May, 2020.  Even if the plaintiff's Emergency Motion for Preliminary Injunction were granted and he was returned to campus, it is <u>impossible</u> for the plaintiff to complete the seven course credits he needs to graduate in May, 2020.   At the time of the hearing now scheduled for March 26, 2020, more than half of the term will have passed.  The thirteen-week term began on January 13, 2020.  Midterm exams will be completed on March 6, 2020, before the two-week spring recess from March 7 to March 22, 2020.  Classes end on April 24, 2020.  As of the present date, the plaintiff needs to complete seven full semester courses in order to reach the thirty-six completed courses he needs in order to graduate.  Even if the Court were to grant the plaintiff's injunction as of March 26, 2020, the plaintiff would have just four weeks of classes in the thirteen-week semester to finish seven complete courses.  This would be roughly the equivalent of taking 14 courses over the course of a full semester.  The standard course load at Yale is four or five courses per 13-week semester.  Given that the plaintiff only earned a total of three course credits over the course of the 2019 Spring and Fall terms combined, it is impossible for the plaintiff to earn the seven course credits he requires to graduate in only four weeks.  Indeed, he acknowledges in his court filing that a student's normal course load is between four and five course credits per semester.  Under the circumstances, the Court should deny the request for a permanent injunction without an evidentiary hearing, even if the plaintiff could somehow satisfy his burden of demonstrating the likelihood of success on the merits.

## II.    Factual Background

The plaintiff matriculated at Yale University as an undergraduate student in the Fall term of 2016.  Over the course of his first two and a half years at Yale College, the plaintiff appeared to be an eager student.  Entering the Spring, 2019 term, he had earned a total of twenty-six course credits, five more than required at that time.  (DX C, p. 1-2; DX A, p. 1.) With only ten more course credits required to graduate, the plaintiff was in a position where he only needed to earn three and a half credits per term to graduate in May, 2020.

Beginning in the spring term of his junior year, the plaintiff's attention to his academics significantly diminished.  He had incorporated a consulting business in February, 2019 and claims to have spent over sixty hours a week concentrating on that business.[4]  (Complaint, ¶ 18.)  At the end of the Spring, 2019 term, the plaintiff received an ▮ in one of the two courses in which he was enrolled because he ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  After the quiz, the professor had reached out to the plaintiff, who indicated that he would submit the term paper with the final.  The plaintiff then ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  (DX D, p. 2.)  The Programs of Study provide:

> Academic Warning is an indication that a student's scholastic record is unsatisfactory.  Students on Academic Warning who do not pass all of their courses in the term in which they are on Academic Warning will be dismissed for academic reasons.  No matter how many course credits a student has earned, Academic Warning is automatic in the following cases: (a) failure in one term to earn more than two course credits; (b) a record that shows two grades of F in one term; (c) in two successive terms, a record that shows a grade of F for any course.  The college deans attempt to give written notification of Academic Warning to students whose records show

---

[4] In December, 2019, the plaintiff told his professor that he worked 40+ hours per week on his education consulting business. (DX J, p. 1; Schmertzler Affidavit, ¶ 9.)

these deficiencies, but <u>such students should regard themselves as being on warning even in the absence of written notification.</u>

(Emphasis added.)  (DX A, p. 2.)  Since the plaintiff had only earned one course credit in the Spring, 2019 term, he was automatically on Academic Warning for the Fall, 2019 term.  (DX C, p. 2; DX A, p. 2; DX E.)

Prior to the beginning of the Fall, 2019 term, Benjamin Franklin College Dean Jessie Royce Hill, in an effort to assist the plaintiff in light of his being on Academic Warning, contacted the plaintiff to discuss his academic plan for that term.  (DX F.)  While the plaintiff agreed to meet with Dean Hill shortly after he arrived on campus on August 27, 2019, he chose not do so, despite Dean Hill's assistant attempting to schedule an appointment.  (DX F; PX 13, p. 2.)  On October 10, 2019, Dean Hill contacted the plaintiff to schedule a meeting to discuss a plan for the remainder of the term.  Dean Hill explained: "As you're aware, you are on academic warning this term so it's important to pass your classes and keep progressing."  (PX 13, p. 1.)  While the plaintiff was unaware that he had been placed on Academic Warning for the Fall, 2019 term, he acknowledged that it was his responsibility to be aware of that fact.[5] (PX 13, p. 1.)

The plaintiff acknowledged in his email to Dean Hill on October 10, 2019 that it was his responsibility to monitor his own academic progress pursuant to the Programs of Study.  (PX 13, p. 1).  Dean Hill provided the plaintiff a copy of the May 31, 2019 letter on October

---

[5] Dean Hill had written a letter to plaintiff dated May 31, 2019 informing him that he was on Academic Warning. Unfortunately, due to confusion between Dean Hill and her assistant as to which of them would be forwarding the letter to the plaintiff, the plaintiff did not receive that letter.  (DX E.)  As noted above and as acknowledged by plaintiff, the Programs of Study specify that although the college dean will attempt to notify a student when he or she is placed on Academic Warning, it is the student's job to keep track of his or her academic program.  In this case, it is difficult to imagine that the present plaintiff was unaware that he was failing to accumulate the number of credits required, given that he only received one course credit for the spring semester of 2019.

10, 2019.  (PX 13, p. 2.)  In addition to informing the plaintiff that he had been placed on Academic Warning for the Fall, 2019 term, the letter warned: "Please note that **if you do not pass all of your courses during the Fall 2019 term, you will be withdrawn from Yale for academic reasons.**"  (Emphasis in original.)  (DX E.)  The letter also referred the plaintiff to the section of the Yale College Programs of Study that discussed Academic Warning.  Id.  As of October 10, 2019, two weeks prior to midterm exams and eight weeks prior to before the end of the term, the plaintiff was aware that a failing grade in any of his courses that semester would result in his involuntary withdrawal from Yale College.

