UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____

JAKUB MADEJ

      **Plaintiff,**

v.

YALE UNIVERSITY, MARVIN CHUN,
MARK SCHENKER, PETER SALOVEY,
JESSIE ROYCE HILL

      **Defendants.**

_____

CIVIL ACTION No.  3:20-cv-00133-JCH

JURY TRIAL DEMANDED

MARCH 26, 2020

JAKUB'S SECOND MOTION FOR TEMPORARY RESTRAINING ORDER

MEMORANDUM OF LAW IN SUPPORT OF
EMERGENCY MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Jakub Madej submits this memorandum of law in support of his motions for a temporary restraining order and a preliminary injunction enjoining Yale University from enforcing Jakub's "dismissal for academic reasons" (PI) and enjoining Yale University from denying him physical access to Yale's campus (TRO). Should Defendants wish to submit a brief or memorandum in opposition, I respectfully request no less than three days to submit a reply.

Plaintiff Jakub Madej also moves the Honorable Court for a temporary restraining order enjoining Defendant Yale University from physically restricting him access to Yale's campus for no good reason, in violation of Yale's own regulations, and ostensibly serving no other purpose than related to this very action – in anticipation of the evidentiary hearing.

Jakub cannot seek direct support from his friends because he must stay away from campus or fear arrest – for no reason other than challenging a misleading and potentially fraudulent decision. Jakub has been recently briefly arrested by Yale Police Department like a common criminal, handcuffed, physically removed from campus, and told "not to return"; allegedly because

"he was withdrawn," to quote the officer who identified himself as Michael, but "we don't know or care why". "The University wants you off the property," he stated in plain English.

When he was arrested, Jakub was in fact reviewing Counsel's previous cases in a club room he retained access to because he continued to support the club after his withdrawal, as one reasonably would expect an editor-in-chief of a campus-wide publication to do.

Yale University is open to public. Anyone can enter its libraries until 6:00 pm, whenever they are open (access after 6:00pm is limited to Yale ID holders). You don't have to register for access, tell anyone why you're there, or even write your name down; you just open the door, come in, and read a book. Yale University campus is open to public: anyone can walk on Hillhouse Ave or Prospect St, between department buildings, or inside the Medical School. But not Jakub, who has been deemed an "unwanted person".

For the last two months, Jakub moved between friends' apartments and couches while trying to understand the underlying events and studying law to adequately represent myself in real time. He currently sleeps on the floor in the common room in an apartment that my acquaintance rents, and rely on credit card debt to purchase food and other staples. Now Jakub fears visiting his friends at Yale who extend support of all kinds, or even picking up his mail, because he will be arrested for doing so.

Jakub wishes to enjoy minimal peace of mind before the Honorable Court gathers for a preliminary injunction hearing presently scheduled for April 16, 2020.

**TABLE OF CONTENTS**

TABLE OF CONTENTS ...................................................................................................... 3

PRELIMINARY STATEMENT ........................................................................................... 4

ARGUMENT ....................................................................................................................... 6

   1.   Jakub Will Suffer Irreparable Harm if the Requested Relief is Not Granted. ................... 7

      a.   Jakub Has No Place to Live, No Income, And No Ability to Earn an Income – All of Which Defendants Can Provide to Jakub at a Trivial Cost ................................................... 8

      b.   Jakub Faces and Will Face Reputational Damages .................................................... 10

      c.   Jakub Faces A Break in Education That Cannot Be Readily Financially Compensated  10

      d.   Jakub Will Be Forced to Forfeit This Litigation as Defendants Will Likely Prolong Discovery Indefinitely ...................................................................................................... 12

   2.   Jakub is Likely to Succeed on the Merits of His Claims. ................................................. 13

      a.   Contractual Relationship Between Yale and Jakub Existed and Demanded That Parties Deal Fairly and Honestly With Each Other ...................................................................... 14

      b.   Courts Should Intervene in University Decision-Making If Bad-Faith or Capricious Judgment Is Involved ...................................................................................................... 15

      c.   Defendants Provided Little Relevant Evidence to Show Cause ................................... 16

      d.   Jakub Established Serious Questions Going to The Merits to The Extent Permitted By Accessible Evidence ........................................................................................................ 17

      e.   Yale University and Other Defendants Materially Violated Their Internal Procedures and Acted Arbitratily and Unfairly ................................................................................... 17

      f.   Yale University Breached Common Law Basic Fairness Separate from Its Internal Policies .............................................................................................................................. 18

      g.   Consequential Decisions Demand Additional Diligence and Consideration ............... 19

