## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JAKUB MADEJ, | : | CIVIL CASE NO. |
| Plaintiff, | : | 3:20-cv-133 (JCH) |
| | : | |
| v. | : | |
| | : | |
| YALE UNIVERSITY, et al., | : | |
| Defendants. | : | MARCH 31, 2020 |
| | : | |

### RULING ON MOTION FOR PRELIMINARY INJUNCTION

I.   INTRODUCTION................................................................................ 1

II.  BACKGROUND ............................................................................... 2

III.  STANDARD OF REVIEW................................................................. 8

IV.  DISCUSSION ................................................................................. 11

   A.   Irreparable Harm ...................................................................... 11

   B.   Likelihood of Success .............................................................. 15

      1.   Academic Deference................................................................ 15

      2.   Contract ................................................................................... 17

      3.   Negligence ............................................................................... 33

   C.   Equities / Public Interest........................................................... 40

V.  CONCLUSION ............................................................................... 41

## I.    INTRODUCTION

Plaintiff, Jakub Madej ("Madej"), brings this action pro se against Yale University ("Yale") and several of its administrators (collectively, "the defendants"). See Compl. (Doc. No. 1). Madej alleges that Yale breached a contract with him and acted negligently by withdrawing him from study at Yale College. Id. ¶¶ 86-102, 103-110. He seeks a preliminary injunction restraining Yale from implementing his dismissal and requiring it to reinstate him as a student. See Compl. at 21 ("Prayer for Relief"); Mot. for Prelim. Inj. (Doc. No. 19); Proposed Prelim. Inj. Order (Doc. No. 19-2) at 2. The defendants oppose that Motion. See Defs.' Opp. To Mot. For Prelim. Inj. (Doc. No. 37).

For the reasons below, the court denies the Motion for Preliminary Injunction.

## II.    BACKGROUND[1]

Jakub Madej enrolled at Yale College in August 2016 as an international student. Compl. ¶¶ 10-12.  He completed seven terms at Yale, earning twenty-nine course credits.  Id. ¶ 13.  He also worked as a research assistant for a faculty member.  Id. ¶ 14; see also Snyder Aff. (Doc. No. 19-3).  Madej has been financially independent for two years and has worked at Yale to support himself.  Comp. ¶ 15.

During the spring semester of 2019, Madej completed only two course credits. Id. ¶ 17.  After initially beginning the spring semester with five course credits, Madej reduced his course load to two courses in order to concentrate on his new consulting business, on which he spent sixty hours per week.  Id. ¶ 18.  As a result of completing only two course credits, Yale placed Madej on Academic Warning after the spring semester of 2019.  Id. ¶ 17.  Pursuant to the Yale College Programs of Study ("Course Catalogue"),

> Academic Warning is an indication that a student's scholastic record is unsatisfactory. Students on Academic Warning who do not pass all of their courses in the term in which they are on Academic Warning will be dismissed for academic reasons. No matter how many course credits a student has earned, Academic Warning is automatic in the following cases: (a) failure in one term to earn more than two course credits; (b) a record that shows two grades of F in one term; (c) in two successive terms, a record that shows a grade of F for any course.

---

[1] "In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence." Muwakil-Zakuri v. Zakuri, No. 17-CV-2062 (JCH), 2017 WL 6453399, at *1 (D. Conn. Dec. 11, 2017) (quotation omitted).

<u>See</u> Defs.' Ex. 1, Yale College Programs of Study, Section I (Doc. No. 37-1) at 2

(emphasis added).  If a student on Academic Warning fails a course, he is "dismissed

for academic reasons," <u>id.</u>, and can apply for re-instatement following two terms off

campus, <u>see</u> Pl.'s Ex. 4, Course Catalogue, Section J (Doc. No. 23), at 2-3.

Jessie Royce Hill ("Hill"), the Dean of Madej's residential college, failed to send a

letter to Madej warning him about his placement on Academic Warning in the spring

semester.  Compl. ¶ 21.[2]  Hill contacted Madej in August 2019, to suggest she and

Madej "meet soon" so that she could support him in "setting a plan in place for the

term," but did not specifically mention Academic Warning in that e-mail.  <u>See</u> Defs'. Ex.

6, E-mail from Hill to Madej, dated August 20, 2019, (Doc. No. 37-6).  Hill contacted

Madej again on October 10, 2019, asking if he would

> like to meet . . . to talk through your classes and see what might be helpful
> to optimize your experience in the back half of the semester.  As you're
> aware, you are on academic warning this term so it's important to pass your
> classes and keep progressing.

<u>See</u> Pl.'s Ex. 13, E-mail from Hill to Madej, dated October 10, 2019 (Doc. No. 23) at 1;

Compl. ¶ 19.  Madej responded that he "was not aware [he was] on academic warning

this term, . . . but judging by academic regulations, it should be my responsibility."  Pl.'s

Ex. 13, E-mail from Madej to Hill, dated October 10, 2019 (Doc. No. 23) at 1.  The

academic regulations to which Madej referred state that, "[t]he college deans attempt to

---

[2] Hill believed such a letter had been sent, but later realized it had not.  <u>See</u> Pl.'s Ex. 13, E-mail from Hill to Madej, dated Oct. 20, 2019 (Doc. No. 23) at 3 ("First, my apology, as I checked and see that while I filed your letter of academic warning in May I did not forward you a copy.  I'm sorry about that. While you are correct that the academic regulations place the onus on the student to track their progress, I do make it a practice to inform my students directly.  I checked my sent batch from the spring and yours was not among them. I regret the omission.")

give written notification of Academic Warning to students whose records show these deficiencies, but such students should regard themselves as being on warning even in the absence of written notification." <u>See</u> Course Catalogue, Section I (Doc. No. 37-1) at 2.

In October 2019, Madej injured his wrist and received treatment at Yale-New Haven Hospital. Compl. ¶¶ 24-25. After his injury, Madej sought academic accommodations. <u>Id.</u> ¶¶ 26-27. Although Hill gave Madej a "dean's excuse," he did not receive additional accommodations he requested from Yale's Resource Office on Disabilities. <u>Id.</u> Madej received no exam accommodations. <u>Id.</u>[3]

At the end of the fall semester, Madej left New Haven for China. <u>Id.</u> ¶ 30. One of Madej's courses, Economics 456 ("ECON 456"), had a take-home final examination. <u>See</u> Defs.' Ex. 10, E-mail from Professor Michael Schmertzler to Jakub Madej (Doc. No. 37-10) at 2. The final exam began at 7:00 pm on December 12, 2019 and ended at 5:30 pm on December 18, 2019. <u>See</u> Defs.' Ex. 13, Schmertzler Aff. (Doc. No. 37-13) ¶ 14. Professor Michael Schmertzler, who taught the class, "forewarned students in class twice" that the exam would have to be completed "by a firm deadline at the end of the exam period," <u>id.</u>, and repeated that warning in his cover sheet to the exam: "I will accept PDFs or Word files of your assessments until 17:30 (New Haven) time on December 18, 2019. . . . NO PAPERS SENT AFTER THAT TIME WILL BE ACCEPTED

---

[3] Madej first sought accommodations from Student Accessibility Services on December 10, 2019, acknowledging that "the deadline passed a week [prior]." Defs.' Ex. K (Doc. No. 37-9) at 3. By the time he did so, there was "no more space to add [Madej] to th[e] exam" for which he sought extra time. <u>Id.</u> at 3. Madej's request for accommodation was for ECON 121, not the class he would ultimately fail, ECON 456. <u>Id.</u> at 3.

WITHOUT A DEAN'S WRITTEN EXCUSE. SERIOUSLY." Id. ¶ 15. Nonetheless,

Madej submitted the final exam "roughly 4 hours after what was a very clear deadline."

Defs.' Ex. 10, E-mail from Professor Michael Schmertzler to Jakub Madej, dated

December 19, 2019 (Doc. No. 37-10) at 2; see also Schmertzler Aff. ¶ 17. When asked

to explain his failure to meet the deadline, Madej explained that he had spent time that

day meeting with a professor he works for and obtaining his passport from the Chinese

consulate. Defs.' Ex. 10, E-mail from Jakub Madej to Professor Michael Schmertzler,

dated December 19, 2019 (Doc. No. 37-10) at 1. Professor Schmertzler had previously

reached out to Madej on November 22, 2019, to warn him that he was "at clear risk of

failing [the] course," and had encouraged Madej to "reach out to [Schmertzler] if [Madej]

thought [Schmertzler] could help him prepare for the final examination." Schmertzler

Aff. ¶¶ 5-8; see also Defs.' Ex. 8, E-mail from Professor Michael Schmertzler to Jakub

Madej, dated November 22, 2019 (Doc. No. 37-8) at 1-2.[4] Ultimately, Madej submitted

an exam at 8:55 pm, in the form of a corrupted, unreadable file. Schmertzler Aff. ¶ 17.

Schmertzler gave Madej a failing grade. Compl. ¶ 32; see also Pl.'s Ex. 25, Letter of

Withdrawal (Doc. No. 23); Schmertzler Aff. ¶-21.

