**From:** Jakub Madej, an undergraduate student at Yale College, Class of 2020
**To**: Committee on Honors and Academic Standing c/o Jessie Hill, Dean of Benjamin Franklin College
**Date:** January 8, 2020

PETITION FOR EXCEPTION FROM UNDERGRADUATE REGULATIONS
REGARDING DECISION TO IMPOSE ACADEMIC WITHDRAWAL

My name is Jakub Madej, I am a senior in Benjamin Franklin College at Yale. I am an international student originally from Krakow, Poland. I major in economics, and I have received full financial aid since my first semester at Yale.

My college dean Jessie Hill informed me over e-mail on January 3, 2020, that I would be withdrawn from Yale for two semesters for academic reasons as (a) I was placed on Academic Warning a semester earlier, and (b) received a grade of "F" in the following semester, effective immediately. I am familiar with Undergraduate Regulations, and I acknowledge, accept, and agree that Dean Hill correctly applied the rule imposing the dismissal on me.

<u>I respectfully submit this petition for the Committee's consideration requesting an exception from Undergraduate Regulations that would invalidate the academic withdrawal imposed, and thus allow me to continue the enrollment in the spring semester that begins on January 13, 2020.</u>

I believe that allowing me to enroll in courses, access Yale's facilities and resources, and undertaking alternative measures as the Committee sees fit would amount to a more educationally sound outcome would be beneficial to both myself and Yale University. I also believe that considerable mitigating circumstances exist to explain my academic performance last semester, corroborate my petition, and justify the soundness of the outcome I suggest. I believe my case is meaningfully different from those where the academic withdrawal is intended for, and that my continuing enrollment would be more beneficial for everyone involved than my academic dismissal.

I provide relevant facts, explain my argumentation, and provide additional evidence to support my petition. I believe that the details of my case, when considered in their entirety, substantiate and justify the exception from Undergraduate Regulations and my request to nullify the withdrawal.

I also attach a brief personal note at the end of my petition to explain who I am, what is Yale to me, and why I don't think I'm simply an academically struggling student.

I'm allowed to be lawfully present in the United States on my student visa (F-1) until January 17, 2020. If the Committee is unable of convening or reaching a decision by then, I will have to leave the country and await its decision elsewhere. I have already scheduled an appointment with the amazing advisor Ozan Say from OISS (Yale's office for aliens/non-U.S. people) to discuss the immigration consequences of all possible outcomes. I hold a valid B1/B2 visa, which basically means I can easily return to the United States but not as a student.

<u>Factual Background</u>

I am an international student holding Polish citizenship and having F-1 immigration status (student visa) in the United States.

I was admitted to Yale College in March 2016 and started my program in August 2016. I have been continuously enrolled since that time; I completed seven semesters at Yale and a summer program at the LSE in London.

I was brought up in Poland, where I attended public schools for twelve years. I was brought up speaking Polish, hence English isn't formally my first language. I no longer consider English a foreign language, as I spent the last five years in English-speaking communities at Yale and at Dulwich College, a British high school in London, England.

In addition to my coursework, I have worked full-time since my sophomore spring. I have held a variety of research assistant positions at Yale since my first semester here; I continue to work as an assistant for two senior faculty members. I reached the limit of 19 workhours a week permitted by Yale in almost all weeks in the last two years.

In the same time, I worked as a tutor and educational consultant: first, for an education-focused business based in Warsaw, Poland (Oct 2016 to Feb 2019), and later for a company I founded, incorporated, and operate (Jan 2019 until now). Starting July 2018, I signed a full-time contract with my former employer, received a substantial monthly salary, and had a number of responsibilities to the company and the clients, which were located in Europe and lived in the CEST time zone (six hours past EST). The time zone difference meant that I often worked early mornings or late at night, all concurrently with my coursework and Yale life.

I opened my own company offering similar services in January 2019; we incorporated under Polish law in March 2019 and continue operating to date. I own 50% of the business, and the remaining part belongs to my business partner, who is not affiliated with Yale. I spent my junior summer in Warsaw, Poland, developing the company and performing routine business matters (calling potential clients, maintaining relationships with current clients, performing services, etc.), without any guaranteed compensation or certain benefits. I continue that work until now, albeit remotely and with more limited responsibilities. As an owner of an established business, I have ongoing obligations to clients, employees, and other parties I signed legal agreements with or otherwise maintain a serious business relationship, which I'm responsible for during the semesters, the exam period, holidays, or other breaks, including now.

