UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____

JAKUB MADEJ

      Plaintiff,

v.

YALE UNIVERSITY, MARVIN CHUN,
MARK SCHENKER, PETER SALOVEY,
JESSIE ROYCE HILL

      Defendants.

_____

CIVIL ACTION No. 3:20-cv-00133-JCH

JURY TRIAL DEMANDED

APRIL 27, 2020

**AMENDED COMPLAINT**

Say you have a dog, but you need to create a duck on the financial statements. Fortunately, there are specific accounting rules for what constitutes a duck: yellow feet, white covering, orange beak. So, you take the dog and paint its feet yellow and its fur white and you paste an orange plastic beak on its nose, and then you say to your accountants, 'This is a duck! Don't you agree that it's a duck?' And the accountants say, 'Yes, according to the rules, this is a duck.' Everybody knows that it's a dog, not a duck, but that doesn't matter, because you've met the rules for calling it a duck.

      Bethany McLean, *The Smartest Guys in the Room*

INTRODUCTION

Plaintiff Jakub Madej, a senior international student, completed seven semesters at Yale College. He received full financial aid since his first semester, and worked as a research assistant for two prominent faculty members since 2017. Jakub incorporated a consulting business in February 2019 and reduced his then courseload to two classes. Unfortunately, Yale imposed an academic warning on Jakub for the number of credits alone, not his grades, without notifying him until mid-October, months into the fall semester.

Jakub sustained a serious wrist injury in late October, followed by a surgery, whose financial and logistical burden fell entirely on him. Jakub did not receive academic accommodations he requested and was approved for, and ultimately received a failing grade in one course. Yale dismissed Jakub a semester before graduation, though absent Yale's omissions he would not be on warning, let alone withdrawn.

Upon return to campus in January, Jakub was given 40 minutes to retrieve his property from his old college dorm, was denied any meaningful opportunity to be heard, and only received inconsistent, cursory statements whenever he tried to explain the situation. His college dean and Yale administration refused to meet in person, or to disclose any policies, procedures, or standards his case was decided on. Yale has never published withdrawal statistics, and provided no support or appeal mechanism process to students who were forced to withdraw, including Jakub.

Jakub wrote a petition detailing nine arguments against his withdrawal, an academic plan showing he is still likely to graduate on time, delineated Yale's omissions, attached supporting letters, and provided contact information to professors who can speak of Jakub's abilities. Yale did not address Jakub's petition in any meaningful way, instead stalling for time knowing that Jakub

2

must leave the country in days before violated his immigration status. Yale knew Jakub was treated for depression and attention deficit disorder for years, but provided little to no help in these extremely vulnerable moments.

Relentless and unsatisfied with Yale's treatment of his case, Jakub traveled to Canada in a rental car and returned using a visitor visa in his old, previously canceled passport. He currently relies on hospitality and generosity of his friends and professors but cannot continue his work, education, or even use Yale's libraries for self-education.

Jakub was never charged with violating University regulations yet received no treatment granted to anyone investigated for disciplinary reasons; instead, he was given only 36 hours to leave the country with no ability to appeal. Jakub's future was jeopardized because of administration's arbitrary and capricious decision.

## PARTIES

1.  Jakub MADEJ has been an undergraduate student at Yale College.

2.  Yale University is a private research university in New Haven, Connecticut. Yale's history, academic achievements, wealth, and selectivity have made Yale one of the most prestigious universities in the world.

3.  Peter SALOVEY has been President of Yale University since 2013. The President is the chief executive officer (CEO) of the University and, as such, is responsible for the general direction of all its affairs. Peter Salovey is an acclaimed social psychologist, an early pioneer in emotional intelligence research. Peter Salovey graduated from Yale and Stanford. Peter Salovey lives at 43 Hillhouse Avenue in New Haven, Connecticut.

4. Jessie Royce HILL has been Dean of Benjamin Franklin College since 2017. The Dean is the chief academic and personal adviser to students in her residential college, under the supervision of the Dean of Yale College. She oversees academic progress, advising on intellectual development through courses and internships, and supports students on personal matters. She graduated from Barnard College and from Columbia. She lives at 90 Prospect Street in New Haven, Connecticut.

5. Mark SCHENKER is Dean for Academic Affairs at Yale College, and a lecturer in English at Yale. He has been affiliated with Yale since 1990. According to Yale College website, he chairs the Committee on Honors and Academic Standing. He graduated from Columbia. Mark SCHENKER lives at 346 Prospect Avenue in New Haven, Connecticut. Upon knowledge and belief, Mark SCHENKER resided at all times in New Haven, Connecticut. He continues to work as Dean for Academic Affairs at Yale College.

