**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JAKUB MADEJ | § | |
| Plaintiff, | § | Civil Action No. 20-cv-133 (JCH) |
| vs. | § | |
| | § | JURY TRIAL DEMANDED |
| YALE UNIVERSITY, MARK | § | |
| SCHENKER, JESSIE ROYCE HILL, | § | OCTOBER 9, 2020 |
| MARVIN CHUN, PETER SALOVEY | § | |
| Defendants. | | |

**[PROPOSED] SECOND AMENDED COMPLAINT**

Plaintiff Jakub Madej, a senior international student, completed seven semesters at Yale College. He received full financial aid since his first semester, and worked as a research assistant for two prominent faculty members since 2017. In March 2019, Jakub reduced his then courseload to two classes, advised that such change is administratively proper. In fact, Yale processed that withdrawal, triggering an "academic warning" on Jakub for the number of credits alone, not his grades, without notifying him until mid-October, months into the fall semester.

Jakub sustained a serious wrist injury in late October, followed by a surgery, whose financial and logistical burden fell entirely on him. Jakub did not receive academic accommodations he requested and was approved for, and ultimately received a failing grade in one course. Yale dismissed Jakub a semester before graduation, though absent Yale's omissions he would not be on warning, let alone withdrawn.

Upon return to campus in January, Jakub was given 40 minutes to retrieve his property from his old college dorm, was denied any meaningful opportunity to be heard, and only received inconsistent, cursory statements whenever he tried to explain the situation. His college dean and Yale administration refused to meet in person, or to disclose any policies, procedures, or standards

his case was decided on. Yale has never published withdrawal statistics, and provided no support or appeal mechanism process to students who were forced to withdraw, including Jakub.

Jakub wrote a petition detailing nine arguments against his withdrawal, an academic plan showing he is still likely to graduate on time, delineated Yale's omissions, attached supporting letters, and provided contact information to professors who can speak of Jakub's abilities. Yale did not address Jakub's petition in any meaningful way, instead stalling for time knowing that Jakub must leave the country in days before violated his immigration status. Yale knew Jakub was treated for depression and attention deficit disorder for years, but provided little to no help in these extremely vulnerable moments.

Relentless and unsatisfied with Yale's treatment of his case, Jakub traveled to Canada in a rental car and returned using a visitor visa in his old, previously canceled passport. He currently relies on hospitality and generosity of his friends and professors but cannot continue his work, education, or even use Yale's libraries for self-education.

## PARTIES

1.    Jakub MADEJ has been an undergraduate student at Yale College.

2.    Yale University is a private research university in New Haven, Connecticut. Yale's history, academic achievements, wealth, and selectivity have made Yale one of the most prestigious universities in the world.

3.    Peter SALOVEY has been President of Yale University since 2013. The President is the chief executive officer (CEO) of the University and, as such, is responsible for the general direction of all its affairs. Peter Salovey is an acclaimed social psychologist, an early pioneer in emotional intelligence research. Peter Salovey graduated from Yale and Stanford. Peter Salovey lives at 43 Hillhouse Avenue in New Haven, Connecticut.

4.      Jessie Royce HILL has been Dean of Benjamin Franklin College since 2017. The Dean is the chief academic and personal adviser to students in her residential college, under the supervision of the Dean of Yale College. She oversees academic progress, advising on intellectual development through courses and internships, and supports students on personal matters. She graduated from Barnard College and from Columbia. She lives at 90 Prospect Street in New Haven, Connecticut.

5.      Mark SCHENKER is Dean for Academic Affairs at Yale College, and a lecturer in English at Yale. He has been affiliated with Yale since 1990. According to Yale College website, he chairs the Committee on Honors and Academic Standing. He graduated from Columbia. Mark SCHENKER lives at 346 Prospect Avenue in New Haven, Connecticut. Upon knowledge and belief, Mark SCHENKER resided at all times in New Haven, Connecticut. He continues to work as Dean for Academic Affairs at Yale College.

