**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JAKUB MADEJ | : | CIVIL CASE NO. |
| Plaintiff, | : | 3:20-cv-133 (JCH) |
| | : | |
| v. | : | |
| | : | |
| YALE UNIVERSITY, et al., | : | |
| Defendants. | : | JANUARY 15, 2021 |
| | : | |
| | : | |

**RULING ON MOTION TO DISMISS (DOC. NO. 185)**

**I.    INTRODUCTION**

Plaintiff, Jakub Madej ("Madej"), proceeding pro se, brings this action against

Yale University ("Yale") and several of its administrators (collectively, "the defendants").

See Proposed Second Am. Compl. ("Second Am. Compl.") (Doc. No. 170); Order (Doc.

No. 176 (granting leave to file).   In his Second Amended Complaint, Madej asserts

claims for fraudulent misrepresentation, fraud, breach of contract, negligence, and

tortious interference with contract or economic expectation, all in connection with his

withdrawal from Yale.  See Second Am. Compl. ¶¶ 48-112.  Before the court is the

defendants' Motion to Dismiss the Second Amended Complaint in its entirety.  See

Defs.' Mot. to Dismiss ("Defs.' Mot.") (Doc. No. 185).  Madej opposes this Motion.  See

Pl.'s Mem. of in [sic] Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Opp'n") (Doc. No. 208).

For the reasons explained below, the court grants the defendants' Motion and

dismisses the Second Amended Complaint with prejudice.

## II.      BACKGROUND

### A.      Allegations in the Second Amended Complaint

Madej, who was born in Poland, enrolled at Yale College (a part of Yale University, and also referred to as "Yale" in this Ruling) as an undergraduate student in 2016.  Second Am. Compl. ¶¶ 10, 12.  Madej completed 29 course credits at Yale over the course of seven semesters, nine short of the 36 credits required for graduation.  Id.

In the Spring 2019 semester, Madej initially enrolled in five courses.  Id. ¶ 21. However, he dropped three of those courses in order to "fully concentrate" on his consulting business.  Id.  In March 2019, before Madej dropped his third course (changing his course load from three to two), he contacted Michelle Tracey ("Tracey"), an assistant to Madej's Dean of College, to inquire whether dropping the course would impact Madej's ability to graduate.  Id. ¶ 18.  Tracey "answered in the negative" and "caus[ed]" Madej to file a form requesting withdrawal from the course.  Id.  Madej's Dean of College, Jesse Royce Hill ("Hill"), processed the withdrawal.  Id. ¶ 19.

In October 2019, midway through the Fall 2019 semester, Yale's Registrar Office contacted Madej to inform him that he had enrolled in a course that required prior registration, without having completed such registration.  Id. ¶ 22.  Through this communication, Madej "inadvertently learned" that his reduced course load of two courses in the Spring 2019 semester had automatically triggered his placement on "academic warning" status.  Id. ¶ 20.  Hill and Dean for Academic Affairs at Yale College Mark Schenker ("Schenker") would later state that Hill sent a letter to Madej in May 2019, informing him of his academic warning status, but Hill ultimately admitted that the letter had not been sent at that time.  See id. ¶ 24.  The approval of a student's Dean of

2

College is required before a student's course load may drop to fewer than three credits for a semester.  Id. ¶ 25.

According to Madej, if he had been notified of his academic warning status when he reduced his course load during the Spring 2019 semester, he would have enrolled in a half-semester course or decided against dropping one of the three courses he dropped during the Spring 2019 semester.  Id. ¶ 23.  Madej had previously completed three such "short courses."  Id.

Also in October 2019, Madej was hospitalized with a serious wrist injury.  Id. ¶ 27.  He underwent a successful surgery approximately three weeks later, which was followed by a recovery period of roughly four to five weeks.  Id. ¶ 29.  Madej was given a "dean's excuse," which allowed him extra time to complete certain assignments.  Id. However, despite submitting paperwork to Yale's Resource Office on Disabilities, Madej did not receive any additional academic accommodations, such as extra time for exams or permission to type exams.  Id. ¶ 30.

In addition to his wrist surgery, Madej also received treatment for depression twice while enrolled at Yale.  Id. ¶ 16.  His treatment has included medication for depression and attention deficit disorder, which he has taken "since early 2018, without interruption."  Id.

In December 2019, at the conclusion of the Fall 2019 semester, Madej traveled to China.  Id. ¶ 33.  While Madej was in China, one of his professors emailed him informing Madej that the professor could not open the file Madej submitted as a final report for a course.  Id. ¶ 34.  However, Madej's access to his email account was

blocked while he was in China.  Id. ¶ 34.  As a result, Madej did not read the email from his professor until Madej returned to the United States on January 1, 2020.  Id. ¶ 35.

A few days later, Madej received a failing grade for that course.  Id.  Madej's professor suggested that he might reassess Madej's grade at the request of Hill, but Hill did not respond when Madej reached out to her.  Id. ¶ 36.

On January 3, 2020, Madej received a letter dated January 2, 2020, informing him of his withdrawal from Yale.  Id. ¶ 37.  The letter did not include any information about how to challenge the withdrawal or regarding whom Madej should contact with questions.  Id. ¶ 38.  As an international student with an F-1 visa, Madej was required to leave the United States within 15 days of his withdrawal date.  Id. ¶ 37.

Madej sought to speak with Hill over the phone, but she was not available to speak until three days later.  Id. ¶ 40.  Prior to their conversation, Hill did not provide Madej with any information about whether he could appeal the withdrawal.  Id. ¶ 39.  When Madej and Hill spoke over the phone, Hill told Madej that he could file a petition with the Committee on Honors and Academic Standing ("CHAS").  Id. ¶ 40.  Hill did not provide Madej with any details regarding CHAS.  Id.