On October 23, 2019, the plaintiff broke his wrist while riding an electric skateboard. (PX 24, p. 4.)  He had surgery in early November, 2019 and his recovery took approximately one month.  Id., p. 4-5.  The plaintiff worked with Dean Hill and received dean's excuses to help him catch up on the assignments, commitments, and deadlines he had missed.  (DX K, p. 2.)  During the first week of December, 2019, well before the final exam period started on December 12, 2019, he regained the ability to move his left hand freely and resume typing. Id.[6]

On November 22, 2019, Michael Schmertzler, the plaintiff's professor for the course Private Equity Investing, ECON 456, contacted the plaintiff to inform him that he was "at clear risk of failing this course."  (DX J, p. 1; Schmertzler Affidavit, ¶ 5-6.)  Professor Schmertzler

---

[6] The plaintiff has complained in his submission that after he broke his wrist, he had difficulties with his insurance company and in his dealings with Yale New Haven Hospital.  In the first place, it is quite clear that the plaintiff's broken wrist was healed and he was capable of typing by the time he had to take his final exams.  See, DX K, p. 2; Paxton Affidavit, ¶ 6.  In the second place, Yale University is not responsible for the actions of either the plaintiff's insurance company or Yale New Haven Hospital (which, of course, is an institution entirely separate from Yale University).

noted that the plaintiff's score on the mid-term exam was ████████████████. On the only other written assignment the plaintiff had scored a ██, on a "curved basis," ████████. Knowing that the plaintiff had suffered an injury to his wrist during the semester, Professor Schmertzler counseled the plaintiff to discuss alternatives with his College Dean if the injury had affected his studies or would affect his ability to take the final. (DX J, p. 1-2; Schmertzler Affidavit, ¶ 5-7.) The plaintiff was knowledgeable in the process for requesting Dean's excuses, since he had in fact requested and received Dean's excuses for assignments in two other courses due to his injury. (DX I.) Professor Schmertzler offered to help the plaintiff if he wanted help: "If I can be of help as you prepare for the final examination, which will be a take home case, please do reach out. If you are to pass this course, you will have to write a solid final." (DX J, p. 2; Schmertzler Affidavit, ¶ 8.) The plaintiff never availed himself of the opportunity to get assistance from his professor. (Schmertzler Affidavit, ¶ 8, 16.)

The plaintiff waited two weeks to respond to Professor Schmertzler's November 22, 2019 email. He admitted that he had been focusing on his business instead of his coursework: "I spend 40+ hours a week managing my education consulting business, which I can't drop or deprioritize because of contracts and commitments I made to people I hire and clients that paid me (some up to $10k+). A day has only 24 hours and I find myself unable to spend nearly as much time as I'd like to on a few things, including our seminar." (DX J, p. 1; Schmertzler Affidavit, ¶ 9.)[7] The plaintiff made it clear in this email that he was well aware that if he received an F in ECON 456, he would be withdrawn from school: "Last semester, I dropped

---

[7] Working 40 hours per week would appear to violate the terms of the plaintiff's F-2 student visa, which permits a student to work just 20 hours a week. 8 CFR 214.2 (f).

three classes (down to two courses only) to focus on the business -- but it turns out that taking only two courses in one semester puts you automatically on Academic Warning the following semester.  Read: 'If you fail (get an F) even one class, you're out.  I don't aspire to get an A or even a B, but I hope not to get an F.  So thanks for heads up about the final…'" (DX J, p. 1; Schmertzler Affidavit, ¶ 11.)  Following this e-mail exchange, Professor Schmertzler talked to the plaintiff in person and advised him that he had a full lifetime to work, but he had only one chance to graduate from Yale.  Professor Schmertzler urged the plaintiff to put aside his business and concentrate on his coursework so that he could graduate on time.[8]  (Schmertzler Affidavit, ¶ 13.)

On December 12, the first day of the final exam period, Professor Schmertzler posted the final examination for access by the students in the class, and he set a very clear deadline for submission of the take home final exam:

> I will accept PDFs or Word files of your assessments until 17:30 (New Haven time) on December 18, 2019. Files should be sent to me no later than 17:30 on December 18 at [e-mail address].  NO PAPERS SENT AFTER THAT TIME WILL BE ACCEPTED WITHOUT A DEAN'S WRITTEN EXCUSE.  SERIOUSLY.

(Emphasis in original.)  (Schmertzler Affidavit, ¶ 15.)  Despite having six days to prepare the final exam for submission and despite Professor Schmertzler's clear, firm deadline of

---

[8] On December 10, 2019, the plaintiff contacted the Student Accessibility Services office to request an accommodation for a different final exam.  (DX K, p. 3.)  Although he acknowledged that he had missed the deadline for submitting the request by a week, the plaintiff still requested ▓▓▓▓▓ to complete a final exam in ECON 122.  He did not request accommodations for any other course.  Id.  Due to the untimely request, the Student Accessibility Services office was unable to provide the plaintiff with the requested accommodations due to space constraints.  Id., p. 1-2.  The plaintiff persisted in his request, stating that he had suffered a wrist injury in late October and underwent surgery two weeks later.  He had regained the ability to move his left hand freely and type in the first week of December.  He acknowledged: "I know it's not a good excuse, and I should have been more careful about following the submission deadline for accommodations."  Id., p. 2.  However, after the plaintiff was informed that the exam was three hours long, he then stated that it "shouldn't be as difficult to work under" that time constraint.  Id., p. 1.

December 18, 2019 at 5:30 p.m., the plaintiff did not submit his final exam until 8:55 p.m. on

December 18, 2019, three and a half hours late.  (DX L, p. 2; Schmertzler Affidavit, ¶ 17.)

When Professor Schmertzler asked for an explanation for the late submission, the plaintiff

admitted that he had no valid excuse:

> I want to be honest:  I don't have a good excuse.  I can't motivate
> myself to do class-related stuff with everything I try to do in real
> life….  [A]fter three years at Yale I became more cynical about
> school – I still can't wrap my mind around that most Yale students
> spend days writing papers some graduate student flicks through for
> four minutes and writes one-sentence-long feedback.[9]

(DX L, p. 1; Schmertzler Affidavit, ¶ 18.)  The plaintiff went on to explain that he "did many

things on Friday [the day this take-home exam was due]," including arranging the first video

recording session for a professor whom he assisted as a research assistant and driving to the

Chinese consulate in New York to get his passport prior to boarding a plane to Frankfurt that

night.  (DX L, p. 1.)  The plaintiff waited until the very last day to begin working on the exam

in ECON 456, despite the fact that he had a large number of other things to accomplish that

day.  The plaintiff wrote: "I submitted a paper for a computer science & law class also late,

and also at the airport.  I have no convincing excuse for this, either -- I could build an argument

that the passport was more important than the paper but (1) I had days to write the paper, (2) I

wouldn't believe this either."  (DX L, p. 1; Schmertzler Affidavit, ¶ 19.)  He acknowledged

that Professor Schmertzler's deadlines for submitting the final examinations were

"unambiguous and it was always my responsibility to meet them.  I didn't and I'm sorry."  (DX

L, p. 1; Schmertzler Affidavit, ¶ 20.)  While the plaintiff did not mention it, one way he could

---

[9] In fact, there was no teaching assistant for ECON 456.  Professor Schmertzler had informed the class at the beginning of the semester that he would read the course examinations himself.  (Schmertzler Affidavit, ¶ 18.)

have had more time for completion of his exams would have been to postpone his departure from New Haven until the day following the end of the exam period. Instead, he booked a plane ticket to Frankfurt and thereafter went to China. When he drafted his petition to CHAS, he was in Las Vegas, Nevada. (PX 24, p. 12.) None of this travel was for academic reasons.