   3.   The Balance of Hardships Tips Decidedly in Jakub's Favor ........................................... 19

   4.   The Requested Injunction Is in The Public Interest. ...................................................... 22

CONCLUSION ................................................................................................................. 25

REQUEST FOR EVIDENTIARY HEARING .......................................................................... 26

REQUEST FOR EXPEDITED DISCOVERY ......................................................................... 26

## **PRELIMINARY STATEMENT**

Plaintiff Jakub Madej seeks this injunction to regain means necessary to proceed with this litigation while pursuing his education and employment at Yale College after its administration swiftly dismissed him "for academic reasons" without any academic or professional judgment. Defendants effectively and practically enjoined Jakub from challenging or scrutinizing their decision, or lack thereof, because Yale triggered a federal law provision mandating that Jakub leave the United States or face deportation. Jakub brought this action after adjusting his status by crossing the Canadian border and returning on a visitor visa, which he was lucky enough to do.

Defendants advance an alternative theory of reality where the cause of action was purely academic, and hence urging this Court to deny Jakub's motion. Jakub made it clear on February 23 – more than one month ago – Jakub made it clear he "does <u>not</u> contest any academic judgment" (Doc. 19, p. 2) because the Honorable Court is not an adjudicator of course grades. Yale's grading policy or grading choices of individual instructors are <u>irrelevant</u> to this entire case, let alone the application for preliminary injunction. Most importantly, Jakub alleges that (i) no actual decision was ever made; (ii) Yale intentionally misrepresented its process into believing Defendant Mark Schenker applied professional judgment where he acted arbitrarily and capriciously; (iii) Yale's pertinent rules on withdrawals are in itself prejudiced against Yale students; and (iv) he relied on a specific non-academic advice from Defendant Jessie Royce Hill to his detriment in academic matters.

Absent this injunction, Jakub will be left without a place to live, income, ability to seek employment, or an actual employment – because Jakub has outstanding offers of employment at

4

this very moment that he cannot accept because of his immigration status. As a result, Jakub would be forced to abandon this litigation in the near future, leave the United States, and forfeit his education at Yale, professional and personal connections, and a promising future.

## ARGUMENT

This motion for a temporary restraining order and preliminary injunction should be granted because, as will be discussed herein, Jakub satisfies the four elements for obtaining a temporary restraining order and preliminary injunction:

a)  a likelihood of irreparable harm if the injunction is not issued;

b)  a likelihood of success on the merits *or* sufficiently serious questions going to the merits where the balance of hardships tips decidedly in Jakub's favor;

c)  the balance of hardships tips in Jakub's favor;

d)  the injunction serves the public interest.

See *Benihana, Inc. v. Benihana of Tokyo*, LLC, 784 F. 3d 887, 895 (2d Cir. 2015); *see also Am. Civ. Liberties Union v. Clapper*, 785 F.3d 787, 825 (2d Cir. 2015)

The required standard for obtaining a temporary restraining order applied in the Second Circuit is the same as for obtaining a preliminary injunction, as recently affirmed in Metzgar. *Metzgar v. U.A. Plumbers & Steamfitters Local No. 22 Pension Fund*, 13-CV-85V(F) (W.D.N.Y. Mar. 28, 2019)

A preliminary injunction, while considered an extraordinary remedy, should be issued when necessary to preserve the status quo pending final outcome of a case. *Reuters Ltd v. United Press International, Inc.*, 903 F.2d 904, 909 (2d Cir. 1990). ("[F]or purposes of a preliminary injunction, the status quo is 'the situation that existed between the parties immediately prior to the events that precipitated the dispute.'")

The "'status quo' does not mean the situation existing at the moment the law suit is filed, but the 'last peaceable uncontested status existing between the parties before the dispute developed.'" *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1013 (10th Cir. 2004) (additional citations omitted). *See also LaRouche v. Kezer, 20 F.3d 68, 74 n.7* (2d Cir. 1994) (same); *Phillip v. Fairfield University, 118 F.3d 131, 133-134* (2d Cir. 1997).

The preliminary injunction that I seek here preserves the status quo of me being a student at Yale University; the temporary restraining order seeks the *sub*-status quo of having legal right to be present at the University property.

I will now apply the four-prong test, examining each of the four elements in turn, to demonstrate the requested temporary restraining order and preliminary injunction should be granted.