On January 3, 2020, Yale sent Madej a letter explaining that he had been

withdrawn. Compl. ¶ 34; see also Pl.'s Ex. 25, Letter of Withdrawal. As a result of his

withdrawal, when Madej returned to New Haven on January 12, he was unable to

access his old dorm and was given only forty minutes to retrieve his property. Compl.

---

[4] Madej never contacted Schmertzler about his offer to help Madej prepare. Schmertzler Aff. ¶ 8.

¶¶ 41-45.  Madej's Yale transcript was sealed, and his ID card was cancelled.  Id. ¶¶ 60-
61.

A significant portion of Madej's Complaint focuses on Yale's lack of transparency
around the withdrawal process and the Committee that reviews academic withdrawals.
See Compl. ¶¶ 34-37, 49-50.  For example, the Complaint alleges that the letter
informing Madej of his withdrawal from Yale did not mention any possibility of appeal,
and that Hill, who e-mailed Madej to inform him of the withdrawal on January 2, 2020,
also failed to give him any information about appeal.  Id. ¶¶ 34-36.  Hill ultimately
explained that Madej could write to the Committee on Honors and Academic Standing
("CHAS") but did not provide information as to "what the Committee is, who sits on the
Committee, what guidelines or principles the Committee makes decisions on, or when it
might arrive at the decision."  Id. ¶ 37.

Although he alleges he had limited information, Madej wrote a 6,200-word
document to CHAS contesting his withdrawal and submitted letters of support for
CHAS's consideration.  Id. ¶ 38-39; see also Petition for Exception from Undergraduate
Regulations (Doc. No. 27).  Mark Schenker ("Schenker"), the chair of CHAS, informed
Madej by e-mail dated January 15, 2020, that his petition was denied.  Compl. ¶ 46; see
also Pl.'s Ex. 14.  Schenker's e-mail read, in part:

> [T]he Committee on Academic Standing met on 13 January to consider your
> petition for an exception to the Academic Regulations regarding withdrawal
> for academic reasons.  As you also know, the Committee voted not to grant
> your request. As a result, your withdrawal from College for academic
> reasons has been reinstated.
>
> The Committee is made up of tenured and non-tenured members of the
> Yale College Faculty, representatives of the Yale College Dean's Office,
> and undergraduate students.  I serve as Chairman.  In advance of the

meeting, each of the members of the Committee had received a copy of: your (dated 8 January);[5] a cover letter (8 January) from the residential college dean in the form on [sic] an email; a letter from Dean Hill to you (6 January) informing you of this academic withdrawal; and your academic record.

The members reviewed these materials with care, and with special attention to the grade of F you earned last term in ECON 456, which grade resulted in your withdrawal from Yale College for academic reasons. Noting that your "argument" that the "Grade of 'F' in ECON 456 Wasn't Justified" was the last of those you presented in your petition, members could find no grounds for agreeing with your view of that grade. The Committee observed that you stated in your petition that you "made a series of easily avoidable mistakes" and that you submitted the final paper after the deadline.

They noted also that, while it is regrettable that the BF Dean's Office did not send you in May a letter informing you that you would be on Academic Warning (AW) in for the fall term of 2019-2020, you had been informed of this consequence by the BF Dean's Office senior administrative assistant in spring 2019, when you withdrew from MATH 251 after midterm, thereby having a course schedule that would earn no more than two course credits, which is a condition of AW. They noted also that Dean Hill subsequently gave you a copy of the AW letter in August and that by your own account, you were aware of your AW status in October, well before the end of the fall term.

See Pl.'s Ex. 14, E-mail from Mark Schenker to Jakub Madej, dated January 15, 2019 (Doc. No. 23) at 1-2. In the Complaint, Madej alleges that Schenker failed to respond to the arguments in Madej's petition. Compl. ¶ 47-49, 52-54. In addition to the "black box" around the Committee, Yale failed to provide Madej with clear information about, inter alia, his eligibility for mental health counseling, access to his e-mail, and rules about his physical presence on campus. Id. ¶ 67.

In addition to the events detailed above, Madej's withdrawal from Yale University has implications on his immigration status in the United States. As an international

---

[5] The court notes that a word is missing from this clause of the e-mail.

student on an F-1 Visa, Madej was required to leave the United States within 15 days of his withdrawal from Yale University.  Id. ¶ 34.  Shortly before his legal immigration status as a student expired, Madej traveled to Canada and returned to the United States on a visitor visa.  Id. ¶ 65.  Further, Yale's actions have had a negative effect on Madej's mental health.  Madej, who has been treated for depression at Yale, has experienced insomnia, alienation, anxiety and depression since his forced withdrawal.  Id. ¶¶ 16, 70.  In addition, because he is no longer enrolled, Madej is no longer eligible for financial aid from Yale and has suffered economic loss.  Id. ¶ 77.

Madej first filed his Complaint on January 30, 2020, naming as defendants Yale University, Dean Hill, CHAS Chair Schenker, Yale President Peter Salovey, and Dean of Yale College Marvin Chun.  See Compl.  The Complaint alleges two common-law causes of action—breach of contract and negligence—based on a variety of wrongful actions, including the defendants' failure to "conduct an exhaustive investigation" into Madej's situation, their failure to provide information about the Committee, and their failure to provide consistent or clear answers to his questions.  Id. ¶¶ 79-85.  On February 23, 2020, Madej filed a Motion for Preliminary Injunction, which is the subject of the instant Ruling.  See Mot. for Prelim. Inj. (Doc. No. 19); see also Pl.'s Exhibits in Support of Mot. for Prelim. Inj. (Doc. No. 23).  The court ordered the defendants to respond to that Motion, see Order to Show Cause (Doc. No. 24), and they responded on March 9, 2020.  See Defs.' Opp. to Mot. for Prelim. Inj. (Doc. No. 37).

III.    STANDARD OF REVIEW

In Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008), the Supreme Court stated that, "[a] plaintiff seeking a preliminary injunction must establish that he is

likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence

of preliminary relief, that the balance of equities tips in his favor, and that an injunction is

in the public interest." Winter, 555 U.S. at 20; see also Benihana, Inc. v. Benihana of

Tokyo, LLC, 784 F.3d 887, 895 (2d Cir. 2015) (citing Salinger v. Colting, 607 F.3d 68,

79–80 (2d Cir. 2010)).  The Second Circuit has "repeatedly said that district courts may

grant a preliminary injunction where a plaintiff demonstrates irreparable harm and meets

either of two standards: '(a) a likelihood of success on the merits, or (b) sufficiently

serious questions going to the merits to make them a fair ground for litigation, and a

balance of hardships tipping decidedly in the movant's favor.'"  Trump v. Deutsche Bank

AG, 943 F.3d 627, 635 (2d Cir.), cert. granted, 140 S. Ct. 660 (2019); see also Citigroup

Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 35–

38 (2d Cir. 2010) (explaining that Winter does not preclude the Second Circuit's use of

the "serious questions" formulation). [6]

    Courts in this Circuit refer to injunctions as either "prohibitory," if they maintain

the status quo, or "mandatory," if they change the status quo.  See N. Am. Soccer

League, LLC v. United States Soccer Fed'n, Inc., 883 F.3d 32, 36–37 (2d Cir. 2018).

The relevant status quo is the status quo ante—that is, "the last actual, peaceable

uncontested status which preceded the pending controversy."  Id. at 37 (quoting Mastrio

v. Sebelius, 768 F.3d 116, 120 (2d Cir. 2014) (per curiam) (internal quotation omitted));

---

[6] The plaintiff's argument that the "[d]efendants offered no factual statement showing that
injunction should not be granted," Pl.'s Mem. at 16, misunderstands the preliminary injunction standard.
The burden is on him, the moving party, to show that an injunction should issue, not on the defendants to
show that it should not.

see also id. at 37, n.5.  "Because mandatory injunctions disrupt the status quo, a party seeking one must meet a heightened legal standard by showing 'a clear or substantial likelihood of success on the merits,'" as opposed to a "likelihood of success on the merits" or "serious questions on the merits and a balance of hardships decidedly favoring the moving party."  N.Y. Civil Liberties Union v. N.Y.C. Transit Auth., 684 F.3d 286, 294 (2d Cir. 2012) (internal quotation marks omitted).

The defendants argue that this court should apply the Second Circuit's heightened standard for the issuance of a mandatory injunction.  Defs.' Opp. to Mot. for Prelim. Inj. at 16-17.  They cite a case in this District, also against Yale, in which the court concluded that request that Yale "reinstate" a student who "has already been expelled and removed from Yale's campus" sought a mandatory injunction.  Montague v. Yale Univ., No. 3:16-cv-00885 (AVC), 2017 WL 4942772, at *3, n. 10 (D. Conn. Mar. 8, 2017) (citing Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 114 (2d Cir. 2006)).  Madej argues that he simply seeks to "preserve[ ] the status quo of . . . being a student."  See Mem. in Supp. of Mot. for Prelim. Inj. (Doc. No. 60) ("Pl.'s Mem.") at 7.  In other cases dealing with school suspensions, courts, including the Second Circuit, have described orders to "permit the [s]tudents to continue attending school" as orders "only to preserve the status quo."  Garcia v. Yonkers Sch. Dist., 561 F.3d 97, 107 (2d Cir. 2009); Christopher P. by Norma P. v. Marcus, 915 F.2d 794, 805 (2d Cir. 1990) (describing a "temporary restraining order . . . requiring the defendants to readmit [a student] to [his] [s]chool" as "simply preserv[ing] the status quo to avoid irreparable harm to the plaintiff"); Doe v. Vassar Coll., No. 19-cv-9601 (NSR), 2019 WL 6222918, at

*4 (S.D.N.Y. Nov. 21, 2019) ("It appears that the status quo <u>ante</u> was the moment before Plaintiff's suspension was imposed.").