I started the Spring 2019 semester with five credits; as the term progressed I decreased my courseload to four, three, and ultimately two credits to allow more time to operate a business I just started, not because I wasn't satisfied with my grades or was at risk of failing. Before submitting the form to Michelle Tracey, an assistant to Dean Hill, I explicitly ensured the withdrawals wouldn't hinder my ability to graduate by requiring completion of too many credits in the two remaining semesters.

I wasn't aware at the time that decreasing the courseload to two credits would automatically trigger an academic warning, an indication that my "academic record is unsatisfactory" and otherwise reserved for extreme cases such as failure in three courses, which I believe are extremely rare or nonexistent. I wasn't anyhow notified or warned that dropping the third class would have such consequences, either by my dean, the dean's assistant, or anyone else. I only realized I was placed on academic warning on October 10, 2019, when I received a message from my college dean Jessie Hill, which read *"As you're aware, you are on academic warning this term so it's important to pass your classes and keep progressing"*.

Retrospectively, my understanding is that I was put on academic warning in March 2019 when I turned in the withdrawal form to my college office. I never received the official notice or any formal letter informing

me about academic warning; according to Dean Hill, such letter was dated in May 2019 and sent to me both electronically and via physical mail to my home address. I never received either of them, and Dean Hill later told me via e-mail that the letter might have not been sent by mistake.

Dean Hill contacted me in mid-August 2019, suggesting a meeting to discuss my plans for the upcoming semester. Nothing in that e-mail mentioned an academic warning, and I didn't suspect the message was anything but routine communication from a dean trying to help her students. As I explained above, I reduced my courseload the previous semester to free up my schedule, and I didn't see myself as a struggling student.

I acknowledge, accept, and agree that Undergraduate Regulations expect the student to know when she is on academic warning. They clearly state that "*the college deans attempt to give written notification of Academic Warning to students whose records show these deficiencies, but such students should regard themselves as being on warning even in the absence of written notification*". I didn't regard myself as being on warning because I didn't consider myself as a struggling student.

In Fall 2019, I enrolled in five courses but gradually decreased the courseload to three, as I preferred to spend more time on developing my business. As I explained above, I wasn't aware about my academic warning until October 10, and didn't factor in this information into my decision-making process.

Petitioner's Argumentation

**Argument 1: I Am Capable of, on Track to, and Likely Will Graduate on Time.**

I need to complete seven (7) credits to reach a minimum of 36 credits required for graduation. The required courseload outstanding would drop to only six (6) credits if the grade of "F" I received in ECON 456, which I assert was unjustified, is successfully challenged and amended.

I believe that my academic record to date (*vide* my transcript) proves that I am capable of maintaining a course load of five or more credits and receiving grades much higher than a passing "D-".

In November 2019, I met in person with James Surowiecki and Ryan Wepler, two writing instructors affiliated with the English Department, whose courses I considered taking this coming semester. I wanted to verify and convince myself ahead of time whether (a) I find their courses of enough interest to me to reasonably commit myself to taking them, knowing that I couldn't withdraw from them if I wanted to graduate on time. I learned more about the instructors from outside sources, checked the course material, and considered whether and if so, how these classes would advance my goals. After careful consideration, I decided to enroll in both, and will do so should my academic dismissal be reversed.

I am required to complete one science credit and one writing credit to fully satisfy my distributional requirements. I initially selected specific courses I intended to take my senior spring to satisfy the outstanding requirements in October 2019 on CourseTable. I have already chosen two writing courses (above) and narrowed down my choice of the science credit class to two courses: a psychopharmacology course in the psychology department, and an applied physics class for non-majors (APHY 110).

I am not required to take any unusually demanding courses, whether technically advanced or mathematically heavy, in the major or outside the major. I have already completed all required such courses to date, including the mathematics requirement for my economics major, and an econometrics class.

To my best knowledge, I completed all required courses in the economics major and I obtained enough credits in the major to graduate. I have already contacted Qazi Aram, Undergraduate Registrar Economics, about this. I intend to meet with him in person when I return to campus to ensure I didn't forget about anything.

I submitted my preferences for an economics senior seminar via a standard departmental allocation procedure within the deadline, and I was already assigned to one of my preferences.

I intend to enroll in five (5) courses in Spring 2020 and obtain the two remaining credits in Yale Summer Session directly following that semester. Should my petition challenging the grade in ECON 456 be resolved favorable, I would enroll in either one or two classes through the Summer Session, depending on my future preferences.