6. Marvin CHUN has been Dean of Yale College since 2016. Dean of Yale College is responsible for determining policies concerning student life and discipline; he also supervises the deans of the fourteen residential colleges and works in close collaboration with the heads of the colleges. Marvin Chun is also a prominent specialist on behavioral methods to study attention, perception, memory and learning. He graduated from MIT and from Yonsei University in Seoul, Korea. Marvin Chun lives at 3 Morris Street in West Haven, Connecticut.

## JURISDICTION AND VENUE

7. This Court has subject-matter jurisdiction (diversity) under 28 U.S.C. §1332.

8. This Court has personal jurisdiction because Yale University conducts regular business in the State of Connecticut.

4

9.  Venue is proper under 28 U.S.C. § 1391(b)(1) because the events giving rise to the claims detailed herein occurred in the District of Connecticut.

FACTS

**Jakub's First Years in America Were Fundamental in Shaping His Mindset and Future Plans**

10. Jakub graduated from a British boarding school in southeast London, achieving top marks at A Levels, U.K.'s main school leaving examination. He moved to England after receiving a prestigious scholarship for his academic achievements, which covered his tuition.

11. Jakub previously attended a top public high school in Poland, the country of his birth. He excelled in foreign languages, including Spanish, French, Russian and Italian. He continues to be fluent in all four.

12. Jakub enrolled at Yale College in August 2016 and completed seven consecutive terms, obtaining a total of twenty-nine credits. Yale requires thirty-six credits for graduation. Most undergraduates graduate in eight semesters, or four years.

13. Since 2016, Jakub continuously worked as a research assistant for a prominent Nobel Prize-winning faculty member. Jakub's employment was extended three times at professor's request; he also acknowledged Jakub's contributions in his most recent book.

Jakub has been financially independent for over two years, by his own volition, and does not receive any funds from friends or family. He qualified and received full financial aid (no parent contribution) at all times at Yale.

14. Jakub worked at Yale between 17 and 19 hours a week in the last three years, earning funds necessary to support his entrepreneurial plans.

15. Jakub has been treated for depression twice during his time at Yale. He has been on medication for depression and attention deficit disorder since early 2018, without interruption.

**Yale "Forgot" to Notify Jakub about Academic Warning it Imposed For no Apparent Purpose**

16. Jakub inadvertently learned in October 2019 that he was placed on academic warning months earlier because he completed only two credits in the spring 2019 semester. Academic warning is imposed on underperforming students who struggle academically; for example, those who receive three failing grades. Jakub's academic warning was imposed not for his grades or class performance, but for completing only two courses in that particular semester.

17. Jakub obtained 11 credits his sophomore year; an average student completes nine credits a year. Jakub started the spring 2019 semester with five classes but gradually reduced his courseload to two, as he wanted to fully concentrate on his new consulting business that he spent over sixty hours a week on.

18. Yale first notified Jakub about the academic warning after the Registrar realized in mid-October, halfway through the semester, that Jakub was erroneously enrolled in a course that required prior registration. Jakub was unaware that any approval was necessary; the course syllabus made no such mention, no official application was required, and Jakub's course schedule was approved at all stages. Absent this unplanned event, Yale would likely not notify Jakub about the warning it imposed on him until he would be withdrawn.

19. Had Yale notified him about academic warning in a timely manner, he would easily remediate his status by enrolling in a half-semester course, or not withdrawing from another class he

dropped earlier. Students frequently enroll in half-semester classes that start only at the end of March; Jakub completed three such short courses before, and achieved grades of A or A- in all of them.

20. Jessie Hill claimed that she sent a letter to Jakub informing him about AW in May but admitted not doing so when challenged. Mark SCHENKER claimed months later that she passed the letter to Jakub in August, which was also untrue.

21. Course schedules with fewer than three credits must be approved by student's college dean; all schedules and changes to schedules must submitted in person to college dean or their assistant. Jakub never received any notice, verbally or in writing, from his dean, dean's assistant, or anyone else that he would self-impose an academic warning by submitting the schedule. Yale alleged in January 2020, nine months after the supposed event, that his dean's assistant stated this fact clearly but provided no details as to when, or how such an event might have happened.

22. No reasonable student can be expected to impose an academic warning onto themselves if he or she understands the consequences of such a decision, and can easily make an alternative decision that avoids the warning.