6.      Marvin CHUN has been Dean of Yale College since 2016. Dean of Yale College is responsible for determining policies concerning student life and discipline; he also supervises the deans of the fourteen residential colleges and works in close collaboration with the heads of the colleges. Marvin Chun is also a prominent specialist on behavioral methods to study attention, perception, memory and learning. He graduated from MIT and from Yonsei University in Seoul, Korea. Marvin Chun lives at 3 Morris Street in West Haven, Connecticut.


## JURISDICTION AND VENUE

7.      This Court has subject-matter jurisdiction (diversity) under 28 U.S.C. §1332 because complete diversity exists between the parties.

8.      This Court has personal jurisdiction because Yale University conducts regular business in the State of Connecticut.

9.      Venue is proper under 28 U.S.C. § 1391(b)(1) because the events giving rise to the claims detailed herein occurred in the District of Connecticut.


FACTS

10.     Jakub graduated from a British boarding school in southeast London, achieving top marks at A Levels, U.K.'s main school leaving examination. He moved to England after receiving a prestigious scholarship for his academic achievements, which covered his tuition.

11.     Jakub previously attended a top public high school in Poland, the country of his birth. He excelled in foreign languages, including Spanish, French, Russian and Italian. He continues to be fluent in all four.

12.     Jakub enrolled at Yale College in August 2016 and completed seven consecutive terms, obtaining a total of twenty-nine credits. Yale requires thirty-six credits for graduation. Most undergraduates graduate in eight semesters, or four years.

13.     Since 2016, Jakub continuously worked as a research assistant for a prominent Nobel Prize-winning faculty member. Jakub's employment was extended three times at professor's request; he also acknowledged Jakub's contributions in his most recent book.

14.     Jakub has been financially independent for over two years, by his own volition, and does not receive any funds from friends or family. He qualified and received full financial aid (no parent contribution) at all times at Yale.

15.     Jakub worked at Yale between 17 and 19 hours a week in the last three years, earning funds necessary to support his entrepreneurial plans.

16.     Jakub has been treated for depression twice during his time at Yale. He has been on medication for depression and attention deficit disorder since early 2018, without interruption.

17.     In March 2019, Jakub was deliberating whether to withdraw from one course, changing his class workload to two classes, to devote more time to his work.

18.     In March 2019, Jakub inquired at his dean of college's assistant, Michelle Tracey, whether withdrawing from that third class would have any consequences for his graduation as a matter of Yale's administrative policies. The assistant answered in the negative, causing Jakub to submit a paper form requesting that he be withdrawn from the third course.

19.     Jakub's dean, Jessie Royce Hill, processed the above-mentioned withdrawal.

20.     Jakub inadvertently learned in October 2019 that Yale automatically placed him on "academic warning" months earlier because he completed only two credits in the spring 2019 semester – even though Yale processed that withdrawal, and despite the unambiguous assertion that "dropping" the class would have no administrative consequences. Academic warning is usually imposed on underperforming students who struggle academically; for example, those who receive three failing grades. Jakub's academic warning was imposed not for his grades or class performance, but for completing only two courses in that particular semester.

21.     Jakub obtained 11 credits his sophomore year; an average student completes nine credits a year. Jakub started the spring 2019 semester with five classes but gradually reduced his courseload to two, as he wanted to fully concentrate on his new consulting business that he spent over sixty hours a week on.

22.  Yale first notified Jakub about the academic warning after the Registrar realized in mid-October, halfway through the semester, that Jakub was erroneously enrolled in a course that required prior registration. Jakub was unaware that any approval was necessary; the course syllabus made no such mention, no official application was required, and Jakub's course schedule was approved at all stages. Absent this unplanned event, Yale would likely not notify Jakub about the warning it imposed on him until he would be withdrawn.

23.  Had Yale notified him about academic warning in a timely manner, he would easily remediate his status by enrolling in a half-semester course, or not withdrawing from another class he dropped earlier. Students frequently enroll in half-semester classes that start only at the end of March; Jakub completed three such short courses before, and achieved grades of A or A- in all of them.