Despite not receiving guidance concerning how to petition CHAS, Madej submitted a 6,200-word petition to Hill via email.  Id. ¶¶ 41, 43.  Hill told Madej that she forwarded the petition to CHAS.  Id. ¶ 43.  Madej also asked three people to write letters on his behalf to CHAS.  Id. ¶ 42.

On January 12, 2020, Madej returned to New Haven after attending research conferences in San Diego and Las Vegas.  Id. ¶ 44.  The next morning, Madej attempted to retrieve his personal property from a dormitory.  Id. ¶ 45.  Previously, at the

4

end of the Fall 2019 semester, Madej had "notified" Yale staff that he would be leaving property in the dormitory; he "hoped" that he would be given a full day to retrieve his belongings.  Id.  While Madej was back in New Haven, Hill refused to meet with or speak with him.  Id. ¶ 47.

On January 15, 2020, Schenker sent Madej a letter representing that CHAS had met on January 13, 2020, and voted unanimously to reject Madej's petition.  Id. ¶ 52.  At the time, Madej "was in an employment contract" with a Yale professor and "received a regular compensation from this contract."  Id. ¶ 107.

In a letter and emails sent on January 7, 15, and 19, 2020, Schenker told Madej that the other members of CHAS included faculty, administrators, and students.  Id. ¶ 53.  Schenker also told Madej that the members of CHAS had received copies of Madej's petition, an email and letter from Yale administrators, and Madej's academic record, and that the members had deliberated prior to their vote.  Id. ¶¶ 54-55.

According to Madej, these statements were all false, because Schenker knew "that [CHAS] did not meet on January 13, or at any other time, with regards to Madej's petition"; that CHAS "ha[d] been an alter ego of [ ] Schenker since at least [ ] 2015"; "that the Committee did not have any real members, and no documents were provided to any purported 'member'"; "that no voting, or a similar formal indication of choice, took place"; and "that the Committee ha[d] not adopted any written policies establishing the way in which Committee members render a final decision at any time."  Id. ¶¶ 52-55.  In other words, CHAS "is indistinguishable from Schenker himself, and existed only on paper to create a perception that an adjudicative body made a decision on the merits of the case presented to it when, in fact, [CHAS] has never existed."  Id. ¶ 56.  Schenker

knew all this "because he chaired [CHAS] continuously since academic year 1998, and

has been the only person acting on its behalf."  Id. ¶ 60.  According to Madej, Schenker

lied in order to frustrate Madej's ability to contest his withdrawal or seek legal remedies.

Id. ¶¶ 64, 75, 77-78.

Certain statements published by Yale concerning CHAS sought "to engineer a

false perception of meaningful decision-making" and thereby buttressed Schenker's

false statements.  Id. ¶ 68.  These include statements "that matters related but not

limited to withdrawals from Yale College were considered and adjudicated by [CHAS], a

deliberative body within Yale College"; and that CHAS convenes "about twice a month

during the regular academic year", as well as a webpage listing the purported members

of CHAS.  Id. ¶¶ 69-71.  Further, Yale "did not implement any procedures or policies to

provide procedural safeguards to student[s] who have been in the process of being

involuntarily withdrawn from Yale."  Id. ¶ 83.

B.    Procedural Background

Madej filed his initial Complaint on January 30, 2020.  See Compl. (Doc. No. 1).

He moved for a preliminary injunction and for a temporary restraining order on February

23 and March 4, 2020, respectively.  See Emergency Mot. for Prelim. Inj. (Doc. No. 19);

Mot. for Ex Parte Temporary Restraining Order (Doc. No. 28).  The court denied

Madej's Motion for a Temporary Restraining Order during a telephonic conference on

March 5, 2020.  See Min. Entry (Doc. No. 33).  Following consideration of the parties'

arguments and exhibits, the court issued a Ruling denying Madej's Motion for a

Preliminary Injunction on March 31, 2020.  See Ruling on Mot. for Prelim. Inj. ("Prelim.

Inj. Ruling") (Doc. No. 64).

Madej filed his Amended Complaint on April 27, 2020.  See Am. Compl. (Doc. No. 87).  The defendants moved to dismiss the Amended Complaint on May 6, 2020.  See Defs.' Mot. to Dismiss (Doc. No. 90).[1]  Madej then moved for leave to file a Second Amended Complaint on June 22, 2020.  See Pl.'s Mot. for Leave to File Second Am. Compl. (Doc. No. 110).  Subsequently, because Madej had neither attached a copy of his Proposed Second Amended Complaint to his Motion for Leave to File nor responded to the defendants' Motion to Dismiss, the court entered an Order on September 17, 2020, directing Madej to file the Proposed Second Amended Complaint to which he referred in his Motion for Leave to File and to file any opposition to the Motion to Dismiss.  See Order (Doc. No. 161).  On November 4, 2020, the court granted Madej's Motion for Leave to File, despite noting that it appeared likely that the Proposed Second Amended Complaint Madej ultimately submitted was not the same document Madej described in his Motion for Leave to File.  See Order (Doc. No. 176).

Count One of the Second Amended Complaint asserts a claim for fraudulent representation against Schenker.  Second Am. Comp. ¶¶ 48-66.  Count Two asserts claims for fraud against Schenker and Yale.  Id. ¶¶ 67-79.  Count Three asserts a claim for breach of contract against Yale.  Id. ¶¶ 80-98.  Counts Four and Five assert claims for negligence and tortious interference with contract or economic expectation against all the defendants.  Id. ¶¶ 99-112.