Due to his poor performance in the course prior to the final exam and his failure to submit the final exam by the clear deadline, the plaintiff received a grade of F in Professor Schmertzler's course, while on Academic Warning. (Schmertzler Affidavit, ¶ 4, 21; DX C, p. 2.) The Programs of Study provide: "A record that shows a grade of F for a student who is on Academic Warning in that term will result in that student's dismissal for academic reasons." (DX A, p. 3.) Since the plaintiff was withdrawn for academic reasons, the Programs of Study require that he must remain away from classes for at least one fall term and one spring term, not including the term in which the withdrawal occurred. (PX 4, p. 2.) Therefore, the plaintiff is not permitted to enroll in courses until the spring term of 2021.

Dean Hill informed the plaintiff of his withdrawal for academic reasons on January 3, 2020. (DX M, p. 5.) After speaking with Dean Hill, the plaintiff submitted a petition to the Committee on Honors and Academic Standing ("CHAS") in which he sought an exception from the rules requiring withdrawal. (PX 24.) At the outset, the plaintiff stated: "███████████

███████████████████████████████████████████

█████████████████████" Id., p. 1. He further "████████████████

███████████████████████████████████████████

██████████████████" Id., p. 3. In an attempt to persuade CHAS to lift the withdrawal and allow him to enroll in classes in the Spring, 2020 term, the plaintiff included a "personal note," explaining: "████████████████████████████████████████████



████ ████████████████████████████████████████████████

████████████████████████████████████████████ " Id., p. 11.  He continued:

Id.  He then concluded his personal note by stating: "████████████████

██████████████████████████████████████████████

████████████████ " Id., p. 11-12.  In other words, the plaintiff admitted that ██████

████████████████████████████████████████████████

---

[10] The plaintiff received a grade of █ in The U.S. Banking System course because he had ████████

████████████. (DX C, p. 2; DX D.)

████████████████████████████████████████████████████

████████████████████   Since the "Academic Regulations" should not apply differently to him than to any other Yale student, the defendants had no basis for intervening and applying the rules differently to the plaintiff than any other Yale student.

CHAS met on January 13, 2020 to review the plaintiff's petition and unanimously voted to deny the petition. (PX 14, p. 1-3, 6-8.) CHAS noted that the plaintiff admitted in his petition that he had "████████████████████████████" and that he submitted the final paper after a clear deadline. (PX 14, p. 7.) CHAS also considered that, under the Programs of Study, the plaintiff was to regard himself as being on Academic Warning even in the absence of written notification and that the plaintiff, by his own admission, had been aware of the Academic Warning as of early October, well before the end of the fall term. Id., p. 7-8. As noted above, Dean Hill, the plaintiff's residential college dean, informed the plaintiff that it was important that he pay attention to his studies, since if he did not pass all of his courses that semester, he would be withdrawn for academic reasons. Thereafter, Professor Schmertzler both emailed the plaintiff and talked with him in an effort to persuade him to pay more attention to his studies. The plaintiff ignored that advice, did poorly on all aspects of ECON 456 and then, without any excuse whatsoever, failed to submit the final examination on time, after having had six full days to complete it. There is nothing surprising, or inappropriate, about the fact that the plaintiff was then subjected to the sanction listed in the Yale College Programs of Study.[11]

---

[11] While the plaintiff claims that he had problems discovering the identities of the individuals who are members of CHAS, those individuals are specifically listed on the Committee on Honors and Academic Standing page on the Yale College website. (DX B, p. 2.)

The plaintiff filed the instant action on January 30, 2020, asserting claims for breach of contract and negligence.  He now seeks an emergency preliminary injunction and requests that the defendants be ordered to (1) allow the plaintiff access to Yale College campus and all Yale University facilities; (2) permit the plaintiff to immediately and fully participate in all University activities, including enrollment in courses and student employment; and (3) grant the plaintiff all other privileges he enjoyed as a student before the dismissal.  It is clear that the plaintiff would prefer to focus on his business rather than attend class and successfully complete his courses at Yale University.  That decision resulted in the plaintiff being withdrawn for academic reasons.  Had he devoted even half of the time that he claims to have devoted to his business to his courses at Yale College, he would not be in his current predicament.

The plaintiff's goal is apparently to graduate on time with his class in May, 2020.  The short answer to this request is that it is literally impossible for the plaintiff to achieve that goal.  Yale students are required to accumulate 36 course credits in order to graduate.  Accordingly, the average number of course credits taken by students over the course of eight semesters is 4.5.  As of the present time, including two courses which the plaintiff took at another institution for which he has received credit, he has completed 29 out of the 36 courses.  He therefore needs seven more courses to graduate.  As of the present date, the spring term is more than half completed, with classes ending on April 24 and final exams being administered during the period April 30 to May 6.  It would be impossible for any student to complete seven full courses in one half of one semester.  Any time a student desires to join a course late, it would require the advance permission of the instructor in the course.  Taking a course load of more than five in a full semester requires the permission of CHAS.  There is literally no chance that the

plaintiff can receive permission to complete seven courses in what remains of the spring term of 2020. This would be the equivalent of the plaintiff completing 14 courses in a single semester. By way of comparison, the plaintiff was able to accumulate just one credit in the Spring, 2019 term and two credits in the Fall, 2019 term. The plaintiff's record in those courses was mediocre at best. He received grades of ███ and ██. In short, the plaintiff cannot enroll in the number of courses he needs to graduate; and an order from this Court requiring that Yale permit him to take seven courses over the next half semester would only doom him to failure. Accordingly, the Court should dismiss this application for Preliminary Injunction without convening an evidentiary hearing.[12]

III.    **Legal Standard**

Preliminary injunctive relief "is an 'extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion.'" JBR, Inc. v. Keurig Green Mt., Inc., 618 Fed. App'x 31, 33 (2d Cir. 2015) (quoting Sussman v. Crawford, 488 F.3d 136, 139 (2d Cir. 2007)); Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curiam) (same). The Supreme Court has held that a movant "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of

---

[12] The plaintiff appears to be suggesting that he can complete all of the academic work (reading, writing projects, exams, etc.) without attending classes. In fact, the plaintiff informed Dean Hill after he was informed of his dismissal and prior to submitting his petition for reinstatement that "99 % of my learning at Yale takes place outside of classes," and that the classes themselves often "ended up being a waste of time." (DX M, p.3.) Even if it were possible for the plaintiff to complete the course requirements for seven courses in a half semester without attending the courses themselves, Yale University believes that its classes are an integral part of the academic process. The Yale College Programs of Study states: "Regular classroom attendance is expected of all students…A student who, in the opinion of the instructor, and of the residential college dean, has been absent from a course to an excessive degree and without an excuse may at any time be placed on Cut Restriction and that course or in all courses. A student on Cut Restriction who continues to be absent in a course may, with the concurrence of the college dean and the Committee on Honors and Academic Standing, be excluded from it without credit." (DX A, p. 2.)