1. <u>Jakub Will Suffer Irreparable Harm if the Requested Relief is Not Granted.</u>

To demonstrate irreparable harm, the moving party must establish that he is subject to a continuing harm that cannot be adequately addressed by final relief on the merits and for which money damages are inadequate. *See LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48, 56 (2d Cir. 2004); *Wisdom Import Sales Co., LLC v. Labatt Brewing Co., Ltd.,* 339 F.3d 101, 113-114 (2d Cir. 2003). 8). This Circuit has held that "irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Rodrigues v. DeBuono*, 175 F.3d 227, 234-235 (2d Cir. 1999).

Jakub in fact already suffered harm that was irreparable when he first brought it to Defendants' attention – both *before* and *after* he opened this case. Jakub originally sought reinstatement to graduate on time, as he declared in his January 2020 petition; but now a timely graduation is extremely unlikely as a matter of practicality. While Jakub seeks monetary damages for these already inflicted harms, he pursues this injunction to prevent further irreparable harm, as described above.

    a.   *Jakub Has No Place to Live, No Income, And No Ability to Earn an Income – All of Which Defendants Can Provide to Jakub at a Trivial Cost*

Imminent irreparable harm clearly holds here because at this very moment Jakub has no place to live, no income, and no ability to earn income. He cannot seek direct support from most of his friends because he must stay away from campus or fear arrest – for no reason other than challenging a misleading and potentially fraudulent decision. For the last two months, he moved between friends' apartments and couches while trying to understand the underlying events and studying law to adequately represent myself in real time. He currently sleeps on the floor in the common room in an apartment that my acquaintance rents, and rely on credit card debt to purchase food and other staples. Should the injunction be granted, he would automatically get access to specific tools he would counteract the future harm while pursuing compensation for already inflicted injury at trial.

These tools include a place to live during the day and sleep at night, possible income obtained from employment, ability to seek employment, or an actual employment. In the last two months, specific Yale faculty members sought to find alternative ways to pay me for work I performed but could not accept compensation for – I engaged in this work because it extended

from a long-established relationship that, because of the nature of my work, could not be suddenly stopped without significant harm to the employer.

Absent this injunction, Jakub will remain without adequate access to healthcare for one obvious, and one non-obvious reason. Obviously, reinstatement automatically means that he would fall under the coverage of Yale insurance. Non-obviously, however, Jakub is virtually unable to establish a similar patient-doctor relationship at another clinic because his international insurance is frequently refused, and most clinics refused to serve him Jakub for cash – a standard practice in most countries but not in the United States. Even if this obstacle could be overcome, clinics will refuse Jakub prescription he previously obtained without a referral from a physician in Defendants' clinic, which already proved extremely incapable of supporting the Jakub's basic needs under his withdrawal.

Any further delay lowers Jakub's chances of obtaining employment authorization for off-campus work in the mid-future because USCIS, the relevant federal agency, ordinarily takes between three and four months to process such applications. This cause alone caused Yale to take an extraordinary step in May 2019 where the University created a placeholder course for international students that appears on student transcripts but was merely a way to legally circumvent USCIS processing delays that delayed previously agreed upon internships. Yale University can therefore easily take necessary steps easily if it only decides to do so.

Irreparable harm with regards to employment is imminent because Jakub has outstanding employment offers that are solely predicated upon his immigration status, which Yale can easily change.

b.   *Jakub Faces and Will Face Reputational Damages*

Whoever is determined to be academically incompetent or deficient, obviously faces a highly stigmatizing effect at every possible stage of their life.

This effect applies with double force to this Jakub because the public, including hundreds of Yale community members, knows about his academic withdrawal and carefully follows this case. Yale Daily News, the primary campus newspaper, covered this suit again last week[1] for the second time even though all of their editors are forced to work remotely.

But the same public does not delve into any details of this case; as the title of YDN article suggests, the public may have limited ability to understand what is happening at any particular stage of this action, or to articulate where Jakub stands on the merits. To these undergraduate students only one determination matters, even if temporary, namely the student status.

c.   *Jakub Faces A Break in Education That Cannot Be Readily Financially Compensated*

Defendants' decision to withdraw Jakub for academic reasons is not temporary but permanent, unless Jakub takes a set of specific actions and Defendants themselves unilaterally and arbitrarily approve his re-admission. Should Jakub wish to reenroll under current policies, he must regain his previous student status through a special process of readmission (currently labeled as "reinstatement") that in no way guarantees re-admission or, in fact, even a reasonable justification for decision to re-admit Jakub or to deny him re-admission.