In this court's view, the status quo <u>ante</u>--"the last actual, peaceable uncontested status which preceded the pending controversy," <u>N. Am. Soccer League</u>, 883 F.3d at 37 (quotation omitted)--is the status quo <u>before</u> Yale took the alleged harmful actions. That is, it is the status quo <u>prior</u> to Madej's academic withdrawal. Therefore, this court applies the lower standard and asks whether Madej has shown a "likelihood of success on the merits" or "serious questions going to the merits . . . and a balance of hardships tipping decidedly" in his favor.[7] <u>Citigroup</u>, 598 F.3d at 35.

## IV.  DISCUSSION

### A.  <u>Irreparable Harm</u>

In order for a preliminary injunction to issue, the moving party must first demonstrate that, in the absence of such injunction, he will suffer irreparable harm. <u>Benihana</u>, 784 F.3d at 895. Madej has failed to do so here.

Numerous courts in this Circuit have concluded that a dismissed student will not suffer irreparable harm in the absence of reinstatement. <u>See, e.g.</u>, <u>Doe v. Vassar Coll.</u>, 2019 WL 6222918, at *6 (finding no irreparable harm where plaintiff claimed he would "lose the ability to play college soccer as well as his ability to graduate with his class this

---

[7] Throughout this Ruling, the court will refer to the "likelihood of success on the merits." Each time it does so, it will have also considered the formulation of whether Madej has shown "serious questions going to the merits." Thus, it should be understood that, each time this court references a "likelihood of success on the merits," it incorporates the full standard, as outlined in <u>Citigroup</u>: a "likelihood of success on the merits" or "serious questions going to the merits . . . and a balance of hardships tipping decidedly" in his favor, <u>Citigroup</u>, 598 F.3d at 35, and its conclusion applies to each of the alternative formulations.

year"); Montague v. Yale, 2017 WL 4942772, at *4 ("If Montague prevails on the merits of his underlying claims and he is reinstated to Yale, he will have suffered a delay in his education, analogous to a suspension, which can be remedied through monetary compensation."); Caiola v. Saddlemire, No. 3:12-CV-00624 (VLB), 2013 WL 1310002, at *2 (D. Conn. Mar. 27, 2013) (rejecting plaintiff's claim that stigma of expulsion could interfere with his career as "speculative" and noting that "[i]n order to demonstrate that he will suffer irreparable injury, plaintiff must show that a monetary award will not adequately compensate him for his injuries."); see also Phillips v. Marsh, 687 F. 2d 620 (2d Cir. 1982) ("We can conceive of no irreparable harm that would accrue to [the plaintiff] in allowing her graduation to await the outcome of the trial on the merits; any damages to her from deferring her career as a military officer in that period of time would surely be compensable by monetary damages.") As the District Court in Montague reasoned, a plaintiff cannot show "irreparable harm" if his harm can be remedied through future monetary compensation. Montague v. Yale, 2017 WL 4942772, at *4.[8]

---

[8] As the District Court in Doe v. Vassar Coll., No. 19-cv-9601 (NSR), 2019 WL 6222918 (S.D.N.Y. Nov. 21, 2019), noted, although the Second Circuit has held that the harms that result in a delay in graduation can adequately be remedied by damages, "[w]hether an interruption in coursework is irreparable harm is a closer question, which the Second Circuit has not squarely addressed, and on which it appears that district courts have disagreed." 2019 WL 6222918, at *6 (citing Phillips v. Marsh, 687 F.2d 620 (2d Cir. 1982) and collecting cases). However, many of the cases finding an irreparable harm from a delay in coursework are distinguishable from Madej's case. In Doe v. Middlebury Coll., No. 1:15-CV-192-JGM, 2015 WL 5488109 (D. Vt. Sept. 16, 2015), the plaintiff had a particular job offer, to begin on a set date, "contingent on the successful completion of his degree at Middlebury." 2015 WL 5488109, at *3. In Bhandari v. Trustees of Columbia Univ., No. 00-cv-1735 (JGK), 2000 WL 310344 (S.D.N.Y. Mar. 27, 2000), the plaintiff was suspended midway through the semester and would lose "the benefit of the work he has already performed this semester." 2000 WL 310334, at *5. In King v. DePauw Univ., No. 2:14-CV-70 (WTL/DKL), 2014 WL 4197507 (S.D. Ind. Aug. 22, 2014), the student was found guilty of sexual assault, and the court reasoned that, "any explanation [he could give to a potential employer or graduate school admissions committee] is unlikely to erase the stigma associated with such a finding." Id. at *13.

12

So here, Madej has not shown that he will be irreparably harmed absent reinstatement at Yale this semester. Madej's Academic Withdrawal does not mean that he will never be able to obtain his degree; rather, his ability to do so will be delayed by two semesters. See Pl.'s Ex. 4, Course Catalogue, Section J (Doc. No. 23), at 3 (discussing eligibility for reinstatement after two terms off campus). As in Montague, any delay in Madej's graduation "can be remedied through monetary compensation." Montague v. Yale, 2017 WL 4942772, at *4.[9] The court reaches the same conclusion regarding Madej's argument that, "[a]bsent the injunction, he will not be able to support himself" because he received full financial aid from Yale and does not receive external financial help. Mot. for Prelim. Inj. at 2; see also Pl.'s Mem. at 8-9. To the extent Madej suffers an economic loss as a result of Yale's actions, he will be able to seek monetary damages for that loss if he prevails on the merits.

Further, Madej argues that he faces "reputational damages," because he has been "determined to be academically . . . deficient." Pl.'s Mem. at 10. However, courts

_____

Madej also cites two additional district court cases, in this Circuit, which support his argument that he will suffer an irreparable harm. In both, district courts concluded that a student would be irreparably harmed by a disruption in his education. See Maczaczyj v. State of N.Y., 956 F. Supp. 403, 408 (W.D.N.Y. 1997); Phillip v. Nat'l Collegiate Athletic Ass'n, 960 F. Supp. 552, 558 (D. Conn. 1997). Although these cases support Madej's argument, the weight of the caselaw within this Circuit and Judge Winter's concurrence in Phillips support defendants' position that Madej will not suffer "irreparable harm" in the absence of an injunction. See Phillips 687 F.2d at 624 (Winter, J., concurring) (explaining that the irreparable harm "is not [plaintiff's loss of instruction time but the interruption of her career," as "[t]here is no lack of colleges or universities which [plaintiff] might attend if all that is at stake is loss of instruction time.") Further, as there are only a few weeks left in the semester, it would be impossible for Madej to enroll in seven courses and successfully earn enough credits to graduate in May, as he admits in his Memorandum. See Pl.'s Mem. at 8.

[9] Further, although Madej argues that he will lose access to an education "that cannot be measured in money," Pl.'s Mem. at 11, he does not discuss why he could not pursue educational activities at another university see Doe v. Vassar Coll., 2019 WL 6222918, at *6, or wait one year and pursue those activities at Yale

in this Circuit have rejected students' claims that they will suffer irreparable reputational harm in the absence of an injunction. See Caiola, 2013 WL 1310002, at *2 (rejecting plaintiff's claim that stigma of expulsion could interfere with his career as "speculative"); Doe v. Vassar Coll., 2019 WL 6222918, at *6. Should Madej win his case on the merits—or lose on the merits and seek reinstatement as a student pursuant to Yale's policy in spring 2020—he will be able to repair any reputational harm. Although he may have to explain a gap in his education, "the mere fact that Plaintiff might have to explain a gap in his studies does not automatically result in a finding of irreparable harm. Any delay in graduation might be subject to inquiry, but such delay does not always constitute irreparable harm." Doe v. Vassar Coll., 2019 WL 6222918, at *6 (citing Phillips, 687 F.2d at 622). Further, like the plaintiffs in Doe v. Vassar and Caiola, Madej has offered only broad assertions that he will suffer reputational harm, and such assertions are "too speculative to warrant injunctive relief, since he has identified no plans to attend any graduate school" and no specific career prospects that have been injured. Id.[10]

Finally, Madej argues that his "ability to continue this action depends on whether he can be physically present in the United States." Mot. for Prelim. Inj. at 2. First, the court notes that legal actions can proceed even where the plaintiff is required to leave the United States. See, e.g., Swaby v. Ashcroft, 357 F.3d 156, 160–61 (2d Cir. 2004) (concluding that deportation does not moot an individual's case so long as an actual

---

[10] The fact that the Yale Daily News has reported on Madej's case does not change the court's conclusion, as Madej points to no specific harms resulting from that reporting.

controversy persists).  Further, as the defendants note, Madej will be re-eligible for a student visa as soon as Spring 2021, should he re-enroll at Yale.  Defs.' Opp. to Mot. for Summ. J. at 18.  In the meantime, Madej appears to have a valid visa, see Pl. Aff. ¶¶ 7, 27, and has not argued that such visa could not be extended, or another obtained.[11]

Therefore, the court concludes that Madej has failed to meet the first requirement for this court to issue a preliminary injunction: he has failed to show that he will suffer "irreparable harm" in the absence of an injunction. Benihana, 784 F.3d at 895.