I believe all of this constitutes a feasible degree completion plan which convinces you that I have taken reasonable steps, both before and after learning about my academic withdrawal, to ensure a smooth continuation of my Yale career and a timely graduation.

### Argument 2: Unforeseen Circumstances Impacted My Academic Progress In Fall 2019, But These Circumstances Are Unlikely To Carry Over Into Spring 2020.

I sustained an injury late evening of October 23, 2019, where I broke my wrist while riding an electric skateboard, my usual means of transport around New Haven, on Prospect Street, close to Benjamin Franklin College.

I consulted my first-care physician (my mum), and on her advice I turned myself to Yale Health the morning after for an x-ray scan, which revealed an open fracture. I was referred to the emergency department of Yale-New Haven Hospital, where I received narcotic painkillers, had my wrist reset and put into a cast. I received an estimated bill for $28,000 for the two hours I spent at the hospital, I was advised to undergo surgery, which we scheduled for approx. ten days later.

I have an international non-Yale insurance with a company based in the UK, which I now know doesn't have an ongoing relationship with Yale-New Haven. I provided the two parties with mutual contact information in hope they would solve the billing between each other; they both speak English as their first language, after all. The reality was more complicated: Yale-New Haven personnel confirmed the coverage via phone and e-mail a day before the surgery, yet the medical team at McGivney Center I met when I turned myself for the procedure said they're unaware of such arrangement and asked me to sign a form which imposes financial responsibility on me should the insurer not extend the cover.

While on site, I gathered information from an issuer of another policy I have, attempted to call my primary insurer, and eventually decided that I understand the situation enough to sign the form. Once I verbally agreed to sign the form and consented to the procedure, the surgeon was unable to begin surgery due to scheduling issues. We scheduled the surgery for the week after, which took place as planned and was successful.

The full recovery took over a month and was rather smooth. I was advised not to attend gym or engage in sports until January. I feel much better now, and all that's left after this accident is a line-shaped scar on my left wrist, a minor occasional pain during manual tasks, and memories.

Navigating this process was cognitively taxing because:
1. I was unable to use my left hand in any significant way, whether for typing, showering, or any manual work for a month;
2. I had to ensure I make an informed decision regarding treatment and surgery because I'd be financially responsible, not my parents or family. In the same time, (a) nobody at Yale-New Haven was able to tell me how much the procedure might cost, or to give me an order of magnitude of this amount, (b) nobody at Yale-New Haven could point me to someone else who might know that amount;
3. My insurance company had trouble communicating with Yale-New Haven regarding coverage, and I wasn't comfortable signing necessary forms that impose all financial burden on me, unless I knew my insurer has communicated with Yale-New Haven about coverage;
4. As an international student with no previous exposure to the US healthcare system, I was unfamiliar with how it operates, including questions such as where to go for treatment, how would I be billed, how much would I pay and when, etc.;
5. I was prescribed narcotic painkillers (oxycodone) for ten days after surgery as part of doctor-advised pain management plan.

<u>I effectively closed this case for good, including the payment-related matters. No issues stemming from or otherwise related to this accident are likely to carry over to the upcoming semester.</u>

.

I have taken prescription medication for depression and attention deficit disorder consistently during the entire academic year. In the past, I resolved all mental health matters back home in Europe; however, I established myself in the Mental Health and Counseling Department of Yale Health in December 2019, had two appointments to date, and have two future appointments scheduled for January 2020.

I experienced no significant negative mental health-related issues in Fall 2019, and I don't expect to experience any in Spring 2020. Nonetheless, the recently established relationship with Mental Health department of Yale Health provides a readily available channel of support, should any problems arise in the future.

### Argument 3: Continuous Enrollment Will Benefit My Learning More Than Academic Withdrawal

I love Yale as a place of (relatively) free exchange of ideas. If I am academically withdrawn, I would spend almost all of my time working on my company, which provides less educational value to me than a Yale experience does, even though I learn a lot running routine business matters.

### Argument 4: My Academic Withdrawal Will Negatively Impact the Work of Two Yale Professors

I have worked with Robert Shiller as his research assistant since March 2017, without interruptions. My employment was extended three times at his request. I was his only research assistant for most of that time; Megan Xu HC '21 recently joined our team as Bob's new RA.