## Jakub Sustained an Open Wrist Injury in October, Followed by a Surgery and Month-long Recovery

23. Jakub sustained a serious wrist injury in late October 2019. He was referred to the emergency department of Yale-New Haven Hospital ("Yale-NHH") where he received narcotic painkillers, had his wrist reset, and put into a cast. The Hospital staff scheduled a surgery for

two weeks later. At all times Jakub had to arrange all visits himself, i.e. without any support of Yale University.

24. Jakub's emergency hospital bill was estimated at $28,000 for facilities alone. Jakub spent hours throughout the next few weeks contacting various departments of Yale-NHH to ensure his coverage was in place after he notified his insurer about the injury. Unfortunately, miscommunication within the Hospital caused stress and delays. Jakub's first operation was cancelled after he arrived on site for financial reasons even though a Yale-NHH staff member confirmed the coverage by phone a day before.

25. Jakub had a surgery approx. three weeks after the injury. The surgery was successful, and recovery took between four and five weeks. Jakub received a dean's excuse, a usual procedure at Yale granting students additional time to complete assignments. Yale provided no additional support, for example academic accommodations he was granted two years earlier for an unrelated reason.

26. Academic accommodations at Yale are organized by Resource Office on Disabilities ("ROD"). Standard accommodations include extended time on tests and exams, permission to type on exams instead of handwriting, and ability to take exams in a separate room at ROD supervised by a proctor. Jakub completed the necessary paperwork but did not receive these accommodations. Anecdotal evidence reveals that many students struggled to organize accommodations in similar circumstances; most often, ROD's staff promised to return to the student with details but did not, also after repeated reminders.

27. The injury caused significant stress and cost Jakub enormous energy and time, as he was responsible for arranging all visits, procedures, and coverage. Yale University provided little guidance or understanding.

**Jakub Encountered Numerous Logistical Issues within Yale's Support System**

28. Consequences of the injury dragged into December. Jakub received no exam accommodations from Yale's Resource Office on Disabilities, even though his circumstances were more serious than usual. In some courses it was impossible for Jakub to arrange such accommodations as the Office requires to be notified in advance about any requests while instructors provided information about exams a few days in advance.

29. Jakub submitted all of his end-of-term assignments and left New Haven for China on a personal visit. Unbeknown to Jakub, one of his instructors was unable to open the document Jakub sent him with his final report. The instructor e-mailed Jakub asking to have the file re-sent.

30. At that time Jakub was already in China, and was unable to access his Yale e-mail account because the Chinese government blocks access to all services operated by Google. Yale uses Google to provide e-mail accounts to all undergraduate students.

31. Jakub arrived in the United States on January 1. Only then did he realize the instructor was unable to access his final report few days earlier. As a result, Jakub ultimately received a failing grade in that course.

32. Jakub explained the situation to the instructor, who suggested he might read Jakub's report and reassess the grade upon request of his college dean, Jessie Hill. Jakub provided detailed information about his situation to her but she took no action.

33. On January 3, Jakub received a withdrawal letter dated January 2. International students on student visa (F-1) must leave the U.S. within 15 days from stated withdrawal date. Yale did not explain how and who specifically determined the withdrawal date, or why it delayed notifying Jakub.

34. The letter did not mention any possibility of appeal, explanation, or contact information to an administrator Jakub might explained the situation to.

35. Jessie Hill also did not advise Jakub whether he was entitled to appeal, hearing, conversation with an advisor, or how should he proceed in case of disagreement. Should the withdrawal be imposed in error, or its consequences be unambiguously detrimental, a student would struggle to identify any possible steps he could take.

36. Jakub insisted on talking over the phone with his dean; she was only available three days later. Before the conversation, he sent her a detailed description of all relevant circumstances and explicitly asked how to seek an appeal. During the conversation, she verbally advised Jakub to petition the Committee on Honors and Academic Standing ("Committee"). She did not explain what the Committee is.

37. Not knowing what he is petitioning for, Jakub wrote a 6200-word-long document, and spent approx. thirty hours on writing, proofreading, and fact-checking to ensure all facts are correct, and that he included all information a reader might want to find about him. Among others, he (a) provided nine clearly separated arguments against the withdrawal imposed, (b) described his accident in detail and declared its consequences are unlikely to impact his performance the following semester, (c) explained what accommodations Yale failed to provide, (d) attached a detailed academic plan which showed he is likely to graduate on time

iff he is petition is granted. He also provided clear contact information, and specific dates and times when he is available to explain his situation in person.

38. Jakub asked three people who knew him well to write letters to the "Committee". Jakub never learned the contents of any letter, and engineered a way to never be able to read them. Jakub also included phone numbers of senior faculty members he worked with who could speak to his integrity and character, and described the extent of their joint work.