24.  Jessie Hill claimed that she sent a letter to Jakub informing him about AW in May but admitted not doing so when challenged. Mark SCHENKER claimed months later that she passed the letter to Jakub in August, which was also untrue.

25.  Course schedules with fewer than three credits must be approved by student's college dean; all schedules and changes to schedules must submitted in person to college dean or their assistant. Jakub never received any notice, verbally or in writing, from his dean, dean's assistant, or anyone else that he would self-impose an academic warning by submitting the schedule. Yale alleged in January 2020, nine months after the supposed event, that his dean's assistant stated this fact clearly but provided no details as to when, or how such an event might have happened.

26. No reasonable student can be expected to impose an academic warning onto themselves if he or she understands the consequences of such a decision, and can easily make an alternative decision that avoids the warning.

27. Jakub sustained a serious wrist injury in late October 2019. He was referred to the emergency department of Yale-New Haven Hospital ("Yale-NHH") where he received narcotic painkillers, had his wrist reset, and put into a cast. The Hospital staff scheduled a surgery for two weeks later. At all times Jakub had to arrange all visits himself, i.e. without any support of Yale University.

28. Jakub's emergency hospital bill was estimated at $28,000 for facilities alone. Jakub spent hours throughout the next few weeks contacting various departments of Yale-NHH to ensure his coverage was in place after he notified his insurer about the injury. Unfortunately, miscommunication within the Hospital caused stress and delays. Jakub's first operation was cancelled after he arrived on site for financial reasons even though a Yale-NHH staff member confirmed the coverage by phone a day before.

29. Jakub had a surgery approx. three weeks after the injury. The surgery was successful, and recovery took between four and five weeks. Jakub received a dean's excuse, a usual procedure at Yale granting students additional time to complete assignments. Yale provided no additional support, for example academic accommodations he was granted two years earlier for an unrelated reason.

30. Academic accommodations at Yale are organized by Resource Office on Disabilities ("ROD"). Standard accommodations include extended time on tests and exams, permission to type on exams instead of handwriting, and ability to take exams in a separate room at ROD supervised by a proctor. Jakub completed the necessary paperwork but did not

receive these accommodations. Anecdotal evidence reveals that many students struggled to organize accommodations in similar circumstances; most often, ROD's staff promised to return to the student with details but did not, also after repeated reminders.

31.    The injury caused significant stress and cost Jakub enormous energy and time, as he was responsible for arranging all visits, procedures, and coverage. Yale University provided little guidance or understanding.

32.    Consequences of the injury dragged into December. Jakub received no exam accommodations from Yale's Resource Office on Disabilities, even though his circumstances were more serious than usual. In some courses it was impossible for Jakub to arrange such accommodations as the Office requires to be notified in advance about any requests while instructors provided information about exams a few days in advance.

33.    Jakub submitted all of his end-of-term assignments and left New Haven for China on a personal visit. Unbeknown to Jakub, one of his instructors was unable to open the document Jakub sent him with his final report. The instructor e-mailed Jakub asking to have the file re-sent.

34.    At that time Jakub was already in China, and was unable to access his Yale e-mail account because the Chinese government blocks access to all services operated by Google. Yale uses Google to provide e-mail accounts to all undergraduate students.

35.    Jakub arrived in the United States on January 1. Only then did he realize the instructor was unable to access his final report few days earlier. As a result, Jakub ultimately received a failing grade in that course.

36. Jakub explained the situation to the instructor, who suggested he might read Jakub's report and reassess the grade upon request of his college dean, Jessie Hill. Jakub provided detailed information about his situation to her but she took no action.

37. On January 3, Jakub received a withdrawal letter dated January 2. International students on student visa (F-1) must leave the U.S. within 15 days from stated withdrawal date. Yale did not explain how and who specifically determined the withdrawal date, or why it delayed notifying Jakub.

38. The letter did not mention any possibility of appeal, explanation, or contact information to an administrator Jakub might explained the situation to.