---

[1] The court terminates that Motion to Dismiss the Amended Complaint (Doc. No. 90) as moot, in light of the Second Amended Complaint and the defendants' Motion to Dismiss the Second Amended Complaint.

On November 23, 2020, the defendants moved to dismiss the Second Amended Complaint in its entirety.  See Defs.' Mot.  In an accompanying Memorandum of Law, the defendants argue, inter alia, that the court may consider--in connection with the defendants' present Motion to Dismiss--certain exhibits filed by the parties in connection with Madej's unsuccessful Motion for a Preliminary Injunction.  Mem. of Law in Supp. of Defs.' Mot. to Dismiss ("Defs.' Mem.") (Doc. No. 185-1) at 8-9, 12 & 12 n.7.  On December 14, 2020, Madej filed his Opposition to the defendants' Motion to Dismiss.  See Pl.'s Opp'n  Madej contends that the court may not consider the exhibits to which the defendants cite in their Memorandum.  Id. at 11-15.  The defendants filed a Reply on December 22, 2020.  Reply to Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Dismiss ("Defs.' Reply") (Doc. No. 217).

## III.    STANDARD OF REVIEW

To defeat a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Id.  Reviewing a motion to dismiss under Rule 12(b)(6), the court liberally construes the claims, accepts the factual allegations in the Complaint as true, and draws all reasonable inferences in the non-movant's favor.  La Liberte v. Reid, 966 F.3d 79, 85 (2d Cir. 2020).  However, the court does not credit legal conclusions or "[t]hreadbare recitals of the elements of a cause of action."  Iqbal, 556 U.S. at 678.

8

A court reviewing a <u>pro se</u> complaint must construe the complaint "liberally to raise the strongest arguments it suggests." <u>McCray v. Lee</u>, 963 F.3d 110, 116 (2d Cir. 2020) (citations, alterations, and internal quotation marks omitted).  Nevertheless, even a <u>pro se</u> complaint will not survive dismissal unless its allegations meet the plausibility standard.  <u>See, e.g.</u>, <u>Fowlkes v. Ironworkers Local 40</u>, 790 F.3d 378, 387 (2d Cir. 2015).

## IV. DISCUSSION

### A. <u>Materials Properly Before the Court</u>

When reviewing a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), "[a] court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side." <u>Lynch v. City of New York</u>, 952 F.3d 67, 76 (2d Cir. 2020).  As the Second Circuit has explained, "[t]he purpose of Rule 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief <u>without</u> resolving a contest regarding its substantive merits," whereas "[t]he streamlined testing of the substantive merits . . . is more appropriately reserved for the summary judgment procedure, governed by Rule 56." <u>Global Network Commc'ns, Inc. v. City of New York</u>, 458 F.3d 150, 155 (2d Cir. 2006).

Consistent with this principle, Rule 12(b) mandates that, "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(b).  In the event that a court treats a motion under Rule 12(b)(6) as one for summary judgment, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  <u>Id.</u>

Accordingly, the circumstances in which a court may consider materials beyond a complaint when deciding a motion to dismiss under Rule 12(b)(6) are narrow.  A court may take judicial notice of certain facts that are "not subject to reasonable dispute," Fed. R. Evid. 201(b), such as public records, Giraldo v. Kessler, 694 F.3d 161, 164 (2d Cir. 2012).  A court may also consider "written instrument[s]" attached as exhibits to a complaint or incorporated by reference.  Lynch, 952 F.3d at 79 (quoting Fed. R. Civ. P. 10(c)) (other citations omitted).  The Second Circuit has observed that "[t]he term 'written instrument' generally refers to a legal document that defines rights, duties, entitlements, or liabilities, such as a statute, contract, will, promissory note, or share certificate."  Id. (citations and internal quotation marks omitted).

If a plaintiff declines to attach a written instrument as an exhibit, a court may nevertheless treat the written instrument as "incorporate[d] [ ] by reference" and therefore amenable to consideration in connection with a Rule 12(b)(6) motion if the written instrument is "integral to the complaint."  Id. (citation and internal quotation marks omitted).  A written instrument is "integral" if a complaint "relies heavily upon its terms and effect."  Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (citation and internal quotation marks omitted).  As the Second Circuit has explained, "[i]n most instances where this exception is recognized, the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason--usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim--was not attached to complaint."  Global Network Commc'ns, 458 F.3d at 157.

10

Although the Second Circuit has remarked that "[t]he exception [ ] prevents plaintiffs from generating complaints invulnerable to Rule 12(b)(6) simply by clever drafting," id., it does not appear that the Circuit has sanctioned application of the exception outside the context of "written instruments" of the type described above.  In other words, the incorporation-by-reference exception is not a mechanism for responding to all situations where a plaintiff withholds damaging information from a complaint.  Rather, the exception prevents plaintiffs from generating complaints invulnerable to Rule 12(b)(6) only in certain situations, e.g., when plaintiffs have selectively quoted from certain types of written instruments.  In many circumstances, the proper recourse for a complaint that withholds other types of information is to move for summary judgment, following discovery.

Here, the defendants urge the court to consider, in connection with its assessment of the defendants' instant Motion to Dismiss, several exhibits filed in connection with Madej's unsuccessful Motion for a Preliminary Injunction.  Defs.' Mem. at 9, 12 & 12 n.7; Defs.' Reply at 2-3.  First, the defendants argue that the court should consider "Yale University's Programs of Study for the 2019/2020 school year," (the "Programs of Study") because Madej's "claims arise out of his contract with Yale University, which consists of [said Programs of Study]."  Defs.' Mem. at 9.  A contract is a "written instrument" which may be treated as having been incorporated by reference. Lynch, 952 F.3d at 79.  However, the Second Amended Complaint nowhere mentions the Programs of Study.  See Second Am. Compl.  The defendants characterize certain allegations in the Second Amended Complaint, such as Madej's placement on "academic warning" status, as implicit references to the Programs of Study.  See Defs.'