14

preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." Winter v. Nat'l Res. Defense Council, Inc., 555 U.S. 7, 20 (2008).  The Second Circuit's modified test requires that a movant "must demonstrate:  (1) a likelihood of success on the merits or…sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips the in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction."  (Internal quotations omitted.)  Benihana, Inc. v. Benihana of Tokyo, LLC, 784 F.3d 887, 895 (2d Cir. 2015) (quoting Salinger v. Colting, 607 F.3d 68, 79-80 (2d Cir. 2010)).  The plaintiff bears the burden of proof on each element.  Blum v. Schlegel, 830 F. Supp. 712, 723 (W.D.N.Y. 1993).

A prohibitory injunction seeks to "maintain the status quo pending a trial on the merits," while a mandatory injunction seeks to "alter the status quo by commanding some positive act." Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 34 (2d Cir. 1995).  "Status quo" is simply defined as "[t]he situation that currently exists."  Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc., 454 F. Supp. 2d 62, 68 (E.D.N.Y. 2006).  See also, Mastrovincenzo v. City of New York, 435 F.3d 78, 89 (2d Cir. 2006) (mandatory injunction "is said to alter the status quo by commanding some positive act").  "The standard of proof to be applied in determining whether the moving party has satisfied the elements for a preliminary injunction depends on whether the party is seeking a mandatory or prohibitory injunction." Vantico Holdings S.A. v. Apollo Mgmt., 247 F. Supp. 2d 437, 450 (S.D.N.Y. 2003).  "[I]f a party seeks a mandatory injunction, the party must satisfy a higher standard and the preliminary injunction should be granted only upon a clear showing that the moving party is entitled to the

relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." Id. at 451. "A mandatory injunction imposes a significant burden on the defendant and requires careful consideration of the intrusiveness of the ordered act, as well as the difficulties that may be encountered in supervising the enjoined party's compliance with the court's order." Kartman v. State Farm Mut. Auto. Ins. Co., 634 F.3d 883, 892 (7th Cir. 2011).

There can be no question that the injunctive relief that the plaintiff seeks here is mandatory. See, e.g., Montague v. Yale University, 2017 U.S. Dist. LEXIS 216093 n. 10 (D. Conn. Mar. 8, 2017) (Covello, J.) (concluding that the plaintiff sought a mandatory injunction because he requested the court to order Yale to reinstate him, which was an affirmative act since the plaintiff had already been expelled); Barsoumian v. Williams, 29 F. Supp. 3d 303, 319 (W.D.N.Y. 2014) (plaintiff surgical resident's motion for preliminary injunction seeking "reinstatement as an active surgical resident for the purpose of continued training during the pendency of this action" sought mandatory relief); Holmes v. Poskanzer, 2007 U.S. Dist. LEXIS 3216, *8-9 (N.D.N.Y. Jan. 3, 2007) ("because Plaintiffs seek an injunction that would command SUNY-New Paltz to reinstate them and alter the status quo, they are moving for a mandatory injunction, and must meet a higher showing for the issuance of an injunction in this matter"); Cartagena v. Crew, 1996 U.S. Dist. LEXIS 20178, *17 (E.D.N.Y. Sept. 5, 1996) (reinstatement of suspended school board members would constitute mandatory relief); accord Schrier v. Univ. of Colo., 427 F.3d 1253, 1261 (10th Cir. 2005) (holding that plaintiff-professor's motion for preliminary injunction seeking reinstatement would require an affirmative act and therefore requested mandatory relief); Preston v. Bd. of Trs. of Chi. State Univ., 120 F. Supp. 3d 801, 804-05 (N.D. Ill. 2015) (reinstatement of expelled university

16

student would constitute mandatory relief); Isler v. N.M. Activities Ass'n, 2010 U.S. Dist. LEXIS 14454, *23 (D.N.M. Feb. 19, 2010) (terminated employee's motion for preliminary injunction seeking reinstatement "reflects the essential characteristics of a mandatory injunction" and is thus subject to a higher degree of scrutiny).   The plaintiff here was withdrawn for academic reasons and now seeks reinstatement as a student.  Since granting an injunction in the present action would alter the "situation as it currently exists," the plaintiff seeks a mandatory injunction and must meet the higher burden of proof.

**IV.    Argument**

      **A.    The Plaintiff Cannot Establish Irreparable Harm.**

The Second Circuit has repeatedly admonished that "[i]rreparable harm is the single most important prerequisite for the issuance of a preliminary injunction."   Rodriguez v. DeBuono, 175 F.3d 227, 234-35 (2d Cir. 1999) (citations and quotations omitted).  Indeed, irreparable harm "is the 'sine qua non for preliminary injunctive relief.'"  JBR, Inc., 618 Fed. App'x at 33 (quoting USA Recycling, Inc. v. Town of Babylon, 66 F.3d 1272, 1295 (2d Cir. 1995)).  "As such, the moving party *must first demonstrate that irreparable harm would be 'likely'* in the absence of a preliminary injunction *'before the other requirements for the issuance of [a preliminary] injunction will be considered*.'"  Id. (quoting Rodriquez, 175 F.3d at 234) (emphasis added).  "In the absence of a showing of irreparable harm, a motion for preliminary injunction should be denied."  Rodriguez, 175 F.3d at 234.  See also, Thompson v. Lantz, 2008 U.S. Dist. LEXIS 21907, *7 (D. Conn. Mar. 20, 2008) (Thompson, J.) (a party seeking injunctive relief must demonstrate irreparable harm before other requirements for the issuance of an injunction will be considered.)

The plaintiff alleges in his Emergency Motion for Preliminary Injunction that he will suffer irreparable harm because he is only permitted to stay in the country for six months under his immigration status and cannot engage in any paid employment. The plaintiff claims in his declaration that he reentered the United States on a B1/B2 visa on January 15, 2020 and that individuals holding a B1/B2 are permitted to remain in the country for six months. (Pl. Affidavit, ¶ 8, 27.) Thus, he is permitted to stay in the United States until mid-July on his current visa. As noted earlier, there is no way the plaintiff can take and complete seven full semester courses between the present date and mid-July. The only courses offered by Yale College are those which started in January, and classes will end before April 24, 2020. Given that, the plaintiff cannot achieve the goal he seeks, the Court should not even entertain the present motion. Of course, should he re-enroll, as he is allowed to do for the spring semester of 2021, he will be eligible for a student visa at that time.