---

[1] https://yaledailynews.com/blog/2020/03/24/student-suing-yale-files-preliminary-injunction/

Without injunctive relief, Jakub will lose *at least* a year of education, which delays his anticipated graduation date and postpones his ability to secure employment in the United States or to obtain admission to a graduate school in the future, as his transcript will be permanently marked with a notation of the academic penalty – which has extreme connotations involved that cannot be explained away in any possible way. The one-year threshold is a bare minimum because Defendants, and Defendants alone would adjudicate whether to re-admit Jakub or not.

Jakub's break in education is not merely a "paper harm" in that he will have to explain to future employers, even though courts held this harm alone constitutes irreparable harm. *King v. DePauw Univ.*, No. 2:14-cv-70-WTL-DKL (S.D. Ind. Aug. 22, 2014) (if Jakub not permitted to complete studies, he will forever have either a gap or senior-year transfer on his record, which he will have to explain to future employers or graduate school admissions committees by revealing sexual misconduct finding, and money damages would not provide adequate remedy).

Jakub's break in education also means that he cannot seek education. That inability, or the loss of time Jakub could engage in meaningful activities within Yale, including coursework, also cannot be measured in money.

For all of these losses, money damages cannot make him whole. *See, e.g., John Doe v. Middlebury Coll., No. 1:15-cv-192-jgm* (D. Vt. Sep. 16, 2015) (while Plaintiff may recover money damages to compensate for lost wages, money damages cannot compensate him for loss of his senior year in college with his class, the delay in completing his degree, or the opportunity to begin his future career upon graduation); *Phillip v. Nat'l Collegiate Athletic Ass'n*, 960 F. Supp. 552, 558 (D. Conn. 1997) (Plaintiff demonstrated irreparable harm where, if preliminary injunction not granted, Jakub's education would be interrupted and delayed, perhaps for years); *Maczaczyj v.*

11

*State of N.Y., 956 F. Supp. 403, 408* (W.D. N.Y. 1997) (Plaintiff showed irreparable harm where, in absence of injunction, he would not be able to participate in his master's program, which would likely affect ability to engage in future employment of his choice and would have an unquantifiable effect on his mental health).

> d. *Jakub Will Be Forced to Forfeit This Litigation as Defendants Will Likely Prolong Discovery Indefinitely*

The Federal Rules of Civil Procedure allow a litigant to pursue information from the other party by, for example, depositions, interrogatories, document production requests, requests for physical or mental examination, and requests for admission. Litigants must even provide their opponents with information that may not be admissible at trial if the information could reasonably lead to the discovery of admissible evidence.

Defendants, however, vigorously prevented disclosure of information in the present action: they opposed expedited discovery on questionable grounds, never met or conferred, and engaged in no informal discovery. Instead, they procured affidavits from Jakub's professors that have no relevance to the merits but do have a psychological effect of Jakub in that they undermine his credibility and believability, also to himself.

Abusive tactics in discovery are well-recognized, easy to employ, and difficult to prevent – or even to detect, as could reasonably be the case for the *pro se* Jakub here.

Defendants may engage in such practices to harass, cause delay, or wear down Jakub by outright refusal to answer interrogatories, or take excessive time to answer. Defendants may choose

to craft uninformative or inadequate responses to obscure important information. Defendants may also stonewall discovery, or oppose otherwise proper discovery requests for the purpose of frustrating the *pro se* Jakub. Counsel's conduct to date offers at least one clear example of each tactic aimed at discouraging Jakub from continuing this action. Absent this injunction, Defendants will likely obstruct further litigation and prevent any meaningful factfinding, as they have to date.

Defendants also have crucial means to prolong this action for virtually as long as they want because (i) they control all information requisite to proceeding with this suit; (ii) they legally control non-party individuals that have personal knowledge of Jakub's allegations; and (iii) they have immense financial resources that the *pro se* Jakub lacks. Jakub hereby moves once again for expedited discovery but fears it will be futile or incomplete.

2.   Jakub is Likely to Succeed on the Merits of His Claims.

The Supreme Court has recognized that "a party thus is not required to prove his case in full at a preliminary-injunction hearing, and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (internal citations omitted).

At this stage, Jakub need only demonstrate some likelihood that he will prevail on the merits of his claims, not that he will definitely prevail. Jakub seeks expedited discovery at this time to uncover facts to substantiate his allegations; however, he states the legal fundaments as to why evidence procured in the future would likely raise substantial questions going to the merits.