B.      Likelihood of Success

In addition to showing irreparable harm, a party seeking a preliminary injunction must show either a "likelihood of success on the merits" or "serious questions going to the merits . . . and a balance of hardships tipping decidedly" in his favor.  Citigroup, 598 F.3d at 35; see also Benihana, 784 F.3d at 895.  Madej's Complaint includes two counts: breach of contract and negligence.  The court addresses each in turn.

1.      Academic Deference

The court's analysis of Madej's Complaint and Motion for Preliminary Injunction is informed by a long line of cases counseling that, in matters involving academic judgment, courts must defer to academic institutions.  See Ruggiero v. Yale Univ., No. 3:06-CV-1165(WWE), 2007 WL 2684631, at *2 (D. Conn. Sept. 10, 2007) (citing Gupta v. New Britain Hospital, 239 Conn. 574, 581–82, 687 A.2d 111 (1996)).  "A court must be careful not to substitute its judgment improperly for the academic judgment of the

_____

[11] Madej's allegations that Yale "may engage in" abusive discovery tactics, Pl.'s Mem. at 12, are baseless; further, that the other party may litigate discovery issues is a hazard of litigation, not cause for a preliminary injunction.

school," not only because such academic judgments implicate the First Amendment, Craine v. Trinity Coll., 259 Conn. 625, 646 (2002), but also because courts are poorly suited to make academic decisions.  As the Supreme Court explained in Board of Curators of University of Missouri v. Horowitz,

> Like the decision of an individual professor as to the proper grade for a student in his course, the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking.

435 U.S. 78, 90 (1978) (quoting Goss v. Lopez, 419 U.S. 565, 594 (1975)).  In Horowitz, noting that a "public hearing may be regarded as helpful to the ascertainment of misconduct and useless or harmful in finding out the truth as to scholarship," the Supreme Court concluded that a student at a state university could be dismissed without a formal, pre-dismissal hearing.  Horowitz, 419 U.S. at 87, 91.  As the Connecticut Supreme Court explained in Gupta v. New Britain General Hospital, 239 Conn. 574 (1996), because courts are "ill-equipped" to review the "soundness of [an educational institution's] method of teaching," claims that force courts into the difficult position of "defining what constitutes a reasonable educational program and of deciding whether that standard has been breached" have generally been rejected.  Gupta, 239 Conn. at 590-91.

Madej states that his "action does not contest any academic judgment . . .but alleges a year[-]long pattern of Defendants' ill-advised conduct and negligent actions which ultimately prevented Plaintiff from obtaining any reasonable judgment of his academic standing and other factors material in determining whether to dismiss a student or not."  Mot. for Prelim. Inj. at 2.  The court disagrees; to the extent that the

action challenges Madej's withdrawal, it challenges an academic judgment.  The

Supreme Court has made this clear: "[l]ike the decision of an individual professor as to

the proper grade for a student in his course, the determination whether to dismiss a

student for academic reasons requires an expert evaluation of cumulative information."

Horowitz, 435 U.S. at 90.  The court defers to Yale's academic judgment in setting the

criteria for withdrawal—that is, the mandatory system under which "[s]tudents on

Academic Warning who do not pass all of their courses . . . will be dismissed for

academic reasons"—and to Yale's academic judgment that that policy was applicable to

Madej.  See Defs.' Ex. 1, Course Catalogue, Section I (Doc. No. 37-1) at 2 (emphasis

added).  However, to the extent that Madej's action rests on Hill's failure to send him

notice of his placement on Academic Warning or other actions that do not relate to

Madej's academic performance, the principle that courts must defer to educational

institution's academic judgment does not apply.

> 2.    Contract

In Count One, Madej alleges a breach of contract.  Connecticut's courts have

long recognized that, "under special circumstances, a student may challenge her

dismissal from an educational program as a breach of contract."  Faigel v. Fairfield

Univ., 75 Conn. App. 37 (2003) (citing Gupta, 239 Conn. at 592–93 (1996)); see also

Johnson v. Schmitz, 119 F. Supp. 2d 90, 93 (D. Conn. 2000) ("[T]he basic legal relation

between a student and a private university or college is contractual in nature.") (citations

omitted).  Because Madej brings this action against a private university, he is not

entitled to the due process protections of the Fourteenth Amendment, which apply only

to public institutions.  See Rendell-Baker v. Kohn, 457 U.S. 830, 837–38 (1982) ("[T]he

Fourteenth Amendment, which prohibits the states from denying federal constitutional rights and which guarantees due process, applies to acts of the states, not to acts of private persons or entities.") (citing <u>Civil Rights Cases</u>, 109 U.S. 3, 11 (1883); <u>Shelley v. Kraemer</u>, 334 U.S. 1, 13 (1948)).   Rather, for Madej to be entitled to procedural protections, those protections must be afforded to him by his contract with Yale.

In the academic context, a student's contract with the university is defined by the "catalogues, bulletins, circulars and regulations of the institution." <u>Johnson v. Schmitz</u>, 119 F. Supp. 2d at 93.  As discussed above, Yale's Course Catalogue, which forms part of its contract with Madej, contains the following provisions:

> Academic Warning is an indication that a student's scholastic record is unsatisfactory. <u>Students on Academic Warning who do not pass all of their courses in the term in which they are on Academic Warning will be dismissed for academic reasons.</u> No matter how many course credits a student has earned, <u>Academic Warning is automatic in the following cases: (a) failure in one term to earn more than two course credits;</u> (b) a record that shows two grades of F in one term; (c) in two successive terms, a record that shows a grade of F for any course.

<u>See</u> Defs.' Ex. 1, Course Catalogue, Section I (Doc. No. 37-1) at 2 (emphasis added). The same section of the Course Catalogue repeats: "[a] record that shows a grade of F for a student who is on Academic Warning in that term will result in that student's dismissal for academic reasons." <u>Id.</u> at 2.  A student who has been dismissed for academic reasons can apply for re-instatement after two terms off campus.  <u>See</u> Pl.'s Ex. 4, Course Catalogue, Section J (Doc. No. 23), at 2-3.  Nowhere, to the court's knowledge, does the Course Catalogue state or imply that a student is entitled to graduate with a Yale diploma regardless of whether he complies with its regulations, or

that a student is entitled to graduate within four years.  Nor does Madej argue that Yale explicitly or implicitly made such promises.

In order to succeed on his breach-of-contract action, Madej will ultimately need to show that Yale violated its contract with him.  Although courts have "generally . . . rejected" "contract claims challenging the overall quality of educational programs," there are certain narrow circumstances in which a student may bring a breach-of-contract claim against a university.  See, e.g., Gupta, 239 Conn. at 592 (1996).  First, the Connecticut Supreme Court has recognized "at least two situations wherein courts will entertain a cause of action for institutional breach of contract for educational services." Gupta, 239 Conn. at 592.

> The first would be exemplified by a showing that the educational program failed in some fundamental respect, as by not offering any of the courses necessary to obtain certification in a particular field.  The second would arise if the educational institution failed to fulfil a specific contractual promise distinct from any overall obligation to offer a reasonable program.

Id.  In addition, the Gupta Court considered an argument that the student's dismissal was improper, even as an academic decision, because it resulted from "arbitrary, capricious, and bad faith conduct by the [educational institution]."  Id. at 594.  Finally, the Gupta Court considered a claim that a student's dismissal was improper, even as an academic decision, because the dismissal "violated the implied covenant of good faith and fair dealing."  Id. at 597.

This court reads Madej's pro se Complaint and Motion for Preliminary Injunction as raising three of the four arguments considered by the Gupta Court.[12]  It considers the following three arguments.  First, the court will consider whether Yale breached a "specific contractual promise" to Madej, either by dismissing him or by failing to afford him sufficient notice or review of that dismissal.  Second, the court will consider whether Madej's automatic withdrawal was the result of arbitrary and capricious conduct. Finally, the court will consider whether any of the defendants violated the covenant of good faith and fair dealing.

a.      Specific Contractual Promise

First, the court considers whether Madej has shown a likelihood of success on a claim that "the educational institution failed to fulfil a specific contractual promise distinct from any overall obligation to offer a reasonable program."  Gupta, 239 Conn. at 593. The court concludes that Madej has not shown a likelihood of success on the merits of such a claim.[13]

A "specific contractual promise" must be narrow enough that a factfinder could determine whether it has been violated.  In Gupta, for example, the Connecticut Supreme Court considered an argument that the hospital where the plaintiff was a resident had failed to "live up to the promise contained in the residency agreement that

_____

[12] The court does not read Madej's Complaint or Motion for Preliminary Injunction to argue that Yale's "educational program failed in some fundamental respect, as by not offering any of the courses necessary to obtain certification in a particular field."  Gupta, 239 Conn. at 592.  See generally Compl.; Mot. for Prelim. Inj.