Professor Shiller ("Bob") is an economics professor holding a joint appointment in the Economics Department and Yale SOM. He played an instrumental role in creating and developing behavioral economics and behavioral finance, two rapidly growing disciplines which were virtually unrecognized and frowned upon among academic economists. He received a Nobel Prize in Economics in 2013 for his contributions to asset pricing theory, an important building block of academic finance.

In my opinion, Bob values my contributions because I apply critical judgment to all of his ideas and observations whenever we meet, not because I have a better understanding of models taught in macroeconomics classes, which I don't, or because of my mathematical capabilities, which are obviously limited. Bob often recognized my contributions, for example in the book and during his presentation in San Diego a few days ago, which always makes me feel appreciated and recognized for what I can do well.

When I started working with Bob my freshman spring, he just started developing the idea of 'narrative economics'; in October 2019, or two and a half years later, "Narrative Economics" was published by Princeton University Press as a fully-fledged book. Prior to the break, we worked on his presentation on narratives shaping economic behavior in the last decade, which he delivered at an economics conference in San Diego three days ago.

We have several ongoing projects, including a Coursera course on Narrative Economics, and we scheduled the next meeting around January 15.

I haven't decided what exactly to do about my work for Bob in case of withdrawal. I worked with him for almost three years, and he seems happy to have a loyal RA who enjoys the work. I wouldn't just leave Bob and abandon our work in case of withdrawal, though I am yet to decide on specific ways to continue should I be dismissed.

Bob could certainly speak to our work, my contributions, character, and intellectual capacity. I hope not to get him involved in this, not because I want to conceal any of this from him, but because he's overburdened with e-mails, invitations, and upcoming visits while his longtime personal assistant Bonnie Blake is recovering from injury, and unable to work.

If you wish to contact Bob regarding my case, his e-mail is *robert.shiller@yale.edu*. He is more likely to be reached by cellphone at ███████████. His phone number is not public information, so please don't share it with anyone.

.

I have been a personal research assistant for Ted Snyder of Yale SOM, the School's dean between 2011 and 2019. I started my work with Ted my freshman fall, and it continued during his last year of deanship until now that he is a senior faculty member in the School of Management.

Ted is teaching a business school course "Economics of High-Tech Industries" open to MBA-level students at Yale SOM and other member schools of the Global Network for Advanced Management, a global alliance of business schools which Ted started and developed, starting January 23. I had worked on this class ever since Ted envisioned it. I developed one-pagers and industry briefs for enrolled students; I also suggested incorporating short beginning-of-class Qualtrics quizzes and executed this idea.

I have ongoing responsibilities in this project, which would be disrupted should my withdrawal continue unchallenged. Ted hasn't taught a class in decades, and is very excited about the class topic. Given the nature and length of my relationship with Ted, I wouldn't abandon him and the project in case of withdrawal, and I would find another ways to continue my involvement, whether I continue to be paid or not. But it would make my life a little more difficult.

I believe Ted would also speak to my motivation, integrity, and intellectual capabilities. His office phone number is ███████████, and his e-mail is edward.snyder@yale.edu.

**Argument 5: I Am a Person of Good Character Who Has Upheld the University's Values in Meaningful Ways.**

> *Yale is committed to improving the world today and for future generations through outstanding research and scholarship, education, preservation, and practice. Yale educates aspiring leaders worldwide who serve all sectors of society. We carry out this mission through the free exchange of ideas in an ethical, interdependent, and diverse community of faculty, staff, students, and alumni.*
>
> Yale University Mission Statement

I have never been charged with any violation of Undergraduate Regulations. I was never called before the Executive Committee of Yale College. To my best knowledge, no complaint was ever submitted against me, whether to UWC, Title IX Coordinator, or elsewhere. I wasn't ever subject to a complaint for routine alcohol violation, I wasn't transported or referred for intoxication. (I'm twenty-three, and I drink only socially.) I have never had outstanding balance due to the University. I was never charged with any instance of academic dishonesty, serious or minor, though the room for improving my grades is huge. Plagiarism it not my thing; I would rather submit a bad assignment than someone else's assignment, and I sometimes do. I was never charged with other violations at Yale and, in fact, any other institutions.  I haven't engaged in any disreputable conduct by my personal standards or conscience.

I'm not ideal – I have received a ticket for speeding once, lied to a girlfriend, or made an unfeasible commitment out of poor judgment and didn't keep it. But I don't do things maliciously.