39. Jakub submitted his document via e-mail to Jessie Hill, who claimed she forwarded it to the Committee.

**Less-than-happy return to New Haven, Connecticut**

40. Jakub returned to New Haven at night of Sunday, January 12. He earlier attended two conferences as part of his research work, one in San Diego, the other in Las Vegas.

41. On Monday morning, Jakub attempted to retrieve his personal property he left in the old dorm in Benjamin Franklin College. He was unable to take most of his items when the fall term ended a month earlier. Jakub notified the College staff when he left New Haven in December, and hoped to receive a full day to clean his room.

42. Unfortunately, he was given <u>forty minutes</u> to take most important items and leave all of his personal property behind, without being ever able to receive it back.

43. Retrieving his personal property was only possible because a friendly college worker helped him gain access to the room. In the process, Jakub learned that he is not welcome at the College, and that Jessie Hill was unhappy that college workers wanted to help Jakub.

44. Jessie Hill knew about Jakub's difficult situation but did not meet, talk or call Jakub after his return to New Haven.

### A Committee That Wasn't

45. On Monday evening, Jakub received an email from Mark SCHENKER. He introduced himself as Committee's Chair. SCHENKER made the following representation:

> At its meeting this afternoon the Committee on Honors and Academic Standing voted without dissent not to approve your petition for an exception to the Academic Regulations concerning withdrawal for academic reasons. As a result, your withdrawal for academic reasons is hereby reinstated and you will have 72 hours from 8 pm this evening to turn in your ID card and any other University property (such as keys or access devices) to the office of your residential college dean. You will not be charged tuition for spring term 2019-2020, but there may be a prorated charge for room and board, if relevant. You will want to be sure to consult with the Office of Financial Aid — again, if relevant.
>
> [emphasis added]

46. SCHENKER knew that his representation was false because he knew the Committee did not meet that afternoon, nor did it not vote to approve or deny Jakub's petition. SCHENKER knew at all times that, if he denies Jakub's petition, Jakub must leave the United States immediately and would not scrutinize whether the Committee met, considered the pedagogical merit of Jakub's request, and reached an informed conclusion – or whether the Committee, in fact, does *not* exist.

47. Over the course of electronic communication, SCHENKER made the following representation:

> I neither had a vote in the members' decision nor am I empowered to alter it, I ask that you send me any questions or concerns in writing, and I will do my best to reply to you as soon as I am able, within the limits of what I have written above

(that is, I will not be speaking for the members regarding your petition nor the Committee's vote).

48. SCHENKER knew this statement was false because he was the only person that decided on Jakub's fate. Further, he knew Jakub would never be able to investigate the nature of his representations.

49. SCHENKER knew his characterization of the appeal process is false because he was the Committee's only member since at least year 2000. He was solely responsible for Committee's actions, enjoyed no oversight from Dean of Yale College, or anyone else.

50. SCHENKER had extensive communications with other University administrators to ensure Jakub's remote work on his company did not pose compliance threats to the University given Jakub's immigration status.

51. SCHENKER repeated the above representations to Yale University Registrar and other officials, who processed Jakub's withdrawal – and who did not know that SCHENKER's representations are false.

### CAUSES OF ACTION

### COUNT I.
### FRAUDULENT MISREPRESENTATION
(MARK SCHENKER, YALE UNIVERSITY)

52. Mark Schenker made materially false statements to Jakub, as stated above.

53. Mark Schenker knew at all times that his statements are false.

54. Jakub relied on Mark Schenker's statements in believing the University made an informed decision about Jakub's withdrawal when it, in fact, did not.

55. Jakub did not intervene, or did not take any other action, to uncover Schenker's misrepresentations and was forced to leave the country.

## COUNT II.
## BREACH OF CONTRACT
### (YALE UNIVERSITY)

56. Jakub's accepting Yale's offer of admission and moving to the United States should be construed as a contract.

57. Jakub was repeatedly promised, in writing and orally, that Yale is committed to helping international students thrive on campus.

> I write now to affirm Yale's steadfast commitment to our international students and scholars; they are vital to the university community. (...) We pair our unequivocal commitment to careful research stewardship with another: international students and scholars are welcome and respected on our campus."
>
> Peter Salovey, Jun 06, 2019

58. As a member of the Yale community, Jakub has certain rights that are contractual in nature.

59. Yale University breached its contract by not following or disclosing guidelines for protecting Jakub's civil rights.

60. Yale University breached its agreement by failing to provide Jakub with timely information he needed to make reasonable decisions regarding his academic choices.

61. Yale University breached its agreement by creating hostile atmosphere in his residential college, where he felt alienated and unwelcome by his college dean, Jessie Hill.