39. Jessie Hill failed to provide basic information to Jakub as to whether he was entitled to appeal, hearing, conversation with an advisor, or how should he proceed in case of disagreement. Should the withdrawal be imposed in error, or its consequences be unambiguously detrimental, a student would struggle to identify any possible steps he could take.

40. Jakub insisted on talking over the phone with his dean; she was only available three days later. Before the conversation, he sent her a detailed description of all relevant circumstances and explicitly asked how to seek an appeal. During the conversation, she verbally advised Jakub to petition the Committee on Honors and Academic Standing ("Committee"). She did not explain what the Committee is.

41. Not knowing what he is petitioning for, Jakub wrote a 6200-word-long document, and spent approx. thirty hours on writing, proofreading, and fact-checking to ensure all facts are correct, and that he included all information a reader might want to find about him. Among others, he (a) provided nine clearly separated arguments against the withdrawal

imposed, (b) described his accident in detail and declared its consequences are unlikely to impact his performance the following semester, (c) explained what accommodations Yale failed to provide, (d) attached a detailed academic plan which showed he is likely to graduate on time iff he is petition is granted. He also provided clear contact information, and specific dates and times when he is available to explain his situation in person.

42.     Jakub asked three people who knew him well to write letters to the "Committee". Jakub never learned the contents of any letter, and engineered a way to never be able to read them. Jakub also included phone numbers of senior faculty members he worked with who could speak to his integrity and character, and described the extent of their joint work.

43.     Jakub submitted his document via e-mail to Jessie Hill, who claimed she forwarded it to the Committee.


**Less-than-happy return to New Haven, Connecticut**


44.     Jakub returned to New Haven at night of Sunday, January 12. He earlier attended two conferences as part of his research work for Yale, one in San Diego, the other in Las Vegas. Jakub's attendance and other fees were paid in full by Yale University.

45.     On Monday morning, Jakub attempted to retrieve his personal property he left in the old dorm in Benjamin Franklin College. He was unable to take most of his items when the fall term ended a month earlier. Jakub notified the College staff when he left New Haven in December, and hoped to receive a full day to clean his room.

46.     He was most important items and leave all of his personal property behind, without being ever able to receive it back.

47.     Jessie Hill knew about Jakub's Catch-22 situation but refused to meet, talk or call Jakub

        after his return to New Haven.

<u>COUNT I</u>
<u>FRAUDULENT MISREPRESENTATION</u>
(MARK SCHENKER, YALE UNIVERSITY)

48.     Plaintiff incorporates the foregoing paragraphs by reference.

49.     At all relevant times, Mark J. Schenker was chairman of the Committee on Honors and

        Academic Standing (the "Committee"), an internal adjudicative body within Yale

        College responsible for enforcing, interpreting, and applying the academic regulations of

        Yale College. Mark J. Schenker has served as chairman since academic year 1998.

50.     At all relevant times, the following individuals were members of the Committee, as

        represented by Yale University: Mark Schenker, Sarah Insley, Dana Angluin, Benjamin

        Glaser, Jason Shaw, Kirk Wetters, Daria Vander Veer, Helena Lyng-Olsen, and Keshav

        Raghavan.

51.     On or about January 9, 2020, until or on about January 23, 2020, in the District of

        Connecticut, the defendant

MARK SCHENKER
a/k/a
DEAN SCHENKER

did willfully make false representations of material fact that he knew were not true and correct as

to every material matter.

52.     Specifically, the January 15, 2020 letter, which SCHENKER was prepared, signed, and

        which SCHENKER caused to he prepared and signed, falsely represented that the

        Committee on Honors and Academic Standing met on January 13, 2020 and voted

        without dissent not to approve Madej's petition. In truth and in fact, SCHENKER knew

at all relevant times that the Committee did not meet on January 13, or at any other time, with regards to Madej's petition.

53. On or about January 7, January 15, and January 19, 2020, SCHENKER represented in an official letter written on Yale University's stationary and via email that the Committee on Honors and Academic Standing, which he serves as chairman, is made up of tenured and non-tenured members of the Yale College Faculty, representatives of the Yale College Dean's Office, and undergraduate students when, in truth and in fact, the Committee has been an alter ego of defendant SCHENKER since at least year 2015, precise date being unknown to Plaintiff.