11

Mem. at 21.  Yet, the defendants include in their Memorandum neither any citation to a

case in which a court treated a similar document as incorporated by reference, nor any

analysis as to why these purported implicit references to the Programs of Study rise to

the level of being integral to the Second Amended Complaint.[2]  See id. at 9, 21-23

Defs.' Reply at 2-3.  Given these deficiencies, Madej's pro se status, and the permissive

language of the Second Circuit's statement that "[a] court may take [a] document [that a

complaint incorporates by reference] into consideration," Lynch, 952 F.3d at 79

(emphasis added), the court concludes that--even assuming that it may consider the

Programs of Study--it will not consider this exhibit.  Accordingly, the court declines to

consider the Programs of Study in connection with the defendants' present Motion.

The defendants also argue that the court should consider an email sent by Hill, a

letter and emails sent by Schenker, the petition Madej submitted to CHAS, a webpage

published by Yale, and an Affidavit from a Yale professor.  Defs.' Reply at 2-3; see

Defs.' Mem. at 4-6.  None of these exhibits is a written instrument of the type described

in the Second Circuit's decisions applying the incorporation-by-reference exception.

See Lynch, 952 F.3d at 79; Global Network Commc'ns, 58 F.3d at 157.  The defendants

do not argue that these exhibits are subject to judicial notice.  See Defs.' Mem. at 12 &

---

[2] The defendants include citations in their Memorandum and Reply to an unpublished decision of
the U.S. District Court for the Western District of New York.  See Defs.' Mem. at 8, 12 n.7 (citing Adekoya
v. Herron, No. 6:10-cv-6646 (MAT), 2013 WL 6092507 (W.D.N.Y. Nov. 19, 2013)); Defs.' Reply at 1, 4
(same).  The defendants make absolutely no attempt to explain how the circumstances of that case--
which involved consideration of documents a plaintiff had attached as exhibits to his complaint, see
Adekoya, 2013 WL 6092507, at *7-8--relate to this case.  See Defs.' Mem. at 8, 12 n.7; Defs.' Reply at 1,
4.

12 n.7; Defs.' Reply at 1-4.  Therefore, the court concludes that it may not consider these exhibits in connection with the defendants' present Motion.

The court declines to convert the defendants' Motion to Dismiss into one for summary judgment.  See Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 573 (2d Cir. 2005) (recognizing that "[it] is within the discretion of th[e] [c]ourt to convert a motion filed under [Rule] 12(b)(6) into one seeking summary judgment").  Under Rule 12(b), converting the defendants' Motion will require giving "[a]ll parties . . . a reasonable opportunity to present all material that is pertinent to the motion."  Fed. R. Civ. P. 12(b).  Discovery in this case has been contentious.  See, e.g., Order (Doc. No. 72); Min. Entry. (Doc. No. 83); Min. Entry (Doc. No. 104); Ruling (Doc. No. 174).  Converting the Motion would invite arguments that Madej has not yet obtained "all material that is pertinent to the motion",  see Fed. R. Civ. P. 12(b), and thereby risk delay.  Further, Madej asks the court not to convert the defendants' Motion.  Pl.'s Opp'n at 15.  In these circumstances, the court concludes that the better course of action is to give the parties the benefit of this Ruling on the defendants' present Motion now, without consideration of materials beyond the Second Amended Complaint, instead of risking delay.  Therefore, the court declines to convert the defendants' Motion.

B.   Fraudulent Misrepresentation and Fraud (Counts One and Two)

Counts One and Two of the Second Amended Complaint seek to assert claims for the closely related torts of fraudulent misrepresentation and fraud, against Schenker and Yale.  See Second Am. Compl. ¶¶ 48-79.  The essential elements of fraudulent misrepresentation or fraud are (1) "a false representation was made as a statement of fact," (2) the statement "was untrue and known to be so by" the maker of the statement,

13

(3) the statement was made with the intent to induce reliance; and (4) the other party relied on the statement to his detriment or injury. <u>Manzo-III v. Schoonmaker</u>, 188 Conn. App. 343, 346 n.5 (2019) (fraudulent misrepresentation); <u>Longbottom v. Longbottom</u>, 197 Conn. App. 64, 72-73 (2020) (fraud). Thus, if a plaintiff does not allege facts supporting a reasonable inference of reliance, it is possible for a plaintiff to allege that a false statement was made with the requisite intent and nevertheless fail to satisfy the essential elements of fraudulent misrepresentation or fraud. <u>See Stuart v. Freiberg</u>, 316 Conn. 809, 826-32 (2015) (discussing reliance element in the context of summary judgment).

> In contradistinction with trespass and other direct injuries for which the complainant is awarded nominal damages if he should fail to plead and prove actual damage, deceit belongs to that class of tort of which pecuniary loss generally constitutes part of the cause of action. In other words, the action of deceit is based on fraud and damage; broadly speaking, it will lie when both concur, and will not lie unless both do concur.

<u>See</u> <u>Beik v. Thorsen</u>, 169 Conn. 593, 595 (1975) (quoting 37 Am. Jur. 2d <u>Fraud and Deceit</u> § 283)); <u>see</u> <u>also</u> <u>All the Best People, Inc. v. Maier True Commc'ns</u>, No. NNHCV196087280S, 2019 WL 5066833, at *2 (Conn. Sup. Ct. Sept. 13, 2019) ("The plaintiff alleges that it did so act upon that unstated false representation but does not allege that the representation caused it to act to its injury."). Put differently, the torts of fraud and fraudulent misrepresentation do not reach attempts.