The plaintiff also claims in his affidavit that, while on a B1/B2 visa, he is prohibited from accepting employment, performing productive work or opening a new business in the United States. (Pl. Affidavit, ¶ 5.) Even if the plaintiff is not permitted to work in the United States under his immigration status, he claims to ███████████████████████████ ███████████████. (PX 24, p. 2.) There is no suggestion that ███████████████ ██████████████████████████ is impacted by his immigration status in the United States. The plaintiff informed Professor Schmertzler in December, 2019 that some of his clients had paid him up to $10,000+ for his consulting services. (DX J, p. 1; Schmertzler Affidavit, ¶ 9.) As an owner of an established business, it appears that the plaintiff has the ability to earn income at the present time despite his immigration status in this country.

Significantly, the plaintiff does not claim that he will suffer irreparable harm if he remains withdrawn from Yale University until the Spring, 2021 semester starts.  Nevertheless, it should be noted that the rule in this District is that even the permanent expulsion of a student does not constitute irreparable harm as a matter of law.  In Montague v. Yale Univ., 2017 U.S. Dist. LEXIS 216093, *5 (D. Conn. Mar. 8, 2017), Judge Covello concluded that the expulsion of a second semester senior undergraduate student did not constitute irreparable harm.  In that case, the plaintiff, who had been expelled from Yale after a University Wide Committee panel concluded that he had sexually assaulted a female student, argued that, without temporary injunctive relief, he would not graduate from college, enter a post-graduate degree program, or secure the same types of employment opportunities as he would have been able to secure with a Yale degree.  Judge Covello concluded that, while the plaintiff might suffer harm from the expulsion, he could not as a matter of law establish the irreparable harm required for the imposition of a mandatory injunction, and dismissed the application for preliminary injunction without a hearing.  Id. at *6.  As is true with most of the college students who predict an inability to graduate from college or to pursue a professional career if they are not reinstated, Mr. Montague's fears proved to be unfounded.  He received his bachelor's degree from a different university and was awarded his Master's in Accountancy.  He even started a job with PricewaterhouseCoopers, one of the world's largest accounting firms.  All of this occurred despite the fact that Mr. Montague solicited, and received, nationwide publicity from the media throughout the course of the litigation.

In denying the application for preliminary injunction without holding an evidentiary hearing, Judge Covello in the Montague case reasoned that if the plaintiff subsequently prevailed on the merits of his claims and was reinstated to Yale following a trial, "he will have

suffered a delay in his education, analogous to a suspension, which can be remedied through monetary compensation." Id. at *7.  Since the plaintiff failed to demonstrate irreparable harm, his motion for injunctive relief was denied.  The same reasoning applies with equal force in the present case.  The plaintiff's withdrawal for two terms will not produce irreparable harm.  There is no reason for this Court to enter a mandatory injunction prior to allowing the defendants to conduct discovery and contest the plaintiff's claims in the normal course at a trial, rather than granting him his ultimate relief now.

Phillips v. Marsh, 687 F.2d 620 (2d Cir. 1982), is also illustrative.  In that case, the plaintiff, a cadet at the United States Military Academy at West Point, was expelled from the Academy in her final semester following repeated violations of the Cadet Disciplinary System.  The district court granted her motion for a preliminary injunction seeking reinstatement.  On appeal, the Second Circuit reversed the trial court's decision, because the plaintiff had failed to make a showing of irreparable harm:  "We can conceive of no irreparable harm that would accrue to her in allowing her graduation to await the outcome of the trial on the merits; any damages to her from deferring her career as a military officer in that period of time would surely be compensable by monetary damages." Id. at 622.  See also, Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70 (2d Cir. 1979).  Nothing distinguishes the harm claimed and rejected by the Second Circuit in Phillips from the harm claimed by the present plaintiff.

Similarly, in Caiola v. Saddlemire, 2013 U.S. Dist. LEXIS 43208 (D. Conn. Mar. 27, 2013) (Bryant, J.), the plaintiff filed suit and a motion for a preliminary injunction just one month after his expulsion from the University of Connecticut for violations of the Student Code.  Judge Bryant denied the motion because the plaintiff failed to establish irreparable harm:

> While an expulsion is a severe penalty, particularly since [the plaintiff] was on the verge of graduation and had been admitted into a masters in education program, he is not entitled to the relief sought because he failed to establish irreparable harm. In order to demonstrate that he will suffer irreparable injury, plaintiff must show that a monetary award will not adequately compensate him for his injuries.

Id. at *4 (citations omitted). The court summarily dismissed as "speculative" the plaintiff's generalized claim that "the stigma from his expulsion will interfere with his academic and teaching career." Id. at *4-5. Similarly, the present plaintiff can be compensated by monetary damages if he can prove his case at trial. Economic experts commonly testify in both employment cases and personal injury cases as to the calculation of both past and future lost earnings. It is hornbook law that when a claimed wrong can be remedied by an award of monetary damages, there is no irreparable harm and an injunction may not issue. Similarly, juries can, and often do, award monetary damages for emotional distress.

Cases finding an absence of irreparable harm in circumstances involving the suspension or expulsion of a student are legion. See, e.g., Silman v. Utica Coll., 2015 U.S. Dist. LEXIS 8829, *5 n. 2 (N.D.N.Y. Jan. 27, 2015) (plaintiff cannot show irreparable harm because classes can be taken at other accredited universities); Yu v. Vassar Coll., No. 13-cv-4373, ECF No. 29, 1 (S.D.N.Y. Feb. 25, 2014) (denying motion for preliminary injunction because "[o]rdinarily a one-year delay in obtaining admission to a graduate school…is insufficient to warrant an injunction in the absence of other circumstances militating in favor of such relief"); Mostaghim v. Fashion Inst. of Tech., 2001 U.S. Dist. LEXIS 19789, *8-9 (S.D.N.Y. Nov. 30, 2001) (even if plaintiff had been expelled, he would not suffer irreparable harm, "since the irreparable harm would flow from the permanent deprivation of his degree, which was not the inevitable consequence of either suspension or expulsion"); accord Knoch, 2016 U.S. Dist.

LEXIS 117081, *27-28 (plaintiff's speculative contention that he would be unable to enter the workforce due to his suspension did not constitute irreparable harm, and any interruption of his education and delay in entering the workforce could be adequately compensated by monetary damages); <u>Pham. v. Univ. of La. At Monroe</u>, 2016 U.S. Dist. LEXIS 91663, *24-25 (W.D. La. July 13, 2016) (plaintiff's expulsion did not amount to irreparable harm because university had already expelled plaintiff by the time he brought suit and "[t]herefore, there is no threat of irreparable or reason to preserve the status quo because the status quo is not what is desired"); <u>Howe v. Pa. State Univ. Harrisburg</u>, 2016 U.S. Dist. LEXIS 11981, *20-21 (M.D. Pa. Feb. 2, 2016) ("even if the plaintiff would experience a delay [in his education] as a result of his suspension, this would not constitute irreparable harm which would not be compensated with monetary damages in the future, if warranted").