13

a.   *Contractual Relationship Between Yale and Jakub Existed and Demanded That*
     *Parties Deal Fairly and Honestly With Each Other*

Courts have long regarded the relationship between a student and a university as contractual in nature. *Kashmiri v. Regents of Univ. of California*, 156 Cal. App. 4th 809 (2007). "[B]y the act of matriculation, together with payment of required fees, a contract between the student and the institution is created...." *Id. (internal citations omitted)*. "The catalogues, bulletins, circulars, and regulations of the institution made available to the matriculant become a part of the contract." *Zumbrun v. University of Southern California*, 25 Cal. App. 3d 1, 101 Cal. Rptr. 499, 504 (1972) (collecting cases from numerous states). "The terms of the contract may include statements provided in student manuals and registration materials." *Mangla v. Brown Univ.*, 135 F.3d 80, 83 (1st Cir.1998).

Here, the contract is directed by Yale College Academic Regulations and other documents Yale distributes to its students regarding the code of faculty conduct, and decision-making processes. Importantly, relevant contractual terms include provisions directed to faculty and other university employees where such individuals played a role in Jakub's case. Together, all of these written policies constitute Yale's contract with Jakub, and the standard for interpreting the contract is that of "reasonable expectation," i.e., "what meaning the party making the manifestation, the university, should reasonably expect the other party to give it." *Doe v. Brandeis Univ., 177 F.3d 561, 594* (D. Mass. Mar. 31, 2016); *Doe v. Brown Univ., 166 F.Supp.3d 177* (D. R.I. 2016) (same).

14

"The general nature and terms of the agreement are usually implied, with specific terms to be found in the university bulletin and other publications; custom and usages can also become specific terms by implication." *Wickstrom*, 725 P.2d at 157 (quoting *Peretti*, 464 F. Supp. at 786).

Jakub applied to and enrolled at Yale College, and received scholarship covering his tuition. Jakub did so in reliance on the understanding and with the reasonable expectation that Yale would properly implement and execute reasonable and fair policies set forth in its official publications and otherwise reasonably expected to exist at a university.

An express contract or, alternatively, a contract implied in law or in fact was formed between Yale and Jakub. The contract contained an implied covenant of good faith and fair dealing that required any proceedings be conducted with basic fairness. See *Doe v. Trustees of Bos. Coll., 892 F.3d 67, 87* (1st Cir. 2018) ("the implied covenant of good faith and fair dealings imposed on every contract by Massachusetts law, applied in the context of school disciplinary proceedings, creates an independent duty to provide basic fairness.")

  b. *Courts Should Intervene in University Decision-Making If Bad-Faith or Capricious Judgment Is Involved*

If Yale's decision-making process is neither fair nor reasonable, it demands judicial scrutiny merely because students are the weaker party in the student-university contract. In reality, students frequently lack mechanisms or sophistication to understand how they might have been disadvantaged by decisions made in ways that were unfair or unreasonable.

Courts have interest in protecting students' rights in such cases, also because judicial scrutiny encourages universities to establish and/or improve their internal policies. "The judicial

15

inquiry should be directed towards the *bona fides* of the decision-making and the fairness of its implementation: whether the institution acted in good faith and dealt fairly with its student body should be the polestar of the judicial inquiry." *Beukas v. Farliegh Dickinson Univ.*, 255 N.J. Super. 420 (1992).

Where Yale disclosed policies on adjudicating academic withdrawals appear vague, "any ambiguity in contract is construed in accordance with reasonable expectations of non-drafting party when that party entered into the contract". *Travelers Casualty & Surety Co. of America v. The Netherlands Ins. Co.*, 312 Conn. 714, 740 (2014). This argument is particularly on point with regards to undergraduate students acting in good faith because they are at a clear disadvantage with regards to university administrators. Students entrust their administration expecting they know the relevant rules better; however, when administrators make a likely mistake, the considerations should be construed with reasonable expectations of non-drafting party when that party entered into the contract.

### c. *Defendants Provided Little Relevant Evidence to Show Cause*

Defendants offered no factual statements showing that injunction should not be granted because no serious questions exist.

Counsel merely tells a story that implies Jakub is an academically lacking student; regardless of the accuracy of Counsel's interpretation of reality, he must show cause relevant to the merits, not on Jakub's academic record. Merits here concern specific procedures Defendants failed to observe and avoid disclosing relevant facts.