[13] As discussed at footnote 5, when the court refers to a "likelihood of success on the merits," it has also considered, and thus incorporates, the "serious questions" standard discussed in Citigroup, 598 F.3d at 35.  See, supra, n. 5.

the hospital 'is, and will continue to be, properly accredited by all necessary accrediting authorities.'"  The Court concluded that, because the plaintiff had failed to adduce any evidence that the hospital had lost its accreditation, summary judgment for the hospital was appropriate.  Gupta, 239 Conn. at 593.  Since Gupta, the Connecticut Supreme Court has identified "specific contractual promise[s]" in educational contracts.  In Craine v. Trinity College, 259 Conn. 625 (2002), the Court concluded that the faculty manual-- "a binding employment contract," id. at 655--contained several specific contractual promises that had been broken.  Among other promises, the faculty manual contained a provision promising that a "negative [tenure] decision [would] be based on failure to meet the standards of improvement . . . specified in the last letter of reappointment," id. at 632.  The plaintiff introduced evidence that the College had breached this promise by failing to emphasize "the quantity of publication" at any time before it denied her tenure, and the Court agreed.  Id. at 656-660.  However, not all of a College's statements constitute a "specific contractual promise."  In Faigel v. Fairfield Univ., 75 Conn. App. 37 (2003), the Appellate Court concluded that a foreign student's allegations that Fairfield University promised that it would give her "many credits" for her studies abroad was "too imprecise to qualify for consideration as a 'specific contractual promise,'" and granted summary judgment on the breach-of-contract claim in favor of the university.  Id.

Madej has not identified a "specific contractual promise" that entitles him to avoid academic withdrawal or to any more review than he received.  In the Complaint, Madej points to a statement by Yale's president, Peter Salovey, which reads as follows:

> I write now to affirm Yale's steadfast commitment to our international
> students and scholars; they are vital to the university community. . . . We

> pair our unequivocal commitment to careful research stewardship with
> another: international students and scholars are welcome and respected on
> our campus.

Compl. ¶ 88. Salovey's statement does little more than outline guiding principles. Like Fairfield's statement that the plaintiff in <u>Faigel</u> could obtain "many credits" for other work, the statement that Yale has a "steadfast commitment to [its] international students" and that such students are "welcome and respected on [its] campus" is too imprecise to qualify for consideration as a specific contractual promise. <u>Faigel</u>, 75 Conn. App. at 42. Unlike the provisions at issue in <u>Craine</u>, which outlined processes that the university failed to follow, Salovey's statements are too general for any court to conclude they have been violated.[14]

Further, Madej has not identified any provisions of his contract with Yale, relating to review of an academic withdrawal, that Yale violated. Rather, taking Yale's Course Catalogue to form part of its contract with Madej, it appears that Yale followed the contract to the letter. The Course Catalogue made clear that Academic Warning status would be "automatic" if Madej failed to earn more than two credits, that he "should regard [himself] as being on warning even in the absence of written notice," and that, if he failed a class while on Academic Warning, he would be dismissed from Yale College. <u>See</u> Defs.' Ex. 1, Course Catalogue, Section I at 1-3.[15] Yale withdrew Madej from its

_____

[14] In an earlier paragraph in the Complaint, Madej cites two newspaper articles that quote Yale, which he states "directly contradict [his] experience." Compl. ¶ 78. These statements, like those by Salovey, are insufficiently precise to constitute a "specific contractual promise."

[15] The court disagrees with Madej that the contract with Yale is "vague" and should be interpreted in favor of the non-drafting party. <u>See</u> Pl.'s Mem. at 16. The Course Catalogue is very clear; a student who earns only two credits is placed on Academic Warning, and a student on Academic Warning who earns a failing grade will be withdrawn.

programs of study only after Madej met these criteria for withdrawal.[16]  Madej was also able to petition the CHAS for an exemption from automatic academic withdrawal, and the Committee reviewed his petition.  See Compl. ¶¶ 38-39, 46; Pl.'s Ex. 14, E-mail from Mark Schenker to Jakub Madej (Doc. No. 23); Petition for Exception (Doc. No. 27).  In short, there appears to be nothing about Madej's withdrawal, or the CHAS's review of that withdrawal, that violates a "specific contractual promise" Yale made.

For similar reasons, Madej has not shown that he is likely to succeed on a claim that Yale's lack of transparency violated any contractual promises Yale made.  In the Complaint, Madej alleges that Yale, inter alia, failed to explain "how Committee arrived at [the] decision" upholding the automatic academic withdrawal, Compl. ¶ 46, and failed to release "statistics or any empirical information about withdrawals," id. ¶ 59.  However, nothing in the record supports an argument that Yale promised to share such data, nor does Madej identify another source for a specific contractual promise of transparency.

Therefore, the court concludes that Madej has failed to show a "likelihood of success on the merits" on a breach-of-contract claim based on a claim Yale breached a specific contractual promise to him.  Citigroup, 598 F.3d at 35.

b.    Arbitrary and Capricious

Next, the court considers whether Madej is likely to succeed on a claim that his withdrawal, or the review process associated with that withdrawal, was arbitrary and

---

[16] As noted above, prior to the withdrawal, Dean Hill and Professor Schmertzler reached out to him to encourage him to focus on his studies.  See Pl.'s Ex. 13 (Doc. No. 23) at 1; Defs.' Ex. 8 (Doc. No. 37-8) at 1.

capricious.  In Gupta, the Connecticut Supreme Court considered such a claim, warning that, even though courts must defer to academic judgments,

> [e]ducational discretion is, nonetheless, not limitless. The plaintiff properly observes that, in exercising its professional judgment, an educational institution does not have license to act arbitrarily, capriciously, or in bad faith. Such a substantial departure from academic norms may implicate substantive due process[17] . . . or may constitute the breach of an educational contract by a private institution.

Gupta, 239 Conn. at 595 (citations omitted).

Madej "bears a heavy burden in showing that his withdrawal resulted from arbitrary or capricious action. To prevail, he must show that the [university's] decision had no 'discernable rational basis.'" Id. at 596; see also Mara v. MacNamara, No. 14-cv-01095 (RNC), 2015 WL 4392956, at *10 (D. Conn. July 15, 2015) (concluding that the arbitrary and capricious standard was not met "with regard to the school's initial decision to dismiss the plaintiff and bar him from campus because at that point he had been arrested for a violent assault.")  Applying this standard, another court in this District concluded that a dismissal based on a student's failure to abide by the provisions of a Student Handbook is not arbitrary and capricious.  See Bass ex rel. Bass v. Miss Porter's School, 738 F. Supp. 2d 307 (D. Conn. 2010) (Arterton, J.).

Madej has not shown that he is likely to succeed on the merits and meet the "heavy burden" to show that his withdrawal resulted from arbitrary or capricious action.

---

[17] As discussed earlier, it is well established that the "guarantees of due process" cannot be invoked against private educational institutions like Yale.  See Rendell-Baker v. Kohn, 457 U.S. 830, 837–38 (1982) ("[T]he Fourteenth Amendment, which prohibits the states from denying federal constitutional rights and which guarantees due process, applies to acts of the states, not to acts of private persons or entities.") (citing Civil Rights Cases, 109 U.S. 3, 11 (1883); Shelley v. Kraemer, 334 U.S. 1, 13 (1948)).

Madej does not contest the facts underlying his academic withdrawal.  He acknowledges that he earned only two course credits in Spring 2019 and then earned an F in a course the following semester.  Compl. ¶¶ 17-18; 31-32.  By the terms of Yale's Course Catalogue, Madej's withdrawal from the University was mandatory.  In other words, Yale has offered a "rational basis" for Madej's withdrawal: he failed to abide by its academic policies.  See Bass ex rel. Bass v. Miss Porter's School, 738 F. Supp. 2d 307 (D. Conn. 2010) ("Because the [Student] Handbook provides that a dismissal is warranted upon violation of any Major Rule and because Plaintiff violated a Major Rule . . . [defendant's] determination to dismiss plaintiff does not lack a 'discernable rational basis'.")  Although Madej argues that Yale acted arbitrarily and "[m]aterially [v]iolated [its] Internal Procedures," Pl.'s Mem. at 17, he does not identify any procedures that were violated.  Rather, the evidence thus far supports a conclusion that Yale followed the procedures in the Course Catalogue.