Whenever a conflict arose between me or an organization I was leading, and anyone else, at Yale or elsewhere, I have striven to resolve such conflict amicably, quickly, and with a mutual benefit. Some of these disputes took place over e-mail and were hence recorded; I am happy to provide the Committee, and anyone else who asks for it, with specific examples.

I maintain a good relationship with administrative stuff: dining hall workers, library employees, security guards, and assistants to the faculty. Many know me by name, and some have my personal phone number. Two people I easily recognize by name are Darryl Gaetano, a Yale security officer in Franklin College, and Kirsta McLellan, the superintendent of Franklin College.

I don't organize, participate, or support protests that disrupt public events or important work of crucial university departments. I find Yale's financial aid policies extremely generous, don't support the "abolish SIC" [Student Income Contribution] movement and publicly defend this and other unpopular policies Yale put in place which I think are right -- in press, through social media, and during long conversations with students.

I moved my substantial book collection to Franklin College library to enable anyone to use them for free whenever they wish; it's the same library whose shelves have been empty for years after the College's opening.

I believe over these four years more students, close friends and acquaintances alike, confided in me or asked for help for mental health reasons than to any other undergraduate ever -- because I intentionally make myself available for people and give them an opportunity to confide and suggest ways to seeking help, often in lieu of my coursework.

I never expect or wish to be compensated or recognized for any of this in any way, for example by putting it on my resume. I do these, and other, things because I believe in them, and I believe they are right. Even if the world around me suggests the opposite.

I have publicly defended some of Yale's unpopular policies, both in press [2] and by extensive discussions with students, friends, and other members of the Yale community. I have benefited greatly from Yale's generous financial aid. I will always stand by what I said then, regardless of this petition.

**Argument 6: Academic Warning Imposed on Me in Spring 2019 Didn't Serve Its Educational Purpose.**

The institution of Academic Warning exists to mark out academically struggling students who need to be particularly careful about their academic performance.

I wasn't aware about being placed on Academic Warning for most of the period in question (until October 2019) despite taking reasonable steps to understand my situation. My actions that automatically triggered the Academic Warning didn't stem from academic struggles but from uninformed preferences to spend all my available time on building a business, which I operate to date.

Having lived the prospect of academic withdrawal and familiarizing myself with all relevant regulations, I am unlikely to ever be in a similar situation again.

**Argument 7: Approved Academic Accommodations Were Not Adequately Provided.**

I have been approved to receive academic accommodations by Resource Office on Disabilities my sophomore fall. The approved accommodations include granting additional time on exams and tests, being allowed to type the exams instead of handwriting, and providing a separate room for the exam time, supervised by an Office-hired proctor.

Obtaining these accommodations proved virtually impossible for ECON 456 as (a) the class syllabus doesn't specify dates of any exams, nor does it say whether and how many would there be, and (b) the ROD expects students to notify them in advance of every exam they need an accommodation for, sometimes a week in advance. For instance, my accommodations petition for ECON 122 was denied last December because it was submitted late, and ROD was unable to accommodate me even despite extraordinary circumstances (i.e. my surgery and post-surgery recovery).

In the past, I was often able to arrange accommodations informally at a last minute thanks to Anthony Kulikowski, a former Associate Director of ROD, who knew me for a long time and was always of great help to me. I believe Anthony is no longer associated with the University, and I was instructed to address all accommodations-related questions to someone else.

I understand that ROD is struggling to provide adequate accommodations on time to everyone; Yale Daily News even covered this issue extensively in January 2019 [1]. I see no obvious solution to the bigger problem hundreds of students like me are facing, yet not receiving help I was promised doesn't help, and at times may tip the scales in occasional situations like mine.

### Argument 8: Dismissal for Two Semesters is An Excessively Harsh Academic Punishment.

I tried to research any records of previous cases like mine which were brought under the Committee to make a judgment as to if and how should I explain my case. I couldn't find any, but I did find detailed records kept by the Executive Committee [3-7].

I recognize that academic dismissal is markedly different from suspension; the former is, I believe, an academic penalty, and the latter is simply a penalty. They seem to be administered in different and non-overlapping situations yet contain a nearly identical provision, even if enforced with varying levels of rigidity, namely that "*a student may not return to campus during the period of suspension for any reason unless he or she receives express written permission in advance from his or her residential college head or dean*".

This harsh measure means I wouldn't be able to use Yale's libraries, meet with faculty, friends, or alumni, or even receive mail addressed to me that is sent to the College.