62. Yale University breached its agreement by providing conflicting, illogical answers to all questions regarding his situation, and refusing to provide reasonable support in the face of unusual circumstances.

63. Yale University breached its contract with Jakub by refusing to consider whether the Committee's decision is arbitrary, supported by the evidence, and not providing any way to request such action.

64. Yale's incomplete and arbitrary actions breached the binding contract with Jakub by failing to provide the guarantees of due process and fundamental fairness, and breaking the implied covenant of good faith and fair dealing.

65. Yale breached its contract with Jakub by improperly investigating withdrawals at Yale College, providing scant resources to the dismissed student in his most vulnerable moment, and no avenue for meaningful review of unexplained and unclear decision.

66. Yale's dismissal of Jakub will preclude him from completing his undergraduate degree and will negatively contribute to his overall education.

67. As a direct and foreseeable consequence of these breaches, Jakub has sustained damages.

68. Yale's secret adjudicatory process is contrary to Jakub's reasonable expectations.

69. Yale's decision to automatically withdraw Jakub from the University, failure to provide a mechanism to explain his situation is in violation of Jakub's procedural and substantive contractual rights and reasonable expectations.

70. Yale's decision to withdraw Jakub from the University is capricious and arbitrary.

71. As a direct and proximate result of the foregoing events of breach, Jakub faces imminent irreparable harm to his emotional well-being, ongoing education and professional career goals

for which no adequate legal remedy exists. Jakub intends to motion this Distinguished Court for injunctive relief.

COUNT III.
NEGLIGENCE
(ALL DEFENDANTS)

72. When Jakub made academic choices, he relied on defendants' duty to provide him with information that might materially impact Jakub's decision.

73. When Jakub appealed the involuntary withdrawal, he relied on defendants' duty to protect him from reasonable harm.

74. Defendants knew, or was negligent in not knowing, that it adopted no mechanism or avenue for appeal to Jakub, or any other person in Jakub's situation.

75. Defendants knew that Jakub has been treated for depression, and that Jakub reasonably relied on their duty to protect him from harm.

76. Defendants breached their duty of reasonable care.

77. A reasonable person would have suffered severe emotional distress under the same or similar circumstances.

78. As a result, Jakub is entitled to recover damages, to be determined at trial, plus attorney fees and costs.

COUNT IV.
INTERFERENCE WITH CONTRACT,
INTERFERENCE WITH ECONOMIC EXPECTATION
(ALL DEFENDANTS)

79. At all times, Jakub was in an employment contract with Professor Edward A. Snyder. Jakub received a regular compensation from this contract, which enabled Jakub to support himself.

80. Mark Schenker knew about Jakub's contract because Jakub specifically indicated so in his petition.

81. Mark Schenker engaged in fraudulent misrepresentation, as described in Count I.

82. Mark Schenker wished to disrupt Jakub's employment contract.

83. Had it not been for Schenker's conduct, Jakub would not have suffered a loss of employment and employment authorization.

**PRAYER FOR RELIEF**

Jakub demands judgment against Yale University and remaining defendants as follows:

- Produce and publicly release all statistics regarding the number of students withdrawn;

- Compel Yale University to reassess procedures for adjudicating academic withdrawal, and publicly audit how previously used policies were implemented, if such policies existed;

- Restrain and enjoin Yale University from denying Jakub the opportunities and benefits afforded undergraduate students, including access to libraries and reading rooms;

- Restrain and enjoin Defendant, Yale University, from implementing Jakub's dismissal;

- Admitting Jakub as a student in good academic standing;

- Award Jakub damages for breach of contract in an amount exceeding $314,159, to be determined at trial;

- Award Jakub damages for emotional distress in an amount exceeding $121,232, to be determined at trial;

- Compel Yale University to introduce and implement all-university Plain Language policy, similar to the federal plain language policies, in all communication with students;

- Compel Yale University to investigate all instances of involuntary withdrawals it executed since the beginning of spring 2016 term, and determine the extent to which Yale's employees contributed to these dismissals;

- Award Jakub damages in an amount to be determined at trial for past and future economic losses, loss of educational and career opportunities, attorneys' fees, expenses, costs and disbursements;

- Award punitive damages for intentionally inflicting emotional distress upon Jakub.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims so triable.


Dated: April 27, 2020 in San Jose, California.


Respectfully submitted,
/s/ Jakub Madej

Jakub Madej
65 Dwight St
New Haven, CT 06511
Telephone: (203) 928-8486
Facsimile: (646) 776-0066
Fax: (203) 902-0070
Email: j.madej@lawsheet.com

18