54. On or about January 15, 2020, SCHENKER represented that each of the members of the Committee received requisite documents before the alleged meeting, that is, a copy of Plaintiff's petition (dated 8 January); a cover letter (8 January) from the residential college dean in the form on an email; a letter from Dean Hill to Plaintiff (6 January) informing Plaintiff of this academic withdrawal; and Plaintiff's academic record. In reality, SCHENKER knew, at the time the statements were made, that the Committee did not have any real members, and no documents were provided to any purported "member".

55. SCHENKER knowingly and fraudulently referred to "members' deliberations" and their "vote", thus creating a false perception that the Committee members deliberated and voted on Plaintiff's application. In reality, SCHENKER was aware that no voting, or a similar formal indication of choice, took place on Madej's application; and that the Committee has not adopted any written policies establishing the way in which Committee members render a final decision at any time.

56.   The Committee has been an alter ego of defendant SCHENKER in that the Committee is
indistinguishable from SCHENKER himself, and existed only on paper to create a
perception that an adjudicative body made a decision on the merits of the case presented
to it when, in fact, the Committee has never existed.

57.   At all relevant times, the Committee has not maintained any contemporaneous records,
and observed little to no organizational formalities.

58.   In truth and in fact, the Committee has never adopted or established any written policies,
procedures, or rules setting out the form, manner or procedure in which the Committee
should be, or indeed is run; the Committee lacked any documentation that stated its
purpose, who are its members, how are they elected, how meetings are conducted, what
responsibilities the Committee and its members will have, and a description of their
duties.

59.   The Committee did not have a physical office or an address, a telephone number, or a
website.

60.   SCHENKER knew that his statements were false because he chaired the Committee
continuously since academic year 1998, and has been the only person acting on its behalf.

61.   SCHENKER made his statements in conscious ignorance of the truth, or recklessly,
without caring whether they are true or false.

62.   SCHENKER's statements were fraudulent because they created a misleading impression
that a collective body existed within Yale College that was charged with adjudicating
Madej's application and applications of similarly situated students when, in fact,
SCHENKER knew that the Committee did not meet at any time in academic year
2019/2020, and that SCHENKER acted alone on all requests made to the Committee,

falsely representing that his decisions were returned by a group of people appointed for a specific function, that is, to enforce, interpret, and apply the academic regulations of Yale College.

63.     SCHENKER's false representations were intended to prevent Madej from discovering that SCHENKER fraudulently acted on behalf of other individuals without their knowledge, rendering decisions of material consequences to students involved.

64.     SCHENKER reasonably expected that Madej would be unable to question the veracity of SCHENKER's representations because Madej would be legally obliged to depart the United States within two days after SCHENKER made his fraudulent statements.

65.     SCHENKER repeated the above representations to Yale University Registrar and other officials, who processed Jakub's withdrawal – and who did not know that SCHENKER's representations are false.

66.     As a result of SCHENKER's fraudulent conduct, Plaintiff suffered damages in an amount to be proven at trial.

<u>COUNT II</u>
<u>FRAUD</u>
(YALE UNIVERSITY, MARK SCHENKER)

67.     Plaintiff incorporates the foregoing paragraphs by reference.

68.     From on or about October 24, 2018, until on or about January 20, 2020, in the District of Connecticut and elsewhere, defendants

MARK J. SCHENKER and YALE UNIVERSITY

attempted to devise and devised a scheme and artifice to defraud and obtain property from Plaintiff and certain other Yale College students by means of materially false and fraudulent

pretenses, representations, and promises, and did knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, namely transmitting the name and the identity of the Committee on Honors and Academic Standing the Committee to engineer a false perception of meaningful decision-making regarding certain affairs concerning undergraduate students where, in fact, there was none.