Here, even assuming that the Second Amended Complaint meets the first three elements for fraudulent misrepresentation and fraud in Counts One and Two, the Second Amended Complaint fails to allege that Madej relied on Schenker's statements to his detriment. In Count One, Madej alleges that Schenker's statements "created a

misleading impression that a collective body existed within Yale College that was charged with adjudicating Madej's application and applications of similarly situated students."  Second Am. Compl. ¶ 62.  Madej also accuses Schenker of endeavoring "to prevent Madej from discovering that Schenker fraudulently acted on behalf of other individuals without their knowledge", and from "question[ing] the veracity of Schenker's representations because Madej would be legally obliged to depart the United States within two days after Schenker made his fraudulent statements."  Id. ¶¶ 63-64. Additionally, Madej alleges that Schenker "repeated the [false] representations to [the] Yale University Registrar and other officials, who processed [Madej]'s withdrawal--and who did not know that Schenker's representations are false."  Id. ¶ 65.

However, Madej does not allege that Schenker actually induced Madej to rely on the statements.  See Second Am. Compl. ¶¶ 48-66.  Nor does Madej allege that the statements made by Schenker were repeated by the Yale University Registrar, and that Madej actually relied on those repeated statements.  See id. ¶ 65; Giulietti v. Giulietti, 65 Conn. App. 813, 842-43 (2001) ("[W]here a party [Schenker] makes false representations to another [the Yale University Registrar] with the intent or knowledge that they be exhibited or repeated to a third party [Madej] for the purpose of deceiving him, the third party [Madej], if so deceived to his injury, can maintain an action in tort . . . ." (emphasis added)).  Madej alleges only that Schenker lied in an attempt to deceiver Madej.   Accepting Madej's factual allegations as true, the court assumes that CHAS did not exist, that Schenker lied about the non-existence of CHAS in order to trick Madej into thinking that CHAS had deliberated and voted on Madej's petition, and that

Schenker hoped Madej would be forced to leave the United States before uncovering Schenker's deception.  Second Am. Compl. ¶¶ 62-64.

Without an explanation as to how Schenker's lies actually deceived Madej, and how such deception actually injured Madej, however, Count One cannot state a claim for fraudulent misrepresentation.  The Second Amended Complaint does not allege that Schenker succeeded in deceiving Madej.  Nor does the Second Amended Complaint explain how being deceived about the existence or non-existence of CHAS could injure Madej.  The Second Amended Complaint does not allege that Yale was obligated to have a committee deliberate or vote on Madej's withdrawal.  Therefore, Count One of the Second Amended Complaint fails to plead the fourth element of fraudulent representation, i.e., reliance, and is dismissed.

The court specifies that dismissal of Count One is with prejudice.  "Although Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend 'shall be freely given when justice so requires,' it is within the sound discretion of the district court to grant or deny leave to amend."  McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007) (quoting Fed. R. Civ. P. 15(a)) (other citations omitted).  Leave to amend may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."  Id. (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).  When assessing whether there is good reason to deny leave to amend, courts may consider whether a plaintiff has had the benefit of discovery material, whether a complaint has previously been amended, and whether previous motions or other filings by a defendant have put a plaintiff on notice regarding pleading defects.  Id. at 201

(discovery); Wilson v. Merrill Lynch & Co., 671 F.3d 120, 139-40 (2d Cir. 2011) (filings by defendants and prior amendments).

Here, a year has elapsed since Madej filed his initial Complaint, and he has already amended his Complaint twice.  Although Madej did not include claims for fraudulent misrepresentation or fraud in his initial Complaint and therefore did not benefit from the court's Ruling on his Motion for a Preliminary Injunction when drafting Count One of the Second Amended Complaint, Madej did benefit from some discovery and from review of the defendants' first Motion to Dismiss and accompanying Memorandum, which argued for dismissal of a fraudulent representation claim.  See Mem. of Law in Supp. of Defs.' Mot. to Dismiss (Doc. No. 90-1) at 9-14.  Notably, that Memorandum identified the essential elements of a fraudulent misrepresentation claim, including that "the other party did so act upon the false representation to his injury."  Id. at 9 (quoting Solano v. Calegari, 108 Conn. App. 731, 741 (2008), cert. denied, 289 Conn. 943)).  In considering whether permitting further leave to amend would cause the defendants undue prejudice, the court also observes that discovery in this case has been contentious, and that Madej recently caused a delay by misrepresenting to the court whether he had secured a court reporter for depositions.  See Order (Doc. No. 210).  In these circumstances, the court concludes that there is good reason to deny future leave to amend with respect to Count One.  Therefore, Count One is dismissed with prejudice.

In Count Two, Madej alleges that Schenker sought "to shield Yale and Schenker [ ] from potential liability and to give an appearance of legitimacy to decisions", that Schenker intended to create a false impression "that an activity had taken place that

17

would fulfill the contractual obligation of Yale", and that, "[b]y disguising his identity behind the committee veil, Schenker attempted to prevent and prevented [Madej] from disguising [sic][3] the scheme described herein on a timely basis, which would have prevented [Madej] from being involuntarily withdrawn."  Id. ¶¶ 75, 77-78.  The first two of these three allegations fail to allege that Schenker's statements actually induced Madej to act in reliance and to Madej's detriment,  see id. ¶ 78, and thus the court will not address them further.