Other jurisdictions have reached same conclusion. <u>See</u>, <u>Preston v. Bd. of Trs. of Chi. State Univ.</u>, 120 F. Supp. 3d 801, 805-06 (N.D. Ill. 2015) ("a student's ambitions in a particular future employment path" do not warrant the entry of a mandatory interlocutory injunction); <u>B.P.C. v. Temple Univ.</u>, 2014 U.S. Dist. LEXIS 130410, *12-15 (E.D. Pa. Aug. 27, 2014) (plaintiff failed to establish irreparable harm because he did not put forth evidence showing that he was "potentially barred" from employment, but merely impaired from obtaining employment; and plaintiff's loss of education can be remedied since reinstatement is a possible remedy if he prevails at trial); <u>LaFreniere v. Regents of the Univ. of Cal.</u>, 2006 U.S. Dist. LEXIS 47252, *11-12 (N.D. Cal. July 6, 2006) (plaintiff's unsupported claim that he will suffer "irreparable psychological injury" if injunction is denied held insufficient to establish irreparable harm); <u>Marsh v. Del. State Univ.</u>, 2006 U.S. Dist. LEXIS 1658, *18 (D. Del. Jan. 19, 2006) (delay in education does not constitute irreparable harm where university has policy

that would permit plaintiff to reapply three years following expulsion); <u>Baer v. Nat'l Bd. of Medical Examiners</u>, 392 F. Supp. 2d 42, 49 (D. Mass. 2005) (in the context of the a medical student's ADA claim, "[the plaintiff's] inability to continue as a medical student without interruption at Drexel, while [un]desirable, is not a harm that is irreparable to [plaintiff's] potential medical career"); <u>Ben-Yonatan v. Concordia Coll. Corp.</u>, 863 F. Supp. 983, 986 (D. Minn. 1994) (plaintiff's argument that she may never be admitted to medical school because of her one year break in her academic record is purely speculative and not sufficient to show the irreparable harm necessary to justify injunctive relief); <u>Sohmer v. Kinnard</u>, 535 F. Supp. 50, 52 (D. Md. 1982) ("a mere delay in plaintiff's entry into the profession does not constitute irreparable harm").

The plaintiff in the present case has been withdrawn for two terms and is able to resume his studies in the Spring, 2021 term.  If his claims are found to have merit, the delay of one year in his graduation can be remedied by money damages.  Since the plaintiff cannot establish irreparable harm, his motion for a preliminary injunction should be denied without an evidentiary hearing.

**B.      The Plaintiff is Unlikely to Succeed on the Merits.**

Even if this Court determines that the plaintiff has made an adequate showing of irreparable harm – and he has not – the plaintiff still cannot prevail on his motion because he cannot demonstrate that he is likely to prevail on the merits of his claims.  Indeed, Judge Hall observed during the telephonic status conference on March 5, 2020 that the plaintiff had not yet shown a likelihood of success on the merits or serious questions as to the merits of his claims.

i.      The Defendants' Decision to Withdraw the Plaintiff for Academic
        Reasons Should Be Given Great Deference.

Both federal and state courts have repeatedly recognized that an educational institution's academic and disciplinary decisions should be given great deference by the courts. The United States Supreme Court has itself expressly enjoined that "courts should refrain from second-guessing the disciplinary decisions made by school administrators." Davis v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 648 (1999). See also, Does v. Trs. of Boston Coll., 2016 U.S. Dist. LEXIS 137777, *60 (D. Mass. Oct. 4, 2016) ("the courts must recognize and respect the strong interest of a private university in managing its own affairs"); Doe v. Brandeis Univ., 177 F. Supp. 3d 561, 572 (D. Mass 2016) ("[I]t is not generally the role of the federal courts to tell a private university how to conduct its affairs."); Charest v. President of Harvard Coll., 2016 U.S. Dist. LEXIS 18493, *51 n. 9 (D. Mass. Feb. 16, 2016) ("courts are chary about interfering with academic and disciplinary decisions made by private colleges and universities"); Gupta v. New Britain Gen. Hosp., 239 Conn. 574, 594 (1996) ("[W]e approach with caution, and with deference to academic decision making, the plaintiff's challenge to the motivation of the hospital in terminating his residency."); Rafalko v. University of New Haven, 129 Conn. App. 44, 48 (2011) ("A court must be careful not to substitute its judgment improperly for the academic judgment of the school.")

In Doe v. Brown University, 210 F. Supp. 3d 310, 331 (D.R.I. 2016), the district court explained: "To be perfectly clear, a student is not entitled to a perfect disciplinary process, and it is not the Court's role to be an appeals court for [the university's] disciplinary decisions." See also, Stockstill v. Quinnipiac Univ., 2010 U.S. Dist. LEXIS 49481, *22-23 (D. Conn. May 19, 2010) (an educational institution's decisions "involve the exercise of professional judgment

to which courts should defer."); <u>Ruggiero v. Yale Univ.</u>, 2007 U.S. Dist. LEXIS 66290, \*2 (D. Conn. Sept. 10, 2007) (Eginton, J.) ("[A]n educational institution's academic decisions involve the exercise of professional judgment to which courts should defer").

A corollary to the principle that academic institutions are to be given substantial deference in academic decisions is that the courts require only that an educational institution has "substantially complied" with its rules and regulations. Thus, it has been held: "Judicial review of the institution's actions is limited to whether the institution acted arbitrarily or whether it substantially complied with its own rules and regulations." <u>Jones v. Trs. of Union Coll.</u>, 937 N.Y.S.2d 475, 477 (App. Div. 2012). <u>See also</u>, <u>Routh v. Univ. of Rochester</u>, 981 F. Supp. 2d 184, 208 (W.D.N.Y. 2013); <u>Faiaz v. Colgate Univ.</u>, 64 F. Supp. 3d 336, 358 (N.D.N.Y. 2014); <u>Doe v. Colgate Univ.</u>, 2017 U.S. Dist. LEXIS 180267, \*59 (N.D.N.Y. Oct. 31, 2017); <u>Rolph v. Hobart & William Smith Colls.</u>, 271 F. Supp. 3d 386, 405 (W.D.N.Y. 2017); <u>Purcell v. New York Inst. Of Technology-College of Osteopathic Med.</u>, 2017 U.S. Dist. LEXIS 124432, \*25 (E.D.N.Y. Aug. 4, 2017). Therefore, the defendants' decision, in compliance with its Programs of Study, to withdraw the plaintiff from Yale College for academic reasons because he had received a failing grade while on Academic Warning should be given great deference by this Court.

  ii. <u>The Plaintiff Cannot Prevail on His Breach of Contract and Negligence Claims.</u>

The plaintiff cannot prevail on his breach of contract and negligence claims in this case for the simple reason that he agrees that he was properly withdrawn for academic reasons under

the Programs of Study.[13]   When Dean Hill first notified the plaintiff of his withdrawal, the plaintiff indicated that he understood her decision and accepted its "underpinnings in Academic Regulations."  (DX M, p. 5.)  After a telephone conversation with Dean Hill, he again agreed that his withdrawal for academic reasons was consistent with the Programs of Study: "I have fully reviewed and am familiar with the Undergraduate Regulations of Yale College.  I don't dispute that the measure you administered considering all facts available to you at the time, i.e. an academic withdrawal for two semesters, is in line with the Regulations.  No disagreement here."  Id., p. 1.  He also informed CHAS that he agreed that Dean Hill correctly imposed the rule regarding his withdrawal.  (PX 24, p. 1.)  Despite the claim in his petition that ██████████████████████████████████████████████ , that is exactly the outcome that the plaintiff requests of the Court.  Since he has provided no reason for a jury to ignore the Programs of Study and set aside the withdrawal, he is unlikely to succeed on the merits.