16

d. *Jakub Established Serious Questions Going to The Merits to The Extent Permitted By Accessible Evidence*

Because the "purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held[,] . . . a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 725 (4th Cir. 2016) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)), vacated on other grounds, 137 S.Ct. 1239 (2017). For instance, in ruling on a motion for preliminary injunction, courts may consider "hearsay or other inadmissible evidence," id. at 726.

The most visible serious question going to the merit is whether Yale College made any genuine determination of Jakub's academic record, which Jakub alleges did not happen at any point. Such a determination cannot be based upon blind faith in Defendants' omniscience for at least two reasons: (i) evidence on record suggests Defendants are extremely unwilling to examine how they make such a determination themselves; and (ii) Yale University is not omniscient.

e. *Yale University and Other Defendants Materially Violated Their Internal Procedures and Acted Arbitratily and Unfairly*

A number of recent lawsuits challenged the failure to adhere to university procedures as federal courts expressed concern about the failure of schools to comply with their own procedures. See e.g., *Collick v. William Paterson Univ.*, Collick v. William Paterson Univ., Civ. No. 16-471 *69-70 (D.N.J. Apr. 25, 2017) ("the Complaint sufficiently alleges that Defendants did not adhere to [the school's] own rules, that the procedure they followed was unfair, and that the

decision was not based on sufficient evidence"); *Doe v. Syracuse Univ., 2019 WL 2021026, at *11*
(N.D.N.Y. May 8, 2019) (Plaintiff adequately pleaded breach of contract claim when specifically
referred to "expressly enumerated conditions and rights").

> f.   *Yale University Breached Common Law Basic Fairness Separate from Its Internal*
>       *Policies*

Courts recognize that a private university may not act "arbitrarily or capriciously" in
disciplining a student. *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 600 (D. Mass. 2016).
Specifically, "[s]chool disciplinary hearings must be "conducted with basic fairness." *Cloud v.
Trustees of Boston University*, 720 F.2d 721, 725 (citing *Coveney v. President & Trustees of Holy Cross
College*, 445 N.E.2d 136, 139 (1983); *Schaer v. Brandeis University*, 432 Mass. 474, 481, 735
N.E.2d 373, 380 (2000).

The California Court of Appeal, Second District similarly discussed the requirements of a
fair hearing in the private university disciplinary context in *Doe v. Allee* (30 Cal. App. 5th 1036,
1061, 242 Cal. Rptr. 3d 109, 130 (Ct. App. 2019)). The Court in Allee affirmed that "[f]or
practical purposes, common law requirements for a fair disciplinary hearing at a private university
mirror the due process protections at public universities."

Yale College's obligation to provide basic fairness in its proceedings is separate from and
in addition to its contractual obligation to follow the rules it set forth in its policies. *Doe v. Brandeis
Univ.*, 177 F. Supp. 3d 561, 601 (D. Mass. 2016). Thus, Defendants had a duty, either under an
express or implied contract or as a matter of common law, to ensure that the proceedings
determining Jakub's withdrawal were conducted in good faith and with basic fairness. *Doe v. Trs.*

*of Bos. Coll.*, 892 F.3d at 88 (obligation of fundamental fairness in student conduct proceedings is defined by the parties' contractual relationship).

### g.  *Consequential Decisions Demand Additional Diligence and Consideration*

Dismissal is a single most consequential decision that any university, including Yale University can make. Common sense and the covenant of good faith and fair dealing implies an extra level of consideration and professional judgment. Yale University itself recognizes this principle with regards to matters Yale College deems disciplinary; procedures invoked and exercised in such case offer a fair chance for a student to make his case, or at least state grounds why a to-be decision may have additional effects that merit no purpose. But not in Jakub's case – merely because Yale College deemed his decision "academic".

Even if the institution deems a decision "academic," the decision does <u>not</u> become automatically academic. Also, not all academic deisions decisions carry equal consequences. Merely an assumption that Yale University must act fairly and in good faith demands that decisions of monumental consequence to the student be subjected to adequate level of judgment and scrutiny before they are final.

### 3.  <u>The Balance of Hardships Tips Decidedly in Jakub's Favor</u>

The third element of the four-prong test concerns the "balance of equities," or whether the risk of harm to Jakub outweighs the risk of harm to Yale if the injunction is granted. Seventh Circuit phrased the Court's role as guided by determination how best to "minimize the costs of being mistaken." *Stuller, Inc. v. Steak N Shake Enterprises, Inc.*, 695 F.3d 676, 678 (7th Cir. 2012)

Risk of harm to Jakub is substantial, clear, and imminent: if the injunction is not granted, he will have no place to live and no income. Just as he cannot earn an income now, he will remain incapable of earning an income as long as the Court makes a ruling on the merits – all because Jakub's immigration status precludes him from seeking employment. Yale University is now singularly at a switch with regards to whether Jakub will be able to make a living or not. Risk to Jakub's income is not a mere risk; as a matter of law, it is certainty.