The court could also read Madej's Complaint and Motion for Preliminary Injunction to argue that Yale's process for Academic Withdrawal—e.g., the mandatory withdrawal of students who earn an F while on Academic Warning and the limited review provided by CHAS—is arbitrary and capricious.  However, such a claim would also fail.  With regard to the mandatory nature of the policy, the court is reluctant to evaluate academic performance standards, see Horowitz, 435 U.S. at 92, and Madej has not shown that there is anything inherently "arbitrary" or "capricious" about having a mandatory policy as opposed to a discretionary one.  Of course, a discretionary policy would give Yale's administration more leeway to consider the best approach for each

particular student.  However, it is certainly not irrational for Yale to conclude that such leeway is not necessary where it has made its expectations abundantly clear and has created some opportunity for review.  Here, Yale's expectations were abundantly clear. See Defs.' Ex. 1, Course Catalogue, Section I (Doc. No. 37-1).  In addition, Madej was given an opportunity to be heard in writing and seek review of the policy's application in his case, see Compl. ¶¶ 38-39; Pl.'s Ex. 14; Pl.'s Ex. 24.  Although Madej views this review as insufficient, he has not shown that it is a "substantial departure from academic norms" or deficient to the extent that it is "arbitrary and capricious."  Gupta, 239 Conn. at 595.[18]  Further, Madej will be given yet another opportunity for review of his academic performance should he reapply to Yale.  If a student on Academic Warning fails a course, he is "dismissed for academic reasons," id., and can apply for re-instatement following two terms off campus, see Pl.'s Ex. 4, Course Catalogue, Section J (Doc. No. 23), at 2-3.  Given these safeguards, the court cannot conclude that Madej has shown a likelihood of success on a claim that Yale's mandatory withdrawal policy and review process are arbitrary and capricious.

Finally, although Madej bemoans Yale's lack of transparency around the withdrawal process, see, e.g., Compl. ¶¶ 37, 49, his exhibits are insufficient to carry his

---

[18] Madej cites to King v. DePauw Univ., No. 2:14-CV-70-WTL-DKL, 2014 WL 4197507 (S.D. Ind. Aug. 22, 2014), a sexual-assault case, and argues that in comparison to the process in King, he received no process at Yale.  Pl.'s Mem. at 22.  He also cites to a California state court case, Doe v. Allee, 30 Cal. App. 5th 1036 (Ct. App. 2019), for the proposition that "common law requirements for a fair disciplinary hearing at a private university mirror the due process protections at public universities."  30 Cal. App. 5th at 1061.  Madej, who was dismissed for academic reasons, is not entitled to the protections owed students in the context of disciplinary proceedings.  See, e.g., Horowitz, 435 U.S. at 86 (noting the "significant difference between the failure of a student to meet academic standards and the violation by a student of valid rules of conduct," and concluding that, "[t]his difference calls for far less stringent procedural requirements in the case of an academic dismissal.")

burden to show a likelihood of success on a claim that the lack of transparency renders Yale's withdrawal process arbitrary and capricious. In practice, Madej received information that enabled him to petition the Committee and seek review of his academic withdrawal. As he acknowledges in the Complaint, Hill "verbally advised [Madej] to petition the Committee on Honors and Academic Standing," and "offered to pass the petition to the Committee." Compl. ¶ 37. Although Yale may post on its CHAS webpages less information than the Massachusetts Institute of Technology does concerning its comparable activities, see Compl. ¶ 57, Madej advances no arguments that Yale's choice to disseminate the information it does about the Committee and its review is arbitrary or a ""substantial departure from Academic Norms." Gupta, 239 Conn. at 595.

Thus, the court concludes that Madej has not shown that he is likely to succeed on a claim that the University's decision to follow its policies and withdraw him from study was "arbitrary and capricious" or had "no discernable rational basis," nor has he shown "serious questions going to the merits . . . and a balance of hardships tipping decidedly" in his favor. Citigroup, 598 F.3d at 35.

c.    Covenant of Good Faith and Fair Dealing

Finally, the court considers the third argument considered in Gupta, which Madej raises in his Complaint: that Yale breached the implied covenant of good faith and fair dealing. See Compl. ¶ 95. As with the arguments that Yale breached a specific contractual promise or acted in an arbitrary and capricious manner with regard to either the withdrawal or the review of the withdrawal, the court concludes Madej has not

shown a likelihood of success on his claim that the defendants breached the covenant of good faith and fair dealing.

It is well established that, under Connecticut law, "[e]very contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." Habetz v. Condon, 224 Conn. 231, 238 (1992).

> Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. . . . Bad faith means more than mere negligence; it involves a dishonest purpose.

De La Concha of Hartford, Inc. v. Aetna Life Ins. Co., 269 Conn. 424, 433 (2004). (citations and internal quotation marks omitted). The Gupta Court noted that it was unclear "how an implied covenant of good faith and fair dealing provides greater protections than that afforded [the plaintiff] under the arbitrary, capricious, and bad faith standard." [19] Id. Still, even assuming an argument that the two standards are different could be made, the Gupta Court concluded that plaintiff's suggestions that, "by occasionally offering the plaintiff positive feedback and by delaying his dismissal until he had already been promoted to his fourth year, the hospital acted pursuant to some sinister motive," were insufficient to support his claims. Id. Rather than malevolence,

---

[19] Since Gupta, at least one lower court has concluded that the implied covenant of good faith and fair dealing "provides protection less than or equal to that afforded . . . under the arbitrary, capricious or bad faith standard" and that therefore, "the plaintiff's breach of the implied covenant claim is either subsumed by or coterminous with his breach of contract claims. In either case, it no longer is relevant to our analysis." Daley v. Wesleyan Univ., 63 Conn. App. 119, 134, n. 18 (2001).

the court saw in those actions "patience and willingness to allow the plaintiff to overcome his performance." Id.

Madej has not shown that he is likely to succeed on the merits of a claim that any of the defendants breached the covenant of good faith and fair dealing in withdrawing him from the University. First, he has not shown a likelihood of success on a claim that Hill breached the covenant of good faith and fair dealing by failing to inform Madej that he was on Academic Warning in Spring 2019. Hill acknowledged that her office failed to send Madej notice that he was on Academic Warning in Spring 2019. See Compl. ¶ 21; Pl.'s Ex. 13, E-mail from Hill to Madej (Doc. No. 23) at 3. However, subsequent to that failure, Hill contacted Madej at least twice to schedule a meeting. See id. at 1 (asking, on October 10, if Madej wanted to meet to talk through classes and noting the Academic Warning); id. at 2 (noting that Hill had e-mailed Madej to set up a meeting in August); Defs.' Ex. 6, E-mail from Hill to Madej (Doc. No. 37-6) (asking, in August 2019, Madej to "meet soon"). Hill also explained that she believed the notice had been sent, and "regret[ted] the omission." See Pl.'s Ex. 13, E-mail from Hill to Madej (Doc. No. 23) at 3. Hill's attempts to follow-up, as well as her apology e-mail to Madej, suggest that her failure to contact him in May 2019, was prompted by an "honest mistake," rather than "some interested or sinister motive." De La Concha of Hartford, 269 Conn. at 433. Further, Madej acknowledged that it was his "responsibility" to monitor whether he was on Academic Warning. Pl.'s Ex. 13, E-mail from Madej to Hill, dated October 10, 2019 (Doc. No. 23) at 1; see also Course Catalogue, Section I (Doc. No. 37-1) at 2 ("[S]tudents should regard themselves as being on warning even in the absence of

written notification.")  Thus, even to the extent that Hill made a mistake in not mailing

the notice, that mistake did not "injure [Madej's] right . . . to receive the benefits of the

agreement."  Habetz v. Condon, 224 Conn. at 238 (1992).

Further, it is clear that it was not the Academic Warning status, alone, that led to

Madej's dismissal.  Rather, it was his failure of his Economics seminar that triggered

academic withdrawal.  See Defs.' Ex. 1, Course Catalogue, Section I (Doc. No. 37-1) at

2 ("Students on Academic Warning who do not pass all of their courses in the term in

which they are on Academic Warning will be dismissed for academic reasons."); Compl.

¶ 32; see also Pl.'s Ex. 25, Letter of Withdrawal (Doc. No. 23).  In other words,

assuming arguendo Hill acted maliciously in failing to warn Madej that he was on

Academic Warning, that action did not cause the ultimate harm—it did not "injure the

right of the other to receive the benefits of the agreement."  Habetz v. Condon, 224

Conn. at 238.