I made a short list of individuals and the infractions they committed, who were suspended for their actions and hence were subject to the same consequences that would be imposed on me, should the withdrawal continue.

Academic Year 2011
- "Junior, charged with cheating for plagiarizing a final paper, was suspended for 1 term."
- "Freshman charged with Acts of Violence, Drugs, Alcohol and Defiance of Authority for smoking marijuana in his room, threatening his roommate while drunk and disregarding authority, was suspended for 2 terms. Student must apply for readmission"
- "Senior, charged with Harassment, Drugs, Misconduct During a Formal Hearing or Disposition, Defiance of Authority & Imperiling the integrity of the university, was suspended for 2 terms and apply for readmission."
- "Junior, charged with Academic Dishonesty for plagiarizing a final paper, was suspended for 2 terms."

Academic Year 2012
- "Junior, charged with Academic Dishonesty for plagiarizing an entire paper, was suspended for 2 terms and required to apply for readmission."

Academic Year 2013
- "Senior, charged with Academic Dishonesty for collaborating with other students on computer programming assignments, was suspended for 2 terms."
- "Junior, charged with Academic Dishonesty for plagiarizing a paper, was suspended for 2 terms"

Academic Year 2014
- "Senior, charged with Academic Dishonesty for plagiarizing a paper, was suspended for 1 term."
- "Junior, charged with Academic Dishonesty for plagiarizing a paper,"

- "Freshman, charged with Academic Dishonesty for plagiarizing a paper, was placed on probation for 1 term."
- "Sophomore, charged with violating drug regulations for possession and use of LSD, was suspended for 3 terms."
- "Sophomore, charged with Academic Dishonesty for plagiarizing an assignment was suspended for 1 term."

Academic Year 2015
- "Senior, charged with Academic Dishonesty for plagiarizing a paper written by another student, was suspended for 2 terms"
- "Junior, charged with Academic Dishonesty for attaching a cover sheet with his name to another student's problem sets and submitting them as his own, was suspended for 3 terms."
- "Junior, charged with Acts of Violence and Defiance for choking a suitemate and not cooperating with police officers in Calhoun College, was suspended for 2 terms"

Academic Year 2016
- "Freshman, charged with Academic Dishonesty for showing correct answers on an exam without corresponding correct calculations, was placed on 2 terms suspension."
- "Sophomore, charged with Academic Dishonesty for plagiarizing a final paper, was suspended for 4 terms."

Academic Year 2017:
- "Sophomore, charged with Academic Dishonesty for plagiarizing a final paper, was suspended for 1 term."
- "Junior, charged with Academic Dishonesty for submitting another student's exam as his own, was suspended for 2 terms."

I don't think I deserve a similar level of penalty as individuals who were charged with actions I listed above.

On that note, I would like to mention that I submitted a written application through Yale College Council to become a student member of the Executive Committee some 1.5 years ago. I never heard back from them.

### Argument 9: A Grade of "F" in ECON 456 Wasn't Justified.

I believe what ultimately decided on my grade was the fact that the instructor wasn't able to access the file I sent him with my final paper. I submitted my final paper about three hours after the deadline, and only realized he wasn't able to read my submission a week later, as I was visiting China until December 31 and had limited access to my Yale inbox (Google services are banned in China).

I believe many extenuating factors could be used to support my argument; however, I understand that instructors exercise significant freedom in assigning grades, and Dean Hill warned me the bar for challenging grades is high. I know that I made a series of easily avoidable mistakes and, retrospectively, I could easily earn a grade of at least "D-".

Given the timeliness of this matter, I decided not to submit a petition challenging the grade to the DUS at this time, or to submit a petition to the Committee to allow re-submission of my final paper. I may decide to do so in the future, if I believe my case is strong enough.

In either case, I can provide the Committee with any documentation about the course, including the full written communication with the instructor.

Proposed Outcome

Nullifying the academic withdrawal and allowing me to enroll in courses this semester, as suggested in my degree completion plan outlined in Argument 1.

I am open to alternative restrictions, penalties, and other actions that the Committee sees. I am receptive to academic support, whether by regular check-ups, performance monitoring, or other suggested means.

I am ready to sign an agreement committing to attendance at academic support and other resource meetings, maintaining a certain level of academic performance throughout the semester, and meet additional conditions the Committee determines to be educationally sound. I don't find such measures necessary; I believe having a pending withdrawal for two semesters was a teachable moment that did the job well. But I am ready to go with the Committee's judgment, whatever it might be.