69.    Specifically, Yale University represented that matters related but not limited to withdrawals from Yale College were considered and adjudicated by Committee on Honors and Academic Standing, a deliberative body within Yale College.

70.    Yale further represents that the Committee meets "about twice a month during the regular academic year".

71.    SCHENKER and YALE represented, and continue to represent on its website that the Committee is composed of representatives of the Yale College Dean's Office, tenured and non-tenured faculty members, as well as undergraduate students.

72.    Each student whose matter appeared before the Committee received a substantially similar letter, which set forth the facts stated above.

73.    In reality, the Committee has never existed, has not considered any matters, and has been an alter ego of defendant SCHENKER, as specified above.

74.    At all times set forth above, the Committee has not convened, met, or gathered at all; the Committee did not have any members, and did not maintain any contemporaneous records.

75.    Defendant SCHENKER falsely characterized that decisions he was responsible for making were deliberated and rendered by the Committee, an internal adjudicative body,

to shield YALE and SCHENKER himself from potential liability and to give an appearance of legitimacy to decisions made without regards to the merits of each individual case.

76. In the course of communication with Plaintiff, SCHENKER took affirmative steps to disguise the nature of his fraudulent conduct by, without limitation:

a) Failing to disclose the names of alleged members of the Committee;

b) Refusing to identify the members involved in rendering the decision upon request;

c) Providing inconsistent answers regarding the Committee's internal affairs than those supplied by defendant UNIVERSITY;

d) Refusing to meet in person with Plaintiff, which would likely reveal SCHENKER's scheme;

e) Falsely representing that he had no bearing on "the member's" vote.


77. SCHENKER engaged in conduct with intent to convey false and misleading information under circumstances where such information may and would reasonably be believed and where such information indicated that an activity had taken place that would fulfill the contractual obligation of YALE with Plaintiff.

78. By disguising his identity behind the committee veil, SCHENKER attempted to prevent and prevented Plaintiff from disguising the scheme described herein on a timely basis, which would have prevented Plaintiff from being involuntarily withdrawn.

79. As a result of SCHENKER's fraudulent conduct, Plaintiff suffered damages in an amount to be proven at trial.

<u>COUNT III</u>
<u>BREACH OF CONTRACT</u>
(YALE UNIVERSITY)

80.    Plaintiff incorporates the foregoing paragraphs by reference.

81.    It is well-settled that a relationship between a student and a university in which he enrolls is contractual in nature.

82.    A material part of that contract is the conditions, procedures, and policies in which a student may be involuntarily withdrawn from the university.

83.    At all relevant times, Yale University did not implement any procedures or policies to provide procedural safeguards to student who have been in the process of being involuntarily withdrawn from Yale.

84.    Yale University does not know who, when, and how was involuntarily withdrawn from Yale College.

85.    Yale University knowingly chose not to collect the above-defined information solely to prevent it from being discovered in litigation.

86. Yale University breached its contract by not following or disclosing guidelines for protecting Jakub's fundamental rights.

87. Yale University breached its agreement by failing to provide Jakub with timely information he needed to make reasonable decisions regarding his academic choices.

88. Yale University breached its agreement by creating hostile atmosphere in his residential college, where he felt alienated and unwelcome by his college dean, Jessie Hill.

89. Yale University breached its agreement by providing conflicting, illogical answers to all questions regarding his situation, and refusing to provide reasonable support in the face of unusual circumstances.

90. Yale University breached its contract with Jakub by refusing to consider whether the Committee's decision is arbitrary, supported by the evidence, and not providing any way to request such action.

91.   Yale's incomplete and arbitrary actions breached the binding contract with Jakub by failing to provide the guarantees of due process and fundamental fairness, and breaking the implied covenant of good faith and fair dealing.

92. Yale breached its contract with Jakub by improperly investigating withdrawals at Yale College, providing scant resources to the dismissed student in his most vulnerable moment, and no avenue for meaningful review of unexplained and unclear decision.

93.   Yale's dismissal of Jakub will preclude him from completing his undergraduate degree and will negatively contribute to his overall education.