The third allegation goes a step further by stating that Madej was in fact prevented from uncovering the "scheme [ ] on a timely basis", and asserting that Madej would have prevented his withdrawal from Yale but for this delay.  See id. ¶ 78.  However, the Second Amended Complaint alleges no facts that might explain or even suggest why or how this is so: it simply asserts that an earlier discovery "would have prevented [Madej] from being involuntarily withdrawn."  See id.  This is precisely the type of "[t]hreadbare recital[ ] of . . . [an] element[ ], supported by [a] mere conclusory statement[,]" that is insufficient under the plausibility standard.  See Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555).  Therefore, Count Two of the Second Amended Complaint fails to plead the fourth element of fraud, i.e., reliance, and is dismissed.  For the same reasons identified above in connection with Count One, the court's dismissal of Count Two is with prejudice.  See McCarthy, 482 F.2d at 200-01.

---

[3] It appears that Madej meant to write that Schenker prevented Madej from "discovering the scheme."  See Second Am. Comp. ¶ 78.

C.      Breach of Contract (Count Three)

Count Three of the Second Amended Complaint seeks to a raise a claim for breach of contract against Yale.  See Second Am. Compl.  ¶¶ 80-98.  The Connecticut Supreme Court has recognized "two situations wherein courts will entertain a cause of action for institutional breach of a contract for educational services."  Gupta v. New Britain General Hosp., 239 Conn. 574, 592 (1996).  First, a plaintiff may allege that an "educational program failed in some fundamental respect, as by not offering any of the courses necessary to obtain certification in a particular field."  Id. (citations omitted).  Second, a plaintiff may maintain an action for breach of contract if an "educational institution failed to fulfill a specific contractual promise distinct from any overall obligation to offer a reasonable program."  Id. at 593.  Examples of alleged promises that fall short of the "specific contractual promise" required under Gupta include a promise "that the plaintiff would be allowed 'many credits' from her prior engineering studies", Faigel v. Fairfield Univ., 75 Conn. App. 37, 42 (2003), and promises that a university "does not discriminate in admissions, educational programs, or employment," requires "all student organizations . . . [to] operate in accordance with [the University's] policies on equal opportunity," and "is committed to maintaining and strengthening educational, working, and living environments founded on mutual respect," McNeil v. Yale Univ., 436 F. Supp. 3d 489, 531-32 & 531 nn.6-8 (D. Conn. 2020).

Here, Madej does not allege the type of "fundamental" educational failure described in Gupta.  See Second Am. Compl. ¶¶ 80-98.  Rather, Madej alleges that Yale failed to implement adequate policies governing withdrawal of students.  Id. ¶ 83.

As such, Madej must identify "a specific contractual promise distinct from any overall obligation to offer a reasonable program."  Gupta, 239 Conn. at 593.

Madej's assertions that "[i]t is well-settled that a relationship between a student and the university in which he enrolls is contractual in nature", and that "[a] material part of that contract is the conditions, procedures, and policies in which a student may be involuntarily withdrawn from the university", Second Am. Comp. ¶¶ 81-82, fall far short of this requirement.  In effect, Madej alleges a vague, generalized implicit agreement to implement protections for students facing withdrawal.  See id.  Whatever the merits of this notion, Gupta clearly forecloses using an alleged promise of this type as the basis for a breach-of-contract claim.  239 Conn. at 593.  Accordingly, it is of no matter that Madej identifies several aspects of the processes surrounding his withdrawal, which he alleges breached this promise: he fails to identify a specific contractual promise that would convert these alleged shortcomings into contractual breaches.  See Second Am. Compl. ¶¶ 86-92.

Further, Madej cannot maintain a claim for breach of contract or of an implied covenant of good faith and fair dealing based on his allegation that Yale acted "arbitrar[ily] . . . by failing to provide the guarantees of due process fundamental fairness."  See id. ¶¶ 90-91.  In Gupta, the Connecticut Supreme Court acknowledged the possibility that an educational institution's removal of a student from its programs might give rise to liability if the institution's "decision had no discernible rational basis."  239 Conn. at 595-96 (citation and internal quotation marks omitted).  That is not the case here, as Madej alleges in the Second Amended Complaint that his withdrawal from Yale occurred after he failed a course.  See Second Am. Compl. ¶¶ 35, 37.

20

Also in <u>Gupta</u>, the Connecticut Supreme Court acknowledged the possibility that removal of a student might constitute a breach of an implied covenant of good faith and fair dealing, but the Court expressed skepticism that such a claim could "provide[ ] greater protections than that afforded [ ] under the arbitrary, capricious, and bad faith standard."  239 Conn. at 598; <u>see</u> <u>also</u> <u>Daley v. Wesleyan Univ.</u>, 63 Conn. App. 119, 134 n.18 (2001) (holding, in case involving lawsuit by student against university, that, because "[t]he plaintiff did not argue that the implied covenant of good faith and fair dealing provides greater protection than that afforded him under the arbitrary, capricious or bad faith standard . . . the plaintiff's breach of the implied covenant claim is either subsumed by or coterminous with his breach of contract claims").  Madej fails to make any argument in his Opposition explaining why he should receive greater protections under an implied covenant claim.  <u>See</u> Pl.'s Opp'n.  Further, a claim for breach of an implied covenant of good faith and fair dealing typically requires both an allegation of a contractual breach and an improper motive.  <u>See</u> <u>TD Bank, N.A. v. J & M Holdings,</u> <u>LLC</u>, 143 Conn. App. 340, 349 (2013) ("A plaintiff cannot state a claim for breach of the implied covenant simply by alleging a breach of contract, in and of itself.  Instead, to state a legally sufficient claim for breach of the implied covenant sounding in contract, the plaintiff must allege that the defendant acted in bad faith." (citation and alterations omitted)).  For the reasons discussed above, the Second Amended Complaint fails to otherwise state a claim for breach of contract.