The Programs of Study provide that a student will automatically be placed on Academic Warning if the student fails to earn more than two credits in one term.  (DX A, p. 2.)  Since the plaintiff only earned one credit in the Spring, 2019 term, it was consistent with the Programs of Study that he was automatically placed on Academic Warning for the Fall, 2019 term.  (DX C, p. 2; DX E.)  The Programs of Study also state that a student who receives a failing grade while on Academic Warning will be dismissed for academic reasons.  (DX A, p. 3.)  While on

---

[13] The plaintiff has also alleged that he was mistreated by Yale since the University terminated his access to Yale buildings through use of his ID swipe card.  The Programs of Study specifically provides that students who have been withdrawn for academic reasons are not entitled to remain on the Yale campus, may not use their ID cards or gain access to Yale's libraries.  (PX 4, p. 2.)  Thus, his access was appropriately terminated.

Academic Warning in the Fall, 2019 term, the plaintiff received a grade of F in ECON 456. (DX C, p. 2.)  Therefore, under the Programs of Study, Yale properly withdrew the plaintiff for academic reasons.

In an attempt to demonstrate that his circumstances warrant a departure from the Programs of Study, the plaintiff argues that he was unaware that he was on Academic Warning until October 10, 2019 and that he did not receive the accommodations he had requested for the final exams.  As to the first argument, the Programs of Study clearly state that a student who fails to earn more than two credits in one term should regard himself as being on warning even in the absence of written notification.  (DX A, p. 2.)  In fact, the plaintiff acknowledged to Dean Hill in October, 2019 that he should have been aware that he was on Academic Warning, and he made the same acknowledgement in his petition to CHAS.  (PX 13, p. 1; PX 24, p. 3.)  Regardless, the plaintiff became aware of his academic status prior to both midterm and final exams.  He had plenty of time to focus on his coursework so that he could pass all of his courses that term.  The plaintiff, as he informed Professor Schmertzler in early December, 2019, simply chose not to do that in favor of devoting his time to his consulting business.  (DX J, p. 1; Schmertzler Affidavit, ¶ 9, 11.)

As to the request for accommodations, the plaintiff never requested accommodations for the final exam in ECON 456.  In fact, the plaintiff's usual accommodation, ███████ ██████, would not even apply to the take home final for ECON 456.  As noted, ████████; the plaintiff had six full days to complete it.  In any event, the University provided the plaintiff with all the accommodations he requested.  In October, 2019, the plaintiff suffered a broken wrist and thereafter underwent surgery.  He informed the Student Accessibility Services ("SAS") office that he had worked with Dean Hill to catch up on all assignments,

commitments, and deadlines he had missed. (DX K, p. 2.) Dean Hill provided him with Dean's excuses when he requested them. (DX I.) On November 22, 2019, Professor Schmertzler reached out to the plaintiff to alert him that he was "at clear risk of failing this course." (DX J, p. 1; Schmertzler Affidavit, ¶ 5-6.) Knowing that the plaintiff had suffered an injury to his wrist during the semester, Professor Schmertzler counseled the plaintiff to discuss alternatives with his Dean if the injury had affected his studies or would affect his ability to complete the final exam. (DX J, p. 1; Schmertzler Affidavit, ¶ 7.) The plaintiff never suggested that he required accommodations for the final exam. (Schmertzler Affidavit, ¶ 16.) The only accommodations that the plaintiff received while at Yale University was ████████████

████████████████████████████████████████████████████████████████████

████. Since the ECON 456 final exam was a take home assignment and the plaintiff had six days to complete it, neither of these accommodations was applicable. The plaintiff was able to type the exam and there was ██████████████ since it was a take home exam that was to be completed anytime within the six day exam period.[14] It should also be noted that the plaintiff's wrist was healed at this time, and he had been typing since the first week of December, 2019. (DX K, p. 2.)

The only accommodation that the plaintiff was denied with respect to final exams related to a different class, which the plaintiff passed. The plaintiff admitted that he submitted his request for ██████ on the ECON 122 final exam a week late, resulting in the SAS office

---

[14] Final exams began at 7:00 p.m. on December 12, 2019 and ended at 5:30 p.m. on December 18, 2019. Professor Schmertzler posted the final exam for the students at 7:01 p.m. on December 12, 2019. (Schmertzler Affidavit, ¶ 15.) Thus, the plaintiff had the entire exam period to complete it.

being unable to accommodate him due to lack of space.[15]  (DX K, p. 2-3.)  After being denied the requested accommodation, the plaintiff stated that he would be able to complete the exam in the three hours allotted.  Id., p. 1.  Since the plaintiff received a passing grade in ECON 122, the failure to provide ███████ for the final exam did not result in the withdrawal for academic reasons.[16]

The plaintiff acknowledged in an e-mail to Dean Hill that he is an adult who must take responsibility for his actions.  (DX M, p. 3.)  He had written that same sentiment in concluding his article in the Daily News in October, 2019: "No one should expect Yale to take care of everything for us.  We are supposed to be adults, and we are treated as such.  We should behave accordingly."[17]  (DX R, p. 4.)

The plaintiff made it abundantly clear to both Professor Schmertzler and CHAS that he valued his consulting business over his coursework at Yale University.  (DX J, p. 1;

---

[15] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████  The plaintiff referenced ECON 121 in his e-mail to SAS.  This appears to be typographical error, because the plaintiff was enrolled in ECON 121 in the Spring, 2019 term.  He was enrolled in ECON 122 in the Fall, 2019 term.  (Ex. C, p. 2.)

[16] It bears noting that the plaintiff was not actually entitled to ███████ on these exams, since he never claimed a disability which would entitle him to that accommodation.  Rather, his claim was ███████
████████████████████████  The accommodation for which he was listed in the SAS office was to permit him to ████████████████████████████████████████.  Despite never claiming any additional disability or providing any evidence of any such disability, the SAS office did, upon plaintiff's timely request, provide him with ███████ on exams.  There were also occasions when the office was able to schedule ███████ even when the plaintiff made a late request, as he did in this case.