Absent the injunction, Jakub will be forced to leave the United States by June 2020. This essentially puts an end to already challenging litigation for a myriad of reasons not limited to Jakub's compromised ability to engage in discovery, disadvantaged position in any negotiation, and mere inability to represent himself at trial. Discovery ordinarily requires depositions, physical examination of documents, and frequent in-person communication with opposing attorney – all of which are legally impermissible and practically impossible.

Risk of harm to Yale is virtually non-existent, whether financial, organizational, or reputational. If the injunction is granted, Yale would not incur any costs in complying with this Court's order merely because the relief is non-rival in nature: providing Jakub with student status, access to communal spaces, library privileges, and ability to visit his friends on campus does <u>not</u> incur any cost on Yale *or* on anyone else.

As a matter of practicality, an educational institution that reinstates a student needs only to make three or four clicks in its internal information systems. Meanwhile, reinstatement for a student is equivalent to all intangible benefits he enjoys as a member of Yale University community: a sense of belonging, an ability to develop pre-existing relationships, or a possibility to contribute to the University's mission. Even the tangible privileges of reinstating a student such

as a new ID card cost carry negligible cost for any university, let alone Yale University with its annual budget of $3.8 billion.

Risk of intangible harm to Yale is also nil. Should Jakub prevail on the merits, Yale University will only benefit from identifying blatantly unfair actions among its staff and making necessary changes to improve its internal processes. Should Jakub not prevail on the merits, Yale will suffer virtually *no* reputational or some other intangible harm.

Courts have recognized the distinct nature of harm inflicted upon a natural person (a human being) and harm on an institution that is merely a legal and social entity created by natural persons. As a general rule, Courts sympathize with students because the direct harm inflicted upon them is more consequential and potentially irreparable, unlike a harm to an institution.

In *Jones* Jakub, who was charged for cheating on the examination in her nursing school and suspended for one semester, moved for preliminary injunction to enjoin the defendant university from enforcing the suspension. The district court granted, and the appellate court upheld the injunction, holding that "substantial, concrete injury" outweighed the "the University's institutional interest in (…) maintaining public confidence in the integrity of its processes". *Jones v. Board of Governors, University*, N.C, 704 F.2d 713 (4th Cir. 1983)

In a recent case, another court ruled on the balance of harms in student's favor despite the fact that the university has "interest in enforcing its own rules of conduct"…because "the harm [university] will have suffered by [student's] court-ordered return to campus. . . , while real, will not be as great as the harm [student] will have suffered if he is not permitted to return to campus but ultimately wins." *King v. DePauw Univ.,* 2014 WL 4197507, *14 (S.D. Ind. 08/22/14)

*King* was a Title IX sexual misconduct case where university procedures that may result in withdrawal are publicly available, clearly articulate who and how can make a determination of guilt, and provide guidance on appeals and student rights. Jakub in this case was afforded none, even though the likely consequence to him was no lesser than to King in *King*.

Paradoxically, the only identifiable and non-negligible cost to Defendants are legal fees, which in all likelihood already surpassed the amount Yale charges one student every semester in tuition.

Concluding, the balance of hardships tips decidedly in Jakub's favor because the relief he seeks is fundamental in nature in that it enables Jakub to live a normal life he otherwise cannot – an extreme risk under any interpretation, no matter how unfriendly to Jakub – while Defendants face little to no harm if the injunction is granted.


4.  The Requested Injunction Is in The Public Interest.

The public has a strong interest in transparency of consequential decision-making by universities and colleges because the final decisions reached have momentous consequences for specific people that, if unjustly harmed, offer suffer extreme harm that is impossible to convey in words – so much so that most individuals involved keep silent to their closest friends. The public is interested in scrutinizing the underlying decision-making – its adequacy and fairness – and not someone else's opinion on that decision-making.

Decision-making is an umbrella term for the whole process that, in the present case, leads to a determination of dismissal but, and thus encompasses (i) the policies and procedures on who,

how, when, and why makes a decision to dismiss; (ii) on what grounds are these such decisions made; (iii) how are the relevant policies applied in reality; and (iv) are they fair and just to all parties involved.