Rather, the harm was caused when Madej failed ECON 456.  The professor in

that seminar, Michael Schmertzler, reached out to Madej during the semester to attempt

to convince him to devote more efforts to the class and, as Madej admits, made the

deadline for the exam clear.  See Defs.' Ex. 8, E-mail from Professor Michael

Schmertzler to Jakub Madej (Doc. No. 37-8) at 1; Defs.' Ex. 10, E-mail from Professor

Michael Schmertzler to Jakub Madej (Doc. No. 37-10) at 1-2 (discussing Madej's failure

to meet deadline); Schmertzler Aff. ¶¶ 6-9, 15-18, 20-21.  Nonetheless, Madej failed to

meet the class's requirements and, as a result, met the criteria for academic withdrawal,

as he was well aware he would.  See Schmertzler Aff. ¶ 11 (quoting e-mail from Madej

to Schmertzler, explaining that "If you fail (get an F) even one class, you're out.'") There is no evidence that Professor Schmertzler acted with bad faith in setting the deadline for the final, or that any bad-faith conduct, on the part of any Yale administrator or faculty, led Madej to fail the class. Rather, Schmertzler reached out to Madej to ask for an explanation for Madej's failure to meet the deadline at the end of a six-day period in which to take the exam. Defs.' Ex. 10, E-mail from Professor Michael Schmertzler to Jakub Madej, dated December 19, 2019 (Doc. No. 37-10) at 2; see also Schmertzler Aff. ¶ 17. Schmertzler's Affidavit explains that, although he "could have simply graded the exam an F because it was submitted well after the clearly spelled-out deadline, [he] was concerned that there may have been a serious extenuating circumstance that could have caused the delay." Schmertzler Aff. ¶ 17. When asked to explain his failure to meet the deadline, Madej wrote, "I want to be honest: I don't have a good excuse." Defs.' Ex. J, E-mail from Jakub Madej to Michael Schmertzler, dated December 19, 2019 (Doc. No. 37-10) at 1. Therefore, there is no evidence that Yale's bad-faith conduct injured Madej's right to receive a Yale education; rather, his contractual rights were injured by his own failure to meet Yale's academic requirements.

Nor does the court see an intent to "injure [Madej's] right . . to receive the benefits of [his] agreement" with Yale or a "dishonest purpose" in the Committee's review of Madej's withdrawal or his 6,200-word essay contesting that withdrawal. Madej argues that the "most serious question going to the merits is whether Yale College made any genuine determination of Jakub's academic record." Pl.'s Mem. at 17. The

court disagrees.  There is no question that the CHAS reviewed Madej's academic record.  See Pl.'s Ex. 14 at 1-2 ("[T]he Committee on Academic Standing met on 13 January to consider your petition for an exception to the Academic Regulations regarding withdrawal for academic reasons. . . . In advance of the meeting, each of the members of the Committee had received [various materials, including Madej's submission and academic record]. . . . The members reviewed these materials with care, and with special attention to the grade of F you earned last term in ECON 456, which grade resulted in your withdrawal from Yale College for academic reasons.") Yale University may not be "omniscient," Pl.'s Mem. at 17, but it had all of the information it needed to make an academic determination according to its own policies. Although Madej clearly met the criteria for withdrawal, the Committee accepted and reviewed his submission.  Schenker responded to Madej's e-mails explaining the Committee's views.  See Pl.'s Ex. 14; Pl.'s Ex. 23.

Madej argues that Schenker's emails to him "provided no justification for Committee's decision [and] no response to any of Jakub's arguments," or "suggested that Committee never read what [Madej] wrote."  Compl ¶¶ 46-48, 50, 52-54.  However, the Committee did "provide[ ] justification" for its decision: as Madej notes, it concluded that there were "no grounds for granting you the exception you were seeking."  Id.; see also Pl.'s Ex. 14 at 2; Pl.'s Ex. 23 at 2.  Specifically, the Committee's decision states,

> Noting that your "argument" that the "Grade of 'F' in ECON 456 Wasn't Justified" was the last of those you presented in your petition, members could find no grounds for agreeing with your view of that grade. The Committee observed that you stated in your petition that you "made a series of easily avoidable mistakes" and that you submitted the final paper after the deadline.

Pl.'s Ex. 23 at 2.[20]  That the Committee reviewed Madej's document and communicated with him after its decision to uphold the automatic withdrawal, is not evidence that Yale acted with "some interested or sinister motive;" rather, it suggests that the Committee acted with patience toward Madej's situation.[21]

Thus, the court concludes that Madej had not shown a likelihood of success on the merits of, or significant questions as to the merits of, a claim that Yale breached the covenant of good faith and fair dealing.  Therefore, the court concludes that Madej has failed to make the second required showing for the issuance of a preliminary injunction, a "likelihood of success on the merits" or "serious questions going to the merits . . . and a balance of hardships tipping decidedly" in his favor on any of his contract-based claims against Yale.  Citigroup, 598 F.3d at 35.

3.    Negligence

In Count Two, Madej claims that Yale acted negligently.  See Compl. ¶¶ 103-110. Again, mindful of the principles of academic deference discussed supra in Section IV.B.1, the court is careful "not to substitute its judgment improperly for the academic judgment of the school," Craine v. Trinity Coll., 259 Conn. at 646.

---

[20]  Although the court does not review academic judgments, it notes that, if it did, it would not find Madej's argument persuasive.  For example, Madej states that he wrote that he was "not requesting any grade changes," but the Committee "could find no grounds for granting the exception you were seeking." Compl. ¶ 54.  Madej's submission appears to seek an exception to the automatic withdrawal policy, see supra at 2.  The Commission appears to have addressed the argument that an exception should apply to him when it wrote that it could find no grounds for granting the exception.  See Pl.'s Ex. 14 at 2.

[21]  Madej argues that the principle that "Yale University must act fairly and in good faith demands that decisions of monumental consequence to the student be subjected to adequate level of judgment and scrutiny before they are final." Pl.'s Mem. at 19.  This formulation misstates the good faith standard, and, even if it were correct, would add little support for Madej's position.  Yale subjected Madej's withdrawal to "adequate . . . scrutiny" when it reviewed its decision.

"The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury." RK Constructors, Inc. v. Fusco Corp., 231 Conn. 381, 384 (1994). Thus, court must first examine the nature of the "duty," if any, Yale owed to Madej. Connecticut courts have rejected tort claims based on an educational institution's failure to meet its duty to provide a reasonable education, known as educational malpractice claims. See Doe v. Yale Univ., 252 Conn. 641, 657-59 (2000). However, in Doe v. Yale, the Connecticut Supreme Court recognized that, although Connecticut has rejected educational malpractice claims, claims implicating duties other than the duty to educate remain viable. Id. at 659. The Court recognized that,

> at first blush, the distinction between an educational malpractice claim, rejected in Gupta, and a cognizable negligence claim arising in the educational context . . . may not always be clear. We conclude, however, that the distinction lies in the duty that is alleged to have been breached. If the duty alleged to have been breached is the duty to educate effectively, the claim is not cognizable. If the duty alleged to have been breached is the common-law duty not to cause physical injury by negligent conduct, such a claim is, of course, cognizable. That common-law duty does not disappear when the negligent conduct occurs in an educational setting.

Doe v. Yale, 252 Conn. at 660. To determine whether Madej's negligence claim is viable, the court must inquire into the nature of the duty that is alleged to have been breached.

First, this court cannot conclude Madej has shown a likelihood of success on a negligence claim based on a potential duty not to withdraw Madej from Yale's academic programs. As the Doe v. Yale Court noted, Connecticut's court have "rejected the propriety of permitting courts to evaluate such an academic decision as the dismissal of

a student based on poor performance." Doe v. Yale, 252 Conn. at 658 (citing Gupta, 239 Conn. at 590-92, 594-95). A negligence claim challenging the decision to withdraw Madej, in other words, is an impermissible educational malpractice claim.

Second, the court cannot conclude that Madej has shown a likelihood of success on a negligence claim based on Hill's failure to inform him that he was on Academic Warning status in May 2019. First, the Yale Course Catalogue does not state that Hill had a "duty" to inform Madej; rather, the Catalogue provides that, "the college deans attempt to give written notification of Academic Warning to students whose records show these deficiencies, but such students should regard themselves as being on warning even in the absence of written notification." See Course Catalogue, Section I (Doc. No. 37-1) at 2 (emphasis added). Based on the Course Catalogue, it appears that Madej, not Hill, had a duty to track his academic progress. Further, even if the court assumes that Madej's withdrawal constitutes an "injury," for the reasons discussed above, see supra Section IV.B.2.c, Madej has not shown that he is likely to establish causation. It was not the Academic Warning status, alone, that led to Madej's dismissal—-rather, it was his failure of his Economics seminar. See Defs.' Ex. 1, Course Catalogue, Section I (Doc. No. 37-1) at 2; Compl. ¶ 32; see also Pl.'s Ex. 25, Letter of Withdrawal (Doc. No. 23). Even if Hill breached a duty, Madej was aware that he would be withdrawn from Yale before he took the final for his ECON 456 class, see Schmertzler Aff. ¶ 11 (quoting December 5, 2019 e-mail from Madej to Schmertzler, explaining that "If you fail (get an F) even one class, you're out.'") Nonetheless, he failed to meet the deadline for the course and earned a failing grade. Thus, the court

cannot conclude that Madej is likely to succeed on a negligence claim, because the record does not suggest that he likely will be able to show that that Hill's actions caused the harm of withdrawal.