I am happy to do something additional to advance the University's mission that the Committee determines I am well-positioned to do. I don't know what that might be but I'm sure my skills and experience could be used for the benefit of everyone involved, including myself.

Personal Note

Three and a half years at Yale have taught me that I'm just not a school person. I don't thrive in highly structured environments where I must fit narrowly defined rules or compete for a limited number of goals with everyone else. I hated my British boarding school for this very reason.

Yale has provided me with, and continues to provide me with a great environment where I can seek answers to questions I want to answer using whatever reasonable means I want, and I don't feel alone in this pursuit.

99% of my learning at Yale takes places outside of classes I sign up for, whether in conversations I arrange with specific faculty members and students who have some particular life experience I am interested in at the time; department seminars in economics and finance I often come to, class sessions in courses I'm not officially enrolled in where my presence isn't ever recorded or even noticed. In short: I seek answers for questions I want to know the answer to. Enrolling in classes is just an addition to this process, which sometimes proved unexpectedly beneficial while at other times ended up being a waste of time.

Many instructors are familiar with my approach, know that I work full-time concurrently with my classes, and often extend genuine and extensive support. They know I understand potential consequences of my actions on my course grade, and I strive to let them know about that. In fact, I am still unaware of the grade I received in "U.S. Banking System" in Spring 2019 because I don't want my perception of Michael Pascutti, who has provided enormous amount of encouragement and inspiration to me since my first semester at Yale, to be anyhow influenced by the grade he was obliged to give me because I couldn't or didn't come to a quiz because of other obligations.

I never expect to be officially recognized for this. For the purposes of Academic Regulations and my enrollment at Yale, I know none of this can officially make up for the courses I am officially enrolled in and which appear on my transcript. I don't think Academic Regulations should apply differently to me than to

any other student at Yale, nor do I think I am above the Academic Regulations. But I believe we'll be all better off if I continue my education at Yale this January.

<u>Questions, Comments, Thoughts</u>

A brief note on potential conflict of interest: I took MATH 230 with Keshav Raghavan MY '21, who appears to be the Committee's member. We are distant friends, and spoke on multiple occasions, also last semester. Otherwise, I maintain no relationship nor am I familiar with other members of the Committee.

I have asked several people who know me well and can speak to my character, integrity, and intellectual capabilities to write a letter to the Committee. I am unaware of their content, and I engineered this process in a way to by design waive my right to ever review their letters. Technically, I instructed them to send an encrypted pdf of their letter to me, which I attach to this petition, and disclose the password only to Dean Jessie Hill of Franklin College, who would pass them to the Committee. I was instructed only later that the Committee would only consider my arguments; however, I chose not to delete this paragraph from my petition.

I wrote this petition myself in full, without any outside influence or modifications. I stand by everything I wrote, all statements I have made, and by the veracity of all my claims. I am open to any questions, examination, confrontation, mediation, questions and answers, and meeting about anything the Committee deems important, in person, over the phone, video conference, or other means you find suitable.

I don't take this case personally or emotionally with regards to anyone, including my dean Jessie Hill, other administrators and faculty members who have often been a source of great help to date.

I will be available in New Haven starting January 13, and I am available to the Committee at any time. My phone number is (203) 928-8486. I answer all calls and messages, even if I don't pick up right away.


Dated:          Las Vegas, NV
                January 8, 2020

Sincerely,

*Jakub Madej*

Jakub Madej
*Yale College Class of 2020*
os. 2 Pulku Lotniczego 16/157
31-868 Kraków, POLAND
(203) 928-8486

REFERENCES:

[1] https://yaledailynews.com/blog/2019/01/25/out-of-sight-out-of-mind/

[2] https://yaledailynews.com/blog/2019/10/03/madej-yale-has-not-failed-me/
[3] https://yalecollege.yale.edu/sites/default/files/2019-09/xc_fall_2014.pdf
[4] https://yalecollege.yale.edu/sites/default/files/2019-09/xc_spring_2015.pdf
[5] https://yalecollege.yale.edu/sites/default/files/2019-09/xc_fall_2012.pdf
[6] https://yalecollege.yale.edu/sites/default/files/2019-09/xc_fall_2011.pdf
[7] https://yalecollege.yale.edu/sites/default/files/2019-09/xc_spring_2013.pdf