94. As a direct and foreseeable consequence of these breaches, Jakub has sustained damages.

95. Yale's secret adjudicatory process is contrary to Jakub's reasonable expectations.

96.   Yale's decision to automatically withdraw Jakub from the University, failure to provide a mechanism to explain his situation is in violation of Jakub's procedural and substantive contractual rights and reasonable expectations.

97.   Yale's decision to withdraw Jakub from the University is capricious and arbitrary.

98.   As a direct and proximate result of the foregoing events of breach, Jakub faces imminent irreparable harm to his emotional well-being, ongoing education and professional career goals for which no adequate legal remedy exists. Jakub intends to motion this Distinguished Court for injunctive relief.

COUNT IV.

## NEGLIGENCE
### (ALL DEFENDANTS)

99. Plaintiff incorporates the foregoing paragraphs by reference.

100.    When Jakub made academic choices, he relied on defendants' duty to provide him with information that might materially impact Jakub's decision.

101.    When Jakub appealed the involuntary withdrawal, he relied on defendants' duty to protect him from reasonable harm.

102.    Defendants knew, or was negligent in not knowing, that it adopted no mechanism or avenue for appeal to Jakub, or any other person in Jakub's situation.

103.    Defendants knew that Jakub has been treated for depression, and that Jakub reasonably relied on their duty to protect him from harm.

104.    Defendants breached their duty of reasonable care.

105.    A reasonable person would have suffered severe emotional distress under the same or similar circumstances.

106.    As a result, Jakub is entitled to recover damages, to be determined at trial, plus attorney fees and costs.

## COUNT V.
### INTERFERENCE WITH CONTRACT,
### INTERFERENCE WITH ECONOMIC EXPECTATION
### (ALL DEFENDANTS)

107.    At all times, Jakub was in an employment contract with Professor Edward A. Snyder. Jakub received a regular compensation from this contract, which enabled Jakub to support himself.

108.    Mark Schenker knew about Jakub's contract because Jakub specifically indicated so in his petition.

109.   Mark Schenker engaged in fraudulent misrepresentation, as described in Count I.

110.   Mark Schenker acted with reckless disregard to Jakub's employment and cause its termination.

111.   Had it not been for Schenker's conduct, Jakub would not have suffered a loss of employment and employment authorization.

112.   As a result of Schenker's conduct, Jakub is entitled to damages in an amount to be determined at trial.

**PRAYER FOR RELIEF**

Plaintiff respectfully requests the following relief from the Court:

- Produce and publicly release all statistics regarding the number of students withdrawn;

- Compel Yale University to reassess procedures for adjudicating academic withdrawal, and publicly audit how previously used policies were implemented, if such policies existed;

- Restrain and enjoin Yale University from denying Jakub the opportunities and benefits afforded undergraduate students, including access to libraries and reading rooms;

- Restrain and enjoin Defendant, Yale University, from implementing Jakub's dismissal;

- Admitting Jakub as a student in good academic standing;

- Award Jakub damages for breach of contract in an amount to be determined at trial;

- Award Jakub damages for emotional distress in an amount to be determined at trial;

- Compel Yale University to introduce and implement all-university Plain Language policy, similar to the federal plain language policies, in all communication with students;

- Compel Yale University to investigate all instances of involuntary withdrawals it executed since the beginning of spring 2016 term, and determine the extent to which Yale's employees contributed to these dismissals;

- Award Jakub damages in an amount to be determined at trial for past and future economic losses, loss of educational and career opportunities, attorneys' fees, expenses, costs and disbursements;

- Award punitive damages for intentionally inflicting emotional distress upon Jakub.

## <u>JURY DEMAND</u>

Plaintiff hereby demands a trial by jury on all claims so triable.

Respectfully submitted,

By: /s/ Jakub Madej
    Jakub J. Madej
    LAWSHEET
    415 Boston Post Rd Ste 3-1102
    Milford, CT 06460
    T: (203) 928-8486
    F: (203) 902-0070
    E: j.madej@lawsheet.com