Therefore, Count Three of the Second Amended Complaint is dismissed with prejudice.  <u>See</u> <u>McCarthy</u>, 482 F.2d at 200-01.  In addition to the reasons identified above for dismissing Counts One and Two with prejudice, <u>see</u> <u>supra</u> at 16-18, the court

notes that Madej included a breach-of-contract claim in his initial Complaint and thus benefited from the court's Ruling on his Motion for a Preliminary Injunction when drafting Count Three of the Second Amended Complaint, see Compl. ¶¶ 86-102; Prelim. Inj. Ruling at 17-33.

D.    Negligence (Count Four)

Count Four of the Second Amended Complaint seeks to raise a negligence claim against all the defendants.  See Second Am. Compl. ¶¶ 99-106.  "The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury."  Osborn v. City of Waterbury, 333 Conn. 816, 825 (2019) (citation omitted).  The Connecticut Supreme Court has observed that "claims of 'educational malpractice,'" i.e., claims "for tortiously failing to provide adequate educational services or for tortiously failing to diagnose educational impediments," generally "are not cognizable."  Gupta, 239 Conn. at 590-91 & 591 n.15.  However, every "common-law duty does not disappear when [ ] negligent conduct occurs in an educational setting."  Doe v. Yale Univ., 252 Conn. 641, 659 (2000).  If, for example, a student alleges that an educational institution has "breached [ ] the common-law duty not to cause physical injury by negligent conduct, such a claim is, of course, cognizable."  Id.

Count Four of the Second Amended Complaint alleges that the defendants owed Madej three relevant duties.  First, a "duty to provide [Madej] with information that might materially impact" Madej's "academic choices."  Second Am. Compl. ¶ 100.  Second, a "duty to protect him from reasonable harm", on which Madej alleges he "relied" when he

"appealed the involuntary withdrawal."  Id. ¶ 101.  Third, a "duty to protect [Madej] from

harm" associated with the treatment Madej received for depression.  Id. ¶ 103.

Madej alleges that the defendants breached these duties because they "knew, or

was [sic] negligent in not knowing, that it [sic] adopted no mechanism or avenue for

appeal to [Madej], or any other person in [Madej]'s situation."  Id. ¶ 102.  Additionally,

Madej alleges that the defendants were aware of the treatment Madej received for

depression.  Id. ¶ 103.

In his Opposition, Madej clarifies the nature of his negligence claims.  According

to Madej, for the following reasons, Count Four does not constitute an educational

malpractice claim:

> It does not allege that any course was substandard, or professor disorganized.  If
> anything, Madej was satisfied with Yale's educational services--he sought to
> remain at Yale in January to continue coursework, and now seeks the same.
> Yale's educational services--courses offered, professors employed, facilities
> available--were excellent.  The [Second Amended Complaint] brings claims <u>only
> against a sham administrative procedure embodied by the Committee, and false
> representations that Mark Schenker and Yale College made about it</u>. . . .

> Neither [sic] Madej <u>does not allege that the Committee--in any shape or form--
> made an improper educational decision, for example by failing to consider some
> evidence, or putting too much weight on some factors</u>.  Rather, he alleges that (i)
> no students or faculty members ever convened to render a decision in his case;
> and (ii) that they did not do so for any other case brought by any other students
> since at least October 2018.

> Notably, Madej <u>does not allege that Defendants 'acted negligently when they
> withdrew him pursuant to the Programs of Study</u>.'  [Defs.' Mem.'] at 27.  In other
> words, Madej <u>does not fault the Defendants for all or some undefined
> circumstances that led to that withdrawal</u>.  Extending that argument inescapably
> leads to a non-nonsensical conclusion: that Yale is to be faulted for everything
> that happened to Madej when he was a student there.  The [Second Amended
> Complaint] <u>only alleges that Yale acted negligently by not establishing and
> implementing any policies or procedures that govern involuntary withdrawals--not
> just Madej's but that of all Yale College students</u>.

Pl.'s Opp'n at 20 (emphases added).

Even if Madej is correct that his allegations do not constitute educational malpractice claims, this clarification reveals that the Count Four fails to allege an actual injury.  Just as the torts of fraud and fraudulent misrepresentation do not reach attempts, see supra at 14, negligence does not reach breaches of duties detached from allegations of causation and actual injury.  Put differently, because "a plaintiff must establish all of the elements of a negligence claim, including causation and actual injury, in order to recover . . . the technical legal injury concept does not apply to a negligence action." Right v. Breen, 277 Conn. 364, 370 (2006).  According to Madej, "[t]he [Second Amended Complaint] does not fault the Defendants for all or some undefined circumstances that led to [Madej's] withdrawal", and instead "only alleges that Yale acted negligently by not establishing and implementing any policies or procedures that govern involuntary withdrawals." See Pl.'s Opp'n at 20.  He alleges that this lack of process is his injury, but this is a "technical legal injury" that cannot satisfy the injury requirement for a negligence claim.  See Right, 277 Conn. at 370.

The absence of a procedural protection, such as the absence of a committee, is not a cognizable harm for the purposes of negligence.  An allegation of a lack of process could constitute a breach of a duty, but without an allegation as to how that breach caused an actual injury--and an allegation identifying the nature of that actual injury, such as withdrawal from a university--an alleged lack of process does not suffice to state a claim for negligence.  Madej specifically disavows challenging his withdrawal. See Pl.'s Opp'n at 20.  Instead, he seeks to assert a negligence claim based on the theory that Yale's lack of procedures governing involuntary withdrawals constituted his

24

injury.  Id.  This is a technical legal injury.  Therefore, Count Four fails to allege an actual injury.  See Right, 277 Conn. at 370.

Further, Madej's allegation that the defendants knew he was being treated for depression and conclusory assertion that "[a] reasonable person would have suffered severe emotional distress under the same or similar circumstances" are insufficient to state a claim for negligent infliction of emotional distress.  See Second Am. Compl. ¶¶ 103, 105.  Under Connecticut law, the essential elements of a claim for negligent infliction of emotional distress are (1) conduct by the defendant that "created an unreasonable risk of causing the plaintiff emotional distress", that was (2) foreseeable, (3) "severe enough that it might result in illness or bodily harm", and (4) caused by the defendant's conduct.  Carrol v. Allstate Ins. Co., 262 Conn. 433, 444 (2003).  The Second Amended Complaint does not include any allegations addressing how or why the defendants' lack of procedures might have exacerbated Madej's depression in a manner that created an unreasonable risk of emotional distress that was either foreseeable or severe.  See Second Am. Compl. ¶¶ 103, 105.  Rather, the Second Amended Complaint only alleges that Madej was being treated for depression before and during the events surrounding his withdrawal and that the defendants were aware of that treatment.  Id.; see also Faraclas v. Botwick, No. CV20459655S, 2005 WL 527961, at *5 (Conn. Super. Ct. Jan. 25, 2005) ("In the educational context, administrators make decisions that may distress students, but more is required to make such distress actionable in tort.  The administrator's decision must be so wrongful that emotional distress involving illness or bodily harm was foreseeable.").

Therefore, Count Four of the Second Amended Complaint is dismissed with prejudice.  See McCarthy, 482 F.2d at 200-01.  As with Count Three, see supra at 21, the court notes that Madej included a negligence claim in his initial Complaint and thus benefited from some discovery, the defendants' first Motion to Dismiss, and the court's Ruling on his Motion for a Preliminary Injunction when drafting Count Four of the Second Amended Complaint, see Compl. ¶¶ 103-10; Prelim. Inj. Ruling at 33-39.

    E.    Interference with Contractual or Beneficial Relations (Count Five)

Count Five of the Second Amended Complaint seeks to assert a claim for tortious interference with contract or economic expectation against all defendants.  See Second Am. Compl. ¶¶ 107-12.  Under Connecticut law, "the elements of intentional interference with contractual or beneficial relations . . . [are]: (1) the existence of a contractual or beneficial relationship; (2) the defendant's knowledge of that relationship; (3) the defendant's intent to interfere with the relationship; (4) that the interference was tortious; and (5) a loss suffered by the plaintiff that was cause[d] by the defendant's tortious conduct."  Rioux v. Barry, 283 Conn. 338, 351 (2007).  This tort does not give rise to liability for "every act that disturbs a contract or business expectancy."  Metcoff v. Lebovics, 123 Conn. App. 512, 520 (2010) (quoting Larsen Chelsea Realty Co. v. Larsen, 232 Conn. 480, 501 n.24 (1995)).  For example, "it is well-settled that the tort of interference with contractual relations only lies when a third party adversely affects the contractual relations of two other parties."  Id. (quoting Wellington Sys., Inc. v. Redding Grp., Inc., 49 Conn. App. 152, 168, cert. denied, 247 Conn. 905 (1998)).  Accordingly, an agent of a defendant can only be held liable "if the agent did not act legitimately

26

within his scope of duty but used the corporate power improperly for personal gain." Id. at 521 (quoting Wellington Sys., Inc., 49 Conn. App. at 168).

Here, Count Five alleges that Schenker, a Yale administrator, interfered with a contract between Madej and a Yale professor. Second Am. Compl. ¶¶ 107-11. Even assuming that Madej's arrangement with his professor constituted a contract, the Second Amended Complaint does not allege any facts supporting an inference that Schenker acted for personal gain. See id.; Doe v. Quinnipiac Univ., 404 F. Supp. 3d 643, 672-73 (D. Conn. 2019) (rejecting claims for tortious interference with contract by a student against university employees in connection with the student's removal from university).

Further, as discussed above, Madej specifies in his Opposition that "[t]he [Second Amended Complaint] does not fault the Defendants for all or some undefined circumstances that led to [Madej's] withdrawal", and instead "only alleges that Yale acted negligently by not establishing and implementing any policies or procedures that govern involuntary withdrawals." See Pl.'s Opp'n at 20. The Second Amended Complaint fails to explain how the defendants' alleged lack of process, in and of itself, interfered with Madej's contract with his professor. See Second Am. Compl. ¶¶ 107-11.

Therefore, Count Five of the Second Amended Complaint is dismissed. For the same reasons identified above in connection with Counts One and Two, see supra at 16-18, the court's dismissal of Count Five is with prejudice. See McCarthy, 482 F.2d at 200-01; Mem. of Law in Supp. Defs.' Mot. to Dismiss (Doc. No. 90-1) at 33-36 (reflecting that the defendants argued for dismissal of the claim for tortious interference with contract or business expectancies included in the Amended Complaint).

27

**V.      CONCLUSION**

For the reasons discussed above, the court grants the defendants' Motion to Dismiss (Doc. No. 185).  The Second Amended Complaint is dismissed, in its entirety, with prejudice.  The defendants' previous Motion to Dismiss (Doc. No. 90) is terminated as moot, as is any other motion presently pending.  The Clerk is directed to close the case.


**SO ORDERED.**

Dated this 15th day of January 2021, at New Haven, Connecticut.


                                                         /s/ Janet C. Hall
                                                        Janet C. Hall
                                                        United States District Judge