[17] Ironically, the plaintiff's column in the Yale Daily News bears the title "Yale has not failed me."  In the column he noted that Yale students should "learn how to deal with issues ourselves."  (DX R, p. 1).  He went on to state the following: (1) "Yale isn't an individual we can sensibly blame for whatever doesn't work well.  Yale is a huge organization, complex organism…."; (2) "we will always encounter people who can be nicer to us, rules that can be more accommodating, and student groups that can be more appreciative of us.  But the reality is that no large organization is perfect and that's okay."  Id. p. 2.

Schmertzler Affidavit, ¶ 9, 11; PX 24, p. 2.)  Despite being aware that he was on Academic Warning, that he was in real danger of failing ECON 456, and that a failing grade in any of his courses would result in his withdrawal from Yale University for academic reasons, the plaintiff chose to spend his time on his business rather than his coursework.  In doing so, the plaintiff ignored the sage advice of Professor Schmertzler, who counseled the plaintiff that he had a lifetime to work, but only one opportunity to graduate from Yale University.  (Schmertzler Affidavit, ¶ 13.)  The plaintiff acknowledged to CHAS that he "███████████████████████ ███████████████████████████████████████████████████████████."  (PX 24, p. 10.)  As the plaintiff has acknowledged, he is an adult and should be held accountable for his actions, which led to his dismissal for academic reasons.  Since the plaintiff's decision to focus on his consulting business rather than the coursework required to earn his degree from Yale University resulted in his withdrawal for academic reasons, he is unlikely to succeed on the merits of his claims and his motion for preliminary injunction should be denied without an evidentiary hearing.

### C.   The Balance of Equities Tips in Favor the Defendants and Denial of the Plaintiff's Motion for an Injunction is in the Public Interest.

Even if the plaintiff could somehow establish that he will suffer irreparable harm and that he is likely to prevail on the merits, the plaintiff still cannot prevail on his motion for preliminary injunction because he cannot demonstrate that the balance of equities tips decidedly in his favor or that an injunction is in the public interest.  Courts considering the balance of hardships between a student who has been expelled or suspended and an educational institution have routinely found in favor of the educational institution.  The harm to the plaintiff

should his motion be denied – which is anything but irreparable – is clearly outweighed by the harm that would be suffered by the defendant should the plaintiff's motion be granted.

Ordering Yale University to readmit the plaintiff at the present time would eviscerate Yale's legitimate interest in enforcing its own policies regarding academic requirements. See, e.g., Ruggiero v. Yale Univ., 2007 U.S. Dist. LEXIS 66290, *7 (D. Conn. Sep. 10, 2007) (Eginton, J.) ("an educational institution's academic decisions involve the exercise of professional judgment to which courts should defer"); Schaer v. Brandeis Univ., 432 Mass. 474, 482 (2000) ("A college must have broad discretion in determining appropriate sanctions for violations of its policies."). One district court has observed that "an educational institution's authority to make disciplinary decisions without having to resort to court intervention is a substantial public interest. Requiring so would substantially weaken the institution's legitimate disciplinary authority among its students and be detrimental to the public interest, as educational institutions encourage their students to conduct themselves as model citizens in adhering to any applicable code of conduct." Knoch v. Univ. of Pittsburgh, 2016 U.S. Dist. LEXIS 117081, *30 (W.D. Pa. Aug. 31, 2016). See Bleicker v. Bd. of Trustees of Ohio State Univ., Coll. of Veterinary Med., 485 F. Supp. 1381, 1389 (S.D. Ohio 1980) (finding that an educational institution has a considerable interest in protecting the integrity of its disciplinary regulations and a court's intervention into the affairs of the college would "substantially weaken its legitimate authority among its own students" and members of the profession, causing a public disservice).

The balance of hardships tips in favor of the defendants in the present case and denial of the injunction is in the public interest. Yale University would suffer hardship if the plaintiff's motion was granted, since that would force Yale University to readmit a student who

did not fulfill his academic requirements. The judicial undoing of the plaintiff's withdrawal would undermine Yale University's ability to enforce its academic policies, which are in place in order to ensure that only those who adequately complete the required coursework are permitted to earn a degree. This judicial intervention would also be against the public interest. Since the balance of hardships do not tip in the plaintiff's favor and an injunction is contrary to the public interest, this Court should deny the motion for preliminary injunction without an evidentiary hearing.

## V.      Conclusion

The plaintiff's withdrawal for academic reasons resulted from the plaintiff's decision to focus on his consulting business rather than his coursework. The plaintiff chose this course of action despite being aware that he was on Academic Warning, that he was in danger of receiving a failing grade in ECON 456, and that he would be withdrawn for academic reasons if he failed any of his courses in the Fall, 2019 term. The plaintiff has made it clear that he thought very little of classroom attendance, and apparently believes that he can satisfy the course requirements without attending the class. (PX 24, p. 2-3, 11). Contrary to this assumption, Yale University has made it clear that "Regular classroom attendance is expected of all students." (DX A, p. 2.) While the plaintiff may not believe that classroom attendance is important, Yale University does; Yale is not a correspondence school and classroom work is an essential part of the educational curriculum. Accordingly, it would not be appropriate to force Yale to re-admit plaintiff at this point and then force Yale to allow the plaintiff to get credit for courses where he attends less than half of the class sessions.

The documentary evidence demonstrates that the plaintiff has failed to establish, as a matter of law, any of the prerequisites for the issuance of a mandatory preliminary injunction.

He has failed to make the "clear showing" required by the Second Circuit and the Supreme

Court when seeking the "extraordinary and drastic remedy" of a preliminary injunction.  He

has not established that he is likely to suffer irreparable harm in the absence of preliminary

relief, that he is likely to succeed on the merits, that the balance of equities tips in his favor, or

that an injunction is in the public interest.  Under well-established precedent, the plaintiff was

required to make a clear showing on each of those elements.  Since he has not made a showing

on any of the requirements for the issuance of a preliminary injunction, the plaintiff's

application should be denied summarily, without an evidentiary hearing.

THE DEFENDANTS,

YALE UNIVERSITY, MARVIN CHUN,
MARK SCHENKER, PETER SALOVEY AND
JESSIE ROYCE HILL

By:_____/s/_____
PATRICK M. NOONAN – CT00189
COLLEEN NOONAN DAVIS – CT27773
DONAHUE, DURHAM & NOONAN, P.C.
Concept Park
741 Boston Post Road, Suite 306
Guilford, CT  06437
Telephone:  (203) 458-9168
Fax:  (203) 458-4424
Email:  pnoonan@ddnctlaw.com

## **CERTIFICATION**

I hereby certify that, on the above-written date, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

_____/s/_____
Patrick M. Noonan