The fourth element is of particular importance because the and the underlying fairness of the process given its significant consequence. In other words, the public is strongly interested in ensuring that (i) consequential decisions are made upon reasonable information, with fairness, and upon professional judgment; and that (ii) the leeway for action to the contrary – where bad faith, arbitrariness, and negligence may play a role – is minimized.

Yale, one of *the* most elite universities worldwide, was not designed for failing students. Students frequently express intense pressure from peers and Yale itself. When everyone's eyes are on the successes, the need to treat those deemed "failure" doesn't budge.

The public interest supports the commonsensical assertion that *bona fide* students should hold reasonable trust in their universities to adjudicate its internal matters, and <u>not</u> be forced to seek courts' help.   Jakub's assertions severely undermine that trust, which should be based, and is ordinarily based upon reason, not blind faith.

Students are not attorneys because they are students. University decision-making is not adversarial for a reason. Therefore, when a reasonably minded student, in particular a *pro se* from no privileged background, resorts to a judicial system in a foreign country, pleading his case in a foreign language, ostensibly to defend his rights, the public has in interest in giving his assertions a proper consideration based on evidence. In this spirit, the public interest favors ensuring that a

student is not deprived of his educational opportunities – and numerous accompanying opportunities – without a reasonable, fair, and professional process.

The injunction sought is in public interest because Jakub carefully observed the law at all stages of his suit, thus promoting the respect for the law. Defendants intentionally left Jakub with two days to leave the United States or remain in the country unlawfully. Jakub drove 400 miles away to a foreign country and returned, thus changing his immigration status – the first step in ensuring the law is on his side. Jakub had no attorney to help and no legal experience to guide him.

He nonetheless sought professional ways of defending his rights, which brought him before this Court. He accepted the Honorable Court operates according to rules he must learn, and continues to do so.

**CONCLUSION**

Jakub's case is not about Jakub – his case is about policies written with good intentions in mind but occasionally enforced and adjudicated with negligence and blatant disregard to the very student they were created for.

Yale University exists in the first place to improve "the world today and for future generations through outstanding research and scholarship, education, preservation, and practice[2]". Jakub enrolled at Yale to pursue that very mission. Yale succeeded in created an outstanding intellectual environment that provides a large degree of freedom necessary for genuine learning and groundbreaking research – freedom from burdensome rules and unnecessary omnipresent reporting at each step of every activity that serve no purpose. "The academic freedom Yale provides can be both exhilarating and daunting," to quote a Yale admissions catchphrase.

Yale College failed to create "checks and balances" to prevent abuse of that freedom by individuals with less-than-good intentions making unprofessional, unfair, and dishonest decisions under the veil of academic judgment. Unfortunately, abandoned students in their most vulnerable moments. In Jakub's place, that freedom joined forces with negligent and misinformed actions that ultimately enabled and triggered his withdrawal "for academic reasons". Yale College was not

---

[2] Quoting Yale University *Mission Statement*. The full statement reads as follows:

> Yale is committed to improving the world today and for future generations through outstanding research and scholarship, education, preservation, and practice. Yale educates aspiring leaders worldwide who serve all sectors of society. We carry out this mission through the free exchange of ideas in an ethical, interdependent, and diverse community of faculty, staff, students, and alumni.

created for those who fail – and thus its administrators offer no care for those who were deemed "failed".

Jakub brought this action to uncover the underlying arbitrariness and unfairness of multiple decisions made every year within Yale College yet are left untouched, simply because they affect students in their most vulnerable moment *ever*.

Jakub suffered from Defendants' inactions just as much, and seeks this injunctive relief to continue uncovering the truth in this lawsuit while living a normal life and continuing his education. Both of which depend now on this Court's decision.

As a matter of law, the Court should grant a temporary restraining order and preliminary injunction enjoining Defendants from enforcing Jakub's dismissal from Yale College pending the trial on the merits, which concern the underlying decision-making made in circumstances like Jakub's, not just his particular case.

## <u>REQUEST FOR EVIDENTIARY HEARING</u>

Jakub hereby requests an evidentiary hearing on this motion.

## <u>REQUEST FOR EXPEDITED DISCOVERY</u>

Jakub hereby requests an expedited discovery on this motion. A separate motion and memorandum of law is attached.

Respectfully submitted,
/s/ Jakub Madej

Jakub Madej

26

The Jakub

65 Dwight St
New Haven, CT 06511

j.madej@lawsheet.com
Telephone: (646) 776-0066
Fax: (203) 902-0070