Nor can the court conclude that Madej has shown a likelihood of success on a negligence claim based on a duty to provide an avenue for review of its decisions to withdraw a student. Even if such a duty could be alleged as the basis of a claim distinct from an educational malpractice claim-—that is, as a duty distinct from the duty "to educate effectively," which cannot form the basis of a cognizable negligence claim—the court cannot conclude, on the basis of the current record, that Madej has shown a likelihood of success on the merits of an argument that Yale breached such a duty. <u>See</u> <u>RK Constructors</u>, 231 Conn. at 384 (listing, as an "essential element of a cause of action in negligence," breach of a duty). Yale did provide Madej with an opportunity for review. As discussed above, Madej was given an opportunity to be heard in writing and seek review of the policy's application in his case, <u>see</u> Compl. ¶¶ 38-39; Pl.'s Ex. 14; Pl.'s Ex. 24; and he will be given yet another opportunity for review of his academic performance should he reapply to Yale, <u>see</u> Pl.'s Ex. 4, Course Catalogue, Section J (Doc. No. 23), at 2-3.[22]

---

[22] On the record before it, the court cannot conclude that Madej has shown that he has a likelihood of success on a negligence claim based on either a duty to provide <u>more</u> process than he was given or a duty to be completely transparent about the withdrawal process or CHAS's procedures. First, Yale's website provides information about the CHAS, and, as discussed throughout this Ruling, it did provide review, <u>see</u>, <u>e.g.</u>, Defs.' Ex. B (listing the types of members and purpose of CHAS); Pl.'s Ex. 1 (description of the Committee); Pl.'s Ex. 14. Second, even assuming <u>arguendo</u> that Yale wasn't transparent and didn't provide review, the plaintiff has not identified any source for a duty to provide those things to a student. There is no basis for his argument that any such duty exists, and thus, the plaintiff has not shown a likelihood of success on the merits of his negligence claim.

Alternatively, the court could read Madej's pleadings to argue that Yale negligently inflicted emotional distress on him when it withdrew him from its programs of study and offered him, in his opinion, insufficient review. Such a claim, for negligent infliction of emotional distress, would be sufficiently different from an educational malpractice claim that it would not be barred by Gupta. See Vega v. Sacred Heart University, Inc., 836 F. Supp. 2d 58, 61-64 (D. Conn. 2011). However, Madej has also failed to show a likelihood of success on the merits of a negligent infliction of emotional distress claim. In Connecticut, the elements of such a claim are that: "(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress." Carrol v. Allstate Ins. Co., 262 Conn. 433, 444 (2003). In the educational context, this court allowed such a claim to proceed past the motion-to-dismiss stage where the plaintiff alleged that her university failed to protect her from severe hazing, as a result of which she left campus. See Vega, 836 F. Supp. 2d at 61-64 (D. Conn. 2011). However, Vega is distinguishable from Madej's case, both in terms of the risk caused by Yale's actions and in terms of the severity of Madej's emotional distress. "In the educational context, administrators make decisions that may distress students, but more is required to make such distress actionable in tort. The administrator's decision must be so wrongful that emotional distress involving illness or bodily harm was foreseeable." Faraclas v. Botwick, No. CV-20459655S, 2005 WL 527961, at *5 (Conn. Super. Ct. Jan. 25, 2005). Here, Yale withdrew Madej from its

programs of study only after, having received notice and been encouraged to focus on his courses by his Dean and a faculty member, Madej failed a course and, in doing so, met the clear requirements for withdrawal.  See, e.g., Pl.'s Ex. 13, E-mail from Hill to Madej, dated October 10, 2019 (Doc. No. 23) at 1 ("As you're aware, you are on academic warning this term so it's important to pass your classes and keep progressing."); Schmertzler Aff.  ¶ 11 (quoting e-mail from Madej to Schmertzler, explaining that "If you fail (get an F) even one class, you're out.'")  On the record before it, the court cannot conclude that Madej has shown a likelihood of success on a negligent infliction of emotional distress claim, because he has not shown that he is likely to establish that Yale's conduct "created an unreasonable risk of causing [him] emotional distress."  Carrol v. Allstate Ins. Co., 262 Conn. at 444.

Of course, the Complaint and Motion for Preliminary Injunction make clear that Madej suffers from mental health disorders, including depression.  Assuming Yale owes a duty of care to its students with mental health disorders not to inflict unnecessary emotional harm on such students, the exhibits submitted do not show a likelihood of success on a claim that Yale breached that duty here.  In his Petition to the CHAS, Madej stated that he "has taken prescription medication for depression and attention deficit disorder consistently during the entire academic year," and that he "resolved all mental health matters back home in Europe."  See Petition for Exception from Undergraduate Regulations (Doc. No. 27) at 5.  He also states that he "experienced no significant mental health-related issues in Fall 2019."  Id.  These statements suggest that Madej's mental health was adequately maintained by his access to prescription

medication, including from sources outside of Yale.  They also suggest that, prior to

Madej's treatment with Yale, which began on December 11, 2019, Yale was not on

notice of Madej's mental health needs.  <u>See</u> <u>id</u>. ("I established myself in the mental

Health and Counseling Department of Yale health in December 2019"); <u>see also</u> Aff. of

Heather Paxton, M.D. (Doc. No. 32-1) ¶ 4. Thus, the exhibits submitted thus far do not

support a conclusion that Madej is likely to succeed on a negligent-infliction-of-

emotional distress claim, as he has not shown at this time that his automatic withdrawal

or the Committee's decision to affirm that withdrawal "created an unreasonable risk of

causing the plaintiff emotional distress" that was "severe enough that it might result in

illness or bodily harm."  <u>Carrol v. Allstate Ins. Co.</u>, 262 Conn. at 444; <u>Vega,</u> 836 F.

Supp. 2d. at 62-63.

     Thus, having considered Madej's Complaint and Motion for Preliminary

Injunction, the court cannot conclude that he has shown a likelihood of success or

"serious questions going to the merits . . . and a balance of hardships tipping decidedly"

in his favor on any potential negligence claim.  <u>Citigroup</u>, 598 F.3d at 35.  He cannot

bring an educational malpractice claim, and thus cannot challenge his withdrawal.

Further, Madej has not shown that he is likely to succeed on a claim that Yale breached

any duty by failing to provide him notice that he was placed on Academic Warning in

Spring 2019 or by failing to provide him with an opportunity for review after his

withdrawal.  Finally, the court cannot conclude that Madej has shown a likelihood of

success or serious questions on the merits as to a negligent infliction of emotional

distress claim.

C.    Equities / Public Interest

Finally, before it issues a preliminary injunction, the court "must consider the balance of hardships between the plaintiff and defendant," and "ensure that the 'public interest would not be disserved' by the issuance of a preliminary injunction." Salinger v. Colting, 607 F.3d 68, 80 (2d Cir. 2010) (quoting eBay, Inc. v. MercExchange, 547 U.S. 388, 391 (2006), citing Winter, 555 U.S. at 20); see also Benihana, 784 F.2d at 895. Although the court need not address these factors because it has concluded that Madej has not met the first two prerequisites for the issuance of a preliminary injunction, it does so briefly here.

Although the court acknowledges that Madej faces hardships as a result of his withdrawal, Yale's hardship is not insignificant. Yale has a legitimate interest in enforcing its clear policies, and an order requiring Yale to readmit Madej would diminish its ability to enforce those academic policies. Further, as discussed throughout this Ruling, Madej's hardships are diminished by the fact that he is eligible for reinstatement in the spring of 2021; any hardships he faces as a result of his withdrawal are temporary.

Both the Supreme Court of Connecticut and the Supreme Court of the United States have clearly stated that it is not the role of the judicial system to reconsider academic decisions. See Gupta v. New Britain Hospital, 239 Conn. 574(1996); Craine v. Trinity Coll., 259 Conn. 625 (2002); Board of Curators of University of Missouri v. Horowitz, 435 U.S. 78 (1978). These cases recognize a public interest in preserving academic independence and avoiding unnecessary judicial interference into academic judgments, about which the courts lack the requisite expertise. That public interest

40

would be harmed if an injunction were to issue here.  Madej argues that there are other students who may be in his shoes.  <u>See</u> Mot. for Prelim. Inj. at 2.  However, because this court's rulings are not binding on non-parties, this decision will not foreclose those hypothetical students' opportunities to challenge Yale's decisions.  Therefore, such hypothetical students do not weigh heavily in favor of Madej.  Further, although Madej argues that the public has a significant interest in "ensuring that (i) consequential decisions are made upon reasonable information, with fairness, and upon professional judgment; and that (ii) the leeway for action to the contrary . . . is minimized," Pl.'s Mem. at 23, it appears, based on the record before the court, that Yale's decision to withdraw Madej was reached in accord with that public interest—in other words, that Yale did act fairly and upon its professional judgment in upholding Madej's automatic withdrawal.

Although this Ruling rests primarily on Madej's failure to meet the first two requirements for the issuance of a preliminary injunction, the court concludes that the third and fourth requirements—a balance of equities in the moving party's favor and the public interest--are at best neutral, although it is this court's judgment that they counsel against the issuance of a preliminary injunction in this case.

## V.    CONCLUSION

For the foregoing reasons, the court **DENIES** Madej's Motion for Preliminary Injunction (Doc. No. 19).  In order to obtain such an injunction, "[a] party seeking a preliminary injunction must "demonstrate (1) a likelihood of success on the merits or . . . sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips

in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction."  Benihana, 784 F.3d at 895.  The court concludes that Madej has met neither the first nor second factors, and, therefore, declines to issue the injunction.

**SO ORDERED.**

Dated this 31st day of March, 2020, at New Haven Connecticut.

/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge